QUINN EMANUEL URQUHART & SULLIVAN, LLP
Adam B. Wolfson (Bar No. 262125)
adamwolfson@quinnemanuel.com
Ryan S. Landes (Bar No. 252642)
ryanlandes@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Paulina Slagter (Bar No. 318559)
paulinaslagter@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
Telephone: (650) 801 5000
Facsimile: (650) 801 5100

*Attorneys for Plaintiff CureIS Healthcare, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CureIS Healthcare, Inc.,

Plaintiff,

vs.

Epic Systems Corporation,

Defendant.

Case No.

**COMPLAINT**

**CLAIMS FOR RELIEF:**

**1. TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS**

**2. TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**

**3. TRADE LIBEL**

**4. DEFEND TRADE SECRETS ACT**

**5. LANHAM ACT**

**6. UNFAIR COMPETITION (CAL. BUS. PROF. CODE § 17200, *et seq.*)**

**7. FALSE ADVERTISING (CAL. BUS. PROF. CODE § 17500, *et seq.*)**

**JURY TRIAL DEMANDED**

Trial Date: None Set

CureIS Healthcare, Inc. ("CureIS"), by its undersigned counsel, hereby brings this action against Defendant Epic Systems Corporation ("Epic") and alleges as follows:

**PRELIMINARY STATEMENT**

1. In 2006, several healthcare industry veterans founded CureIS, with the mission of improving healthcare through information technology. The U.S. healthcare industry had long been plagued by inefficiencies and added costs stemming from antiquated systems that did not interoperate with each other and did not reflect the latest in technological progress. CureIS sought to help remedy that problem through a variety of software products. Today, it offers a suite of different options that automate, streamline, and optimize complex healthcare operations, including enrollment, claims adjudication, revenue cycle management, compliance, and data management to healthcare providers, payers, and research organizations. In particular, CureIS specializes in technologies that enable managed services for government-managed programs like Medicare, Medicaid, and state healthcare initiatives—historically underserved portions of the overall industry.

2. Defendant Epic is also a company that first sought to improve healthcare through technological innovation, but has since lost the thread of that goal in favor of focusing ever more on growth, no matter the cost. Today, Epic is the dominant provider of electronic health record ("EHR") software in the nation. The vast majority of health providers today have switched to EHR from traditional paper records, giving Epic immense power throughout the entire healthcare industry. Current estimates are that between 8 and 9 out of every 10 people in the U.S. have at least one Epic EHR in their medical records, meaning that the only way to see the patient's full medical history is to obtain records from Epic. This means that nearly every player in the healthcare industry must be able to interact with Epic's EHR software in some way.

3. Epic is also the largest purveyor of managed care revenue cycle management ("RCM") software in the nation. At a high level, this is software specially designed for the healthcare industry that enables industry participants to manage their billing operations. RCM software, however, is not one-size-fits-all and a variety of applications that interact with and improve on basic RCM software have sprung up in the last few decades. One of these application categories includes

managed care data reconciliation ("MCDR") software. CureIS provides this type of software, which depends on the ability to interact with EHR and RCM software to operate properly.

4. For the vast majority of its corporate life, CureIS had no issues with Epic or any other EHR or RCM software provider. It grew its business by providing high quality products to customers needing its software solutions—most often, third party payers (*i.e.*, health insurers)—and helped improve healthcare for those most in need throughout the country. However, that changed when it became clear that what CureIS had once thought were one-off instances of friction with Epic were in fact part of a widespread scheme by Epic to improperly interfere with CureIS's business, as well as that of other providers of MCDR software.

5. Epic did so through a variety of acts. For example, Epic recently imposed an "Epic-first Policy," whereby any entity utilizing Epic's EHR or RCM software must use Epic's versions of other products too, if it has a version of the product in question. Epic exacerbates this problem for competitors like CureIS because Epic also has a practice of misrepresenting to customers that it either has plans to roll out a version of a competitor's product soon, or that Epic has a current product that replicates the functionality of a competitor's product, even though Epic's products are typically of much lower quality. Both of these tactics prevent Epic's EHR and RCM customers from utilizing third parties' products, regardless of their preference.

6. This is not the extent of Epic's wrongful conduct. Among other things, Epic has targeted CureIS specifically by coercing mutual customers to terminate their relationships with CureIS, denying CureIS's customers access to their own data for the purpose of harming CureIS, degrading the quality of CureIS products to stifle competition, misappropriating CureIS's proprietary information and trade secrets, falsely disparaging CureIS to CureIS's current and prospective customers, and engaging in widespread false advertising. CureIS is capable and happy to compete on a level playing field, because it offers superior products and service. But Epic has chosen to compete unfairly using illegal tactics, to the detriment of CureIS and patients nationwide.

7. The "why" behind Epic's misconduct is clear. Epic is nearing the saturation point in EHR software and needs to identify new areas for growth. On the back of its EHR dominance, Epic has grown into a company reportedly worth more than $45 billion. But that is not enough for Epic,

because the healthcare industry is large and involves multiple different product markets. By wielding its power to destroy healthcare technology innovators like CureIS, Epic is feeding its need for more and more cash, even if it means depriving those in the most need of the best possible options for healthcare services. This stranglehold enables Epic to eliminate perceived competitors and insulate itself from market-driven incentives to improve or innovate its own products, permanently lowering the bar for everyone. The cycle of stagnation caused by Epic's unfair and illegal conduct hits managed care organizations particularly hard, because they must make do with the least resources, but are still forced by Epic to pay bloated fees in exchange for mediocrity and ineptitude from Epic's products and services.

8. CureIS cannot allow that rapacious conduct to continue, and therefore brings this lawsuit to stop Epic from engaging in further wrongful behavior. Epic's ongoing actions constitute tortious conduct and unfair competition and have injured CureIS by depriving it of customers, revenue, and market opportunities. And it has injured the market and the public at large by depriving them of products, services, and prices that would result from fair an honest competition. Epic's conduct must be stopped and it must compensate CureIS for the harm it has caused.

## THE PARTIES

### A. Plaintiff

9. Plaintiff CureIS Healthcare, Inc. is a privately held corporation organized and existing under the laws of Minnesota, with principal places of business at 670 Commerce Drive, Suite 200, Woodbury, Minnesota 55125 and 1640 East River Road, Suite 208 Tucson, AZ 85718.

### B. Defendant

10. Defendant Epic Systems Corporation ("Epic") is a privately held corporation organized and existing under the laws of the State of Wisconsin with its principal place of business at 1979 Milky Way, Verona, Wisconsin 53593. Epic operates nationwide and conducts substantial business in the Northern District of California.

## JURISDICTION AND VENUE

11. This Court has personal jurisdiction over Epic pursuant to Federal Rule of Civil Procedure 4(h)(1)(A) and the California long-arm statute because (a) Epic transacts substantial

business in this District; and (b) Epic directed the tortious, and otherwise illegal conduct from which these claims arise toward this district, where CureIS's customer, [REDACTED], resides.

12. This Court has diversity jurisdiction over this action under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and this action is between citizens of different jurisdictions. Epic is a citizen of Wisconsin. CureIS is a citizen of Minnesota.

13. This Court also has subject matter jurisdiction under 28 U.S.C. §§ 1337 and 1331, as this action arises in part under the Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836, *et seq*., as well as the Lanham Act, 15 U.S.C. § 1125(a).

14. Venue is proper under 28 U.S.C. § 1391(b)(2) because Epic is an entity subject to this Court's jurisdiction and a substantial part of the events or omissions giving rise to the claims and affecting interstate commerce occurred in this judicial District, where CureIS's customer [REDACTED] [REDACTED] resides.

## FACTUAL ALLEGATIONS

15. Healthcare in the U.S. has historically operated on a fee-for-service payment model. Under a fee-for-service model, healthcare providers are paid for each service they provide, and are accordingly rewarded for the volume of services, as opposed to the results. Over the last 20 years, there has been a growing concern that fee-for-service healthcare in the U.S. contributes to rising healthcare costs. Healthcare in the U.S. costs significantly more per capita than it does in other countries. As of 2023, the cost of healthcare in the U.S. was about $12,555 per capita, whereas the comparable average in other developed countries was just $6,651. In response, the federal government has turned to legislation and regulation to shift the U.S. towards a value-based care payment model. The Centers for Medicare and Medicaid Services has led this development by testing several voluntary and mandatory programs with hospitals, physician groups, health plans, and other health care entities. These programs include groups of providers referred to as accountable care organizations ("ACOs") and managed care organizations ("MCOs") serving Medicaid members. Approximately 75% of all Medicaid beneficiaries are enrolled in MCOs. MCOs receive payment from the government on a per member, per month basis, which incentivizes these health plans to keep patients healthy in order to keep costs down.

16. 145 million Americans depend on some form of public health insurance (e.g., Medicare, Medicaid, and CHIP). However, MCOs, especially those serving government programs like Medicare and Medicaid, have historically been underserved by healthcare technology companies due to the sector's exceptional complexity, regulatory burdens, and frequent changes. Most mainstream healthcare IT vendors focus on larger, more profitable segments, leaving MCOs to rely on outdated systems and manual workarounds. These MCOs therefore face constant challenges such as maintaining compliance with evolving regulations, ensuring data integrity across disparate sources, and managing intricate enrollment, claims, and reimbursement processes. The lack of tailored, automated solutions has led to inefficiencies, increased operational costs, and heightened risk of penalties or sanctions for non-compliance. All of this prevents MCOs from delivering high-quality, cost-effective care.

17. CureIS recognized this gap and developed technology and managed services specifically for government managed care programs. Unlike generic, off-the-shelf software that struggles to adapt to the specialized workflows and compliance requirements of MCOs, CureIS's solutions are specifically designed to automate and optimize every aspect of managed care operations from enrollment and eligibility determination to claims adjudication and advanced analytics.

18. Today, CureIS offers, among other things: (a) optimization and automation of claims adjudication, (b) enrollment and eligibility management, (c) revenue cycle and compliance tools, and (d) data scrubbing and analytics. These are products in the Managed Care Data Reconciliation Software market, which are explained in further detail below. In order to understand what these products do and how they fit into the healthcare industry—as well as understand Epic's role in all of this—CureIS first provides background on the various products at issue in this dispute.

### A. Electronic Health Records (EHR): The Source of Epic's Wide-Ranging Power in the Healthcare Industry

19. Epic's core product is a proprietary electronic health record software ("EHR Software") platform. An Electronic Health Record ("EHR") is an electronic version of a patient's

medical history that may include some or all of the key administrative clinical data relevant to that person's care. For the reasons discussed below, EHR Software is a relevant antitrust market.

20. EHR Software allows healthcare providers to add, update, maintain, and delete patient EHR data. EHR Software also facilitates the storage, management, and dissemination of EHR data. Most EHR Software also enables providers to manage clinical workflows, billing, scheduling, and other administrative operations required for the provision of healthcare. EHR Software has tremendous upfront costs. Epic's onboarding and implementation typically costs, on average, about $700 million.

21. Epic manages more than 325 million patient records, with at least $813 billion in healthcare expenditures processed through Epic in 2023. Epic generates approximately $5 billion in revenue annually. Over 60% of health systems and academic medical systems use Epic EHR Software, including every health system on U.S. News & World Report's best hospitals list. And over 90% of the country's medical students train on Epic's EHR Software systems. In the U.S., somewhere between 81-94% of patients have at least one medical record stored in an Epic EHR Software system. As a result, retrieving almost any patient's full medical history requires interacting with Epic in some manner.

**B. Managed Care RCM Software**

22. In addition to dominating EHR Software, Epic also is currently the largest player in the market for managed care revenue cycle management software ("RCM Software"). RCM Software platforms enable health systems, health plans, managed care organizations ("MCOs") and healthcare payers (collectively, "Payers") to manage their billing operations. RCM Software does this by collecting and organizing a variety of administrative workflows that are required to adjudicate healthcare claims.

23. Whereas EHR Software generates and stores medical records, RCM Software creates and manages the bills associated with those medical records. Whereas the customer base for EHR Software includes hospitals and other healthcare providers who need to generate medical records, the customer base for RCM Software includes Payers that both provide healthcare and act as payers for that healthcare—so-called "pay-viders."

24. Payers are responsible for overseeing the quality of care delivered to their members, and RCM Software enables better care coordination and monitoring outcomes across provider networks. RCM Software also enables Payers to comply with federal and state regulations regarding quality assurance and reporting, such as encounter reporting. RCM Software is critical to data-driven decision making and performance tracking.

25. Industry reports recognize Epic as a "Key Compan[y]" in the RCM Software market.[1] Epic's primary RCM Software product, Tapestry, has over 43% market share in the RCM Software market, and continues to grow. For the reasons discussed below, RCM Software is a relevant antitrust market.

**C. Managed Care Data Reconciliation Software**

26. Managed care data reconciliation software ("MCDR Software") is software that helps Payers ensure they have accurate and up-to-date data that complies with the constantly changing, countless sets of rules and regulations applicable to them. This includes ensuring accuracy of and compliance with member enrollment and eligibility information, claims encounter information submitted to government entities, or bills sent to members or payments to providers. MCDR Software applications integrate directly with providers' RCM and EHR systems to access clinical and billing data, automate payer-facing processes, and support compliance with regulatory and contractual requirements. CureIS's MCDR Software products include EnrollmentCURE, EncounterCURE, RecoveryCURE, and LettersCURE. Epic represents to the market—falsely, as described below—that its Eligibility & Enrollment, Letters, and Resolute products perform the same functions and have the same distinct purpose as EnrollmentCURE, LettersCURE, and RecoveryCURE, respectively.

27. Critically, MCDR Software relies on receipt of EHR and RCM data in order to function and provide value to customers. Whereas EHR Software and RCM Software prepare data into specific file formats to be sent to the Payer's trading partners, MCDR Software receives this

[1] *Revenue Cycle Management Market Size, Share & Trends*, Grand View Research, https://www.grandviewresearch.com/industry-analysis/revenue-cycle-management-rcm-market.

data and applies ever-changing business logic and rules to the data to ensure Payers are not incorrectly or inaccurately billing for members' care. For example, RCM Software stores a record of all the individuals that are enrolled in a particular health plan. MCDR Software may review those enrollment records on a daily basis and determine whether or not the enrollment information in a Payer's RCM Software platform is up-to-date. For instance, if a member drops out of the health plan and seeks care the next day, MCDR Software would ensure that the Payer does not inadvertently treat that member as covered under the health plan. RCM Software, by itself, does not perform this sort of advanced data reconciliation across disparate sources, verify data accuracy through cross-referencing with other records, identify and close information gaps, or apply dynamic, customized business logic to automate complex manual workflows on a continuous basis.

28. Prior to the development of MCDR Software, Payers required large teams of billers to remedy errors in RCM data and claim denials for data quality or compliance issues. But with MCDR Software, Payers can now drastically reduce the number of errors generated by their RCMs, and accordingly can drastically reduce the amount of manual intervention required by billers. Accordingly, MCDR Software costs much less than traditional manual billing services to assist with revenue cycle management and has unique demand from such traditional services as a result.

## CUREIS'S INNOVATIONS

### A. CureIS Develops Software to Help Managed Care Providers More Efficiently and Effectively Track Payments

29. In contrast to large RCM Software platforms like Epic's Tapestry and Athenahealth's AthenaIDX platform ("IDX"), CureIS has developed a business focused on curing data quality issues affecting the data within customers' systems. For almost two decades, CureIS has developed expertise in ensuring that Payer data is accurate, up-to-date, and properly formatted to ensure complete payment integrity. CureIS scrubs, validates, and parses data as needed, as well as corrects erroneous or incomplete data through automation tools. Once data is clean, CureIS uses it to deliver critical business functions. This work ensures that Payers do not waste valuable time and resources correcting information, and that payments are made for the right members in the right amount and

on time. This eliminates costly errors and administrative waste—areas where traditional platforms, including Epic's Tapestry, routinely fall short.

30. Whereas RCM Software creates and disseminates billing information, CureIS's products focus on ensuring the information contained within RCM Software is accurate, up-to-date, and fully compliant with rules and regulations.

31. Unlike larger, less technically sophisticated competitors, CureIS was founded to address the chronic problems of manual data handling, error-prone legacy processes, and regulatory complexity that most vendors avoid due to the sector's demanding requirements. What sets CureIS apart is its Managed Care Master Data Model, which routinely and proactively updates its products through a complex web of automated business logic rules. CureIS on average makes a change to these logic rules every 24 hours. These changes can be the result of a file format change put in place by a trading partner (e.g. an insurance carrier), or based on a suggestion from a customer seeking to make its billing processes more efficient. These logic rule changes are then reviewed by CureIS personnel and tested rigorously before being implemented at any given customer.

32. Because CureIS is a nimble solution, unlike the underlying clunky RCM Software, CureIS is able to turn around these changes very quickly—often the same day that those changes are flagged. Further, CureIS does not charge customers for these changes. Instead, they are a key feature of CureIS's solutions that customers see as a core value that Epic's Tapestry product does not provide.

**B. CureIS's Products**

33. ***EnrollmentCURE***. EnrollmentCURE is CureIS's oldest and most popular product. EnrollmentCURE was developed in the first instance for [redacted]. The product verifies the enrollment information of all members in a customer's system to ensure that all of the information is accurate. It also ensures members are aligned with the proper primary care providers, and that those primary care providers have accurate information regarding each member's enrollment. This information changes frequently and unexpectedly as members roll on and off health plans or change their addresses, for example. Unlike traditional enrollment functions in

billing systems like Tapestry and IDX, EnrollmentCURE checks for updates to member information in real time so that any claims associated with those members do not get erroneously denied.

34. ***EncounterCURE***. EncounterCURE is tailored primarily to government programs. Medicare and many Medicaid programs require health plans to submit files commonly referred to as "encounters" pursuant to their reporting requirements, such as 42 CFR § 438.602(e), which requires periodic audits of encounter data. These encounters are similar to claims in that they detail information about the patient's care. In managed care plans, encounter data is crucial for monitoring the performance of health plans and whether or not health plans are adhering to regulatory requirements. If the information contained in these encounter files is incorrect, it can result in payment denials or even sanctions by government entities. EncounterCURE uses a proprietary set of rules and cleaning functions to drastically reduce the amount of incorrect information in encounter files submitted to receive payment from state and federal agencies.

35. ***RecoveryCURE***. RecoveryCURE helps customers recover payments for members that are on managed care plans but are subject to payment carveouts or contracts that divide financial responsibility for the member among multiple parties. In these situations, the customer health plan or pay-vider has typically already paid for the member's care and has to identify the correct party to seek reimbursement from. For these members, RecoveryCURE uses proprietary business rules to prepare claims to recover the lost revenue, and it also tracks payments or disputes regarding claims for recovery.

36. ***LettersCURE***. LettersCURE manages correspondence templates and generates correspondence to Payer plan members regarding their benefits. These letters may provide notices regarding, for example, pre-authorization, coverage denials, or claim appeals. The letters are generated based on information contained within RCM Software platforms. While many RCM Software platforms contain a basic template for letter generation, these templates need to be manually checked, printed, and mailed by Payers. LettersCURE automates the generation of letters with specific information required under regulations, attaches an image of the claim, and automatically sends those letters to a printer.

37. CureIS developed its products to sit on top of and work in conjunction with billing systems like Tapestry and IDX. However, as detailed below, Epic has systematically denied CureIS access to CureIS's current and prospective customers' billing data, making it impossible for CureIS to provide these much-needed services. And for many of these customers, Epic has fraudulently claimed it can provide the same services CureIS provides, when in fact it is unable to do so.

**EPIC'S MULTI-PRONG SCHEME TO DESTROY CUREIS'S BUSINESS**

38. Although Epic continues to gain market share in the EHR Software and RCM Software markets, in order for the estimated $45 billion company to continue its growth and dominance of the healthcare industry, it must look to other markets than those which originally gave it so much power.

39. At a certain point, Epic decided that, in its own words, CureIS was "a direct competitor" with "Tapestry Enrollment and Eligibility functionality." As described below, Epic then set about a strategy to stonewall, disparage, and attempt to copy CureIS's products by: (a) cutting off and blocking data access to CureIS's current customers and preventing the onboarding of new customers, (b) pressuring or coercing existing customers and business partners not to work with CureIS, (c) imposing an "Epic-first Policy"—an exclusive dealing that has no legitimate business justification, (d) disseminating false or misleading information about CureIS's and Epic's products, and (e) misappropriating CureIS proprietary software information to unfairly compete. The following representative examples are those of which CureIS is currently aware, but Epic's behavior reflects a broader scheme aimed at impacting CureIS's relations with many other current and prospective customers.

**A. Epic's Intentional Interference with CureIS's Customer Relationships**

40. After becoming aware of CureIS's strength in Managed Care, Epic implemented a multi-prong scheme to undermine CureIS's relationships with existing customers. CureIS's recent investigation has revealed that Epic knowingly interfered with CureIS's contracts with [REDACTED], [REDACTED], [REDACTED], and [REDACTED], among others.

**1.** [redacted]

41. At the end of 2023, Epic impeded [redacted]—a longtime CureIS customer—from continuing its relationship with CureIS, solely because Epic viewed CureIS as its "direct competitor." Prior to Epic's interference, [redacted] had happily partnered with CureIS for over 10 years.

42. In April 2012, [redacted] started working with CureIS on a variety of small projects. [redacted] instantly recognized the value of CureIS's solutions and, over time, [redacted] and CureIS developed a strong working relationship that led to expanded collaboration and services. On September 17, 2018, [redacted] began using CureIS's EnrollmentCURE product. [redacted] originally brought CureIS in to help with member enrollments when [redacted] was still using IDX. [redacted] had been using another vendor to validate its enrollment data, but that vendor primarily used slow and expensive offshore billers to attempt to fix enrollment data.

43. After integrating with [redacted]'s IDX platform, CureIS was able to drastically reduce the amount of time and money [redacted] spent verifying member enrollments. CureIS was also able to cut down enrollment processing time by 80%. This resulted in significant cost savings for [redacted] The longer it takes Payers to verify member enrollment, the more likely it is that the newly enrolled or unenrolled member uses their plan benefits before enrollment is verified. If a member uses benefits while an enrollment change is still processing, their claims can be erroneously denied and that can result in hours of work for a biller to reprocess the claim. CureIS's solutions, including EnrollmentCURE, prevent these types of downstream issues that drive up costs in our healthcare system.

44. In 2018, [redacted] decided to migrate to Epic's platform. [redacted] requested that Epic collaborate with CureIS to adapt EnrollmentCURE to Epic's system. However, Epic refused to provide CureIS with access to the data that was critical for CureIS's product integration and, ultimately, after years of strategic delay, and over [redacted]'s objection, Epic forced [redacted] to terminate its longstanding contract with CureIS on December 31, 2021.

45. Between February and July 2019, CureIS requested data and configuration details from Epic to integrate with Epic's "Workbench" tools—ensuring that CureIS could continue

delivering its valuable EnrollmentCURE solution to [redacted] without interruption, as it had consistently done for over a decade. Throughout this time, Epic repeatedly delayed providing critical data in an effort to stall CureIS's efforts to integrate. After repeated delays, finally, in or around July 2019, Epic outright denied CureIS access to necessary data despite [redacted]'s request that CureIS be granted access. Shortly thereafter, Epic falsely represented to [redacted] that Epic could provide the "same services" as EnrollmentCURE and thus [redacted] no longer needed CureIS's EnrollmentCURE.

46. [redacted] continued trying to push the integration forward, but after over a year of trying to gain access to [redacted]'s data via Epic, and Epic refusing to provide access while mischaracterizing Epic's and CureIS's respective software capabilities, [redacted] terminated its relationship with CureIS and revoked CureIS's server access. When Epic's inferior product failed to deliver as promised, in the summer of 2023, [redacted] asked CureIS once again to try to integrate EnrollmentCURE with Epic's platform. After [redacted] and CureIS devoted many months of planning and significant resources to implementation planning, in August 2024, [redacted] informed CureIS that [redacted] could no longer use any of CureIS's solutions, including EnrollmentCURE, because Epic considered CureIS a direct competitor and would not allow [redacted] to use the product of its choice. In August 2024, Epic blocked further discussions—with [redacted] having no choice but to comply, or else to undergo an extremely costly and impractical switch of its underlying platform—and [redacted]'s project with CureIS was shelved.

**2.** [redacted]

47. On January 1, 2024, CureIS met with prospective customer [redacted] to conduct a deep dive on its RecoveryCURE product, which [redacted] expressed interest in. With discussions continuing, on February 5, 2024, [redacted] signed a non-disclosure agreement ("NDA") regarding a proposal for RecoveryCURE from CureIS. On March 6, 2024, [redacted] hosted CureIS for an on-site meeting to address workflow issues in coordination with [redacted] IT department.

48. On May 22, 2024, and subject to the parties' NDA, CureIS sent [redacted] a 40-page proposal detailing how it would implement its RecoveryCURE product at [redacted]

specifically. This proposal contained proprietary information and specific workflows that would provide substantial value to [redacted]. For example, the proposal included a full system architecture design specified to [redacted]' EHR Software and RCM Software systems. It also included a design specification of how CureIS would keep [redacted]' information safe and secure, and a detailed explanation of how RecoveryCURE would specifically solve [redacted]' problems by customizing RecoveryCURE to [redacted]' needs. The proposal also contained competitively sensitive, confidential pricing and customer information.

49. On June 10, 2024, CureIS met with [redacted] CIO [redacted] and CFO [redacted] to further discuss the impact RecoveryCURE would have on [redacted]'s business.

50. In a surprising about face after months of productive discussions, on June 17, 2024 [redacted] informed CureIS that they could not work with CureIS because Epic imposed on them an "Epic-First" policy. On information and belief, under the Epic-First policy, once a customer adopts Epic's EHR Software or RCM Software, Epic requires that customer to abandon any preexisting third-party tools and forgo exploring non-Epic solutions at any point in the future if Epic believes it has a tool or service that overlaps with the third party's option—even if such third-party solutions offer superior functionality or are better tailored to the customer's unique needs. And in cases like this one, where Epic does not currently offer a tool that meets the customer's requirements, the Epic-First policy prevents customers from turning to necessary third-party alternatives like CureIS. These customers must simply go without for however long it takes Epic to build its replacement solution, which, as in this case, could take *years* (or never happen).

**3. [redacted]**

51. [redacted] is one of CureIS's oldest customers. But as Epic has started the process of replacing IDX at [redacted], [redacted] has reduced CureIS's product integrations with [redacted] and the volume of its business, and has ceased processing new members, all in anticipation of a full integration with Epic. Indeed, [redacted] has indicated that it is planning to terminate its EnrollmentCURE contract with CureIS any day now (i.e., once it fully integrates with Epic)—even

though none of Epic's current products provide the functionality of CureIS's EnrollmentCURE or EncounterCURE products.

52. According to ████ its decision to discontinue its use of EnrollmentCURE was induced by Epic's false promise that it could develop a replacement product. ████ had been a longstanding licensor of CureIS's EnrollmentCURE and EncounterCURE products. However, after ████ transitioned to Epic, and at Epic's direction, ████ has stopped paying for use of EnrollmentCURE. On information and belief—based on multiple prior instances in which Epic promised but failed to deliver replacement products—Epic's representations to ████ were, and remain, false, and Epic knew they were false at the time it made them.

**4. ████**

53. ████████████ is one of the largest non-profit healthcare systems in the U.S. ████ serves over ██ million patients in Northern California and has over ████ employees. ████ operates ██ acute care hospitals and over ██ clinics.

54. As one of CureIS's first clients, ████ has worked with CureIS in multiple capacities for more than 18 years. CureIS developed the first version of its RecoveryCURE product for ████ ██████████ (now a part of ████████) on ████'s IDX platform. In 2010, ████ decided to migrate its EHR Software and RCM Software platforms to Epic.

55. In approximately January 2025, ████ suddenly terminated its contract with CureIS for CureIS's EnrollmentCURE product, a product ████ had relied on without interruption since 2018. ████'s leadership told CureIS that they stopped using EnrollmentCURE because Epic falsely represented that Epic's Tapestry system provided the same functionality. By March 2025, ████ was experiencing significant issues with Epic's purported replacement solution. ████ has informed CureIS that it prefers using EnrollmentCURE over Epic's solution and if Epic was not preventing CureIS's integration, ████ would start using EnrollmentCURE again because it is a superior (and entirely distinct) product.

56. Epic's interference, which resulted in the loss of ████'s business, inflicted lasting and ongoing harm on CureIS, severing a longstanding and mutually beneficial relationship—a relationship from which both ████ and CureIS derived tremendous value.

57. As a direct result of Epic's interference—including false claims about Epic's capabilities, improper blocking of integration, and coercive mandates through the "Epic-First Policy"—CureIS has lost business with at least 7 customers. Further, CureIS stands to lose additional business at any existing customer that migrates its billing system to Epic in the future, and any future customers that are already using Epic's EHR Software who have been forced to adopt an "Epic-First" policy.

**B. Blocking Data Access & Reducing the Quality and Effectiveness of CureIS's Products**

58. Epic, a healthcare information technology developer, has refused to provide CureIS access to customer-authorized data necessary for CureIS products to function. Epic knows, or should know, that its conduct interferes with CureIS's access to and use of electronic health information ("EHI"). Epic's wrongful denial of access to customer data that customers had expressly authorized CureIS to access is a violation of the 21st Century Cures Act's prohibition on blocking of EHI, which includes enrollment and claims data containing individually identifiable health information. Cures Act, 42 U.S.C. § 300jj–52(a)(1) (prohibiting health IT developers from engaging in information blocking), 45 C.F.R. § 171.103(a)(1) (defining practices that constitute information blocking by health IT developers). CureIS products work directly with, and rely on access to, EHI.

**1. [REDACTED]**

59. Epic's orientation towards CureIS appeared to make a noticeable shift in 2019 when one of CureIS's customers, [REDACTED], migrated from IDX to Epic. On September 18, 2018, CureIS executed a contract with [REDACTED] to provide EnrollmentCURE. CureIS knew that [REDACTED] was in the process of migrating from IDX to Epic. At first, Epic appeared willing to work with CureIS to allow CureIS to provide the services it promised [REDACTED] As summarized above, in February 2019, CureIS began working with Epic to get the data it needed for EnrollmentCURE out of a different data repository called Workbench.

60. Epic's Workbench tool allows users to generate analytic reports from Epic's data. Workbench allows users to generate real-time reports. That is because Workbench pulls from Epic's core database, which Epic refers to as Chronicles. However, beginning in March 2019, Epic began

to deny CureIS requests for data, files, and configurations that CureIS needed to adapt its process to the Epic environment. Despite the fact that this data belonged to the *customer*, Epic did not honor these requests. Instead, Epic deliberately delayed its responses and provided ever-shifting excuses as to why it could not provide this information. Throughout this time, Epic wrongfully denied CureIS's customers access to their own data to thwart CureIS's solutions from working for the purpose of harming CureIS's customer relationships.

61. On June 18, 2019, [redacted]'s Healthcare IT Director, [redacted], emailed [redacted]'s Epic representatives and requested that Epic provide CureIS access to [redacted]'s data. Epic informed [redacted] that CureIS would need to complete an "Application for Access form" to receive access to the data CureIS needed.

> **From:** [redacted]
> **Date:** Wednesday, July 10, 2019 at 9:20 AM
> **To:** Bret Randolph <brandolph@cureis.com>
> **Cc:** [redacted]
> **Subject:** RE: CureIS Access Request
>
> Hi Bret,
>
> I have been informed that the Vendor Relations team at Epic has **denied CureIS access to Clarity** due to them being a direct competitor with Tapestry Enrollment and Eligibility functionality.
>
> They are stating also that *Epic does not have an access agreement with CureIS for any customer*. However, this could just mean that CureIS/other clients didn't follow the official process to have the access that you have today with that client.
>
> We need to discuss how we are going to proceed. I can continue to push on this side but do not want to cause any issues for you with your current client.
>
> [redacted]
> *Director, HIT Managed Care*
> [redacted]

62. After a few questions about how to fill out the form correctly, CureIS's CEO, Chris Sawotin, filled out the form that same day. But on July 10, 2019, almost one month after [redacted] made the request and CureIS submitted Epic's requested form, [redacted] informed CureIS that "the Vendor Relations team at Epic has **denied CureIS access to Clarity** due to them being a direct competitor with Tapestry Enrollment and Eligibility functionality."

63. Sawotin responded to ████'s message by clarifying that "I believe we must have some confusion regarding our products functionality. This is very much a complimentary product and not competitive."

64. ████ informed Sawotin that they had "reached out to Epic and asked [Epic] to facilitate a discussion with CureIS to see how we can structure an access agreement that addresses the **Epic concerns**." Sawotin responded "That is great news. I honestly believe it just a misunderstanding of the service. I do not see any overlap with their capability. This actually ***makes Tapestry run more efficiently***." ████ responded, "Thanks Chris, I am sure we will work this out. Not used to this restriction. LOL new world. Ok ill reach out to you as soon as I can!"

65. Despite ████'s optimism and express desire to provide its data to CureIS, Epic never authorized CureIS to receive access to ████'s data. Instead, as a result of being unable to receive its EnrollmentCURE service, ████ eventually informed CureIS in 2020 that they would no longer pay for CureIS's services. After similar requests from ████ to try integration once more, and then the same obstructive tactics from Epic, and then this process stopping and starting many times over, ████ finally cut off integration discussions with CureIS at the end of 2023, citing past issues with Epic gatekeeping data access.

**2. ████**

66. Beginning in 2020, ████'s Executive Director of Claims Administration, ████, advocated for ████ to bring on CureIS's LettersCURE product. ████ moved to ████ in 2016 from a different managed care organization that used LettersCURE. ████ knew that LettersCURE could provide functionality far beyond Epic's capabilities. With Epic, ████'s team had to manually create every single letter that went out to members and make fixes to problems that consistently occurred with the letters. ████ had already spoken with Epic about whether they could implement an automated fix. Despite multiple promises to provide a comprehensive automated fix for these issues, Epic, to this date, has not delivered on its promises.

67. As a result, ████ again, pushed ████'s adoption of LettersCURE forward. On December 22, 2022, ████ approved a project to implement LettersCURE.

[redacted] approved CureIS's budget to begin work in 2023 for the 2023-2024 fiscal year. On December 22, 2022 CureIS met with [redacted] to conduct a Contract Security Review.

68. On May 8, 2023, CureIS and [redacted] held contract finalization meetings to take LettersCURE live, after [redacted] had verbally agreed to a contract with CureIS. On May 17, 2023, CureIS received a question from [redacted] about integrating LettersCURE with Tapestry. After receiving this question, contract discussions between CureIS and [redacted] stalled out. Finally, on June 27, 2023, [redacted] communicated to CureIS that the LettersCURE functionality would be handled "internally."

69. It soon became clear that Epic killed the project. Epic declared to [redacted] it had serious but vague "concerns" about sharing data with CureIS. Epic induced [redacted] to cease further efforts to implement CureIS's LettersCURE by falsely representing to [redacted] that Epic had built a competing product that was just as effective as LettersCURE. This was not true. [redacted] contracted with Epic for Epic to provide its own letters product. Epic took two years to develop this product. The product Epic delivered still requires manual adjustment of each letter and it only provides a subset of all the letters that [redacted] needs.

70. According to [redacted] Epic put significant pressure on [redacted] to kill the LettersCURE project. Epic asked [redacted] if there was any other vendor she would consider working with besides CureIS. Epic informed [redacted] that it had "issues" with giving CureIS access to data in Epic—even though this data belongs to [redacted] not Epic, and the law prohibits Epic from blocking the sharing of [redacted]'s EHI.

71. After Epic killed CureIS's LettersCURE contract by threatening to impose (illegal) data restrictions, CureIS and [redacted] did not work together for over a year. However, [redacted] reengaged CureIS in August 2024. [redacted] reengaged CureIS following a large data breach at Change Health in February 2024. Change Health is owned by UnitedHealth Group, and its system is the source of UnitedHealth member enrollment information. [redacted] was concerned that interacting with Change Health after the data breach would expose their systems to potential breaches as well. On August 8, 2024, CureIS met with [redacted], a Vice President in [redacted]'s IT department. Bret Randolph, Chief Operating Officer at CureIS, proposed a

solution wherein CureIS would act as a conduit between [redacted] and UnitedHealth. CureIS's custom version of EnrollmentCURE would receive member enrollment information from UnitedHealth and [redacted] and send [redacted] a clean and accurate enrollment file. [redacted] specifically turned to CureIS for help on this problem precisely because of CureIS's reputation for robust data security.

72. When [redacted] brought this solution to [redacted]'s IT department on or about December 13, 2024, the IT department informed [redacted] that CureIS was not an Epic-approved vendor, and therefore Epic would refuse to integrate with CureIS, shutting down the project.

**3. [redacted]**

73. As discussed above, [redacted] was one of CureIS's first clients. Between 2010 and 2011, [redacted] migrated its billing software from IDX to Epic and CureIS hired an Epic consultant to help [redacted] migrate the RecoveryCURE product over to the Epic system. On information and belief, during [redacted]'s migration from IDX to Epic, Epic falsely represented to [redacted] that CureIS's services would no longer be needed once Epic was up and running. But [redacted]'s executives understood that CureIS provided value that Epic could not replace. As a result, [redacted] decided to keep CureIS despite Epic's attempt to oust CureIS on false pretenses.

74. Having failed to lure [redacted] by making false claims about Epic's software, Epic resorted to more aggressive tactics. After Epic went live at [redacted] Epic refused to provide CureIS access to [redacted]'s data, which CureIS and [redacted] needed for CureIS's products to function. Epic delayed access to CureIS for several months before finally providing access at the urging of [redacted] leadership. However, Epic limited CureIS's access to data in Epic's Clarity product. Unlike Epic's main datastore, Epic Chronicles, the data in Clarity is not live. Instead, the data in Clarity can be on a delay anywhere from one day to over a week and provides a more limited subset of data inputs and outputs. CureIS products require timely data to deliver necessary services and value to customers. Despite this severe limitation on CureIS's functionality, [redacted] had chosen to continue using CureIS's products because they are far superior to Epic's (even while being choked by Epic). [redacted] used CureIS's products for over fifteen years until Epic escalated even further, and demanded that [redacted] phase out EnrollmentCURE in January 2025 (as discussed above).

**4. ████**

75. CureIS originally developed the first version of EnrollmentCURE for ████ in 2012. In 2017, ████ expanded its relationship with CureIS by entering a licensing agreement for EncounterCURE. When ████ began migrating its EHR Software and RCM Software platforms to Epic in 2022, ████ asked CureIS to help manage the transition from IDX to Epic integration and CureIS agreed to do so at no cost to ████.

76. ████████ returned to Chris Sawotin, CureIS's CEO, and informed him that ████████ would have no need for EnrollmentCURE and EncounterCURE after the system switch was complete because Epic represented it would provide those services instead. ████ ██████'s Vice President of Revenue Cycle Management & Enterprise Resource Planning Systems ████████ informed Mr. Sawotin that ████████ would continue to use EncounterCURE after the integration, but would stop using EnrollmentCURE once the integration was complete.

77. ████████ went live on Epic on March 1, 2024. To date, ████████ has not entirely stopped using EnrollmentCURE. At the moment, ████████ is paying for EnrollmentCURE and EncounterCURE, and EncounterCURE is running on top of Epic in a significantly diminished state due to Epic's ongoing obstruction. However, because Epic does not allow CureIS to communicate directly with its systems to receive ████'s EHI, EncounterCURE is running at diminished capacity by being forced to work with outdated data. While ████ has not indicated that it has plans to stop using all of CureIS's products, ████████ has significantly reduced the number of members it is processing with CureIS because it is in the process of migrating its systems to Epic.

78. CureIS needs access to its customers' data for CureIS products to function. Epic repeatedly and on an ongoing basis stonewalls CureIS's access (and by extension, Epic's and CureIS's mutual customers' access) to vital EHR data, forcing CureIS's customers to abandon integrating with CureIS's products. Epic knowingly engaged in blocking CureIS's EHI access, exchange, or use, and no regulatory exception excuses this conduct.

**C. Raising Unfounded Security Concerns to Defame CureIS**

79. Whenever an Epic customer has asked Epic to integrate with one of CureIS's solutions, Epic has claimed it "wasn't comfortable" with CureIS accessing its systems. Epic's messaging around why it supposedly "wasn't comfortable" was that CureIS's products supposedly presented a data-security risk. CureIS is aware that Epic raised false and unfounded security concerns during critical transition periods for at least the following former CureIS customers: ███ ████████ in August 2024, █████ in 2024, █████ on February 2, 2023, and ████████ in March 2023. But given that CureIS obviously is not privy to these communications in most instances, CureIS understands that they are far more widespread that the specific customers listed herein who have directly informed CureIS of Epic's misstatements.

80. Epic made these false statements with malice and only for the purpose of harming CureIS's reputation and relationships. Epic had no legitimate basis to raise security concerns, and Epic was fully aware that any security-based justifications for blocking integrations with CureIS were entirely pretextual. In fact, Epic was directly involved in situations where CureIS's products were specifically selected by mutual customers to address security concerns associated with existing systems because of CureIS products' superior security. For example, in 2023, ████████████ sought CureIS out to protect its data from the possible data security risks on its existing *Epic* system. When Epic urges a would-be customer to block CureIS's access to customer data because of implied or explicit (but untrue) concerns about CureIS's data security, that is deeply harmful to CureIS, given that one of its primary selling points is its ability to ensure the safe keeping of sensitive health data. CureIS goes to great lengths to ensure that its services are fully compliant with healthcare data security regulations, including HIPAA.

81. Epic's false and disparaging comments about the potential security risk of CureIS integrating with Epic Tapestry or accessing data through Epic's systems were likely to induce and did induce reliance. Once a customer has switched or taken steps to switch its platform to Epic, any decision that would undermine that transition or might require another underlying system change is extremely costly. Put simply, customers cannot afford not to go along with Epic's fearmongering about CureIS integration.

82. Epic's false statements are not susceptible to neutralization. In healthcare IT markets, data-security claims are particularly difficult for customers to verify independently. The complex, specialized nature of managed care enrollment and eligibility systems prevents customers from easily assessing the accuracy of Epic's disparaging statements about CureIS's products. Without access to the necessary infrastructure (which Epic improperly blocks), CureIS cannot effectively showcase its solutions or prove they do not pose the security concerns Epic alleges. Further, and as discussed, the timing of Epic's disparaging statements, during critical customer transition periods, was calculated to exact the most harm and most effectively prevent customers from pushing back. By the time CureIS discovered Epic's misrepresentations, customers had already implemented decisions based on Epic's falsehoods. And Epic knows this.

83. False claims about data security in healthcare settings create lasting reputational damage that persist even after factual corrections. When Epic tells CureIS's customers it is "uncomfortable" integrating with CureIS—especially during critical system transitions—such insinuations carry significant weight in a highly regulated, risk-averse industry where hospital IT departments tend to follow the lead of the large majority of hospitals (including all of the top-ranked hospitals) using Epic.

84. Epic's statements were intended to and did cause harm to CureIS's business. For example, in or around June 2023, Epic knowingly induced [REDACTED] to cease onboarding CureIS's LettersCURE product by claiming it had serious but vague "concerns" about sharing data with CureIS. At the end of 2023, Epic also expressed vague concerns about integrating with EnrollmentCURE to the IT department at [REDACTED]. Thereafter, [REDACTED] terminated its contract with CureIS.

**D. Misappropriation of Proprietary Information**

85. In addition to disparaging CureIS's products and interfering with customers such that they stop or avoid using CureIS's products, and unable to fairly develop a competitive product, Epic has instead attempted to build replacement technology within its own products by using secret information that Epic misappropriated from CureIS. Epic has solicited, acquired, and used detailed information about how CureIS's proprietary software functions, under the guise of integration

discussions, to build Epic's own imitative products. Epic acquired this secret information by inducing CureIS customers to breach the duty those customers owed CureIS to maintain the secrecy of this information. As far as CureIS is currently aware, this occurred at least with [REDACTED] in May 2023 and [REDACTED] in early 2024.

86. As discussed above, on February 5, 2024, CureIS and [REDACTED] executed an NDA—the Mutual Confidentiality Agreement—with regard to CureIS's proposals for RecoveryCURE. The NDA was at all relevant times a valid, binding, and enforceable contract. The NDA bars disclosure of "any Proprietary Information to any third party," and provides that the non-disclosure obligations "with respect to any item of Proprietary Information or with respect to any discussions or agreements between the parties shall survive for five (5) years from the date of Recipient's receipt of such Proprietary Information." The NDA defines Proprietary Information as "any and all information and material … that is marked in writing as confidential or proprietary." This includes, "without limitation, any (a) know-how, idea, invention, process, technique, algorithm, program (whether in source code or object code form), design, schematic, formula, data, plan, strategy and forecast of, and (b) technical, engineering, manufacturing, product, marketing, servicing, financial, personnel and other information and materials of, Discloser and its employees, consultants, investors, affiliates, licensors, suppliers, vendors, customers, clients and other persons and entities."

87. On May 22, 2024, CureIS sent [REDACTED] a 40-page proposal detailing how its RecoveryCURE product worked, and how CureIS would implement it at [REDACTED] specifically. The proposal contained proprietary information that CureIS took significant measures to ensure was kept confidential and secret. In particular, CureIS clearly marked the proposal "Confidential and Proprietary" pursuant to the parties' NDA. This demarcation was contained in a clearly labeled "CONFIDENTIALITY NOTICE" section at the beginning of the proposal immediately before the Executive Summary section.

88. The proprietary and trade secret information contained within the proposal included: (a) detailed specifications about the RecoveryCURE's system design, (b) detailed information about the pricing of CureIS's RecoveryCURE product and CureIS Server product, (c) descriptions of the

24 features that encompassed the functions that RecoveryCURE provided to [redacted], including a description of how CureIS's rules engine and billing engine work, (d) a schematic of RecoveryCURE's architecture as it would be deployed at [redacted], and (e) a detailed schematic of how the product's security protocol works (collectively, "RecoveryCURE Product Specifications"). This RecoveryCURE Product Specifications are valuable, and derive value from secrecy, because they are the product of over 15 years of research, development, and testing by CureIS to identify methods to reliably track down and recover unpaid portions of claims from insurance carriers that CureIS customers work with. A would-be competitor (such as Epic) armed with this information could avoid the substantial investment of time and money that is necessary to independently develop these features, strategies, and technologies, and instead jump straight to a system that CureIS already validated at great expense.

89. At all relevant times, Epic was aware of the NDA and the confidentiality it imposed on proposals CureIS sent to [redacted] as those proposals contained confidentiality notices which specifically identified that the information contained therein was [redacted] Moreover, it is industry custom for proposals such as these to be confidential and protected by non-disclosure agreements.

90. On or after May 2024, Epic promised [redacted] it would build a recovery tool to replace CureIS's RecoveryCURE, in order to induce [redacted] to back out of its planned partnership with CureIS. Epic did not have—and could not independently develop in any timeline that would be competitive—the capabilities that RecoveryCURE has. Nevertheless, Epic promised to build a recovery solution for [redacted] within nine months. Not only would nine months set a record for Epic in developing any feature, but it also fails to account for the additional months—or even years—Epic typically takes to implement a solution (even after Epic originally develops the feature). The timeline Epic promised would only be possible if Epic had an improper head start by misappropriating CureIS's trade secrets.

91. On information and belief, Epic put that plan to action by acquiring CureIS's proprietary proposal from [redacted] despite the clear notice of its confidential nature at the

beginning of the proposal and the NDA in place between CureIS and [REDACTED]. On information and belief, Epic acquired CureIS's proprietary proposal with the intent to use it as a roadmap to develop its own version of RecoveryCURE that it could use to replace CureIS's offering at [REDACTED] and other Payer customers. Indeed, the only way Epic could promise to deliver a RecoveryCURE replacement within nine months would be to skip over much of the independent development process by using the RecoveryCURE Product Specifications contained within CureIS's 40-page proprietary proposal.

92. When CureIS learned of Epic's promise of an impossible development timeline, CureIS investigated further and uncovered other similar instances where Epic improperly acquired CureIS's trade secrets by lying to customers about a claimed need to access CureIS's proprietary product specification details under the pretext of facilitating integration, only to block the integration afterward.

93. CureIS's investigation to date indicates that Epic also sought to obtain CureIS's proprietary information from the longtime CureIS customer [REDACTED] As described above, [REDACTED] decided to migrate its billing system to Epic approximately three years ago. In the course of that migration, [REDACTED]'s Senior Systems Analyst, [REDACTED], began requesting detailed confidential and proprietary information about how CureIS's EnrollmentCURE product worked under the hood.

94. This detailed information included descriptions and ordering of the specific business logic rules EnrollmentCURE applies to enrollment data ("EnrollmentCURE Product Specifications"). These business logic rules are the product of over 15 years of development and testing at dozens of CureIS customers, and are maintained confidentially at CureIS, including through the use of confidentiality agreements with customers and CureIS employees who have access to the information. Access to this information would allow a competitor to compete with EnrollmentCURE without having to expend the cost of compiling and testing all of these rules.

95. CureIS provided the information to [REDACTED] because they were long-time commercial partners, with a confidential relationship pursuant to the Subscription Services Agreement in place between [REDACTED] and CureIS. Given that, CureIS had no reason to believe that [REDACTED] would breach the trust of that relationship (or that Epic would urge [REDACTED] to do so). However, having now seen

that [redacted] suddenly terminated its long-term relationship with CureIS due to a variety of improper tactics by Epic, on information and belief, [redacted] requested CureIS's EnrollmentCure Product Specifications on Epic's behalf because Epic was working to develop a replacement for EnrollmentCURE within Epic's Tapestry, as Epic had unsuccessfully attempted to do for several other CureIS customers. Indeed, [redacted] acknowledged that some of the "asks" he was fielding from [redacted] leadership made him uncomfortable because they entered the "proprietary[] realm." Still, based on Epic's misrepresentations that it needed CureIS's proprietary information for integration purposes, [redacted] reiterated requests for the EnrollmentCURE Product Specifications so he could "share with the workgroup on [his] end." At the time, CureIS did not know and had no reason to believe that the "workgroup on [his] end" included Epic personnel. But now that Epic has blocked CureIS's access and evidently had no intention of allowing CureIS to integrate, there is no other plausible explanation for [redacted]'s request for the EnrollmentCURE Product Specifications, except for Epic seeking to acquire CureIS's trade-secret information on false pretenses for the purpose of attempting to replicate EnrollmentCURE.

### E. Epic's Acts Against CureIS Are Part Of A Broader Attempt To Take Over Nearly Every Part Of The Healthcare Information Technology Industry

96. Epic is unabashed about its goal to use its role as industry gatekeeper for third-party developers of EHR-integrated solutions as a tool for ever more dominance. Epic is executing its strategic expansion beyond its core EHR and billing functions into multiple adjacent and vertically related markets.

97. As Epic notes in a brochure called "Products You Can Replace with Epic," it urges its customers to use Epic instead of competitors for 323 related products under 21 categories, including Patient Access, Patient Digital Experience and Customer Relationship Management, Population Health, Analytics and Machine Learning, Payer Data Integration, and Enterprise Billing. Of these products, 16 are "under development," which means they are not currently available. The brochure is meant to "identify areas where you could use your Epic software to either replace or avoid purchasing niche applications." Recipients are instructed to "Contact your Epic BFF ["best friend forever"] to evaluate your application mix and your functionality needs to see what could be

replaced with Epic." The brochure also includes a list of capabilities Epic does not intend to develop or offer in the future, "Systems You Keep for Now," including, for example, "Mass postcard generation," "E-faxing," and "Telephony and fax."



Products You Can Replace with **Epic**

You may not know all of the functionality you already own with your Epic license. This guide is intended to help you identify areas where you could use your Epic software to either replace or avoid purchasing niche applications – saving money, simplifying workflows for your users, and eliminating duplicate documentation.

If you have our latest enterprise suite of applications, you most likely own these products. If you purchased Epic some time ago, there may be modules that are new to you. Contact your Epic BFF to evaluate your application mix and your functionality needs to see what could be replaced with Epic or email productsyoucanreplace@epic.com for more information.

**Access & Patient Flow**

- Address verification and propensity to pay
- ADT
- Authorization *(submission and status)*
- Auto check-in using geolocation
- Automatic account creation and assignment
- Business continuity offline entry of ADT events
- Census tracking and reporting
- Digital patient room nameplates
- eCheck-in mobile app *(for new or existing patients)*
- Electronic exchange of referral data
- Electronic notification of admission
- Enterprise scheduling
  - Complex procedure/multi-visit scheduling
  - Dental scheduling
  - Inpatient scheduling
  - Oncology scheduling
  - Online scheduling *(for new or existing patients)*
  - Outpatient scheduling
  - Rehabilitation scheduling
  - Referral scheduling
  - Scheduling for translation services
  - Surgical scheduling
  - Enterprise patient registration
  - Emergency department registration
  - Hospital registration
  - Lab registration
  - Office/clinic registration
- Medicaid coverage discovery
- Patient armband formatting
- Patient flow
  - Bed management
  - Capacity management
  - Capacity planning and forecasting
  - Command center
  - Discharge planning
  - Environmental services *(inc. on mobile)*
  - Mass casualty triage
  - Non-patient transport *(inc. on mobile)*
  - Patient transport *(inc. on mobile)*
  - Real-time occupancy
  - Temporary beds/rooms management
  - Transfer center
- Referral document building for automated provider/payer communication
- Referral management *(provider finder and authorization management)*
- Reporting
  - Actionable data
  - No-show predictive analytics
  - Patient flow throughput
  - Productivity reporting
  - Referral throughput
  - Resource utilization
  - Slot availability
  - Staff productivity
- Retail clinic
- Real-time eligibility *(status and benefits)*
- Real-time registration quality assurance/reporting
- Utilization management
- Waitlists
- Wait time transparency *(clinic and emergency department)*

**Systems You Keep for Now**

- *Address verification vendor*
- *Eligibility clearinghouse*
- *Medical necessity content*
- *RTLS/RFID (integrates with Epic)*

**Digital Patient Experience and Customer Relationship Management (CRM)**

- Call center management
- Communication and scheduling preference management
- Consumer and prospective patient marketing
- Digital front door
  - Live chat*
  - Online check-in *(for patients with or without accounts)*
  - Online scheduling *(for patients with or without accounts)*
  - Pre-appointment outreach
  - Provider finder*
  - Self-service arrivals
  - SMS gateway and two-way SMS platform*
  - Symptom checker/self-triage
- Health risk assessments *(for existing patients only)*
- Omnichannel outreach*
- Patient-directed information exchange
- Patient experience portal and app *Refer to the Patient Experience & Portals section for specific features*
- Patient financial experience *(for patients with or without accounts) See more features in the Patient Experience & Portals and Enterprise Billing sections*
  - Financial assistance
  - Price transparency
  - Self-service payment options
- Patient journeys for chronic conditions and a cute care episodes
- Patient-reported outcomes *(PRO)*
- Population health and care management *Refer to the Population Health section for more features*
  - Digital health management tools *(for existing patients only)*
  - Marketing for prospective patients or members*
- Referrals management
- Research recruitment and management
- Virtual care and remote monitoring *Refer to the Telehealth section for remote monitoring features. Refer to the Provider and Clinical Staff Mobility section for secure chat and more*
  - Asynchronous eVisits
  - Scheduled and on-demand video visits

**Systems You Keep for Now**

- *Content management system*
- *Google Ads management*
- *Home device management*
- *HTML content generator*
- *Mass market advertising management*
- *Mass post card generation*
- *Sales and contract management*
- *Search engine optimization*
- *Student management*

*Under Development

98. This brochure directly shows the motivation behind Epic's attacks on CureIS and numerous other innovators and competitors, and (alongside the specific statements described above) is part of Epic's broader false advertising. Indeed, "Epic has marketed the introduction of new products, and in some cases products that don't exist yet, for the apparent purpose and unmistakable impact of reducing market demand for competitor products."[2] But as explained herein, Epic's representations to customers regarding its current or in-development product features are often completely *false*—as exemplified by its attacks on CureIS itself.

---

[2] Seth Joseph, *Epic's Antitrust Paradox: Who Should Control the Levers of Healthcare Innovation?*, Forbes (Feb. 26, 2024), https://www.forbes.com/sites/sethjoseph/2024/02/26/epics-antitrust-paradox-who-should-control-the-levers-of-healthcare-innovation/.

99. To this point, although Epic has failed to deliver on a replacement product to compete with CureIS, the effect of Epic's conduct has been devastating to CureIS's business, to customers, and to the market more generally. Multiple customers terminated or significantly disrupted activity under their contracts with CureIS following Epic's interference, including [REDACTED] [REDACTED] and [REDACTED]. Other potential customers declined to proceed with engagements after Epic's disparagement and obstruction.

100. Due to Epic's conduct, CureIS's revenues have declined significantly, and its growth trajectory has been stunted. CureIS has also been forced to expend significant time and resources to attempt workarounds or appeal to Epic for data access that should have been readily available when their mutual customers authorized such access (not many years later, in a deteriorated inferior state, or not at all). Meanwhile, the market sees less competition as a dominant player entrenches itself further, and health care providers and patients are left with inferior options for patient care.

**FIRST CLAIM FOR RELIEF**
**TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS**

101. CureIS incorporates the foregoing paragraphs by reference as though fully set forth herein.

Service Agreement Breaches.

102. CureIS and [REDACTED] entered into a "CureIS EnrollmentCURE® Software Subscription License Agreement" on September 14, 2018. The subscription term was an initial three years, starting on January 1, 2019, with automatic renewals.

103. CureIS and [REDACTED] entered into a Subscription Services Agreement on July 1, 2020. and an addendum on July 18, 2023.

104. CureIS and [REDACTED] entered into a "CureIS EnrollmentCURE® Software Subscription License Agreement" on August 29, 2018, and an amendment to that agreement on August 5, 2019.

105. The [REDACTED] [REDACTED] and [REDACTED] Agreements were at all relevant times valid, binding, and enforceable contracts. Under the terms of these Agreements, CureIS's Customers agreed to pay monthly fees to CureIS in exchange for the right to use CureIS's products.

106. At all relevant times, Epic was aware of CureIS's agreements with these customers.

107. [redacted] [redacted] and [redacted] breached or disrupted valid and enforceable contracts with CureIS at Epic's direction.

108. [redacted] ceased paying its monthly fees to CureIS in or around January 4, 2022, after a termination date of December 31, 2021.

109. [redacted] and [redacted] stopped running EnrollmentCURE on its members on March 1, 2024, the date that [redacted] switched over to Epic. [redacted] stopped running EncounterCURE on March 1, 2024 as well. [redacted] is running a diminished version of EncounterCURE as of March 1, 2024, but CureIS has been informed that [redacted] is planning to end its contract for EncounterCURE in the near future.

110. [redacted] significantly reduced the monthly fees it pays to CureIS in February 2025 in connection with its decreased use of EnrollmentCURE as a result of Epic's interference.

111. [redacted] ceased paying its monthly fees to CureIS on March 11, 2022, prior to the termination date of March 31, 2022.

112. Epic intentionally procured [redacted] [redacted] and [redacted]'s breach or disruption without justification, with the purpose of harming CureIS. To this end, Epic engaged in independently wrongful conduct, including, for example, falsely disparaging CureIS, blocking CureIS's access to critical customer data, and making fraudulent statements to CureIS's longstanding customers to undermine their confidence and induce breach. Epic's conduct was improper, conducted with malice, and is without privilege or justification.

113. The breach and disruption of the contracts would not have occurred but for Epic's conduct.

114. Because of Epic's conduct, CureIS has suffered, and continues to suffer, damages in an amount to be determined at trial.

115. Epic had knowledge of the contracts between [redacted] [redacted] and [redacted] [redacted] and CureIS. Epic's intentional acts and independently wrongful acts were designed to induce a breach or disruption of these contractual relationships.

116. Because of Epic's conduct, CureIS has suffered, and continues to suffer, damages in an amount to be determined at trial.

**SECOND CLAIM FOR RELIEF**
**TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS**

117. CureIS incorporates the foregoing paragraphs by reference as though fully set forth herein.

118. Epic knowingly interfered with CureIS's prospective business relationships with at least [REDACTED] [REDACTED], [REDACTED] [REDACTED] and [REDACTED] CureIS had existing contracts or was in advanced negotiations with these entities for EnrollmentCURE, RecoveryCURE, LettersCURE, and/or EncounterCURE, creating a strong probability of future economic benefit, including, for example: (a) [REDACTED]'s December 22, 2022 approval of a LettersCURE project and corresponding 2023–2024 budget allocation; (b) [REDACTED] February 5, 2024 execution of a non-disclosure agreement for RecoveryCURE, followed by an on-site meeting on March 6, 2024 and CureIS's submission of a 40-page implementation proposal on May 22, 2024; and (c) CureIS's contract with [REDACTED] to provide EnrollmentCURE, signed on September 18, 2018, with [REDACTED] actively pursuing EnrollmentCURE integration with Epic through August 2023.

119. Epic was aware of CureIS's existing and prospective economic relationships with these customers, as evidenced by Epic's explicit acknowledgement to [REDACTED]'s Healthcare IT Director that CureIS was a "direct competitor with Tapestry Enrollment and Eligibility functionality," its communications with [REDACTED]'s Executive Director directing her to "not go forward" with the CureIS LettersCURE contract, and Epic's communications with [REDACTED] [REDACTED], instructing [REDACTED] not to work with CureIS because of the "Epic-First policy" in June 2024.

120. Epic's independently wrongful acts were designed to disrupt CureIS's economic relationships: (a) Epic made numerous false and misleading statements to CureIS's customers that integrating with CureIS presented security concerns and that Epic's products could replace CureIS's solutions with equivalent functionality, despite knowing these statements were untrue; and (b) Epic wrongfully denied CureIS access to customer data that customers had expressly authorized CureIS to access in violation of the 21st Century Cures Act's prohibition on information blocking of EHI, which includes enrollment and claims data containing individually identifiable health information.

121. As a direct result of Epic's wrongful conduct, CureIS's relationships with current and future customers were actually disrupted: (a) [redacted] terminated its LettersCURE project on June 27, 2023, directly after Epic interfered, despite having previously approved the project and budget; (b) [redacted] abruptly reversed its decision to implement RecoveryCURE on June 17, 2024, after extensive negotiations and a detailed implementation proposal, again, after Epic interfered; (c) [redacted] terminated CureIS's services in 2023 after Epic denied CureIS access to necessary data; and (d) [redacted] [redacted] stopped using CureIS's EnrollmentCURE and significantly reduced use of EncounterCURE in or around March 1, 2024 after Epic denied CureIS access to necessary data and disparaged CureIS to [redacted] Epic intended or should have known that these disruptions were certain or substantially certain to occur as a result of its wrongful conduct.

122. The loss or significant deterioration of CureIS's business relationships with [redacted] [redacted] and [redacted] would not have occurred but for Epic's interference, as each of these organizations did not move forward with CureIS because and only because Epic explicitly instructed them not to.

123. Epic's wrongful acts proximately caused substantial economic harm to CureIS. Because of Epic's conduct, CureIS has suffered, and continues to suffer, damages in an amount to be determined at trial.

## <u>THIRD CLAIM FOR RELIEF</u><br>TRADE LIBEL

124. CureIS incorporates the foregoing paragraphs by reference as though fully set forth herein.

125. Epic has intentionally made false statements to CureIS customers and prospective customers disparaging the security of CureIS's products, including EnrollmentCURE, EncounterCURE, RecoveryCURE, and LettersCURE.

126. Epic's false statements include communicating to [redacted] in June 2023, [redacted] in June 2024, [redacted] on or around February 2, 2023 and 2024, and [redacted] in February 2023 that CureIS's products posed security risks when interfacing with Epic's systems and citing such concerns to block access to data when Epic knew no such risks existed. Epic knew of CureIS's

economic relationships with these customers, and knew that its false statements would disrupt these economic relationships.

127. Epic's purported security concerns were pretextual. Epic admitted to [REDACTED]'s Healthcare IT Director, [REDACTED], that the reason for denying CureIS access had nothing to do with data security, but rather, because Epic viewed CureIS as "a direct competitor." Epic made these statements with knowledge of their falsity because Epic had no basis to claim CureIS products presented any security risks. In fact, Epic was aware of its own customers seeking CureIS out *because of* CureIS's data security superiority.

128. CureIS has been harmed by Epic's statements that CureIS's products pose security risks. As a direct result of Epic's trade libel, CureIS has suffered specific economic losses, including termination of existing contracts with [REDACTED], [REDACTED], and [REDACTED] and lost revenue from licensing fees for its EnrollmentCURE, EncountersCURE, RecoveryCURE, and LettersCURE products.

129. Epic acted maliciously because it knew or should have recognized that CureIS's existing and prospective customers would act in reliance on its false statements regarding CureIS, and that those statements would cause CureIS financial harm.

130. Epic's knowingly false statements caused both reputational and financial harm to CureIS, and also injured CureIS's existing and prospective customers by depriving them of the substantial benefits and cost savings offered by CureIS's products.

## FOURTH CLAIM FOR RELIEF
## TRADE SECRET MISAPPROPRIATION, DEFEND TRADE SECRETS ACT ("DTSA"), 18 U.S.C. § 1836

131. CureIS incorporates the paragraphs (except for paragraphs 101 through 130) by reference as though fully set forth herein.

132. CureIS owns and has developed confidential, proprietary, and trade-secret information related to its software tools. This proprietary information includes product specifications and business logic underpinning EnrollmentCURE and RecoveryCURE. This proprietary information is the result of significant investment, technical development, and refinement over almost two decades and was designed to address critical challenges in the healthcare

data and systems that Epic's products do not adequately solve. CureIS's products implementing this proprietary information are used in, or intended for use in, interstate commerce. CureIS provides these products to dozens of customers in multiple states throughout the United States.

133. The RecoveryCURE Product Specifications and EnrollmentCURE Product Specifications constitute trade secrets. These trade secrets include proprietary analytics for real-time enrollment validation and automated compliance checks, developed over 18 years. CureIS has taken reasonable measures to maintain the secrecy of this information, such as restricting access, marking confidential documents, executing non-disclosure agreements (NDAs), and limiting disclosures to customers and collaborators under strict confidentiality obligations.

134. CureIS's trade secrets derive independent economic value from not being generally known to, and not being readily ascertainable by, others who could obtain economic value from their disclosure or use, including Epic and its product teams. The RecoveryCURE Product Specifications and EnrollmentCURE Product Specifications were the result of over 15 years of research and development.

135. Epic knowingly acquired and used CureIS's trade secret information by improper means. Epic, through a scheme of false pretenses, misrepresented the nature of its interest in CureIS's products.

136. Under the guise of "integration discussions," Epic induced CureIS customers—including [REDACTED] and [REDACTED]—to solicit and disclose CureIS's proprietary technical information. These requests were made either directly by Epic personnel or through Epic's coordination even though Epic never had any intention of integrating with CureIS. Soon after using a CureIS customer to gain access to CureIS's trade secrets, Epic imposed its Epic-First policy on that customer and cut off further integration discussions.

137. Epic's conduct constitutes misappropriation under 18 U.S.C. § 1839(5) because Epic acquired and/or used CureIS's trade secrets by improper means, including through misrepresenting to CureIS's customers such information was requested for the legitimate purpose of integration, when Epic did not intend to integrate with CureIS, and then inducing unauthorized disclosures by CureIS's customers.

138. Epic's misappropriation was willful and malicious. It was designed to unfairly replicate CureIS's innovations, displace CureIS's products in the market, and maintain Epic's dominance not through competition on the merits, but through deception and misuse of CureIS's confidential and proprietary information. Epic was or should have been aware at the time that it acquired CureIS's documents and confidential materials that those documents and confidential materials contained CureIS's trade secrets and confidential information. Epic also knew and intended that this offense would cause injury to CureIS as the owner of those trade secrets.

139. As a direct and proximate result of Epic's conduct, CureIS has suffered and continues to suffer irreparable harm, including lost business opportunities, damage to its competitive standing, and erosion of the value of its trade secrets. CureIS is entitled to injunctive relief, damages, unjust enrichment, exemplary damages, and attorneys' fees under 18 U.S.C. §§ 1836(b)(3)(A)–(D). CureIS is entitled to a reasonable royalty if neither actual damages nor unjust enrichment are provable. CureIS is also entitled to punitive damages because Epic's misappropriation was willful and malicious. Cal. Civ. Code § 3426.3(c); *see Mattel, Inc. v. MGA Entm't, Inc.*, 801 F. Supp. 2d 950, 953 (C.D. Cal. 2011).

## FIFTH CLAIM FOR RELIEF
## FALSE ADVERTISING IN VIOLATION OF THE LANHAM ACT, 15 U.S.C. § 1125(A)

140. CureIS incorporates the foregoing paragraphs (except paragraphs 85 through 95, and paragraphs 131 through 139) by reference as though fully set forth herein.

141. As alleged above, Epic has purposefully made false and misleading statements of facts through commercial statements concerning CureIS's reputation and CureIS's products, as well as about Epic's products and product line up.

142. Epic's deception is material, in that it is likely to—and in many cases, did in fact—influence the purchasing decisions of the public for whom it was intended.

143. Epic introduced its false and misleading statements into interstate commerce via press releases, brochures, other online communications, and communications with CureIS's potential and actual customers.

144. CureIS has been injured as a result of Epic's false statements.

145. CureIS has suffered commercial injury based upon Epic's misrepresentations.

146. CureIS's injury is competitive, *i.e.*, harmful to CureIS's ability to compete.

147. Epic's conduct as alleged is willful and exceptional, such that CureIS is entitled to an award of treble damages and its attorneys' fees.

**SIXTH CLAIM FOR RELIEF**
**UNLAWFUL AND UNFAIR COMPETITION (CAL. BUS. PROF. CODE § 17200, *et seq.*)**

148. CureIS incorporates the foregoing paragraphs (except paragraphs 85 through 95, and paragraphs 131 through 139) by reference as though fully set forth herein.

149. Epic's conduct violates California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*, which prohibits unlawful, unfair or fraudulent business acts or practices.

150. CureIS has standing to bring this claim because it has suffered economic harm and has lost customers and subscription fee revenue, among other harms, as a result of Epic's unfair competition.

151. Epic's conduct is unlawful under California's False Advertising Law (Cal. Bus. & Prof. Code § 17500), the Cures Act, 42 U.S.C. § 300jj–52(a)(1) (prohibiting health IT developers from engaging in information blocking), 45 C.F.R. § 171.103(a)(1) (defining practices that constitute information blocking by health IT developers), and the Federal Lanham Act as false and misleading commercial speech, in addition to constituting unlawful trade libel.

152. For all these reasons, Epic's conduct is also unfair under the UCL. Epic's conduct is additionally unfair because Epic's tortious interference, false advertising, and disparagement were designed to harm CureIS's ability to compete, thereby restraining competition.

153. Epic's conduct is also fraudulent under the UCL. Epic falsely represented to CureIS's customers that Epic either offered or could develop replacement solutions to CureIS's to induce them to terminate their relationships with CureIS. If that did not work, Epic proceeded to block CureIS's integration by blocking CureIS's access to mutual customers' data. Many of these customers had been CureIS's customers for close to two decades.

154. As a direct result of Epic's unlawful, unfair, and fraudulent conduct, CureIS has suffered significant harm, including lost revenue in the form of lost licensing fees, reputational harm, and the demise of valuable long-term customer relationships, which, before Epic's interference, were projected to expand.

155. Absent injunctive relief, CureIS will suffer loss of money or property, and thus has standing to seek relief under section 17200.

**SEVENTH CLAIM FOR RELIEF**
**UNFAIR COMPETITION/FALSE ADVERTISING (CAL. BUS. & PROF. CODE § 17500)**

156. CureIS incorporates the foregoing paragraphs (except paragraphs 85 through 95, and paragraphs 131 through 139) by reference as though fully set forth herein.

157. Epic regularly advertises products it does not actually make, including, by example, by widely disseminating the "Products You Can Replace with ***Epic***" brochure, which falsely represents that Epic offers products or product features it does not offer. Epic also similarly falsely represented to CureIS's actual and potential customers that Epic's products or product features are capable of fully replacing CureIS's products to induce CureIS's customers to sever their contractual and other business relationships with CureIS.

158. Epic knew, or by exercise of reasonable care should have known, that its representations regarding its product features or when it was likely to develop a new product feature were false.

159. Epic's false advertising of the products or product features customers can replace with Epic are likely to deceive members of the public, as a reasonable prospective customer would consider Epic's representations regarding its product features to be accurate.

160. CureIS customers and the healthcare market more broadly were deceived by Epic's false advertisement of its product features or products under development and as a result, terminated their relationships with CureIS and stopped paying licensing subscription fees for CureIS's EnrollmentCURE, LettersCURE, EncounterCURE, and RecoveryCURE.

161. As a result of the Epic's false advertising about its products and/or product features, CureIS's customers and Epic's customers have been deceived into accepting inferior or non-existent Epic products.

162. To prevent future harm to the public, Epic should be enjoined from advertising that it offers products or product features it does not currently offer

163. CureIS is entitled to attorneys' fees incurred to prosecute this action under Code of Civil Procedure section 1021.5 because stopping Epic's false advertising will significantly benefit the public, prosecuting the action will require significant expense on the part of CureIS, and, in the interest of justice, any award of attorneys' fees should not be paid out of CureIS recovery.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff CureIS prays for judgment against Epic as follows:

A. Adjudication that the acts alleged herein violate state laws alleged herein;

B. Adjudication that the acts alleged herein constitute trade secret misappropriation in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836(b).

C. Adjudication that the acts alleged herein constitute false advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a).

D. Actual and treble damages, statutory damages, disgorgement, restitution, punitive or exemplary damages, royalties, and such other relief as provided by the federal statutes, state statutes, and state common law cited herein;

E. Pre-judgment and post-judgment interest on such monetary relief;

F. Equitable relief in the form of enjoining Epic from engaging in the false advertising, unfair competition, trade secret misappropriation, and other tortious conduct alleged herein;

G. Equitable relief as may be required to restore competition and to prevent the recurrence of future statutory and tort violations alleged herein;

H. The costs of bringing this suit, including reasonable attorneys' fees; and

I. All other relief as the Court deems just and proper.

DATED: May 12, 2025

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By ______________________________

Adam B. Wolfson
Attorneys for Plaintiff