**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN**

CureIS Healthcare, Inc.,

                                    Plaintiff,

                vs.

Epic Systems Corporation,

                                    Defendant.

Civil Action No. 3:25-cv-00991-JDP

**REDACTED**

**DEFENDANT EPIC SYSTEMS CORPORATION'S MEMORANDUM OF LAW IN
SUPPORT OF ITS MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................i

CITATION CONVENTIONS ............................................................................................ vii

PRELIMINARY STATEMENT .......................................................................................... 1

BACKGROUND ................................................................................................................. 4

    A.    Epic "Sought To Improve Healthcare Through Technological Innovation". ..... 4

    B.    CureIS Licenses "Middleware" Between EHR and CAPS Software. ............... 6

    C.    CureIS Faces Competition from Epic and a "Growing Number" of Others....... 6

    D.    CureIS Files the Present Lawsuit. ................................................................... 7

LEGAL STANDARD.......................................................................................................... 10

ARGUMENT ....................................................................................................................... 11

I.    CUREIS'S ANTITRUST CLAIMS (COUNTS 1-3) SHOULD BE DISMISSED. ..... 11

    A.    CureIS Fails To Plead a Plausible Antitrust Product Market. ......................... 11

    B.    CureIS Fails To Plausibly Allege Antitrust Injury. ......................................... 19

    C.    CureIS Fails To Plausibly Allege an Unlawful Exclusive Dealing Agreement.21

    D.    CureIS Fails To Plausibly Allege Its Monopolization Claims.......................... 26

II.    CUREIS'S REMAINING CLAIMS (COUNTS 4-9) SHOULD BE DISMISSED. .... 31

    A.    CureIS Fails To State a Claim for Tortious Interference with Contract. .......... 31

    B.    The Tortious Interference with Prospective Business Relations Claim Fails... 33

    C.    CureIS Fails To State a Claim for Trade Libel. ............................................... 37

    D.    CureIS Fails To State a Claim for False Advertising. ..................................... 41

    E.    CureIS Fails To State a Claim Under California's UCL. ................................. 44

CONCLUSION.................................................................................................................... 46

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*7EDU Impact Acad. Inc. v. You*,
    760 F. Supp. 3d 981 (N.D. Cal. 2024) ................................................................34

*Always Towing & Recovery, Inc. v. City of Milwaukee*,
    2 F.4th 695 (7th Cir. 2021) ............................................................................4

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).................................................................................10, 23

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007).............................................................................10, 16, 37

*Briggs & Stratton Corp. v. Kohler Co.*,
    405 F. Supp. 2d 986 (W.D. Wis. 2005) ..............................................................30

*Brown Shoe Co. v. United States*,
    370 U.S. 294 (1962).....................................................................................12

*Brown v. Hanson*,
    2017 WL 2635290 (W.D. Wis. June 19, 2017) ....................................................32

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977)......................................................................................1

*Cannon v. Wells Fargo Bank N.A.*,
    917 F. Supp. 2d 1025 (N.D. Cal. 2013) ........................................................44, 45

*CardioNet, Inc. v. LifeWatch Corp.*,
    2008 WL 567031 (N.D. Ill. Feb. 27, 2008) .........................................................42

*Catilina Nominees Proprietary Ltd. v. Stericycle, Inc.*,
    2021 WL 1165087 (N.D. Ill. Mar. 26, 2021)........................................................43

*Celebrity Chefs Tour, LLC v. Macy's, Inc.*,
    2014 WL 1660674 (S.D. Cal. Apr. 25, 2014)........................................................35

*Chicago Studio Rental, Inc. v. Illinois Dep't of Commerce*,
    940 F.3d 971 (7th Cir. 2019) .......................................................................20, 21

*Conrad v. Russell*,
    2011 WL 3877000 (W.D. Wis. Sept. 1, 2011) .....................................................43

*DeSoto Cab Co. v. Uber Techs., Inc.*,
    2018 WL 10247483 (N.D. Cal. Sept. 24, 2018) ....................................................36

i

*Ducere LLC v. Enbridge (U.S.) Inc.*,
　2025 WL 81373 (N.D. Ill. Jan. 13, 2025) ..................................................26, 27, 28

*Eastman v. Quest Diagnostics Inc.*,
　2016 WL 1640465 (N.D. Cal. Apr. 26, 2016) ........................................................25

*EcoHub, LLC v. Recology Inc.*,
　2023 WL 6725632 (N.D. Cal. Oct. 11, 2023) .........................................................34

*Ehret v. Uber Techs., Inc.*,
　68 F. Supp. 3d 1121 (N.D. Cal. 2014) .....................................................................44

*Eidmann v. Walgreen Co.*,
　522 F. Supp. 3d 634 (N.D. Cal. 2021) .....................................................................45

*Eli Lilly & Co. v. Arla Foods, Inc.*,
　893 F.3d 375 (7th Cir. 2018) ...................................................................................41

*First Advantage Background Servs. Corp. v. Private Eyes, Inc.*,
　569 F. Supp. 2d 929 (N.D. Cal. 2008) .....................................................................39

*Franklin v. Dynamic Details, Inc.*,
　116 Cal. App. 4th 375 (Cal. Ct. App. 2004) ...........................................................40

*GeoData Sys. Mgmt., Inc. v. Am. Pac. Plastic Fabricators, Inc.*,
　2015 WL 12731920 (C.D. Cal. Sept. 21, 2015) ......................................................40

*Google Inc. v. Am. Blind & Wallpaper Factory, Inc.*,
　2005 WL 832398 (N.D. Cal. Mar. 30, 2005).........................................................34

*Gopher Media LLC v. Modern Doc Media*,
　2023 WL 350531 (S.D. Cal. Jan. 20, 2023).............................................................38

*GreenCycle Paint, Inc. v. PaintCare, Inc.*,
　250 F. Supp. 3d 438 (N.D. Cal. 2017) .....................................................................46

*HGCI, Inc. v. Luxx Lighting, Inc.*,
　2020 WL 5913851 (C.D. Cal. Sept. 10, 2020) ........................................................40

*Hicks v. PGA Tour, Inc.*,
　897 F.3d 1109 (9th Cir. 2018) ...............................................................11, 16, 17, 19

*House of Brides, Inc. v. Alfred Angelo, Inc.*,
　2014 WL 64657 (N.D. Ill. Jan. 8, 2014) .................................................................17

*Hytera Comms. Corp. v. Motorola Sols., Inc.*,
　623 F. Supp. 3d 857 (N.D. Ill. 2022) ......................................................................44

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
　360 F. Supp. 3d 788 (N.D. Ill. 2019) ......................................................................23

ii

*In re German Auto. Mfrs. Antitrust Litig.*,
  497 F. Supp. 3d 745 (N.D. Cal. Oct. 23, 2020) ........................................................16

*In re Harley-Davidson Aftermarket Parts Mktg., Sales Practices & Antitrust*
  *Litig.*, 151 F.4th 922 (7th Cir. 2025) .............................................12, 14, 15, 17

*In re Tecfidera Antitrust Litig.*,
  791 F. Supp. 3d 852 (N.D. Ill. 2025) ..........................................................22, 25, 30

*Infectolab Ams. LLC v. ArminLabs GmbH*,
  2021 WL 292182 (N.D. Cal. Jan. 28, 2021) ............................................33, 34, 35

*Int'l Equip. Trading, Ltd. v. Illumina, Inc.*,
  312 F. Supp. 3d 725 (N.D. Ill. 2018) ..........................................................27, 28

*Internal Med. Nephrology, Inc. v. Bio-Medical Applications of Indiana, Inc.*,
  2019 WL 4688712 (S.D. Ind. Sept. 26, 2019) ................................................19, 20

*Kilopass Tech. Inc. v. Sidense Corp.*,
  2010 WL 5141843 (N.D. Cal. Dec. 13, 2010) ........................................................39

*Kunes Country Auto. Mgmt. Inc. v. Walters*,
  2024 WL 2114006 (E.D. Wis. May 10, 2024) ............................................41, 42, 43

*Lazarou v. Am. Bd. of Psychiatry & Neurology*,
  158 F.4th 854 (7th Cir. 2025) ...............................................................................4

*Lloyd v. Mullenex*,
  2019 WL 5788618 (N.D. Cal. Nov. 6, 2019) ........................................................33

*Marion Healthcare v. S. Ill. Healthcare*,
  2013 WL 4510168 (S.D. Ill. Aug. 26, 2013) ...................................................13, 19

*Maritz Inc. v. Carlson Mkt. Grp., Inc.*,
  2009 WL 3561521 (N.D. Cal. Oct. 30, 2009) ........................................................32

*Maui Jim, Inc. v. SmartBuy Guru Enters.*,
  386 F. Supp. 3d 926 (N.D. Ill. 2019) ..........................................................11, 16

*Mercatus Grp., LLC v. Lake Forest Hosp.*,
  641 F.3d 834 (7th Cir. 2011) ...............................................................................30

*Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*,
  795 F.3d 1124 (9th Cir. 2015) .............................................................................31

*Olson v. World Fin. Grp. Ins. Agency, LLC*,
  2024 WL 4668515 (N.D. Cal. Nov. 4, 2024) ........................................................46

*Peak Health Ctr. v. Dorfman*,
  2019 WL 5893188 (N.D. Cal. Nov. 12, 2019) ......................................................38

*Phillips N. Am. LLC v. Glob. Med. Imaging, LLC,*
    2024 WL 4240920 (N.D. Ill. Sept. 19, 2024) ..........................................................31

*PNY Techs., Inc. v. SanDisk Corp.,*
    2014 WL 1677521 (N.D. Cal. Apr. 25, 2014) ..................................................22, 23

*PNY Techs., Inc. v. SanDisk Corp.,*
    2014 WL 2987322 (N.D. Cal. July 2, 2014)..........................................................24

*Resolute Forest Prods., Inc. v. Greenpeace Int'l,*
    2019 WL 281370 (N.D. Cal. Jan. 22, 2019).........................................................38

*Reveal Chat Holdco, LLC v. Facebook, Inc.,*
    471 F. Supp. 3d 981 (N.D. Cal. 2020) ..................................................................21

*Rheumatology Diagnostics Lab'y, Inc. v. Aetna, Inc.,*
    2014 WL 524076 (N.D. Cal. Feb. 6, 2014) ..........................................................25

*Riley v. Info. Sys. Audit & Control Ass'n,*
    2023 WL 3997075 (N.D. Ill. June 14, 2023) ........................................................11

*RingCentral, Inc. v. Nextiva, Inc.,*
    2020 WL 4039322 (N.D. Cal. July 17, 2020)..................................................40, 41

*RingCentral, Inc. v. Nextiva, Inc.,*
    2020 WL 978667 (N.D. Cal. Feb. 28, 2020) ........................................................46

*Rovanco Piping Sys., Inc. v. Perma-Pipe Int'l Holdings, Inc.,*
    2022 WL 683690 (N.D. Ill. Mar. 8, 2022)............................................................43

*Rump v. Philips Lifeline,*
    2010 WL 4502485 (N.D. Cal. Nov. 2, 2010) .......................................................36

*Sanderson v. Culligan Int'l Co.,*
    415 F.3d 620 (7th Cir. 2005) ...............................................................................30

*Sante Fe Props., LP v. Source Bioscience, Inc.,*
    2021 WL 6104156 (C.D. Cal. Feb. 10, 2021).......................................................34

*Segerdahl Corp. v. Am. Litho, Inc.,*
    2019 WL 157924 (N.D. Ill. Jan. 10, 2019) ..........................................................43

*Smith v. Intel Corp.,*
    2025 WL 2381617 (N.D. Cal. Aug. 15, 2025) ................................................45, 46

*Somers v. Apple, Inc.,*
    729 F.3d 953 (9th Cir. 2013) ...............................................................................10

*Spotlight Ticket Mgmt., Inc. v. Concierge Live LLC,*
    2024 WL 4866813 (C.D. Cal. Aug. 30, 2024).................................................35, 36

*Swipe & Bite, Inc. v. Chow*,
　147 F. Supp. 3d 924 (N.D. Cal. 2015) ...............................................................32, 35

*Team Schierl Co. v. Aspirus, Inc.*,
　2023 WL 6847433 (W.D. Wis. Oct. 17, 2023)....................................................22

*Trevari Media, LLC v. Colasse*,
　758 F. Supp. 3d 1175 (C.D. Cal. 2024) ..............................................................39

*Trindade v. Reach Media Grp., LLC*,
　2013 WL 3977034 (N.D. Cal. July 31, 2013).................................................32, 33

*U.S. Bd. of Oral Implantology v. Am. Bd. of Dental Specialties*,
　390 F. Supp. 3d 892 (N.D. Ill. 2019) ..................................................................28

*UMG Recordings, Inc. v. Glob. Eagle Enter., Inc.*,
　117 F. Supp. 3d 1092 (C.D. Cal. 2015) ..............................................................37

*United Wis. Grain Prods. LLC v. Archer Daniels Midland Co.*,
　144 F.4th 976 (7th Cir. 2025) .......................................................................26, 29

*Univ. Grading Serv. v. eBay, Inc.*,
　2011 WL 846060 (N.D. Cal. Mar. 8, 2011).........................................................40

*Van Dusen v. Barrack*,
　376 U.S. 612 (1964)...........................................................................................31

*VBR Tours, LLC v. Nat. R.R. Passenger Corp.*,
　2015 WL 225328 (N.D. Ill. Jan. 15, 2015)..........................................................19

*VBR Tours, LLC v. Nat. R.R. Passenger Corp.*,
　2015 WL 5693735 (N.D. Ill. Sept. 28, 2015) ......................................................23

*Virun, Inc. v. Cymbiotika, Inc.*,
　2022 WL 17371057 (C.D. Cal. Aug. 18, 2022)....................................................40

*Vox Network Sols., Inc. v. Gage Techs., Inc.*,
　2024 WL 1260573 (N.D. Cal. Mar. 25, 2024)......................................................37

*Walker v. Ronin Staffing LLC*,
　2025 WL 2994548 (C.D. Cal. Oct. 10, 2025).......................................................44

*Warner v. Tinder Inc.*,
　105 F. Supp. 3d 1083 (C.D. Cal. July 31, 2015)..................................................44

*Weber-Stephen Prods. LLC v. Sears Holding Corp.*,
　2014 WL 656753 (N.D. Ill. Feb. 20, 2014) .........................................................28

*Williams v. Visa, Inc.*,
　2025 WL 1518044 (N.D. Cal. May 28, 2025)..................................................44, 45

*Wilson v. Frito-Lay N.A., Inc.*,
  961 F. Supp. 2d 1134 (N.D. Cal. 2013) ................................................................42

**Statutes & Rules**

28 U.S.C. § 1404(a) .........................................................................................................31

42 U.S.C. § 300jj-52(a) ...................................................................................................36

21st Century Cures Act, Pub. L. No. 114-255 (2016) ...........................................36, 45

45 C.F.R. § 171.102 .........................................................................................................37

Fed. R. Civ. P. 12(b)(6)....................................................................................................10

Fed. R. Civ. P. 9(b) ............................................................................................4, 41, 42, 43

Lanham Act........................................................................................................... passim

Section 1 of the Sherman Act ........................................................................... passim

Section 2 of the Sherman Act ........................................................................... passim

## <u>CITATION CONVENTIONS</u>

**Entities**

"Plaintiff" or "CureIS":  CureIS Healthcare, Inc.

"Defendant" or "Epic":  Epic Systems Corporation

"Advocate":  Advocate Physician Partners

███████████████████████████████

"Sharp":  Sharp HealthCare and Sharp Health Plan

"Sutter":  Sutter Health

**Terms**

"CAPS":  Core administrative processing system

"Cures Act":  21st Century Cures Act

"EHI":  Electronic health information

"EHR":  Electronic health record

"FAL":  California's False Advertising Law, Cal. Bus. & Prof. Code § 17500

"MCM":  Managed care middleware

"MCO":  Managed care organization

"RCM":  Revenue cycle management

"PSHP":  Provider sponsored health plan

"UCL":  California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200

**Pleadings**

"Amended Complaint" and ¶:  First Amended Complaint, dated July 14, 2025

"Complaint" or "Compl.":  Complaint, dated May 12, 2025

<u>**PRELIMINARY STATEMENT**</u>

In the face of growing competition and innovation, new market entry, and lower prices, CureIS has lost customers and is struggling to compete. Rather than compete on the merits, CureIS invents a narrative that Epic—a leading developer of healthcare software and provider of related services—has suppressed competition in manufactured markets and tortiously interfered with CureIS's business. But CureIS's legal theories are based on the misguided notions that Epic is obligated as a matter of law to keep CureIS in business and that Epic is somehow prohibited from communicating with its own customers about what features it already offers, or what future innovations it will soon offer, as part of their existing Epic license. Not so. The antitrust laws were "enacted for the protection of competition, not competitors". *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977).

Epic was founded nearly fifty years ago with the guiding goal of developing software with the patient at the heart. It has spent the last five decades developing electronic health record, or EHR, software, which allows healthcare providers (such as large hospitals) and others to create, store, and exchange patient health records electronically. Epic's EHR software also facilitates patients' access to their health data and helps patients get well, stay well, and be healthier. As health plans (such as insurance companies) have increasingly become more important in managing patient care, Epic has expanded its software product offerings to meet their unique needs, and continues to constantly improve and iterate upon those products in line with its goal to help its customers be successful so they can improve patient outcomes. As relevant here, Epic's Tapestry software suite enables health plan customers to manage core payment-related administrative and operations tasks within a single system. By its own description, CureIS and a growing number of competitors offer add-on "middleware" that

supplements core solutions like Tapestry by purporting to perform certain discrete tasks.  At the same time, Epic has consistently innovated in response to customer requests to improve and develop new functionality and features that support reducing healthcare costs, lessen the complexity inherent in maintaining multiple software products, and help support better outcomes.  As a result, customers are increasingly able to use their existing core systems like Tapestry to handle a broader range of claims-processing tasks.  This is exactly how competition is supposed to work—innovation, better quality products, and lower costs to customers.

CureIS's antitrust claims should be dismissed for multiple reasons.

*First*, both of the purported relevant markets that CureIS alleges in support of its antitrust claims are gerrymandered markets artificially tailored to suit CureIS's litigation needs.  As pleaded, CureIS's purported PSHP CAPS market is not a cognizable submarket.  The products in CureIS's purported MCM market are alleged to perform the same functions as the products in the alleged CAPS software market, meaning CureIS has failed to establish that these alleged markets are distinct as opposed to interchangeable.  The fact that these alleged markets are facially implausible and internally inconsistent is not surprising given the procedural history here.  Notably, when CureIS first brought this case, it did not assert a single antitrust claim.  (Compl. ¶¶ 101-63.)  It alleged that Epic and CureIS both competed in selling "revenue cycle management software", which it described as software "that enables industry participants to manage their billing operations".  (*Id.* ¶ 3.)  In its Amended Complaint, however, to manufacture antitrust claims, CureIS alleged different purported product markets that were wholly inconsistent with its original pleading, completely changing the description of the products that Epic and CureIS sell.  (*Compare* Compl. ¶ 3 (describing Epic and CureIS as sellers of types of RCM software) *with* Amended Complaint ¶¶ 36-37, 43 (describing CureIS as participant in

"distinct" managed care middleware market) *and* ¶ 32 (describing Epic as participant in core administrative processing systems market).)  The failure to plead a relevant market is fatal to CureIS's late-breaking antitrust claims.  (Section I.A.)

*Second*, CureIS fails to allege that it suffered a cognizable antitrust injury, which is required for CureIS to have standing to pursue an antitrust claim.  Indeed, under CureIS's own market definitions in the Amended Complaint, CureIS and Epic do not compete together in any market, which is a necessary condition for antitrust injury.  Moreover, CureIS alleges harm only to *itself* as opposed to competition as a whole in a relevant product market.  (Section I.B.)

*Third*, CureIS fails to adequately plead an exclusive dealing agreement in violation of Section 1 of the Sherman Act.  Nor do its allegations identify the share of competition foreclosed by any such purported agreement, as is needed under the rule of reason standard.  (Section I.C.)

*Fourth*, CureIS fails to adequately plead the requisite elements of its monopoly maintenance or attempted monopolization claims.  CureIS relies on a facially inadequate calculation using numbers that do not even describe the alleged relevant market.  And CureIS fails to adequately plead both that Epic's alleged conduct was anticompetitive and that Epic's intent was to raise prices or exclude competition.  (Section I.D.)

CureIS's six remaining kitchen-sink statutory and tort claims likewise should be dismissed.  CureIS's tortious interference with contract claim is partially time barred and fails to state a claim because CureIS does not plausibly allege either Epic's knowledge of the relevant contracts or its intention to interfere with them.  (Section II.A.)  CureIS also fails to plead that Epic tortiously interfered with CureIS's prospective customers because CureIS does not plausibly allege that it would have consummated any relationship but for Epic's conduct, that Epic had knowledge of the alleged prospective relationships, or that Epic engaged in any

independently wrongful act.  (Section II.B.)  CureIS's trade libel claim is also partially time

barred, and CureIS fails to plead the non-time-barred statements with particularity or that they

constitute actionable written false statements of fact or played a material and substantial part in

customers not dealing with CureIS.  (Section II.C.)  CureIS's false advertising claims fail

because CureIS does not plead the at-issue statements with the particularity required by

Rule 9(b) or that they were published within a commercial advertisement.  (Section II.D.)

Finally, CureIS's California UCL claim fails because CureIS fails to plead that the UCL applies

extraterritorially or that a violation of any of the UCL's three prongs occurred.  (Section II.E.)

CureIS throws at Epic multiple antitrust claims based on multiple markets and theories of

conduct and multiple tort claims across multiple customers, effectively requiring Epic to respond

to more than 20 claims.  None of these fatally flawed claims sticks, and each should be dismissed

with prejudice.  CureIS has already had the opportunity to amend its complaint once, and further

amendment would be futile.  *See Lazarou v. Am. Bd. of Psychiatry & Neurology*, 158 F.4th 854,

865 (7th Cir. 2025) (finding dismissal with prejudice appropriate where plaintiff fails to establish

how amendment would cure complaint deficiencies); *Always Towing & Recovery, Inc. v. City of

Milwaukee*, 2 F.4th 695, 707 (7th Cir. 2021) (finding dismissal with prejudice appropriate where

district court previously granted leave to amend original complaint).

## BACKGROUND[1]

### A.    Epic "Sought To Improve Healthcare Through Technological Innovation".

Against the backdrop of a United States healthcare industry long "plagued by

inefficiencies and added costs stemming from antiquated systems that did not interoperate with

---

[1] While Epic strongly disputes many of the facts in the Amended Complaint, for the purpose of this motion, Epic assumes them to be true, as it must.  Unless otherwise noted, all emphasis is added, and citations and internal quotations are omitted.

each other and did not reflect the latest in technological progress" (¶ 1), Epic has "sought to improve healthcare through technological innovation" (¶ 2). Whereas once healthcare providers all used paper records of patients' medical history, "[t]he vast majority of healthcare providers today have switched to" electronic health records. (¶¶ 2, 21.) Epic is a developer of EHR software, which provides an electronic version of a patient's medical history and which healthcare providers license to record patient information. (¶¶ 21-22.) Epic also develops and licenses healthcare software for payers that automates claims processing from intake through adjudication, payment, and reporting via its Tapestry product. (¶ 3.) Whereas the initial Complaint alleged that Tapestry was an instance of "managed care revenue cycle management software" (¶¶ 22, 25), the Amended Complaint refers to Tapestry as a form of CAPS software. (*E.g.*, ¶¶ 3, 32.)

CAPS software is used by a variety of customers, including traditional health plans and managed care organizations, or MCOs, in addition to provider-sponsored health plans, known as PSHPs. (¶¶ 32-33, 35.) Epic's Tapestry product competes with multiple other products, including those offered by Cognizant, HealthEdge, Plexis, and Athena. (¶ 35 & n.10.) CureIS does not allege that CAPS software competitors market or license different CAPS software products based on the type of customer. Nonetheless, the Amended Complaint alleges that the licensing of CAPS products to PSHPs constitutes a distinct submarket of a broader market of all CAPS software products.[2] (¶ 33.) CureIS alleges that Tapestry possesses a share of this purported PSHP CAPS software market "as high as 76%", but the calculation inexplicably

---

[2] The industry report CureIS cites to support the existence of the broader CAPS software market does not actually address a CAPS software market; instead, it describes a distinct purported RCM software market. (¶¶ 33 & n.7, 35 & n.9.)

includes non-PSHPs in the numerator and excludes some PSHPs from the denominator.  (¶ 35 n.10.)

## B.    CureIS Licenses "Middleware" Between EHR and CAPS Software.

In contrast to Epic's robust product offerings, CureIS licenses niche software that handles discrete functions for particular payer types, including MCOs and PSHPs.  (¶¶ 19, 36, 48.) According to CureIS, its software "functions as middleware", occupies "the space between EHR and CAPS software", and "translates billing and encounters data from a provider's EHR software into a format that can be properly validated and analyzed within a payer's CAPS software". (¶¶ 3-4.)  CureIS's software does not operate unless the payer has also purchased a separate CAPS software, such as Epic's Tapestry product.  (¶ 43.)  The four CureIS products identified in the Amended Complaint allegedly: (i) verify enrollment information; (ii) audit payers' reports on patient care; (iii) facilitate reimbursement to payers; and (iv) generate correspondence.  (¶ 48.) These products allegedly perform some of the same functions as CAPS software (including, for example, "enrollment functions" and providing a "template for letter generation").  (*Id.*)

## C.    CureIS Faces Competition from Epic and a "Growing Number" of Others.

CureIS alleges that several former and potential customers have decided to forgo purchasing CureIS's add-on software.  (¶¶ 54-57, 61, 73, 76, 80, 84.)  Certain of those customers have represented to CureIS that they have not purchased CureIS's software because their Epic Tapestry license renders it unnecessary.  (¶¶ 55, 57, 59, 61.)  CureIS also claims that "a growing number of healthcare IT companies are developing products in the MCM space", including DataWing, Edifecs, and Gaine.  (¶ 45.)  Although certain CureIS customers have allegedly replaced their CureIS software with Epic's Tapestry software, CureIS claims that it occupies a

purported product market for MCM software that Epic does not compete in and is distinct from the purported CAPS software market in which Epic allegedly does compete.  (¶¶ 36, 45.)

### D.    CureIS Files the Present Lawsuit.

Despite the continued growth of the purported MCM software market in which CureIS allegedly competes (¶ 45), CureIS itself has faced stalled growth, the loss or deterioration of its relationships with certain customers, and a failed sale in 2024 (¶¶ 106-07).  In the face of such competition at work, CureIS filed an initial Complaint against Epic on May 12, 2025 that did not allege a single antitrust claim.  It was not until CureIS filed its Amended Complaint on July 14, 2025 that CureIS claimed antitrust violations and entirely different supposed markets.

CureIS asserts that for the "vast majority" of its corporate existence, it had "no issues with Epic", but that it recently became clear that what it "once thought were one-off instances of friction with Epic" "were in fact part of a widespread scheme by Epic to improperly interfere with CureIS's business".  (¶ 6.)  CureIS claims that Epic has interfered with CureIS's business in essentially three ways:  (i) disseminating purportedly false or misleading information about CureIS's and Epic's products; (ii) imposing a purported "Epic-first Policy"—an alleged exclusive dealing arrangement to coerce Epic's customers not to work with CureIS; and (iii) purportedly preventing CureIS from integrating its software with Epic's.  (¶ 51.)  Each of these elements of Epic's so-called "scheme" lacks specific factual allegations.

**Epic's Alleged Statements.**  The Amended Complaint alleges that Epic has been "growing extremely fast" in the CAPS software space (¶ 9), and as part of that growth, Epic communicates with its existing customers—both through direct communications and marketing materials—about Epic functionalities currently offered and what additional functionalities are in development that will be included in customers' existing licenses.  (¶¶ 54-55, 59, 61, 98.)

Epic allegedly communicated to its customers Sharp and Sutter that Epic software could be used or developed to replace CureIS products, thereby saving those customers both the cost of purchasing add-on software and the inconvenience of integrating multiple products from vendors. (¶¶ 54-55, 59, 61.) Although CureIS conclusorily alleges that Epic's statements were "false", (¶¶ 57, 59), CureIS's other allegations undermine the alleged falsity. For example, CureIS alleges that Sutter "prefers" CureIS's product, not that Epic's Tapestry software cannot provide replacement functionalities. (¶ 61.) And CureIS merely alleges that Epic represented to Sharp that "it could develop a replacement product". (¶ 57.) CureIS likewise claims—without factual support—that in direct communications with certain customers, Epic expressed concerns about potential data-security risks associated with CureIS's products. (¶¶ 90, 96.) CureIS does not identify the substance of these alleged statements, instead describing them as "vague 'concerns' about sharing data" (¶ 77) or leaving their content entirely unspecified (¶¶ 90, 96). CureIS also fails to allege facts explaining that Epic knew its alleged statements were false or that CureIS's products did not pose the security concerns that Epic purportedly raised. (¶ 91.) At the same time, CureIS acknowledges that data security is a crucial issue in the highly regulated healthcare industry in which both CureIS and Epic participate. (¶ 95.)

CureIS also claims that Epic informed its customers of its range of product features in marketing materials, including through a brochure entitled "Products You Can Replace with Epic". (¶¶ 98, 100.) This brochure notes that Epic customers may not be aware of the full suite of "functionality you already own with your Epic license", and the brochure "is intended to help you identify areas where you could use your Epic software to either replace or avoid purchasing niche applications – saving money, simplifying workflows for your users, and eliminating duplicate documentation". (¶ 98.) CureIS claims that Epic's representations of current or in-

development products are false; however, CureIS again fails to allege facts to support its claim and does not allege that a single one of its former or potential customers relied on this document.

**Epic's Alleged Policy.** On "information and belief", CureIS alleges that that Epic "recently" adopted an "Epic-first policy" (¶ 7) that prohibits all Epic EHR and CAPS customers from using any non-Epic software "if Epic believes it has a tool or service that overlaps with the third-party's option" (¶ 84). The purported requirements imposed by the supposed policy, however, differ each time CureIS recites them. (*Compare* ¶ 7 *with* ¶ 113 *and* ¶ 122(a).) The Amended Complaint does not provide any detail about how Epic supposedly requires customers not to use third-party tools: it does not identify, for example, when the so-called "Epic-first policy" was imposed, any contractual provision through which Epic allegedly imposed the purported policy, or how such a provision had the practical effect of foreclosing competition. And the Epic brochure supposedly documenting the purported policy merely describes areas where customers "*could* use [their] Epic software to either replace or avoid purchasing niche applications", not areas where they *must* do so. (¶ 98.) CureIS also does not identify any instance where the purported policy was applied to any third-party application other than those offered by CureIS. Although CureIS alleges it learned of the purported "Epic-first policy" in June 2024 from a prospective customer, ██████████ (¶ 84), and further alleges (without support) that at some point in June 2023 Epic applied the policy to prevent ██████████ from implementing CureIS's LettersCURE product (¶¶ 76-77), multiple Epic customers, including Sutter and Sharp, continued using CureIS products through 2025—*after* the so-called Epic-first policy was put in place (¶¶ 55-56, 61). And CureIS cites only "information and belief", and not a single factual allegation, to describe the nature of the purported "Epic-first policy". (¶ 84.)

**Epic's Alleged Data Integration.** CureIS also faults Epic's unwillingness to actively assist in enhancing the functionality of CureIS software to help CureIS compete against Epic. (*E.g.*, ¶ 89.) CureIS alleges that MCM software does not operate independently from CAPS or EHR software, but rather works with it to perform certain functions more effectively. (*E.g.*, ¶ 4.) As such, CureIS alleges that MCM software must be integrated with CAPS and EHR software in order to access and use data stored within that software. (¶ 41.) CureIS's specific comparative advantage over its competitors allegedly lies in its "Managed Care Master Data Model", which uses frequently updated automated business logic rules to process data. (¶ 46.) But CureIS alleges that Epic does not allow its model the type of access to Epic software that CureIS would prefer and that purportedly would allow CureIS's products to function optimally. (¶¶ 60, 68, 70, 80.) Instead, CureIS complains that Epic requires it to handle "complex data architectures", "extract data through multiple layers", and access information "in unstructured fields". (¶ 89.) Nevertheless, CureIS concedes that Epic has allowed CureIS to integrate with certain elements of Epic's software, such as by granting CureIS access to data in Epic's Clarity product. (¶ 60.)

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a complaint must plead "sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face". *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plausibility requires "facts, as opposed to conclusory allegations or the 'formulaic recitation of the elements of a cause of action,' and must rise above the mere conceivability or possibility of unlawful conduct". *Somers v. Apple, Inc.*, 729 F.3d 953, 959-60 (9th Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

<u>**ARGUMENT**</u>

**I.     CUREIS'S ANTITRUST CLAIMS (COUNTS 1-3) SHOULD BE DISMISSED.**

CureIS fails to state an antitrust claim under either Section 1 or Section 2 of the Sherman Act. *First*, CureIS fails to plausibly allege the existence of a relevant antitrust product market, which is required to state a claim, because both of CureIS's alleged markets—the alleged PSHP CAPS and MCM software markets—fail as a matter of law. (Section I.A.) *Second*, CureIS fails to allege antitrust injury because CureIS alleges neither that it competes with Epic in any relevant product market, nor that there is any injury to the relevant market, as opposed to just CureIS itself. (Section I.B.) *Third*, CureIS fails to plausibly allege an unlawful exclusive dealing agreement under Section 1 because CureIS has pleaded no facts establishing any agreement and because CureIS has not alleged that competition was substantially foreclosed in the alleged MCM software market. (Section I.C.) *Fourth*, CureIS fails to allege monopolization or attempted monopolization under Section 2 because it has not plausibly alleged that Epic has monopoly power or a dangerous probability of achieving monopoly power and because CureIS has not sufficiently alleged exclusionary conduct. (Section I.D.)

**A.     CureIS Fails To Plead a Plausible Antitrust Product Market.**

To state a viable antitrust claim, a complaint must plead the existence of a relevant product market. *See Riley v. Info. Sys. Audit & Control Ass'n*, 2023 WL 3997075, at *2 (N.D. Ill. June 14, 2023). Such a market "encompasses products that have reasonable interchangeability for the purposes for which they are produced". *Id.* A plaintiff's "failure to offer a plausible relevant market is a proper ground for dismissing an antitrust claim". *Maui Jim, Inc. v. SmartBuy Guru Enters.*, 386 F. Supp. 3d 926, 946 (N.D. Ill. 2019); *accord Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1123 (9th Cir. 2018) (affirming dismissal where "proposed product

markets are facially unsustainable because they fail to include many reasonably interchangeable products").  CureIS's antitrust claims rely on two proposed product markets:  a PSHP CAPS software market and an MCM software market.  (¶¶ 114, 123,133.)  Each proposed market fails.

### 1.    CureIS Fails To Plausibly Allege a PSHP CAPS Software Market.

CAPS software is alleged to be software that allows health plans to "evaluate and process healthcare claims".  (¶ 32.)  PSHP CAPS software is a label made up by CureIS to describe CAPS software used by a subset of health plans, namely provider-sponsored health plans. (¶ 33.)  The purported market in which Epic is alleged to compete is defined to include only CAPS software sold to PSHPs.  In other words, CureIS alleges that the relevant antitrust product market is a submarket of CAPS software, restricted by considering only one type of buyer, PSHPs.  To assess whether a plaintiff has pleaded a well-defined submarket, "courts must consider several other factors . . . including 'such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.'"  *In re Harley-Davidson Aftermarket Parts Mktg., Sales Practices & Antitrust Litig.*, 151 F.4th 922, 933 (7th Cir. 2025) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)).  In other words, a properly pleaded submarket consists of a distinct subset of products that are "generally noncompetitive with the other[]" products in other submarkets or in the broader market.  *Brown Shoe*, 370 U.S. at 326.[3]

CureIS's alleged submarket does not fit within this paradigm.  Courts dismiss antitrust claims where a plaintiff has "failed to include in the relevant market[] all potential buyers".

---

[3] *Brown Shoe* itself provides a prime example:  if the broader market is shoes, there can be a relevant submarket of men's shoes because men's shoes do not compete with women's or children's shoes, which occupy different submarkets.  *Id.* at 325-26.

*Marion Healthcare v. S. Ill. Healthcare*, 2013 WL 4510168, at *11 (S.D. Ill. Aug. 26, 2013). The purported PSHP CAPS submarket suffers from precisely this flaw. CureIS does not even attempt to identify a subset of CAPS software products that are sold only to PSHPs and do not compete with CAPS software sold to other customers. To the contrary, it expressly acknowledges that "Epic's PSHP CAPS product, Tapestry" (¶ 35), competes with CAPS software products that are sold to other types of payer customers. (*Id.*) For example, CureIS alleges that Tapestry competes with "Cognizant Facets & QNXT, HealthEdge Health Rules Payer, Plexis, and Oracle IDX FRM".[4] (*Id.*) CureIS alleges the "functionality" of those products is *not* "specifically tailored to the needs of PSHPs". (*Id.*) Indeed, CureIS alleges repeatedly that *Tapestry itself* is simply a CAPS software product licensed to many customer types besides PSHPs in a broader CAPS software market. (¶ 3 (describing Tapestry as "payers' CAPS" software), ¶ 33 (describing Tapestry as "Epic's CAPS software"), ¶ 35 n.10 (describing "Epic's CAPS software product for *Managed Care Organizations*, Tapestry"), ¶ 49 (discussing "payers' claims processing software, or CAPS, like Epic's Tapestry"), ¶ 112 (describing Tapestry as Epic's "CAPS software product"). One alleged competitor, AthenaIDX, is expressly alleged to service multiple customer types beyond PSHPs, namely "health systems, hospitals, large ambulatory groups, and Billing Services". (¶ 35 n.11.) *See, e.g.*, *Marion*, 2013 WL 4510168, at *10 (noting that the plaintiff "made no allegation that patients covered by private insurance were the only patients to whom it could sell").

---

[4] In the footnote accompanying this allegation, CureIS refers to "AthenaIDX", which Epic believes to be the correct name of the entity that appears to have been incorrectly identified in paragraph 35 as "Oracle IDX FRM". (¶ 35 n.11.) AthenaIDX will be used herein.

Application of the additional *Brown Shoe* factors, which "are largely absent from the complaint", *In re Harley-Davidson*, 151 F.4th at 934, further demonstrates that CureIS's alleged PSHP CAPS submarket is not a relevant product market as a matter of law.[5]

*First*, CureIS fails to allege any "industry or public recognition" of its purported submarket (*Brown Shoe* factor (i)).  *Id.* at 933  It cites no industry analysis or similar source distinguishing a PSHP CAPS software submarket from a broader CAPS software market.  In fact, the only industry report cited (¶¶ 32 n.7, 35 n.9) is doubly misused:  (1) CureIS concedes that all the report supposedly shows is that Epic is recognized as a "'Key Compan[y]' in the *broader CAPS software market*" (¶ 35), and (2) the report CureIS affirmatively cites discusses "Revenue Cycle Management Market Size, Share & Trends"—not CAPS software at all.  Nor does CureIS's citation to Epic's own website identify any recognition of a distinct PSHP CAPS software submarket.  (¶ 33 & n.8.)  The sentence quoted from Epic's website explains that "Epic provides a *managed care product*" used by PSHPs, but does not state that the product can be used *only* by PSHPs or that it differs from any managed care products that Epic offers to other types of customers.  (*Id.*)  Indeed, CureIS alleges elsewhere that Tapestry is a "software product for Managed Care Organizations",[6] not for PSHPs only.  (¶ 35 n.10.)  *See also In re Harley-Davidson*, 151 F.4th at 934 ("[A] publication that covered American-made motorcycles for 30 years[] provides scant support for industry or public recognition that American-made motorcycles are effectively a *separate economic entity*").

---

[5] The *Brown Shoe* factor that addresses whether there really are "distinct customers" (*Brown Shoe* factor (iv)), is already addressed above and does not support the alleged submarket as a distinct relevant antitrust product market.  *In re Harley-Davidson*, 151 F.4th at 934.

[6] As CureIS itself recognizes, managed care organizations are not synonymous with PSHPS.  (*Compare* ¶ 9 n.1 (defining managed care organizations) *with* ¶ 32 (describing PSHPs).)

*Second*, CureIS fails to identify the "peculiar characteristics" of PSHP CAPS software (*Brown Shoe* factor (ii)).  *In re Harley-Davidson*, 151 F.4th at 934.  Although the Amended Complaint discusses features of PSHP CAPS software, those features are not "peculiar" to PSHP CAPS software because CureIS alleges those same characteristics are present in software sold in a broader CAPS software market.  For example, CureIS alleges that PSHP CAPS software "requires robust data integration to identify care gaps and support value-based care models" (¶ 33) but also alleges a general "shift [in] the U.S. towards a value-based care payment model" (¶ 17) and explains that MCM software, which is not alleged to be limited to PSHPs, both "enabl[es] actionable workflows to support care gap closures" and is "indispensable to the effective administration of value-based care" (¶ 37).  CureIS further alleges that PSHP CAPS software requires "complex logic to split financial responsibility between payers and provider entities" (¶ 33) but also alleges that MCM software, such as CureIS's own RecoveryCURE product, "helps customers recover payments" under plans "that divide financial responsibility for [a] member among multiple parties" (¶ 48(c)).  Similarly, CureIS alleges that PSHP CAPS software must produce "highly specific file formats, particularly for any information provided to government entities" (¶ 33) but also alleges that Medicare and Medicaid generally require "health plans", not just PSHPs, to submit files in specific formats (¶ 48(b)).

*Third*, CureIS does not allege "unique production facilities", "distinct prices", or "specialized vendors" (*Brown Shoe* factors (iii), (v), and (vii)).  *In re Harley-Davidson*, 151 F.4th at 934.  For example, CureIS does not allege that Epic, or any other identified vendor of PSHP CAPS software, sells CAPS products *only* to PSHPs as opposed to selling CAPS products for other sorts of customers as well.  In fact, CureIS expressly alleges that AthenaIDX is not a

specialized vendor, instead asserting that AthenaIDX sells "CAPS software" more broadly, including to "health systems, hospitals, [and] large ambulatory groups". (¶ 35 n.11.)

*Fourth*, CureIS's unsupported assertion that "PSHPs exhibit unique pricing sensitivities" (¶ 33) (*Brown Shoe* factor (vi)) is a legal conclusion veiled as a factual allegation that the Court can and should disregard because it merely restates a test for market definition without any factual elaboration. *Twombly*, 550 U.S. at 555; *see also Hicks*, 897 F.3d at 1122.[7] CureIS fails to allege any facts in support of this conclusion—indeed, it does not even bother to identify what the supposedly unique pricing sensitivities of PSHPs are. (¶ 33.)

## 2. CureIS Fails To Plausibly Allege an MCM Software Market.

CureIS pleads that MCM software, which is alleged to be a complementary product to CAPS software products that comprises various tools that process the data used by CAPS software and other healthcare software (¶ 38), constitutes a relevant product market distinct from a market for CAPS software. (¶ 43.) But CureIS's allegations "do not permit an inference that [the products] are not interchangeable", requiring dismissal. *Maui Jim*, 386 F. Supp. 3d at 947.

Critically, the only MCM software specifically discussed in the Amended Complaint— namely, CureIS's own software—is alleged to perform the same functions that are also performed by CAPS software. For example, CureIS's LettersCURE product allegedly "manages correspondence templates and generates correspondence". (¶ 48(d).) But "many CAPS software platforms" also allegedly "contain a basic template for letter generation". (*Id.*) Similarly, CureIS's EnrollmentCURE product verifies the enrollment status of a payer's members, but

---

[7] CureIS's conclusory allegation that a hypothetical monopolist of PSHP CAPS software could profitably impose a SSNIP (¶ 33) does not suffice absent supporting allegations quantifying rates of customer switching. *See In re German Auto. Mfrs. Antitrust Litig.*, 497 F. Supp. 3d 745, 757 (N.D. Cal. Oct. 23, 2020) (assessing "empirical evidence" pleaded to show satisfaction of hypothetical-monopolist test).

"legacy systems, such as Tapestry", also offer "enrollment functions". (¶ 48(a).) And CureIS's EncounterCURE product purportedly helps to produce the "encounter files" that, "pursuant to [health plans'] reporting requirements" (¶ 48(b)), must be "submitted to receive payment from state and federal agencies", which are the same reporting functions allegedly performed by CAPS software (¶ 3) and PSHP CAPS software (¶ 33). These similarities and overlapping uses demonstrate that MCM software and CAPS software have a "reasonable interchangeability for the purposes for which they are produced". *In re Harley-Davidson*, 151 F.4th at 933.[8]

Rather than alleging that the MCM software serves a different use than CAPS software, CureIS alleges that MCM software achieves the same use more effectively (*e.g.*, ¶ 48(a) ("Unlike traditional enrollment functions offered by legacy systems, such as Tapestry, EnrollmentCURE checks for updates to member information in real time so that any claims associated with those members are not erroneously denied"; ¶ 48(d) (while "CAPS software platforms['] . . . templates need to be manually checked, printed, and mailed . . . LettersCURE . . . automatically sends those letters to a printer")), such that consumers prefer to use MCM software over CAPS software (¶ 61). But "spare assertions of consumer preferences fall short of rendering it plausible" that products are not "interchangeable substitutes". *House of Brides, Inc. v. Alfred Angelo, Inc.*, 2014 WL 64657, at *6 (N.D. Ill. Jan. 8, 2014); *accord Hicks*, 897 F.3d at 1122 ("This increased effectiveness would not place the advertising format in a distinct market because, as discussed above, companies can reach golf consumers through other formats.").

---

[8] The interchangeability of use between CAPS software and the specific MCM products discussed in the Amended Complaint is further reinforced by its general description of MCM software as performing the same functions as CAPS software. (*Compare, e.g.*, ¶ 37 (describing MCM software as "indispensable to the effective administration of value-based care"), ¶ 41 (describing MCM software as "perform[ing] advanced data reconciliation across disparate sources") *with* ¶ 33 (describing PSHP CAPS software as "integrat[ing] clinical and administrative data . . . and support[ing] value-based care models").)

In fact, the Amended Complaint itself alleges multiple instances in which health plans replaced MCM software with CAPS software—namely, CureIS's EnrollmentCURE with Epic's Tapestry Enrollment and Eligibility functionality—to achieve the same purpose. (*E.g.*, ¶¶ 55-57, 61.) These instances of switching show that these products are substitutes in the *same market*, not in distinct relevant product markets as asserted by CureIS. As such, this market also fails as a matter of law and cannot form the basis for antitrust claims.

*       *       *

The facial unsustainability of these markets is a direct consequence of the gerrymandering going on here, which is demonstrated by the way in which CureIS's allegations have completely changed. In its initial complaint, which did not contain any antitrust claims, CureIS alleged that Tapestry was a "managed care revenue cycle management software" product licensed to "health systems, health plans, managed care organizations . . . and healthcare payers . . . to manage their billing operations". (Compl. ¶¶ 22, 25.) CureIS alleged that many customer types license RCM software (Compl. ¶ 22), and that Epic's share of RCM software is 43% (Compl. ¶ 25). CureIS then pivoted to bringing antitrust claims in its Amended Complaint. But in so doing, it blatantly changed the descriptions of the products and markets at issue. Likely in recognition that its allegations were not going to overcome the market power hurdle, CureIS amended its complaint to come up with a completely different market and describe Tapestry as a completely different product. Instead of "managed care revenue cycle management software", Tapestry is now alleged to be a CAPS software product that "evaluate[s] and "process[es] healthcare claims". (¶ 32.) Instead of a market that includes many customer types like in its initial Complaint, CureIS now alleges Tapestry is in a narrow market that includes only one type of customer—payers—and further still only one type of payer—PSHPs.

(¶ 33.)  From there, CureIS now comes up with a (still flawed, as discussed below) 76% market share for Epic.  (¶ 35.)  The vastly different and inconsistent stories between the initial Complaint and the Amended Complaint make plain that these are artificial markets crafted for litigation.  *See, e.g.*, *Hicks*, 897 F.3d at 1121 (rejecting market definition that was "not natural, artificial, and contorted to meet [plaintiff's] litigation needs"); *Marion Healthcare*, 2013 WL 4510168, at *10 ("[T]he plaintiff cannot circumscribe the market to a few buyers in an effort to manipulate the buyers' market share".).

### B.  CureIS Fails To Plausibly Allege Antitrust Injury.

CureIS's Section 1 and Section 2 antitrust claims also fail as a matter of law because CureIS does not, and cannot, allege a cognizable antitrust injury.  To establish standing under the antitrust laws, a plaintiff must allege an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful".  *VBR Tours, LLC v. Nat. R.R. Passenger Corp.*, 2015 WL 225328, at *4 (N.D. Ill. Jan. 15, 2015) (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990)).  Here, CureIS fails to plausibly allege antitrust injury because it has not alleged that it competes against Epic in any of the product markets identified in the Amended Complaint and because CureIS has not asserted an injury to the relevant market as the whole, as opposed to CureIS alone.

*First*, CureIS fails to allege a cognizable antitrust injury because it alleges it does not compete with Epic in any product market pleaded in the Amended Complaint.  "The Seventh Circuit usually presume[s] that competitors and consumers in the relevant market are the only parties who suffer antitrust injuries and are in a position to efficiently vindicate the antitrust laws".  *Internal Med. Nephrology, Inc. v. Bio-Medical Applications of Indiana, Inc.*, 2019 WL

4688712, at *3 (S.D. Ind. Sept. 26, 2019).[9]  CureIS is not a customer of Epic's products, and, in the Amended Complaint, is not alleged to compete with Epic within any relevant market.  To the contrary, CureIS alleges that it competes only in the purported MCM software market (¶ 36), and that Epic does *not* compete in that market (¶ 45).  Thus, if the Court does not dismiss CureIS's antitrust claims on the basis of CureIS's (implausible) market definitions, all of CureIS's antitrust claims must be dismissed for the independent reason that CureIS does not compete with Epic in any relevant market and thus, cannot plead antitrust injury.  *E.g.*, *Internal Med. Nephrology, Inc.*, 2019 WL 4688712, at *3 (finding plaintiff had not alleged antitrust injury where it was "neither competitor nor consumer in the relevant market").

*Second*, because "[t]he antitrust-injury doctrine was created to filter out complaints by competitors and others who may be hurt by productive efficiencies, higher output, and lower prices, all of which the antitrust laws are designed to encourage", CureIS "must assert an injury not only to itself, but to the relevant market".  *Chicago Studio Rental, Inc. v. Illinois Dep't of Commerce*, 940 F.3d 971, 978 (7th Cir. 2019).  Here, CureIS's antitrust claims are based solely on allegations that Epic engaged in conduct that harmed *CureIS's* business.  Specifically, CureIS alleges that Epic "intentionally interfer[ed] with *CureIS's* customer relationships by pressuring or coercing existing customers and business partners not to work with *CureIS*", "cut[] off and block[ed] data access to *CureIS's* current customers and prevent[ed] the onboarding of new customers", and "disseminat[ed] false or misleading information about *CureIS's* and Epic's

_____

[9] There is a limited exception, known as the "inextricably intertwined" exception, under which a plaintiff can have antitrust standing where the two distinct markets "are so closely related that the distinction between them is of no consequence".  *Internal Med. Nephrology, Inc.*, 2019 WL 4688712, at *4 (cleaned up).  Here, CureIS's own allegations confirm that this exception is inapplicable, given it has alleged express differences between the CAPS and MCM markets.  (¶ 36 (describing purported differences between MCM and CAPS products).)

products". (¶ 51.) None of this alleged conduct is alleged to have ever been directed or applied as to any competitor in the purported MCM software market other than CureIS.

CureIS's vague and conclusory invocation of antitrust buzzwords to try to establish market-wide injury fails. With no supporting facts, it alleges "lower output" in the alleged MCM software market, "lower market wide product quality", and "higher prices for PSHP CAPS software". (¶ 102.) But CureIS's allegations of lower output and higher prices lack any factual support and are too conclusory. *See Chicago Studio Rental, Inc.*, 940 F.3d at 979 (finding no antitrust injury based on allegations of reduced competition and increased transactional costs where plaintiff "merely states these assertions in a conclusory fashion and fails to allege factual allegations supporting the existence of an antitrust injury"); *see also Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981, 997 (N.D. Cal. 2020) (dismissing claim for failure to plead antitrust injury where plaintiff included only "[n]aked assertions devoid of further factual enhancement"). Indeed, rather than allege facts to show injury to competition in the MCM software market, CureIS alleges that "a growing number of healthcare IT companies are developing products in the MCM software space". (¶ 45.)

## C.    CureIS Fails To Plausibly Allege an Unlawful Exclusive Dealing Agreement.

CureIS fails to plausibly allege an exclusive dealing arrangement in violation of Section 1. CureIS claims that Epic imposed an "Epic-first policy" under which customers must "abandon any preexisting third-party tools and forgo exploring non-Epic solutions at any point in the future if Epic believes it has a tool or service that overlaps with the third party's option". (¶ 84.) But, incredibly, the purported smoking gun cited for support is a sales brochure that imposes no requirements at all, but instead informs Epic customers of the functionality already included with their license. (¶ 98.) Given that CureIS pleads no facts concerning any agreement

at all, much less one through which Epic required exclusivity from its customers, the Amended Complaint fails to adequately plead an exclusive dealing arrangement. (*See infra* Section I.C.1.) Further, even when exclusive dealing agreements exist, they "are not uniformly condemned" and "only raise anticompetitive concerns when they foreclose competition in a substantial share" of the at-issue market. *In re Tecfidera Antitrust Litig.*, 791 F. Supp. 3d 852, 863 (N.D. Ill. 2025). CureIS has failed to plausibly allege a substantial foreclosure of competition, which is yet another independent reason requiring dismissal. (*See infra* Section I.C.2.)

### 1. CureIS Fails To Plead an Exclusive Dealing Agreement.

The thrust of CureIS's exclusive dealing argument is that Epic's customers could not contract with CureIS and other third-party vendors because of a so-called "Epic-first policy". (¶¶ 84-85.) A fatal flaw in this claim is that CureIS fails to plead the existence of any agreement reached between Epic and a customer to deal exclusively. Instead, CureIS cites only a "policy" that (allegedly) "*Epic* recently imposed". (¶ 7.) Such unilateral conduct, even if true (and it is not), does not violate Section 1. *See Team Schierl Co. v. Aspirus, Inc.*, 2023 WL 6847433, at *8 (W.D. Wis. Oct. 17, 2023) (dismissing exclusive dealing claim where plaintiff failed to allege an agreement because "an agreement is an element" of this claim). The Epic sales brochure supposedly documenting this "policy" is, at most, Epic's unilateral marketing efforts. (¶ 98.) There is no allegation that Epic ever sought or obtained any agreement from any customer to follow this supposed policy or to deal exclusively with Epic, and CureIS points to no contractual provision reflecting any such agreement. (¶¶ 97-101); *see Team Schierl Co.*, 2023 WL 6847433, at *8; *see also PNY Techs., Inc. v. SanDisk Corp.*, 2014 WL 1677521, at *5 (N.D. Cal. Apr. 25, 2014) (requiring allegations of "agreements" that "unlawfully foreclose competition").

Another flaw with CureIS's theory is that it alleges the "Epic-first policy . . . prohibit[ed] [Epic] customers from utilizing non-Epic *approved* third-party applications". (¶ 113.) But exclusive dealing requires *exclusivity*, and CureIS does not explain how a supposed requirement to use only Epic-*approved* products might impose *de facto* exclusivity. *See VBR Tours, LLC v. Nat. R.R. Passenger Corp.*, 2015 WL 5693735, at *12 (N.D. Ill. Sept. 28, 2015) (finding exclusive dealing claim "implausible" because defendant "continue[d] to sell tickets to tour operators other than [plaintiff]"); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 360 F. Supp. 3d 788, 799-800 (N.D. Ill. 2019) (finding exclusive dealing claim not plausibly pleaded as to certain contracts because plaintiffs "do not allege or even argue that Defendant requires dealers to use and purchase its DMS exclusively, which is necessary to state a claim for exclusive dealing"). As alleged, the so-called "Epic-first policy" is not an exclusive dealing arrangement at all.

Moreover, the conclusory allegation, pleaded "[o]n information and belief", that this supposed policy *requires* customers to deal exclusively with Epic (¶ 84) is nothing more than a bare assertion insufficient to plead exclusive dealing. *Iqbal*, 556 U.S. at 678 ("[A] complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face"). Epic's sales brochure states that Epic's aim is to help its customers identify "all the functionality you already own with your Epic license", and describes where customers "*could* use [their] Epic software to either replace or avoid purchasing niche applications", not areas where they *must* do so. (¶ 98.) CureIS does not allege any inducement, threat, coercive tactic, or any other circumstances that would lead customers to feel compelled to follow this supposed "policy" and deal exclusively with Epic even though not contractually required to do so. *See PNY Techs.*, 2014 WL 1677521, at *6 ("PNY does not allege any factual support explaining how SanDisk 'required' anyone to enter into exclusive contracts with it or why 'affected retailers'

could not carry other manufacturers' products if they wanted to").  Nor can CureIS rely on its

allegation that ███████████ cited an "Epic-first" policy in rejecting CureIS's offer (¶ 84)

because "those allegations [are] bereft of any supporting facts" to show that Epic actually

"prevented [customers] from considering [its] competitors".  *PNY Techs., Inc. v. SanDisk Corp.*,

2014 WL 2987322, at *6 (N.D. Cal. July 2, 2014) (rejecting allegations that customers

"explicitly told [plaintiff] that they cannot even entertain competing offers from [plaintiff] due to

their exclusive agreements" without "further factual enhancement" to support an exclusivity

obligation).

Any purported exclusivity requirement is also directly contradicted by the repeated

allegations in the Amended Complaint that Epic customers used non-Epic products even *after*

the purported "Epic-first policy" was supposedly implemented.[10]  For example, CureIS alleges

that Sharp continued to use its EncounterCURE product as recently as July 15, 2025 (when the

Amended Complaint was filed).  (¶¶ 55-56.)  Similarly, CureIS alleges that Sutter used CureIS

products until as recently as January 2025.  (¶¶ 59-61.)  And immediately following the

allegation that Epic "impos[ed]" the "Epic-first policy" on ███████████ (¶ 77), CureIS alleges

that Epic encouraged ███████████ to use *other third-party vendors* instead of CureIS (¶ 78).

These allegations contradict CureIS's allegation that there is an exclusive dealing arrangement

that precludes Epic customers from buying third-party products, including CureIS's products.

*See PNY Techs.*, 2014 WL 2987322, at *7 (disregarding exclusive dealing allegations

"contradicted by other portions of the [complaint]").

---

[10] While CureIS does not allege *when*, apart from "recently" (¶ 7), the purported "Epic-first policy" was implemented, based on allegations in the Amended Complaint, it purportedly was in effect at least as of June 2023 when Epic allegedly "impos[ed]" it on ███████████.  (¶¶ 76-77.)

## 2.    CureIS Fails To Plead Substantial Foreclosure of Competition.

An exclusive dealing arrangement only violates the Sherman Act when it "foreclose[s] competition in a substantial share of the line of commerce at issue". *In re Tecfidera*, 791 F. Supp. 3d at 863. "Substantial foreclosure may be found where an exclusive dealing arrangement is 'likely to keep at least one significant competitor of the defendant from doing business in a relevant market' and 'the probable . . . effect of the [rival's] exclusion will be to raise prices above the competitive level, or otherwise injure competition'". *Id.* Yet here, the Amended Complaint is devoid of any factual allegations that address the extent of foreclosure in the *MCM software market*—the only alleged market in which CureIS claims to compete—in which competition was allegedly foreclosed by the so-called "Epic-first policy". *See id.* at 867 (finding failure to adequately plead substantial foreclosure where plaintiff included a "dearth of allegations" regarding the alleged foreclosure because "speculation will not do to bridge the gap from possible to plausible foreclosure"); *see also Rheumatology Diagnostics Lab'y, Inc. v. Aetna, Inc.*, 2014 WL 524076, at *11 (N.D. Cal. Feb. 6, 2014) ("For each of the relevant markets, the plaintiffs still do not allege the extent of foreclosure, what size each market is, or how the agreement affected each market or its participants' shares".). Indeed, as noted above, rather than competition being injured in the MCM software market, the Amended Complaint alleges that "a growing number of healthcare IT companies are developing products in the MCM software space". (¶ 45.) This admission is fatal to CureIS's Section 1 claim.[11]

_____

[11] In addition, given that CureIS fails to allege any agreement at all between Epic and its customers—much less any allegations about the purported terms of the agreement—its allegations are also insufficient to plausibly allege substantial foreclosure. *See In re Tecfidera*, 791 F. Supp. 3d at 864 (finding plaintiffs failed to plausibly allege foreclosure absent details about how the purported exclusive dealing arrangement "actually work[ed]"); *Eastman v. Quest Diagnostics Inc.*, 2016 WL 1640465, at *8 n.12 (N.D. Cal. Apr. 26, 2016) (finding substantial foreclosure implausible where plaintiffs provided no "information regarding, for example, the approximate length of the agreements or the process by which they can be terminated").

**D.    CureIS Fails To Plausibly Allege Its Monopolization Claims.**

CureIS contends that Epic has maintained a monopoly in, or attempted to monopolize, the purported market for PSHP CAPS software in violation of Section 2 of the Sherman Act.  "A monopolization claim has two elements:  (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power through exclusionary conduct".  *United Wis. Grain Prods. LLC v. Archer Daniels Midland Co.*, 144 F.4th 976, 980 (7th Cir. 2025).  "An attempted monopolization claim . . . has three elements:  (1) specific intent to monopolize, (2) exclusionary conduct directed to accomplishing this purpose, and (3) a dangerous probability of achieving monopoly power".  *Id.*  CureIS fails to plausibly allege that Epic has monopoly power or a dangerous probability of achieving it in the alleged PSHP CAPS software market and also fails to plausibly allege exclusionary conduct.

**1.    CureIS Fails To Plausibly Allege Monopoly Power.**

CureIS alleges that Epic monopolizes and has attempted to monopolize the alleged PSHP CAPS software market.  (¶¶ 121, 131.)  A plaintiff may plead monopoly power:  "(1) through direct evidence of anticompetitive effects; or (2) by proving relevant product and geographic markets and by showing that the defendant's share exceeds whatever threshold is important for the practice in that case".  *Ducere LLC v. Enbridge (U.S.) Inc.*, 2025 WL 81373, at *4 (N.D. Ill. Jan. 13, 2025).  CureIS pleads neither.

To plead monopoly power through direct evidence, a plaintiff must allege "proof of actual detrimental effects on competition . . . such as reduced output, increased prices, or decreased quality in the relevant market".  *Id.*  As to the purported PSHP CAPS software market that Epic allegedly monopolizes, CureIS presents only the conclusory allegation that Epic's conduct has led to higher prices.  (¶ 102.)  CureIS does not identify the prices of products in the

market or the magnitude of the supposed increase caused by Epic's conduct, and it makes no attempt to "allege proof" that any supposed price increases constituted "detrimental effects on competition" caused by Epic's alleged monopoly. *Ducere*, 2025 WL 81373, at *4. Inasmuch as CureIS alleges no facts about these purported price increases, CureIS alleges no facts that would make it "plausible that the price hikes were an exercise of monopoly power". *Id.* at *5. As such its "allegations are inadequate direct evidence of [Epic]'s monopoly power". *Id.*; *see also Int'l Equip. Trading, Ltd. v. Illumina, Inc.*, 312 F. Supp. 3d 725, 732 (N.D. Ill. 2018) (declining to consider "remaining allegations about Illumina's market power in the relevant market as they are all conclusory").

As to market share, CureIS advances the naked assertion that "Epic's PSHP CAPS software product, Tapestry, has market share that some estimates put as high as 76%". (¶ 35.) But the only support CureIS offers for its calculation of Epic's market share is its allegation that "[t]here are a total of 282 Medicaid MCOs in the United States" and that "Epic's CAPS software product for Managed Care Organizations, Tapestry, has 196 customers". (¶ 35 n.10.) As an initial matter, these figures would yield a market share of less than 70%, not the 76% CureIS alleges. Moreover, the inputs to this calculation do not describe the alleged *PSHP* CAPS software market that Epic is alleged to monopolize. The numerator—the number of customers for "Epic's CAPS software product for Managed Care Organizations"—is drawn from a website that purportedly lists customers for Epic's Tapestry product without stating that the list is limited to *provider-sponsored* health plans, as necessary for the purported market CureIS alleges. (*See* ¶ 35 n.10 (citing Enlyft, Companies Using Epic Tapestry, https://enlyft.com/tech/products/epic-tapestry (last accessed Dec. 19, 2025)).) Indeed, that list contains non-provider companies like Accenture, IBM, and Nationwide Mutual Insurance. (*Id.*) The denominator is drawn from a

website using data from 2022 to list the total number of "Medicaid MCOs in the United States" defined to include "only capitated managed care organizations (MCOs) *providing comprehensive services to Medicaid enrollees*" and to exclude other categories of MCOs. (*Id.* (citing Kaiser Family Foundation, Total Medicaid MCOs, https://www.kff.org/medicaid/state-indicator/total-medicaid-mcos (last accessed Dec. 19, 2025))). But CureIS does not identify what fraction of PSHPs provide "comprehensive services to Medicaid enrollees". (*See, e.g.*, ¶ 18.) CureIS thus attempts to calculate market share by dividing a list of purported Tapestry customers *including non-PSHPs* by a list of entities that *omits an unknown number of PSHPs*. Because this facially unreliable calculation is not based on PSHPs that define the purported market, it cannot justify any plausible inference as to Epic's share of the alleged PSHP CAPS software market. *See, e.g.*, *Ducere*, 2025 WL 81373, at *5 (dismissing monopolization claims "[b]ecause [plaintiff] does not allege enough for the Court to reasonably infer [defendant's] share of the [relevant] market"); *Int'l Equip. Trading*, 312 F. Supp. 3d at 731 (holding market power inadequately pleaded where market share allegations failed to address the purported relevant antitrust market).

Furthermore, even had CureIS plausibly alleged Epic's market share, "in a market with lower barriers to entry, the Seventh Circuit has held that existing market share does not signify power". *Weber-Stephen Prods. LLC v. Sears Holding Corp.*, 2014 WL 656753, at *7 (N.D. Ill. Feb. 20, 2014). Although CureIS discusses barriers to entry with respect to a separate alleged EHR software market (which does not form the basis for any antitrust claim) (¶ 30), it provides only conclusory allegations of such barriers in the alleged PSHP CAPS software market at the core of its monopolization claims (¶¶ 32-35), which independently requires dismissal of those claims. *E.g.*, *U.S. Bd. of Oral Implantology v. Am. Bd. of Dental Specialties*, 390 F. Supp. 3d

892, 908 (N.D. Ill. 2019) (dismissing Section 2 claims because plaintiff failed to plausibly allege the existence of barriers to entry, and "without a barrier there is no market power").[12]

## 2. CureIS Fails To Plead Any Exclusionary Conduct.

CureIS's monopolization claims also fail because it has not plausibly alleged exclusionary or anticompetitive conduct for any of the categories CureIS identified. "Exclusionary conduct", which "reduces competition and thereby harms consumers", is "a feature common to monopolization and attempted monopolization claims". *United Wis. Grain*, 144 F.4th at 980. But the difference between "exclusionary conduct" and "aggressive competition" is "difficult to discern", turning on whether a defendant's acts "decrease consumer welfare" or "increase it". *Id.* CureIS alleges three categories of anticompetitive conduct: (i) the purported "Epic-first policy"; (ii) Epic's alleged statements "disparaging CureIS and other MCM software providers . . . and misrepresenting Epic's product options and product qualities"; and (iii) alleged restrictions on the ability of third-party MCM software providers to integrate with Epic's software.[13] (¶ 122.) As discussed in Section I.B, the alleged conduct purportedly harmed CureIS individually rather than reducing competition as a whole. And none of this alleged conduct is plausibly alleged to have been exclusionary.

---

[12] To plead a "dangerous probability of establishing a monopoly in a particular market", as required for attempted monopolization, "the antitrust plaintiff must also prove the defendant has market power in a relevant market and that the market power will tend to approach monopoly power if the alleged unlawful conduct remains unchecked". *Int'l Equip. Trading*, 312 F. Supp. 3d at 731. For the reasons given in the text, CureIS fails to allege proof that Epic "has market power in a relevant market". And CureIS alleges no facts to prove that Epic's (inadequately pleaded) market power will tend to approach monopoly power if the (implausibly) alleged unlawful conduct remains unchecked.

[13] CureIS also conclusorily alleges that Epic blocked its own customers' access to data (¶ 122), but the allegations describe only requests for CureIS's software to integrate with Epic's software, not requests for customers to access data (*e.g.*, ¶¶ 56, 60, 63, 68, 70, 73, 77-78, 89).

Alleged "Epic-first policy":  The same so-called Epic-first policy on which CureIS bases its Section 1 claim is also alleged to be an anticompetitive exclusive dealing arrangement under Section 2.  But for all of the reasons discussed above (Section I.C), CureIS does not allege that there was any exclusive dealing arrangement at all or that it "foreclose[d] competition in a substantial share of the line of commerce affected".  *In re Tecfidera*, 2025 WL 1755725, at *5.

Alleged misrepresentations about Epic's and CureIS's products:  The Seventh Circuit has adopted a bright-line rule that "absent an accompanying coercive enforcement mechanism of some kind, even demonstrably false commercial speech is not actionable under the antitrust laws".  *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 852 (7th Cir. 2011).  An "enforcement mechanism" capable of rendering commercial speech unlawful must produce a coercive effect on competition, such as if the speech affected a compulsory standard enforced by a government body.  *See Sanderson v. Culligan Int'l Co.*, 415 F.3d 620, 623-24 (7th Cir. 2005).  Applying this principle, courts dismiss antitrust claims premised on a defendant's allegedly false statements about its own or its competitor's products.  *Id.* (affirming dismissal of claim based on derogatory statements about competitor); *Briggs & Stratton Corp. v. Kohler Co.*, 405 F. Supp. 2d 986, 989, 991 (W.D. Wis. 2005) (striking allegations of a manufacturer's "false statements about its own products").  Because CureIS fails to allege the existence of any coercive enforcement mechanism, Epic's alleged misrepresentations cannot constitute unlawful monopolization.

Alleged data blocking or barriers:  CureIS alleges that Epic failed to provide CureIS with the "data, files, and configurations that [it] needed to adapt its process to the Epic environment" (¶ 68), to "integrate with CureIS" as an "Epic-approved vendor" (¶ 80), or to "make accessible" the "complex data architectures" and "unstructured fields" used to store "[c]ritical information such as referral data and provider notes" (¶ 89).  But the Sherman Act does not require Epic to

unilaterally enhance the functionality of CureIS's product by facilitating integration with Epic's own software and access to the data stored therein. Rather, a monopolist is "both expected and permitted to compete like any other firm" and "does not have to lend a helping hand to a competitor trying to bring it down". *Phillips N. Am. LLC v. Glob. Med. Imaging, LLC*, 2024 WL 4240920, at *7 (N.D. Ill. Sept. 19, 2024). As a matter of black letter antitrust law, "even monopolists are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing". *Id.* CureIS's claim here thus fails because Epic has no duty to deal with CureIS in any event.

## II. CUREIS'S REMAINING CLAIMS (COUNTS 4-9) SHOULD BE DISMISSED.[14]

### A. CureIS Fails To State a Claim for Tortious Interference with Contract.

CureIS alleges that Epic tortiously interfered with CureIS's alleged contracts with three of CureIS's customers, Advocate, Sharp, and Sutter.[15] To plead tortious interference with contract as to each customer, CureIS must allege: "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's intentional acts designed to induce breach or disruption of the contract; (4) actual breach or disruption; and (5) resulting damage". *Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*, 795 F.3d 1124, 1134 (9th Cir. 2015). CureIS's claim fails because (i) it is partially time barred; (ii) CureIS fails

---

[14] Because this case has been transferred to the Western District of Wisconsin pursuant to 28 U.S.C. § 1404(a), this Court must apply the same choice-of-law rules that would have applied had the transfer not occurred. *See Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964). For the purposes of this motion to dismiss, Epic applies California law to CureIS's tort and statutory claims, with the exception of CureIS's Lanham Act claim, which Epic assesses under Seventh Circuit law.

[15] CureIS appears to have inadvertently included in this count an entity named ███████. (¶ 149.) To the extent it was intentional, the claim must be dismissed because CureIS alleges none of the elements as to ██████, and it is time barred because the alleged termination occurred on March 31, 2022 (*id.*), more than two years before the Complaint was filed.

to allege that Epic had knowledge of the alleged contracts at issue; and (iii) relatedly, CureIS has not established Epic's intent to disrupt those relationships.

*First*, CureIS's claim is time barred as to Advocate. The statute of limitations for tortious interference with contract is two years and "begins to run no later than the date of the breach or termination of the underlying contract". *Maritz Inc. v. Carlson Mkt. Grp., Inc.*, 2009 WL 3561521, at *2 (N.D. Cal. Oct. 30, 2009). Here, Advocate's contract was allegedly terminated on December 31, 2021. (¶ 146.)[16] The Complaint was not filed until May 12, 2025, after the statute ran on December 31, 2023. Thus, CureIS's claim should be dismissed as to Advocate. *See Maritz*, 2009 WL 3561521, at *3 (dismissing claim as time barred).

*Second*, CureIS fails to allege Epic's knowledge of the alleged Advocate, Sharp, and Sutter contracts. Instead, CureIS alleges the bare legal conclusion that "[a]t all relevant times, Epic was aware of CureIS's agreements with these customers". (¶ 144; *see also* ¶ 153.) Such conclusory allegations are insufficient. *See Swipe & Bite, Inc. v. Chow*, 147 F. Supp. 3d 924, 935 (N.D. Cal. 2015) (dismissing claim where plaintiff failed to "allege any *facts* showing . . . knowledge of the agreements with these specific customers" beyond conclusory statements).

*Third*, because CureIS fails to adequately allege even that Epic had knowledge of the alleged contracts, "it likewise fails to allege that [Epic] developed the requisite intent to disrupt those relationships". *Trindade v. Reach Media Grp., LLC*, 2013 WL 3977034, at *16 (N.D. Cal. July 31, 2013). Moreover, CureIS does not plead facts demonstrating that Epic knew that "interference [was] certain or substantially certain to occur as a result of [its] action". *Id.*

---

[16] CureIS alleges elsewhere that "Advocate terminated its contract with CureIS" at some point after "the end of 2023". (¶ 96.) If this is not a typo, the Court need not accept it as true as it is contradicted by CureIS's more specific allegation that Advocate terminated its contract on December 31, 2021 and CureIS does not allege any contract with Advocate that was in existence as of 2023. *See, e.g.*, *Brown v. Hanson*, 2017 WL 2635290, at *9 (W.D. Wis. June 19, 2017) (explaining that "if plaintiff includes inconsistent allegations in complaint, more specific allegations are controlling").

Instead, CureIS conclusorily alleges that "Epic intentionally procured Advocate, Sharp, and Sutter's termination . . . with the purpose of harming CureIS" (¶ 150), without alleging any facts to support that Epic had actual knowledge that its conduct would affect the specific contractual relationships at issue. This is insufficient. *Trindade*, 2013 WL 3977034, at *16.

## B.    The Tortious Interference with Prospective Business Relations Claim Fails.

CureIS's claim that Epic tortiously interfered with CureIS's prospective business relationships with Advocate, ███████, ███████, and Sharp[17] fares no better. To plead tortious interference with prospective business relations, a plaintiff must allege: "(1) an economic relationship between [plaintiff] and some third party, with the probability of future economic benefit to [the plaintiff]; (2) [defendant's] knowledge of the relationship; (3) intentional acts by [defendant] designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to [plaintiff] proximately caused by the acts of [defendant]". *Infectolab Ams. LLC v. ArminLabs GmbH*, 2021 WL 292182, at *4 (N.D. Cal. Jan. 28, 2021). The acts required by the third element must also be "*wrongful*" and "separate and apart from the interference itself". *Id.* CureIS's claim fails for at least four reasons, including that CureIS has not alleged a lost economic advantage that would have been realized; has not alleged Epic's knowledge of any prospective economic relationship; has not alleged Epic's intent to disrupt such relationships; and has not identified any intentional, wrongful act by Epic.

*First*, CureIS fails to plausibly allege facts demonstrating "that it is reasonably *probable* that the lost economic advantage would have been realized but for the defendant's interference".

---

[17] A stray reference to ███████, *see supra* note 15, occurs in this count as well. (¶ 156.) Such a claim must likewise be dismissed for failure to include any factual allegations whatsoever about the purported prospective relationship with ███████. *See, e.g.*, *Lloyd v. Mullenex*, 2019 WL 5788618, at *4 (N.D. Cal. Nov. 6, 2019) (granting motion to dismiss claim where complaint failed to "define the relevant relationships and describe their disruption, if any").

*Id*.  For example, with respect to Advocate, Epic merely alleges that Advocate "actively pursu[ed] EnrollmentCURE integration with Epic through August 2023".  (¶ 156.)  But CureIS does not plead facts about the actual contract negotiation or how far those negotiations progressed.  In short, CureIS pleads no more than a "[s]peculative expectanc[y]" of a future benefit, which is insufficient.  *See 7EDU Impact Acad. Inc. v. You*, 760 F. Supp. 3d 981, 1001 (N.D. Cal. 2024).  For Sharp, CureIS does not even detail a specific prospective relationship that was purportedly interfered with, instead merely speculating about Sharp's possible future use of CureIS's software absent any information concerning the terms of that prospective relationship.  (¶¶ 156, 159); *see Google Inc. v. Am. Blind & Wallpaper Factory, Inc.*, 2005 WL 832398, at *9 (N.D. Cal. Mar. 30, 2005) (finding speculative allegations of future sales to repeat customers insufficient).  CureIS's allegations are similarly attenuated as to ▮▮▮▮▮▮▮▮, where CureIS alleges only that it sent a proposal to ▮▮▮▮▮▮▮ (¶¶ 81-84, 156), rather than pleading facts showing that an agreement was likely to result but for Epic's conduct.  *See Sante Fe Props., LP v. Source Bioscience, Inc.*, 2021 WL 6104156, at *3 (C.D. Cal. Feb. 10, 2021) (finding speculative economic relationship with prospective customers insufficient to show reasonable probability of future economic benefit); *see also EcoHub, LLC v. Recology Inc.*, 2023 WL 6725632, at *12 (N.D. Cal. Oct. 11, 2023) (dismissing claim where there were "no allegations" suggesting that plaintiff "had any relationship" that would allow "infer[ence] that its bid would eventually yield a contract").  So too with ▮▮▮▮▮▮▮, where the purported "approvals" CureIS received from ▮▮▮▮▮▮▮ were subject to contract finalization meetings and further negotiation.  (¶¶ 75-76.)  In addition, CureIS's allegations as to ▮▮▮▮▮▮▮ are separately deficient because CureIS does not allege that ▮▮▮▮▮▮ declined to contract with CureIS *because of* Epic's alleged conduct; the Amended Complaint shows ▮▮▮▮▮▮▮ determined it

would handle the work "internally". (¶ 76); *see Celebrity Chefs Tour, LLC v. Macy's, Inc.*, 2014 WL 1660674, at *7 (S.D. Cal. Apr. 25, 2014).

*Second*, CureIS fails to allege Epic's knowledge of the supposed prospective relationships with Advocate, ███████, ███████, and Sharp. With respect to Advocate, CureIS's generic allegation that Epic was aware of its prospective relationship because Epic purportedly acknowledged to Advocate that CureIS is a competitor (¶¶ 157, 69) is insufficient. *See Infectolab Ams. LLC*, 2021 WL 292182, at *4 (rejecting assertion that "the requisite knowledge may reasonably be inferred from . . . allegations" regarding plaintiff's "status as a competitor in the industry"). As to Sharp, CureIS fails to plead Epic's knowledge of CureIS's prospective relationship whatsoever (*see* ¶ 157), warranting dismissal. *Swipe & Bite, Inc.*, 147 F. Supp. 3d at 935. With respect to ███████ and ███████, CureIS alleges Epic's knowledge merely based on its insufficient, conclusory allegations that Epic "instructed" them not to work with CureIS in accordance with the alleged "Epic-first policy". (¶ 157.)

*Third*, because CureIS fails to "sufficiently allege [Epic's] knowledge of any economic relationship, [CureIS] also fails to allege [Epic's] intent to disrupt any such relationship". *Infectolab Ams. LLC*, 2021 WL 292182, at *4.

*Fourth*, CureIS fails to allege that Epic engaged in an "intentional wrongful act[] . . . to disrupt the relationship", which "must be separate and apart from the interference itself". *Id.* The conduct must be "proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard". *Spotlight Ticket Mgmt., Inc. v. Concierge Live LLC*, 2024 WL 4866813, at *9 (C.D. Cal. Aug. 30, 2024). CureIS asserts that Epic engaged in two independently wrongful acts to disrupt CureIS's prospective relationships: (1) Epic made false and misleading statements to CureIS's customers "that integrating with CureIS presented

security concerns and that Epic's products could replace CureIS's solutions with equivalent functionality"; and (2) Epic "denied CureIS access to customer data" in violation of the Cures Act. (¶ 158.) Neither satisfies the wrongful act requirement.[18]

CureIS's initial argument regarding Epic's alleged statements rests on the same insufficient allegations as its trade libel and false advertising claims. Because CureIS fails to plead each of those claims, *see infra* Sections II.C-II.D, such allegations cannot constitute an independently wrongful act. *See Spotlight Ticket Mgmt., Inc.*, 2024 WL 4866813, at *10.

CureIS also cannot satisfy the wrongful act requirement because it has failed to allege any violation of the Cures Act's prohibition on information blocking (¶ 158). Information blocking requires a practice that: (1) implicates the access, exchange, or use of electronic health information, or EHI; (2) is "likely to interfere with, prevent, or materially discourage" access, exchange, or use of EHI; (3) does not constitute a "reasonable and necessary activit[y]"; (4) was not "required by law"; and (5) the defendant "knows, or should know" is likely to interfere with the access, exchange, or use of EHI. 42 U.S.C. § 300jj-52(a).

Information blocking is irrelevant for three of the four entities on which this claim is based: ██████████, ██████████, and Sharp. CureIS does not plead that Epic denied CureIS access to any data from ██████████ or ██████████, nor could it given that CureIS never consummated relationships with either. And Sharp allegedly terminated its relationship with CureIS solely due to Epic's alleged misrepresentations (¶¶ 55, 57), so alleged information blocking cannot constitute the wrongful act for CureIS's claim as to Sharp. *E.g.*, *DeSoto Cab*

---

[18] CureIS's claim is time barred as to any alleged conduct that took place prior to May 12, 2023, *i.e.*, more than two years before CureIS filed its Complaint. *Rump v. Philips Lifeline*, 2010 WL 4502485, at *2 (N.D. Cal. Nov. 2, 2010). Accordingly, CureIS's claim relating to Advocate cannot rely on alleged information blocking from 2018-2020 (¶¶ 67-73), and its claim relating to Sharp cannot rely on Epic's alleged raising of security concerns in February 2023 (¶ 90).

*Co. v. Uber Techs., Inc.*, 2018 WL 10247483, at *14 (N.D. Cal. Sept. 24, 2018) (requiring causal nexus between wrongful act and disruption of relationship).

In any event, CureIS's information blocking allegations amount to nothing more than "labels and conclusions, and a formulaic recitation of the elements" (*see* ¶¶ 56, 158), which must be disregarded. *Twombly*, 550 U.S. at 555; *see also UMG Recordings, Inc. v. Glob. Eagle Enter., Inc.*, 117 F. Supp. 3d 1092, 1117 (C.D. Cal. 2015) (dismissing tortious interference claim where party did not adequately plead basis of wrongful conduct allegations). Most notably, CureIS fails to plead that there "is actual EHI at stake", which is "an essential element of the information blocking provision". 85 Fed. Reg. at 25,892. "EHI" for purposes of the information blocking regulations encompasses "electronic protected health information" that would be included in a "designated record set" (as both of those terms are defined). 45 C.F.R. § 171.102. CureIS does not explain how the "customer data" to which Epic allegedly blocked access (¶ 158) satisfies the definition of EHI (or how enrollment and claims data is properly deemed EHI). CureIS also asserts the bare legal conclusion that "no regulatory exception excuses [Epic's] conduct" and that Epic "knowingly engaged in blocking CureIS's EHI access, exchange, or use". (¶ 56.) These conclusory allegations fall short of pleading the requisite factual allegations necessary to establish information blocking. *Vox Network Sols., Inc. v. Gage Techs., Inc.*, 2024 WL 1260573, at *11 (N.D. Cal. Mar. 25, 2024) (declining to "find an independently wrongful act based on the[] conclusory allegations" that lacked supporting factual allegations).

### C.     CureIS Fails To State a Claim for Trade Libel.

CureIS bases its trade libel claim on the following alleged statements:  (1) Epic's "communicating to ███████████ in June 2023, ███████████ in June 2024, Sharp on or around February 2, 2023 and 2024, and Advocate in February 2023 that CureIS's products posed

security risks when interfacing with Epic's systems" (¶ 164); (2) Epic's "claim[ing] it 'wasn't comfortable' with CureIS accessing its systems" with the "messaging around why it supposedly 'wasn't comfortable'" being "that CureIS's products supposedly presented a data-security risk", including to "███████ in August 2024, Sutter in 2024, Sharp on February 2, 2023, and Advocate in March 2023" (¶ 90); and (3) Epic's "express[ing] vague concerns about integrating with EnrollmentCURE to the IT department at Advocate" at "the end of 2023" (¶ 96). To state a claim for trade libel under California law, a plaintiff must allege a statement that was false, disparaging, published to others in writing, induced others not to deal with it, and caused special damages. *See Resolute Forest Prods., Inc. v. Greenpeace Int'l*, 2019 WL 281370, at *12 (N.D. Cal. Jan. 22, 2019). CureIS's claim fails for multiple reasons.

*First*, CureIS's trade libel claim is time barred as to any statements made before May 12, 2023, two years before CureIS filed its Complaint. *Id.* at *7. These include Epic's alleged statements to Sharp on February 2, 2023 (¶¶ 90, 164), Advocate in February 2023 (¶ 164), and Advocate in March 2023 (¶ 90). This leaves only the alleged statements in category (1) above to ███████ in June 2023, ███████ in June 2024, and Sharp in 2024, the alleged statements in category (2) to ███████ in August 2024 and Sutter in 2024, and the alleged statements in category (3) to Advocate at the end of 2023. (¶¶ 90, 96, 164.)

*Second*, as to the non-time-barred statements, CureIS fails to plead who made the statements and to whom, the time and place of publication, and the substance of the statements, which is required for a trade libel claim. *Peak Health Ctr. v. Dorfman*, 2019 WL 5893188, at *5 (N.D. Cal. Nov. 12, 2019). For example, CureIS fails to allege *where* any of the allegedly libelous statements were made (¶¶ 90, 96, 164), and for some alleges only the year they were allegedly made. *See, e.g.*, *Gopher Media LLC v. Modern Doc Media*, 2023 WL 350531, at *8

(S.D. Cal. Jan. 20, 2023) (finding failure to allege time or place of the specific publications merited dismissal); *Kilopass Tech. Inc. v. Sidense Corp.*, 2010 WL 5141843, at \*6 (N.D. Cal. Dec. 13, 2010) (dismissing trade libel claim where plaintiff alleged only that publication "took place sometime in 2010"). CureIS also fails to sufficiently allege the substance of the statements. Generic allegations that Epic told customers that it "wasn't comfortable" with CureIS's products or that Epic expressed data-security concerns (¶¶ 90, 96, 164), do not explain "what exactly they said", as is required. *First Advantage Background Servs. Corp. v. Private Eyes, Inc.*, 569 F. Supp. 2d 929, 937 (N.D. Cal. 2008); *see also Kilopass Tech. Inc.*, 2010 WL 5141843, at \*6 (dismissing claim where plaintiff "does not allege the exact substance of the statements . . . but only states their general content").

     *Third*, CureIS fails to plead actionable false statements of fact. "To be actionable, the defamatory statement must be a false statement of fact; statements of opinion alone will not support a cause of action for trade libel". *Trevari Media, LLC v. Colasse*, 758 F. Supp. 3d 1175, 1181 (C.D. Cal. 2024). To determine whether a statement is sufficiently factual to be actionable, courts assess: (i) the statements in their broad context, analyzing their general tenor, subject matter, setting, and format; (ii) the specific context and content of the statement, including the "extent of figurative or hyperbolic language used and the reasonable expectations of the audience"; and (iii) whether the statement is sufficiently factual to be susceptible of being proved true or false. *Id.* As an initial matter, the alleged statements were too vague to be capable of being proven true or false. (*E.g.*, ¶ 77 ("Epic declared to ██████████ it had serious but vague 'concerns' about sharing data with CureIS"); ¶ 96 (Epic "expressed vague concerns about integrating with EnrollmentCURE to the IT department at Advocate"); ¶ 90 ("Epic has claimed it 'wasn't comfortable' with CureIS accessing its systems").) As such, they are inactionable. *See*

*Franklin v. Dynamic Details, Inc.*, 116 Cal. App. 4th 375, 390 (Cal. Ct. App. 2004) (explaining that "vague" statements are not actionable). The limited context provided in the Amended Complaint makes clear that Epic's alleged statements were about perceived data and security risks associated with CureIS's products. But a party's stated "belief that [another party's] products were generally unsafe is a non-actionable opinion". *HGCI, Inc. v. Luxx Lighting, Inc.*, 2020 WL 5913851, at *5 (C.D. Cal. Sept. 10, 2020).

*Fourth*, CureIS fails to plead that any of Epic's allegedly libelous statements were published to CureIS's customers in writing. *See, e.g.*, *Virun, Inc. v. Cymbiotika, Inc.*, 2022 WL 17371057, at *6 (C.D. Cal. Aug. 18, 2022) (dismissing trade libel claim where plaintiff failed to allege statements were published in writing); *GeoData Sys. Mgmt., Inc. v. Am. Pac. Plastic Fabricators, Inc.*, 2015 WL 12731920, at *16 (C.D. Cal. Sept. 21, 2015) (same).

*Fifth*, CureIS fails to allege that Epic's alleged statements "played a material and substantial part in inducing others not to deal with [it]". *Univ. Grading Serv. v. eBay, Inc.*, 2011 WL 846060, at *9 (N.D. Cal. Mar. 8, 2011). Instead, CureIS pleads only that "[a]s a direct result of Epic's trade libel, CureIS has suffered specific economic losses, including termination of existing contracts with ███████, ███████, and Advocate". (¶ 166.) Conclusory allegations of this nature are insufficient. *See, e.g.*, *RingCentral, Inc. v. Nextiva, Inc.*, 2020 WL 4039322, at *4 (N.D. Cal. July 17, 2020) (dismissing trade libel claim where plaintiff's allegations "merely conclude that it lost those four named clients 'as a result' of [defendant's] disparagement"). In fact, other allegations contradict that causation allegation. For example, CureIS alleges that "Epic *admitted* to [Advocate] that the reason for denying CureIS access had nothing to do with data security". (¶ 165.) As a result, it is not plausible that Advocate

terminated its CureIS contract based on any alleged statement by Epic that CureIS posed a data security risk.  (*See* ¶ 166.)

**D.      CureIS Fails To State a Claim for False Advertising.**

CureIS's claims for false advertising under the Lanham Act, the FAL, and the fraudulent prong of the UCL are "substantially congruent" and, accordingly, the portions of CureIS's FAL and UCL claims predicated on false advertising should be addressed together with its Lanham Act claim.  *See RingCentral, Inc.*, 2020 WL 4039322, at *2.  CureIS bases its false advertising claims on two categories of allegedly false and misleading statements:  (1) statements regarding "CureIS's reputation and CureIS's products" (¶ 170), and (2) statements regarding "Epic's products and product line up" (¶ 170) and representations "that Epic either offered or could develop replacement solutions to CureIS's" products (¶¶ 182, 186).

To state a claim for false advertising, a plaintiff must allege:  "(1) the defendant made a material false statement of fact in a commercial advertisement; (2) the false statement actually deceived or had the tendency to deceive a substantial segment of its audience; and (3) the plaintiff has been or is likely to be injured as a result of the false statement".  *Eli Lilly & Co. v. Arla Foods, Inc.*, 893 F.3d 375, 381-82 (7th Cir. 2018).  District courts within the Seventh Circuit consistently hold that Rule 9(b) applies to false advertising claims under the Lanham Act. *See, e.g.*, *Kunes Country Auto. Mgmt. Inc. v. Walters*, 2024 WL 2114006, at *8 (E.D. Wis. May 10, 2024) (applying 9(b) to Lanham Act false advertising claim).[19]  To plead fraud with

---

[19] The same heightened pleading standards apply to UCL and FAL claims.  *See RingCentral, Inc.*, 2020 WL 4039322, at *3.

particularity under Rule 9(b), a plaintiff must allege the "who, what, when, where, and how" of the charged misconduct. *Kunes*, 2024 WL 2114006, at *4. CureIS fails to do so.[20]

CureIS's categories approach to pleading these claims fails because CureIS does not allege "what particular false statements were made, to whom, when they were made, or how they were communicated to any specific client or prospective client" as is required by Rule 9(b). *Kunes*, 2024 WL 2114006, at *9. To the extent that the statements in category (1) overlap with those that form the basis for the trade libel claim, those statements are not actionable (*see supra* Section II.C), and are even more deficient here under Rule 9(b). *Id.* As to category (2), CureIS appears to rely on a handful of alleged statements that are too nonspecific as to "when", "where", or "how they were communicated" to be actionable under Rule 9(b). (*See* ¶ 55 (alleging Epic "represented to Sharp that it would provide" the EnrollmentCURE and EncounterCURE "services instead"), ¶ 57 (alleging Epic made a "false promise" to Sharp "that it could develop a replacement product" for EnrollmentCURE), ¶ 59 (alleging Epic "falsely represented to Sutter that CureIS's services would no longer be needed once Epic was up and running"), ¶ 61 (alleging Epic "falsely represented" to Sutter "that Epic's Tapestry system provided the same functionality" as EnrollmentCURE).) Similarly, CureIS also points to a document titled "Products You Can Replace with Epic" and conclusorily alleges that it was widely disseminated and "falsely represents that Epic offers products or product features it does not offer". (¶ 186; *see also* ¶ 99.) None of these allegations satisfies Rule 9(b). *See, e.g.*, *CardioNet, Inc. v. LifeWatch Corp.*, 2008 WL 567031, at *3 (N.D. Ill. Feb. 27, 2008) (finding dismissal appropriate where plaintiff "does not identify *who* made false and misleading statements, *when* they were

---

[20] CureIS's FAL claim should also be dismissed because, for the same reasons that apply to its UCL claim (*see infra* Section II.E.1), it has failed to establish that the FAL should be applied extraterritorially, *Wilson v. Frito-Lay N.A., Inc.*, 961 F. Supp. 2d 1134, 1147 (N.D. Cal. 2013).

made, *where* they were made, or the medium in which they were made" (emphasis in original));
*see also Rovanco Piping Sys., Inc. v. Perma-Pipe Int'l Holdings, Inc.*, 2022 WL 683690, at *9
(N.D. Ill. Mar. 8, 2022) (finding allegations that letter with purportedly false statements was
disseminated to the "target market" insufficiently precise to satisfy Rule 9(b)); *Catilina
Nominees Proprietary Ltd. v. Stericycle, Inc.*, 2021 WL 1165087, at *7 (N.D. Ill. Mar. 26, 2021)
(dismissing false advertising claim where plaintiff "simply alleges that [defendant] sent
promotional materials to potential customers" but did not list examples of customers or provide
additional details about dissemination).   In addition, these alleged statements all appear to be
"general statements about quality", which "are not 'facts' for the purpose of a claim of false
advertising, but are more appropriately classified as opinion or 'puffery'".  *Conrad v. Russell*,
2011 WL 3877000, at *1 (W.D. Wis. Sept. 1, 2011).

Moreover, CureIS also fails to establish that any false or misleading statement was made
within a "commercial advertising or promotion".  *Kunes*, 2024 WL 2114006, at *9.  As an initial
matter, "communication[s] sent to current customers are not actionable under the Lanham Act
because those statements are not communicated for promotional purposes".  *Segerdahl Corp. v.
Am. Litho, Inc.*, 2019 WL 157924, at *3 (N.D. Ill. Jan. 10, 2019).  Because Epic is alleged to
have made false or misleading statements *to its existing customers* (¶¶ 55, 57, 59, 61, 98, 170),
this alone merits dismissal of CureIS's Lanham Act claims.  But even if this were not alone
sufficient, CureIS has not established that Epic engaged in a "systematic communicative
endeavor to persuade possible customers" that rises to the level of commercial advertising and
promotion.  *Kunes*, 2024 WL 2114006, at *9.  Instead, CureIS alleges at most a handful of
"one-to-one interactions with Plaintiffs' customers or potential customers in which [the
defendant] allegedly made false statements" (*see* ¶¶ 55, 57, 59, 61), which is insufficient.  *Kunes*,

2024 WL 2114006, at *10 (finding allegations that defendants made false statements to "three or more" clients individually did not rise to a "systematic communicative endeavor"); *Hytera Comms. Corp. v. Motorola Sols., Inc.*, 623 F. Supp. 3d 857, 887 (N.D. Ill. 2022) (explaining that "person-to-person comments aren't advertising").

      **E.**      **CureIS Fails To State a Claim Under California's UCL.**

      "To bring a UCL claim, a plaintiff must show either an (1) unlawful, unfair, or fraudulent business act or practice, or (2) unfair, deceptive, untrue or misleading advertising". *Walker v. Ronin Staffing LLC*, 2025 WL 2994548, at *5 (C.D. Cal. Oct. 10, 2025). CureIS's UCL claim fails because the UCL has no extraterritorial application here and, even if it did, CureIS fails to allege any of the three types of unlawful, unfair, or fraudulent business practice.[21]

      **1.**      **CureIS Fails To Plead Extraterritorial Application of the UCL.**

      CureIS fails to state a UCL claim because "extraterritorial application of the UCL is improper where non-residents of California raise claims based on conduct that allegedly occurred outside of the state". *Williams v. Visa, Inc.*, 2025 WL 1518044, at *6 (N.D. Cal. May 28, 2025). To overcome the "strong presumption against the extraterritorial application of California law", including the UCL and FAL, out-of-state parties like CureIS must show they were harmed by wrongful conduct occurring in California. *Warner v. Tinder Inc.*, 105 F. Supp. 3d 1083, 1096 (C.D. Cal. July 31, 2015). To determine whether the wrongful conduct occurred in California, courts consider, among other factors, "whether the defendant's principal offices are located in California" and "the location from which decisions" relevant to the litigation "were made". *Cannon v. Wells Fargo Bank N.A.*, 917 F. Supp. 2d 1025, 1056 (N.D. Cal. 2013); *see also Ehret*

---

[21] CureIS's failure to plead a UCL claim as to the second prong, misleading advertising, is discussed above. (*See supra* Section II.D.)

*v. Uber Techs., Inc.*, 68 F. Supp. 3d 1121, 1130 (N.D. Cal. 2014) (applying the UCL where "the alleged fraudulent activity emanated from California" because the statute's focus is "on the defendant's conduct, rather than the plaintiff's damages"). Here, CureIS does not allege any Epic conduct in California. Instead, Epic's alleged conduct encompassed within CureIS's UCL claim, including, for example, any dissemination of allegedly libelous statements or false advertisements, would have emanated from Epic's headquarters in Wisconsin. (¶ 12.) Accordingly, the UCL does not govern Epic's conduct and CureIS's claim should be dismissed. *See, e.g.*, *Williams*, 2025 WL 1518044, at *6; *Cannon*, 917 F. Supp. 2d at 1056 (same).

### 2. CureIS Fails To Plead Unlawful, Unfair, or Fraudulent Conduct.

To plead a UCL claim under the "unlawful" prong, a plaintiff must allege the elements of a violation of law; "if the plaintiff cannot state a claim under the predicate law[,] the UCL claim also fails". *Eidmann v. Walgreen Co.*, 522 F. Supp. 3d 634, 647 (N.D. Cal. 2021) (cleaned up); *see also Smith v. Intel Corp.*, 2025 WL 2381617, at *8 (N.D. Cal. Aug. 15, 2025) ("Plaintiffs can only survive a motion to dismiss brought under [the unlawful] prong [of the UCL] if they plead sufficient facts to support another cause of action".). Here, CureIS alleges violations of (1) California's FAL, (2) the Cures Act, (3) the Lanham Act, and (4) common law trade libel. (¶ 180.) For the reasons stated above in Sections II.B-II.D, CureIS fails to adequately plead a violation of any of these laws.[22] Thus, CureIS cannot use these laws to support a UCL claim.

To plead a UCL claim under the "unfairness" prong, a plaintiff must allege conduct that "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise

---

[22] With respect to the Cures Act claim, while Epic's discussion in Section II.B does not address CureIS's information blocking allegations specific to Sutter or Advocate outside the applicable statute of limitations (¶¶ 60-61, 67-73), Epic's arguments apply equally to both.

significantly threatens or harms competition". *Olson v. World Fin. Grp. Ins. Agency, LLC*, 2024 WL 4668515, at *3 (N.D. Cal. Nov. 4, 2024). CureIS asserts that Epic's conduct is unfair because Epic's conduct is unlawful (¶ 181), but because the unlawfulness prong fails, so too does this prong. *See, e.g.*, *Smith*, 2025 WL 2381617, at *8. The bare legal conclusion that "Epic's tortious interference, false advertising, and disparagement were designed to harm CureIS's ability to compete, thereby restraining competition" falls far short. (¶ 181.) Courts dismiss claims under the "unfairness" prong of the UCL where, as here (*see* Sections I.B-I.D), the plaintiff's allegations "center around harm to itself, not competition" and the plaintiff "fails to identify any violation of an antitrust law". *RingCentral, Inc. v. Nextiva, Inc.*, 2020 WL 978667, at *5 (N.D. Cal. Feb. 28, 2020).

To plead a UCL claim under the "fraudulent" prong, a plaintiff "must show that the defendant's representations were false or were likely to have misled reasonable consumers". *GreenCycle Paint, Inc. v. PaintCare, Inc.*, 250 F. Supp. 3d 438, 452 (N.D. Cal. 2017). The conduct alleged as part of CureIS's claim under the fraudulent prong overlaps entirely with that alleged under its Lanham Act and California FAL claims. (¶ 182; *see also* ¶¶ 170, 186.) Here, for the same reasons that CureIS's Lanham Act and FAL claims fail, so too should its UCL claim. (*See supra* Section II.D.)

<u>**CONCLUSION**</u>

For the foregoing reasons, Epic respectfully requests that the Court grant its motion to dismiss CureIS's Amended Complaint in its entirety with prejudice.

Dated:  December 19, 2025

Respectfully submitted,

By:     *Lauren A. Moskowitz*

Lauren A. Moskowitz
Michael P. Addis
**Cravath, Swaine & Moore LLP**
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
Telephone:  (212) 474-1000
lmoskowitz@cravath.com
maddis@cravath.com

Matthew J. Duchemin
Bryce A. Loken
**Quarles & Brady LLP**
33 East Main Street, Suite 900
Madison, WI 53703
Telephone:  (608) 251-5000
matthew.duchemin@quarles.com
bryce.loken@quarles.com

*Attorneys for Defendant Epic Systems Corporation*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on December 19, 2025, a true and correct copy of the foregoing with redactions to under seal information was served upon all counsel of record via CM/ECF system.  Further, a true, correct, and under seal copy of the foregoing was also served upon counsel of record via email.

*/s/ Madalyn Vaughn*
Madalyn Vaughn
