# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

CureIS Healthcare, Inc.,

Plaintiff,

vs.

Epic Systems Corporation,

Defendant.

Civil Action No. 3:25-cv-00991-JDP

**REDACTED**

# DEFENDANT EPIC SYSTEMS CORPORATION'S REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................ ii

CITATION CONVENTIONS ........................................................................... viii

PRELIMINARY STATEMENT ............................................................................1

ARGUMENT ........................................................................................................3

I.     CUREIS'S ANTITRUST CLAIMS (COUNTS 1-3) SHOULD BE DISMISSED. ...........3

     A.     CureIS Fails To Plead a Plausible Antitrust Product Market. ...............................3

     B.     CureIS Fails To Plausibly Allege Antitrust Injury. ...............................................9

     C.     CureIS Fails To Plausibly Allege an Unlawful Exclusive Dealing Agreement. .....................................................................................................14

     D.     CureIS Fails To Plausibly Allege Its Monopolization Claims. ...........................19

II.     CUREIS'S REMAINING CLAIMS (COUNTS 4-9) SHOULD BE DISMISSED..........27

     A.     CureIS Fails To State a Claim for Tortious Interference with Contract. ..............27

     B.     The Tortious Interference with Prospective Business Relations Claim Fails..................................................................................................................29

     C.     CureIS Fails To State a Claim for Trade Libel....................................................33

     D.     CureIS Fails To State a Claim for False Advertising...........................................36

     E.     CureIS Fails To State a Claim Under California's UCL.......................................39

CONCLUSION....................................................................................................41

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*7EDU Impact Acad. Inc. v. You,*
  760 F. Supp. 3d 981 (N.D. Cal. 2024)................................................................30

*Agnew v. Nat'l Collegiate Athletic Ass'n,*
  683 F.3d 328 (7th Cir. 2012)..............................................................................4

*AT&T Mobility LLC v. AU Optronics Corp.,*
  707 F.3d 1106 (9th Cir. 2013).............................................................................40

*Atl. Richfield Co. v. USA Petroleum Co.,*
  495 U.S. 328 (1990) .............................................................................................9

*Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.,*
  166 F. Supp. 3d 988 (N.D. Cal. 2015).........................................................32, 33

*Bernstein v. Kemper Indep. Ins. Co.,*
  670 F. Supp. 3d 1018 (E.D. Cal. 2023) .............................................................35

*Blue Shield of Va. v. McCready,*
  457 U.S. 465 (1982) ...........................................................................................11

*Briggs & Stratton Corp. v. Kohler Co.,*
  405 F. Supp. 2d 986 (W.D. Wis. 2005).............................................................24

*Brown Shoe Co. v. United States,*
  370 U.S. 294 (1962) .............................................................................................5

*CardioNet, Inc. v. LifeWatch Corp.,*
  2008 WL 567031 (N.D. Ill. Feb. 27, 2008) ......................................................37

*Chicago Studio Rental, Inc. v. Ill. Dep't of Com.,*
  940 F.3d 971 (7th Cir. 2019).......................................................................10, 14

*Conrad v. Russell,*
  2011 WL 3877000 (W.D. Wis. Sept. 1, 2011)..................................................38

*Constr. Aggregate Transp., Inc. v. Florida Rock Indus., Inc.,*
  710 F.2d 752 (11th Cir. 1983).............................................................................16

*Cont'l Ore Co. v. Union Carbide & Cabron Corp.,*
  370 U.S. 690 (1962) ...........................................................................................18

*Copperweld Corp. v. Indep. Tube Corp.,*
  467 U.S. 752 (1984) ...........................................................................................16

*DeSoto Cab. Co. v. Uber Techs., Inc.*,
    2018 WL 10247483 (N.D. Cal. Sept. 24, 2018) ....................................................33

*Digene Corp. v. Third Wave Techs., Inc.*,
    536 F. Supp. 2d 996 (W.D. Wis. 2008), *aff'd*, 323 F. App'x 902
    (Fed. Cir. 2009) ......................................................................................................4

*Diva Limousine, Ltd. v. Uber Tech., Inc.*,
    392 F. Supp. 3d 1074 (N.D. Cal. 2019) ................................................................40

*Ducere LLC v. Enbridge (U.S.) Inc.*,
    2025 WL 81373 (N.D. Ill. Jan. 13, 2025) ................................................ 19, 20, 21

*Eco Elec. Sys. v. Reliaguard, Inc.*,
    2022 WL 1157481 (N.D. Cal. Apr. 19, 2022) .......................................................29

*EcoHub, LLC v. Recology Inc.*,
    2023 WL 6725632 (N.D. Cal. Oct. 11, 2023) .......................................................29

*Ehret v. Uber Techs., Inc.*,
    68 F. Supp. 3d 1121 (N.D. Cal. 2014) ...........................................................39, 40

*ErgoCare, Inc. v. D.T. Davis Enters., Ltd.*,
    2013 WL 12246342 (C.D. Cal. Dec. 26, 2013) ...................................................28

*Force Partners, LLC v. KSA Lighting & Controls, Inc.*,
    2022 WL 580808 (N.D. Ill. Feb. 25, 2022) .........................................................13

*GeoData Sys. Mgmt., Inc. v. Am. Pac. Plastic Fabricators, Inc.*,
    2015 WL 12731920 (C.D. Cal. Sept. 21, 2015) ..................................................36

*Gopher Media LLC v. Mod. Doc Media*,
    2023 WL 350531 (S.D. Cal. Jan. 20, 2023) .........................................................36

*Gulf States Reorg. Grp., Inc. v. Nucor Corp.*,
    466 F.3d 961 (11th Cir. 2006) ..............................................................................14

*HGCI, Inc. v. Luxx Lighting, Inc.*,
    2020 WL 5913851 (C.D. Cal. Sept. 10, 2020) ...............................................34, 35

*Hicks v. PGA Tour, Inc.*,
    897 F.3d 1109 (9th Cir. 2018) ............................................................................5, 9

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
    313 F. Supp. 3d 931 (N.D. Ill. 2018) ...................................................................16

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
    360 F. Supp. 3d 788 (N.D. Ill. 2019) ...................................................................16

*In re Harley-Davidson Aftermarket Parts Mktg., Sales Pracs. & Antitrust Litig.*,
    151 F.4th 922 (7th Cir. 2025) ........................................................................4, 5

*In re Surescripts Antitrust Litig.*,
    608 F. Supp. 3d 629 (N.D. Ill. 2022) ...................................................................6

*In re Tecfidera Antitrust Litig.*,
    791 F. Supp. 3d 852 (N.D. Ill. June 25, 2025) ................................ 17, 18, 19, 23

*Infectolab Ams. LLC v. ArminLabs GmbH*,
    2021 WL 292182 (N.D. Cal. Jan. 28, 2021) ......................................... 29, 30, 31

*Int'l Equip. Trading, Ltd. v. AB SCIEX LLC*,
    2013 WL 4599903 (N.D. Ill. Aug. 29, 2013) ........................................................8

*Int'l Equip. Trading, Ltd. v. Illumina, Inc.*,
    312 F. Supp. 3d 725 (N.D. Ill. 2018) ..................................................................20

*Internal Med. Nephrology, Inc. v. Bio-Medical Apps. of Ind., Inc.*,
    2019 WL 4688712 (S.D. Ind. Sept. 26, 2019) ........................................ 10, 12, 13

*Isaken v. Vermont Castings, Inc.*,
    825 F.2d 1158 (7th Cir. 1987) ....................................................................... 16, 17

*Jensen Enters. Inc. v. Oldcastle, Inc.*,
    2006 WL 2583681 (N.D. Cal. Sept. 7, 2006) .....................................................28

*Kaiser Aluminum & Chem. Corp. v. F.T.C.*,
    652 F.2d 1324 (7th Cir. 1981) ................................................................... 5, 8, 9

*Korea Supply Co. v. Lockheed Martin Corp.*,
    29 Cal. 4th 1134 (Cal. 2003) .............................................................................31

*Kunes Country Auto. Mgmt. Inc. v. Walters*,
    2024 WL 2114006 (E.D. Wis. May 10, 2024) ........................................ 37, 38, 39

*Lazarou v. Am. Bd. of Psychiatry & Neurology*,
    158 F.4th 854 (7th Cir. 2025) ..............................................................................2

*Lorain Journal Co. v. United States*,
    342 U.S. 143 (1951) ............................................................................................26

*Maui Jim, Inc. v. SmartBuy Guru Enters.*,
    386 F. Supp. 3d 926 (N.D. Ill. 2019) ...............................................................4, 8

*Mercatus Grp., LLC v. Lake Forest Hosp.*,
    641 F.3d 834 (7th Cir. 2011) ..............................................................................24

*Mosafer Inc. v. Broidy*,
    2022 WL 793029 (C.D. Cal. Feb. 4, 2022) ........................................................34

*Novell, Inc. v. Microsoft Corp.*,
  731 F.3d 1064 (10th Cir. 2013)........................................................25

*Nucap Indus., Inc. v. Robert Borsch LLC*,
  273 F. Supp. 3d 986 (N.D. Ill. 2017)................................................4

*Oracle International Corp. v. Rimini Street, Inc.*,
  123 F.4th 986 (9th Cir. 2024).........................................................38

*Pacific Bell Tel. Co. v. LinkLine Comms., Inc.*,
  555 U.S. 438 (2009)......................................................................25

*Phillips N. Am. LLC v. Glob. Med. Imaging, LLC*,
  2024 WL 4240920 (N.D. Ill. Sept. 19, 2024)...................................26

*Priority Int'l Animal Concepts, Inc. v. Bryk*,
  2012 WL 6020044 (E.D. Wis. Dec. 3, 2012)....................................37

*Quelimane Co. v. Stewart Title Guaranty Co.*,
  19 Cal. 4th 26 (Cal. 1998).............................................................28

*Qureshi v. Countrywide Home Loans, Inc.*,
  2010 WL 841669 (N.D. Cal. Mar. 10, 2010)....................................27

*RBG Plastics, LLC v. Sparkles Gift & Party Shop, Inc.*,
  2025 WL 2764505 (N.D. Ill. Sept. 29, 2025)...................................37

*RealPage, Inc. v. Yardi Sys., Inc.*,
  852 F. Supp. 2d 1215 (C.D. Cal. Feb. 13, 2013)..............................30

*Reifert v. S. Cent. Wisconsin MLS Corp.*,
  450 F.3d 312 (7th Cir. 2006)............................................................5

*Republic Tobacco Co. v. N. Atl. Trading Co.*,
  381 F.3d 717 (7th Cir. 2004)......................................................6, 19

*Rheumatology Diagnostics Lab'y, Inc. v. Aetna, Inc.*,
  2014 WL 524076 (N.D. Cal. Feb. 6, 2014) .....................................18

*Sanderson v. Culligan Int'l Co.*,
  415 F.3d 620 (7th Cir. 2005)..........................................................24

*Segerdahl Corp. v. Am. Litho, Inc.*,
  2019 WL 157924 (N.D. Ill. Jan. 10, 2019).......................................39

*Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*,
  950 F.3d 911 (7th Cir. 2020)............................................................4

*Silicon Labs Integration, Inc. v. Melman*,
  2010 WL 890140 (N.D. Cal. Mar. 8, 2010).......................................29

*Soliman v. Philip Morris Inc.*,
    311 F.3d 966 (9th Cir. 2002)............................................................................. 33, 34

*Solyndra Residual Tr., by & through Neilson v. Suntech Power Holdings Co.*,
    62 F. Supp. 3d 1027 (N.D. Cal. 2014).......................................................... 27, 30

*Spotlight Ticket Mgmt., Inc. v. Concierge Live LLC*,
    2024 WL 4866813 (C.D. Cal. Aug. 30, 2024)............................................. 31, 32

*St. Clair v. Citizens Fin. Grp.*,
    340 F.App'x 62 (3d Cir. 2009)...............................................................................22

*Sunny Handicraft Ltd. v. Envision This!, LLC*,
    2015 WL 231108 (N.D. Ill. Jan. 16, 2015)................................................. 33, 39

*Team Schierl Cos. v. Aspirus, Inc.*,
    2023 WL 6847433 (W.D. Wis. Oct. 17, 2023)....................................................16

*TransWeb, LLC v. 3M Innovative Properties Co.*,
    16 F. Supp. 3d 385 (D.N.J. 2014), *aff'd*, 812 F.3d 1295 (Fed. Cir. 2016) ............12

*Trevari Media, LLC v. Colasse*,
    758 F. Supp. 3d 1175 (C.D. Cal. 2024) ...............................................................35

*Trindade v. Reach Media Grp., LLC*,
    2013 WL 3977034 (N.D. Cal. July 31, 2013)............................................. 28, 30

*U.S. Bd. of Oral Implantology v. Am. Bd. of Dental Specialties*,
    390 F. Supp. 3d 892 (N.D. Ill. 2019)...................................................................22

*United States v. Apple, Inc.*,
    2025 WL 1829127 (D.N.J. June 30, 2025)................................................. 25, 26

*United States v. Colgate & Co.*,
    250 U.S. 300 (1919) ...............................................................................................25

*United States v. Falstaff Brewing Corp.*,
    410 U.S. 526 (1973) ...............................................................................................13

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) ............................................................................8, 11

*United Wis. Grain Prods. LLC v. Archer Daniels Midland Co.*,
    144 F.4th 976 (7th Cir. 2025) ..............................................................................19

*Univ. Grading Serv. v. eBay, Inc.*,
    2011 WL 846060 (N.D. Cal. Mar. 8, 2011)........................................................36

*VBR Tours, LLC v. Nat'l. R.R. Passenger Corp.*,
    2015 WL 225328 (N.D. Ill. Jan. 15, 2015)..................................................9, 11

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP,*
540 U.S. 398 (2004) .................................................................................. 25, 26

*Viamedia, Inc. v. Comcast Corp.,*
951 F.3d 429 (7th Cir. 2020) ................................................................................ 6

*Virun, Inc. v. Cymbiotika, Inc.,*
2022 WL 17371057 (C.D. Cal. Aug. 18, 2022) ................................................. 36

*Vox Network Sols., Inc. v. Gage Techs., Inc.,*
2024 WL 1260573 (N.D. Cal. Mar. 25, 2024) ................................................... 32

*Williams v. Visa, Inc.,*
2025 WL 1518044 (N.D. Cal. May 28, 2025) ................................................... 40

**Statutes & Rules**

21st Century Cures Act, Pub. L. No. 114-255 (2016) ............................ 26, 32, 40, 41

Fed. R. Civ. P. 9(b) ........................................................................................ 2, 37, 38

Fed. R. Civ. P. 12(b)(6) ......................................................................................... 4, 9

Lanham Act ......................................................................................................... 36, 39

Section 1 of the Sherman Act ............................................................................. passim

Section 2 of the Sherman Act ........................................................................... 1, 3, 23

# CITATION CONVENTIONS

**Entities**

"Plaintiff" or "CureIS":  CureIS Healthcare, Inc.

"Defendant" or "Epic":  Epic Systems Corporation

"Advocate":  Advocate Physician Partners

"":

"Sharp":  Sharp HealthCare and Sharp Health Plan

"Sutter":  Sutter Health

**Terms**

"CAPS":  Core administrative processing system

"Cures Act":  21st Century Cures Act

"EHR":  Electronic health record

"FAL":  California's False Advertising Law, Cal. Bus. & Prof. Code § 17500

"MCM":  Managed care middleware

"MCO":  Managed care organization

"PSHP":  Provider sponsored health plan

"UCL":  California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200

**Pleadings**

"Amended Complaint" and ¶:  First Amended Complaint, dated July 14, 2025 (Dkt. No. 40)

"Complaint" or "Compl.": Complaint, dated May 12, 2025 (Dkt. No. 4)

"Motion" or "Mot.":  Epic's Memorandum of Law in Support of Its Motion to Dismiss, dated December 19, 2025 (Dkt. No. 81)

"Opposition" or "Opp.": CureIS's Opposition to Epic's Motion to Dismiss, dated January 20, 2026 (Dkt. No. 102)

## PRELIMINARY STATEMENT

Epic's Motion demonstrated that CureIS's Amended Complaint fails at every step to plausibly make out a claim. CureIS's Opposition does nothing to credibly defend or ameliorate the deficiencies in the Amended Complaint. Instead, the Opposition is rife with deflection and misdirection.

CureIS's antitrust claims are fundamentally flawed and should be dismissed. *First*, CureIS does not plausibly allege the existence of a relevant antitrust product market as to the only two alleged markets in which anticompetitive effects are alleged to have occurred. (Section I.A.) *Second*, CureIS does not plausibly allege that it has suffered a cognizable antitrust injury; CureIS fails to plead a plausible theory of harm in any market, pleading at most harm to a single competitor—itself—rather than to competition at large. (Section I.B.) *Third*, CureIS fails to plausibly allege an exclusive dealing arrangement or any other concerted action giving rise to a viable claim under Section 1 of the Sherman Act. (Section I.C.) *Fourth*, CureIS's Section 2 monopolization claims fail because they do not plausibly allege monopoly power and are predicated on conduct that is not plausibly alleged and is not the type of conduct that is prohibited under Section 2, including most notably relying on a supposed refusal to deal with CureIS, which cannot support an antitrust claim under black letter antitrust law. (Section I.D.)

CureIS's other jumble of flawed and often internally inconsistent claims also fail. *First*, CureIS's claim of tortious interference with existing contracts fails to plausibly allege knowledge or intent to interfere with a particular contractual relationship, let alone any details about the terms of such contracts. (Section II.A.) *Second*, CureIS's claim for tortious interference with prospective business relations suffers from the same failures and in addition fails to plausibly allege any reasonable probability of an economic benefit and to plead any non-conclusory allegations of independently wrongful conduct. (Section II.B.) *Third*, CureIS's trade

libel claim is partially time-barred, and CureIS fails to identify with sufficient particularity any purported materially false written statements of fact that were published to customers. (Section II.C.) *Fourth*, CureIS's false advertising claims do not survive Rule 9(b) of the Federal Rules of Civil Procedure because CureIS fails to allege with specificity any false "commercial advertising or promotion" and fails to identify what was said and how it was communicated. (Section II.D.) *Fifth*, CureIS's UCL claim should be dismissed because the UCL does not apply extraterritorially to non-residents where the at-issue conduct emanated from Wisconsin rather than from California, and CureIS fails to identify a predicate wrongful act under the UCL's unlawful, unfair, or fraudulent prongs. (Section II.E.)

Contrary to CureIS's argument (Opp. 48), CureIS should not be permitted yet another opportunity to try and correct the many deficiencies undermining its Amended Complaint. CureIS already had one opportunity to amend, which it used to invent a completely new set of alleged facts (often contrary to the facts in its original Complaint)[1] that still fails to make out a cognizable claim. CureIS does not and cannot show how further amendment could cure the deficiencies in its pleadings. *See Lazarou v. Am. Bd. of Psychiatry & Neurology*, 158 F.4th 854, 865 (7th Cir. 2025) (denying leave to amend for plaintiff's failure to explain "how they could address the identified deficiencies through an amendment").[2] Enough is enough; the Amended Complaint should be dismissed with prejudice.

---

[1] CureIS objects to Epic identifying the evolution and inconsistency between CureIS's initial and operative complaints. (Opp. 12.) But Epic is not asking the Court to construe CureIS's prior allegations as if they are the salient allegations for purposes of the motion. Rather, Epic simply points out CureIS's shifting and contradictory allegations undermine the plausibility of its current allegations.

[2] Unless otherwise noted, all emphasis is added, and citations and internal quotations are omitted.

# ARGUMENT

## I.      CUREIS'S ANTITRUST CLAIMS (COUNTS 1-3) SHOULD BE DISMISSED.

CureIS's three antitrust claims under Section 1 and Section 2 of the Sherman Act fail as a matter of law.

### A.      CureIS Fails To Plead a Plausible Antitrust Product Market.

In its Motion, Epic showed that CureIS fails to plausibly plead the only two markets where anticompetitive harm has allegedly occurred—the alleged markets for PSHP CAPS software and for MCM software.  (Mot. Section I.A.)  In its Opposition, CureIS does not dispute that CureIS must plead the existence of relevant product markets to state a viable claim for each of its antitrust causes of action.  (Opp. 10-18.)  CureIS nonetheless argues that it need not define *these* specific markets and that in any event it *has* plausibly defined these two markets.  These arguments are unavailing.

#### 1.      CureIS Has To, But Fails To, Define the Markets in Which Harm Is Alleged to Have Occurred.

As noted above, Epic's Motion focused on CureIS's failure to plausibly define the markets in which it alleges anticompetitive harm.  In its Opposition, CureIS argues that because Epic did not challenge in its Motion CureIS's definition of a separate market—the alleged EHR software market[3]—"Epic's arguments about PSHP CAPS software market definition [are] irrelevant" and "CureIS does not need to establish Epic's power in the PSHP CAPS software [market] to proceed with its theory that Epic wielded market power anticompetitively to harm competition in the MCM software market".  (Opp. 12.)  Not so.  CureIS's theory of harm is that Epic used its market power in the alleged EHR and PSHP CAPS software markets to harm

---

[3] For the avoidance of doubt, Epic disputes CureIS's EHR software market definition, but Epic did not raise that issue in its Motion because CureIS does not allege anticompetitive effects in that market to support any of its claims.

competition in the alleged MCM software market, so as to entrench its market power in the PSHP CAPS software market. (*Id.*) That convoluted theory fails for multiple reasons explained in Epic's Motion and further below. For present purposes, however, the salient point is that CureIS's theory alleges harm in only two of the three alleged markets—the alleged PSHP CAPS software market and the alleged MCM software market; no harm is alleged in the alleged EHR software market. That means that for CureIS to state any claim on its theory of harm, it has to plausibly define each of the two purported markets in "which [defendant's] actions have an *anticompetitive effect*". *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 337 (7th Cir. 2012). "The entire point of the Sherman Act is to protect competition in the commercial arena" and "without a commercial market, the goals of the Sherman Act have no place". *Id.* "[W]ithout a definition of [the relevant] market there is no way to measure the [defendant's] ability to lessen or destroy competition". *Digene Corp. v. Third Wave Techs., Inc.*, 536 F. Supp. 2d 996, 1004 (W.D. Wis. 2008), *aff'd*, 323 F. App'x 902 (Fed. Cir. 2009). As discussed below, CureIS does not plausibly define the two markets it alleges were harmed by Epic's conduct. Thus, its antitrust claims must be dismissed. *See Nucap Indus., Inc. v. Robert Borsch LLC*, 273 F. Supp. 3d 986, 1011 (N.D. Ill. 2017) ("[F]ailure to offer a plausible relevant market is a proper ground for dismissing an antitrust claim at the Rule 12(b)(6) stage".).[4]

## 2. CureIS Fails To Plausibly Allege a PSHP CAPS Software Market.

In its Motion (Mot. 12-16), Epic demonstrated that CureIS fails to plausibly plead a PSHP CAPS software market, pointing out the Amended Complaint's failure to adequately plead

---

[4] CureIS also argues in its Opposition that market definition arguments "are typically inappropriate for dispositive motions". (Opp. 11.) But courts in this circuit routinely grant (or affirm the grant of) motions to dismiss for failure to plausibly plead a relevant market. *See, e.g.*, *In re Harley-Davidson Aftermarket Parts Mktg., Sales Pracs. & Antitrust Litig.*, 151 F.4th 922, 933-34 (7th Cir. 2025); *Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 917-18 (7th Cir. 2020); *Maui Jim, Inc. v. SmartBuy Guru Enters.*, 386 F. Supp. 3d 926, 945-46 (N.D. Ill. 2019).

the *Brown Shoe* factors and noting that "courts *must* consider . . . such practical indicia" in assessing whether the plaintiff has pleaded a well-defined market. *In re Harley-Davidson Aftermarket Parts Mktg., Sales Practices & Antitrust Litig.*, 151 F.4th 922, 933 (7th Cir. 2025) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)).

In its Opposition, CureIS raises three arguments. *First¸* CureIS argues that a conclusory allegation that a product purportedly satisfies the hypothetical monopolist test suffices to define a market and that the *Brown Shoe* factors need not be considered. (Opp. 11.) But CureIS's allegation that a "hypothetical monopolist of PSHP CAPS software could impose a SSNIP" (¶ 33) "is a legal conclusion veiled as a factual allegation that [courts] do not consider when ruling on a motion to dismiss". *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1122 (9th Cir. 2018). And in any event, CureIS is wrong on the law. As the Seventh Circuit noted in *In re Harley-Davidson*, "courts *must* consider" the *Brown Shoe* factors. 151 F.4th at 933-34 (holding that complaint failed to adequately plead a submarket where *Brown Shoe* factors were "largely absent"). Cases cited by CureIS are not to the contrary. *See, e.g.*, *Kaiser Aluminum & Chem. Corp. v. F.T.C.*, 652 F.2d 1324, 1330, 1332 (7th Cir. 1981) (stating that *Brown Shoe* "sets forth a standard test for defining product submarkets" and then applying the *Brown Shoe* factors to define the submarket); *Reifert v. S. Cent. Wisconsin MLS Corp.*, 450 F.3d 312, 320 (7th Cir. 2006) (stating that the *Brown Shoe* factors "are important considerations in defining a market"). Thus, CureIS's conclusory hypothetical-monopolist test allegations are no substitute for plausible factual allegations showing CureIS's purported PSHP CAPS software market has the "practical indicia" of a well-defined submarket.

*Second*, CureIS argues that it need only plead "the rough contours" of a relevant market to survive Epic's market definition challenge. (Opp. 14.) That argument too misses the mark.

The Seventh Circuit has been clear that "the rough contours" concept is relevant only in the limited circumstance where "there [is] no significant dispute about the rough contours of the relevant market". *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 737 (7th Cir. 2004) (collecting cases). In that limited circumstance, courts may allow direct evidence of anticompetitive effects in that roughly defined market "in lieu of the usual showing of a precisely defined relevant market and a monopoly market share". *Id.* Here, the very existence of a PSHP CAPS software market is hotly disputed, and CureIS has not plausibly pleaded even its "rough contours"—much less with the precision Seventh Circuit law requires in these circumstances.[5]

*Third*, CureIS's conclusory attempts to differentiate PSHP CAPS software do not satisfy any, let alone the majority, of the necessary *Brown Shoe* factors. In its Motion, Epic walked through the various factors and demonstrated the deficiencies in CureIS's allegations on each, noting the lack of plausible allegations of distinct customers (Mot. 13), industry recognition (*id*. at 14), peculiar characteristics and uses (*id*. at 15), unique production facilities *(id*. at 15-16) (a factor CureIS concedes it fails to plausibly allege (Opp. 15-16)), distinct prices (Mot. 15-16), specialized vendors (*id*.), and unique pricing sensitivities (*id*. at 16). The Opposition attempts to gloss over these deficiencies to no avail. Most notably, CureIS cannot hide from the fact that the Amended Complaint does not contain *any* allegations identifying by name a vendor who sells CAPS software exclusively to PSHPs, or a CAPS software product that is sold exclusively to such customers to the exclusion of other payers. Nor does the Amended Complaint plausibly

---

[5] Nor is "evidence of market structure" an alternative standard for pleading a relevant market. (Opp. 14 (quoting *In re Surescripts Antitrust Litig.*, 608 F. Supp. 3d 629, 643 (N.D. Ill. 2022).) The court's reference in *In re Surescripts* to "evidence of market structure", 608 F. Supp. 3d at 643, relates to pleading exclusive dealing arrangements under the rule of reason standard and encompasses pleading *both* "market power and relevant markets". *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 462 (7th Cir. 2020). Nothing in *In re Surescripts* absolves CureIS of its obligation to plead a relevant market for each of its antitrust claims.

allege any difference in the price of CAPS software sold to PSHPs as opposed to other payers. Absent such allegations, the Amended Complaint does not adequately define a submarket for PSHP CAPS software that is distinct from a market encompassing all CAPS software products sold to all payers—a market that CureIS does not attempt to define.

In lieu of plausible allegations, CureIS's Opposition makes repeated references to a single page on Epic's website discussing Tapestry. (Opp. 13 (citing ¶ 33 n.8), 15-16 (same)). That webpage, however, describes Tapestry as a product for "managed care"—a category that CureIS itself defines as far broader than PSHPs and that includes "HMOs, PPOs, and POSs", as well as every health insurance plan that contracts with healthcare providers "to provide care at reduced costs". (¶ 9 n.1.) CureIS hangs its hat on the webpage's statement that Epic provides Tapestry, its "managed care product", for use by "our organizations that provide a health plan". (¶ 33 n.8.) But nothing on that webpage suggests that Epic provides Tapestry *only* to provider organizations to the exclusion of non-PSHP payers. As noted above, the Amended Complaint does not allege that Epic sells Tapestry only to PSHPs, nor does it identify any other Epic CAPS software product that supposedly is provided to non-PSHP customers in lieu of Tapestry. Indeed, CureIS acknowledges that Tapestry competes with CAPS software products—such as Cognizant Facets & QNXT, HealthEdge Health Rules Payer, Plexis, and Oracle IDX FRM— which are expressly alleged *not* to be "specifically tailored to the needs of PSHPs". (¶ 35.) CureIS simply comes nowhere close to plausibly pleading a PSHP CAPS software market.

### 3.     CureIS Fails To Plausibly Allege an MCM Software Market.

In its Motion, Epic demonstrated that the Amended Complaint does not plausibly define a relevant market for MCM software because while CureIS pleads that MCM software is complementary to and separate from CAPS software, its factual allegations "do not permit an inference that [the products] are not interchangeable", requiring dismissal. (Mot. 16 (quoting

*Maui Jim, Inc. v. SmartBuy Guru Enters.*, 386 F. Supp. 3d 926, 947 (N.D. Ill. 2019)); *see also*

*Int'l Equip. Trading, Ltd. v. AB SCIEX LLC*, 2013 WL 4599903, at *3 (N.D. Ill. Aug. 29, 2013)

("[C]ourts should dismiss a claim when the alleged relevant market clearly does not encompass

all interchangeable substitute products").  Specifically, Epic pointed out that the only MCM

software identified in the Amended Complaint is CureIS's own software, which is alleged to

offer services that CAPS software is also alleged to offer.  (Mot. 16-17 (detailing examples

where CureIS's MCM software products overlap with CAPS software).)  Indeed, the alleged

overlap in uses between MCM software and CAPS software is further underscored by CureIS's

allegations that health plans *replaced* MCM software with CAPS software—for example,

switching from CureIS's EnrollmentCURE to Epic's Tapestry Enrollment and Eligibility

functionality—to achieve the same purpose.  (Mot. 16-18; ¶¶ 55-57, 61.)

     In its Opposition, CureIS relies on several cases to support its argument that MCM

software and CAPS software products are complements and not substitutes.  But those cases are

inapposite—the products in each of those cases, unlike here, were very clearly *not*

interchangeable.  For example, in *United States v. Microsoft Corp.*, 253 F.3d 34, 52, 54

(D.C. Cir. 2001), the court held that computer operating systems and middleware software

(which "are not operating systems at all") were in different product markets because regardless

of whether middleware "might eventually take over" all computer operating system functions,

"consumers could not now abandon their operating systems and switch to middleware".

Similarly, in *Kaiser*, the court held that alkaline and acidic refractories could not be in the same

product market because "there is virtually no interchangeability of use", where using one in lieu

of the other would cause unwanted chemical interactions.  652 F.2d at 1331.  By contrast, CureIS

alleges that consumers in fact *have* abandoned MCM software and replaced it with CAPS

software.  (¶¶ 55, 57, 61, 63.)  Actual substitution between products is "the clearest indication that products should be included in the same market".  *Kaiser*, 652 F.2d at 1330.

CureIS also argues that Epic "implicitly concede[s] the sufficiency of the MCM software relevant market definition" by "not engag[ing] with CureIS's hypothetical monopolist/SSNIP and *Brown Shoe* allegations".  (Opp. 18.)  Nothing could be further from the truth.  CureIS's conclusory allegations that "a hypothetical monopolist of MCM software can profitably implement a SSNIP" and that "MCM software customers would not switch to other types of products . . . in sufficient numbers" (¶ 43) are legal conclusions that carry no weight on a Rule 12(b)(6) motion, and thus required no engagement by Epic.  *Hicks*, 897 F.3d at 1122.  As for the *Brown Shoe* factors, Epic did engage with the only factor that is the subject of any factual allegations, namely peculiar characteristics and uses.  Epic argued that CureIS's MCM software product is not alleged to be peculiar or to be used for different purposes or by different customers than CAPS software.  (Mot. 16-17.)  And Epic also noted that the two products are alleged to be the subject of real-world substitution.  (*Id.* at 18.)  Thus, far from "conced[ing] the sufficiency of" this purported market (Opp. 18), Epic has argued that CureIS's purported MCM software market does not include all reasonably interchangeable substitutes, such as CAPS software, and thus, fails as a matter of law.  (Mot. 12-18.)

### B.    CureIS Fails To Plausibly Allege Antitrust Injury.

In its Motion, Epic demonstrated that CureIS fails to plead antitrust injury—an injury to the plaintiff "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful", *VBR Tours, LLC v. Nat'l. R.R. Passenger Corp.*, 2015 WL 225328, at *4 (N.D. Ill. Jan. 15, 2015) (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990))—for two reasons.  *First*, CureIS fails to plead antitrust injury because antitrust injury is generally suffered by competitors or customers of an antitrust defendant, and

CureIS specifically alleges it is *not* a competitor (nor a customer) of Epic. *Second*, CureIS fails to plead antitrust injury because to show such injury, CureIS must "assert an injury not only to itself, but to the relevant market", *Chicago Studio Rental, Inc. v. Ill. Dep't of Com.*, 940 F.3d 971, 978 (7th Cir. 2019), which the Amended Complaint utterly fails to do. CureIS's responses and their shortcomings are discussed in turn below.

### *CureIS's alleged injury does not flow from plausibly alleged anticompetitive conduct.*

As Epic pointed out in its Motion, "[t]he Seventh Circuit usually presume[s] that competitors and consumers in the relevant market are the only parties who suffer antitrust injuries and are in a position to effectively vindicate the antitrust laws". *Internal Med. Nephrology, Inc. v. Bio-Medical Applications of Ind., Inc.*, 2019 WL 4688712, at *3 (S.D. Ind. Sept. 26, 2019). Here, CureIS concedes that it is neither a competitor nor a customer in the purported PSHP CAPS software market. (Opp. 18-21; ¶¶ 36, 45.) That should end the inquiry.

Nevertheless, CureIS argues that it alleges an antitrust injury because "Epic is trying to eliminate [CureIS] and other MCM software providers because they reduce (if not eliminate) Epic's ability to obtain or maintain monopoly power in the PSHP CAPS software market". (Opp. 19.) But this argument quickly falls apart because CureIS does not explain *why* or *how* eliminating MCM software providers has any bearing on Epic's ability to compete in the PSHP CAPS software market.

CureIS tries to connect the dots on its theory by asserting that MCM software—which it characterizes as "middleware"—makes CAPS software (not even PSHP CAPS software specifically) and EHR software solutions less "'sticky' (*i.e.*, reduces switching costs between EHR and CAPS software solutions)" (¶ 40), but does not include factual allegations or even a threadbare explanation on *how* MCM software purportedly reduces "stickiness" between these

products.  Simply put, CureIS pleads no theory of antitrust harm or injury.  CureIS's allegations

of "stickiness" that "middleware" purportedly helps address is nothing more than a transparent

attempt by CureIS to match the labels used in *Microsoft*, to prop up a misguided analogy

between that case and the Amended Complaint.  253 F.3d at 47.  The cases are nothing alike.  In

*Microsoft*, browsers such as Netscape promised to untether Microsoft's dominant operating

system, Windows, from the applications developers wrote for use by PC users, thereby allowing

users to switch operating systems without losing access to their favorite applications.  *Id.* at 53.[6]

Here, no similar mechanism is alleged or explained, let alone plausibly so.  The Amended

Complaint is devoid of any factual allegations or explanation as to why a PSHP that uses

CureIS's products could more easily switch from Tapestry to a third-party PSHP-specific CAPS

software product or vice versa.  Accordingly, CureIS fails to plausibly allege injury that is "of

the type the antitrust laws were intended to prevent".  *VBR Tours*, 2015 WL 225328, at *4.

CureIS further argues for the application of a limited exception whereby a plaintiff can

have standing where its injury is "inextricably intertwined with the injury the [defendant] sought

to inflict".  (Opp. 19 (citing *Blue Shield of Va. v. McCready*, 457 U.S. 465, 484 (1982).)  That

argument fails for similar reasons to the one discussed above.  The Amended Complaint is again

devoid of plausible allegations or even an explanation of the mechanism by which CureIS's

alleged injuries in the alleged MCM software market affect the alleged PSHP CAPS software

market in any way, let alone how the alleged harms in the two purported markets are inextricably

---

[6] Tellingly, in *Microsoft*, while third-party browsers did not compete with Windows for *users*, they did compete with Windows for attracting *developers*, making them fit neatly into the Seventh Circuit's presumption as to the likely victims of antitrust injury.  253 F.3d at 53.  CureIS, by contrast, insists that it is *not* competing with CAPS software *at all*, further distinguishing this case from *Microsoft*.

intertwined.[7]  *Internal Medical Nephrology* is illustrative.  There, the court considered and rejected application of *McCready*'s limited exception because the plaintiff's alleged harm "was only indirectly related and incidental to the alleged anticompetitive scheme, the intent and effect of which was allegedly to gain control of" a separate purported market.  *Internal Med. Nephrology, Inc.*, 2019 WL 4688712, at *5 (cleaned up).  Similarly here, because CureIS does not allege how its personal injury is related to, let alone inextricably intertwined with, the alleged anticompetitive scheme to preserve Epic's position in the purported PSHP CAPS software market, this exception does not apply.

CureIS also argues that it can establish antitrust injury because "[i]f a defendant eliminates preexisting competition in a market to clear the way, it cannot later claim lack of antitrust injury".  (Opp. 19-20.)  Clear the way to what?  CureIS does not finish the sentence to answer that question.  CureIS does not plausibly allege any scheme by Epic to enter into, let alone monopolize, the MCM software market.  It alleges instead that Epic "is trying to eliminate [CureIS] and other [undefined and unnamed] MCM software providers because they reduce (if not eliminate) Epic's ability to obtain or maintain monopoly power in the [purported] PSHP CAPS software market".  (Opp. 19.)  As noted above, that theory lacks any factual support or explanation in the Amended Complaint, and thus fails.  And the two cases CureIS cites in support of this argument are easily distinguishable.  In *TransWeb, LLC v. 3M Innovative Properties Co.*, 16 F. Supp. 3d 385, 388 (D.N.J. 2014), *aff'd*, 812 F.3d 1295 (Fed. Cir. 2016), the

---

[7] Moreover, *Internal Medical Nephrology* makes clear that for the "inextricably intertwined" exception to apply, the two markets at issue must be "so closely related that the distinction between them is of no consequence".  *Internal Med. Nephrology*, 2019 WL 4688712, at *4 (finding medical director services market and the dialysis services market not "so closely related" as, for example, "the cash and futures markets for a single commodity").  Here, CureIS alleges specific differences between purported CAPS and MCM software markets that, if taken as true, demonstrate CureIS has pleaded itself out of this requirement, including by alleging different purported market participants and that MCM software offers "unique functionality" from CAPS software.  (¶¶ 36, 38, 43, 45; *see also* Mot. 20 n.9.)

plaintiff and defendant were both alleged to compete in the same market, as they both "independently developed filtration web for use in the[] NIOSH-approved respirators". And CureIS's citation to *United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 531-37 (1973), is entirely misplaced because that case dealt with a potential competitor, addressed a violation of Section 7 of the Clayton Act, and was brought by the United States, which is not subject to the antitrust injury requirement.

CureIS finally argues in the alternative that CureIS has suffered antitrust injury because Epic has harmed "CureIS's *customers'* access to their own data", and "Epic's exclusionary conduct has reduced [customers'] choice for PSHP CAPS software". (Opp. 20.) But CureIS is not its customers, and cannot manufacture antitrust injury by trying to stand in their shoes. *See Internal Med. Nephrology, Inc.*, 2019 WL 4688712, at *3 (recognizing antitrust injury requires "causal connection" between violation and harm to plaintiff).[8] And of course, this argument too fails to address the fundamental shortcoming of CureIS's claim, namely the lack of any explanation of how the supposed elimination of MCM products reduces customers' choice in a supposedly separate product market for PSHP CAPS software.

**CureIS alleges injury to itself, not to competition.** Epic argued in its Motion that CureIS fails to plead antitrust injury because it pleads only harm to itself, and not to competition writ large in any alleged market. (Mot. 20-21.) In its Opposition, CureIS cites an out-of-circuit case, supposedly to support the proposition that CureIS has pleaded antitrust injury because CureIS is allegedly "the main competitor" in the purported MCM software market, and thus, excluding

---

[8] CureIS's cited support (Opp. 20) is not to the contrary. In *Force Partners, LLC v. KSA Lighting & Controls, Inc.*, 2022 WL 580808, at *14 (N.D. Ill. Feb. 25, 2022), the plaintiff and defendants were alleged to be competitors in the same market, with defendants purportedly engaging in a horizontal conspiracy to boycott the plaintiff. It did not hold that a plaintiff that is not a competitor in the relevant market could stand in the shoes of a customer in that market for purposes of establishing antitrust injury.

CureIS from working with Epic's customers "would either destroy an entire market or eliminate the risk it poses to a defendant's power". (Opp. 20-21 (citing *Gulf States Reorg. Grp., Inc. v. Nucor Corp.*, 466 F.3d 961, 967-68 (11th Cir. 2006).) Even setting aside the fact that CureIS's dominance in the alleged MCM software market is not alleged with any detail in the Amended Complaint, *Gulf States* does not support CureIS's position. *Gulf States* dealt with an acquisition of assets by a monopolist (and was thus assessed under Section 7 of the Clayton Act, *see* 466 F.3d at 966), and the court found that the exclusion of the plaintiff—a would-be acquirer and potential entrant into the market—is "inseparable from the alleged harm to competition", *id.* at 967. That is not the situation here, where CureIS insists it is neither a current nor a would-be competitor of Epic in any market. Moreover, the Seventh Circuit in *Chicago Studio Rental*, distinguished *Gulf States* and limited it to its circumstances—the outright exclusion of a potential entrant into an otherwise monopolized market. *Chicago Studio Rental*, 940 F.3d at 978-79. Here, CureIS "does not allege that it was entirely excluded" from any market, and its argument must be rejected under that binding Seventh Circuit precedent as well. *Id.*

C.   **CureIS Fails To Plausibly Allege an Unlawful Exclusive Dealing Agreement.**

In its Motion, Epic demonstrated that CureIS fails to plausibly allege an exclusive dealing agreement, because it fails to plausibly plead any exclusive arrangement, let alone one that results in substantial foreclosure. (Mot. 21-25.) In its Opposition (perhaps recognizing the flaws with its exclusive dealing theory), CureIS tries to reframe its exclusive dealing claim as a supposedly broader claim of "concerted action" on the basis that "coercing customers into not doing business with another is a sufficient agreement . . . regardless of whether it fits into the exclusive dealing bucket". (Opp. 21-22.)

As an initial matter, CureIS's attempt to reframe its allegations in an opposition brief is improper, as the reframing it calls for is flatly inconsistent with the Amended Complaint. The

14

title of CureIS's claim is "Violation of the Sherman Act Section 1 (15 U.S.C. § 1): *Exclusive Dealing*", and the only alleged arrangement CureIS identifies in the Amended Complaint is the supposed "Epic-first policy", which the Amended Complaint characterizes as "long-term *exclusive dealing arrangements* with customers". (¶¶ 112-13.) CureIS's reliance on language in the Amended Complaint that its claims "include *but are not limited*" to "long-term exclusive dealing arrangements" (¶ 112), without specifying any other type of agreement, does not convert its self-titled "Exclusive Dealing" claim into a broader concerted action claim that covers other, unidentified agreements.

To the extent the Court considers CureIS's argument that it has alleged a claim of "concerted action" that is somehow broader than the alleged exclusive dealing agreements explicitly identified in the Amended Complaint, such claims fail for the same reason as its exclusive dealing claim set forth below: CureIS fails to adequately plead an agreement that may be subject to a Section 1 claim and substantial foreclosure.

### 1. CureIS Fails To Plead an Exclusive Dealing Agreement or Concerted Action Agreement.

As noted above, in its Motion, Epic demonstrated that CureIS fails to allege any agreement sufficient to plead a Section 1 violation. (Mot. 22-24.)

In its Opposition, CureIS does not respond to (and thus concedes) two of Epic's points in this context: (1) that the alleged "Epic-first policy", as pleaded, only restricted "non-Epic *approved* third-party applications", not all third-party applications, and thus was not *exclusive* (Mot. 23 (quoting ¶ 113)); and (2) that there can be no *exclusive* agreement pleaded because CureIS alleges that "Epic customers used non-Epic products even *after* the purported 'Epic-first policy' was supposedly implemented" (*id.* at 24). Each of these unrebutted arguments

independently requires dismissal.  *See, e.g.*, *In re Dealer Mgmt. Sys. Antitrust Litig.*, 360 F. Supp. 3d 788, 799-800 (N.D. Ill. 2019).

Epic also argued in its Motion that CureIS's Section 1 claim should be dismissed because CureIS pleads only unilateral conduct on the part of Epic rather than an "agreement" between Epic and its customers.  (Mot. 22); *see Team Schierl Cos. v. Aspirus, Inc.*, 2023 WL 6847433, at *8 (W.D. Wis. Oct. 17, 2023).  Indeed, CureIS alleges that customers expressly *disagreed* with Epic and wanted to use CureIS's products but were precluded from doing so by Epic's unilateral conduct.  (¶ 73 (discussing Advocate); ¶ 80 (discussing ███████).)  Whether CureIS wished to allege an exclusive dealing or some other arrangement, a bilateral *agreement* among two parties is the *sine qua non* of a Section 1 claim, and CureIS simply does not plead such an agreement.  *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984) ("Section 1 of the Sherman Act, in contrast, reaches unreasonable restraints of trade effected by a contract, combination . . . or conspiracy between separate entities.  *It does not reach conduct that is wholly unilateral*".).  CureIS's cited concerted action cases are not to the contrary.  (Opp. 21-22.)  Both *Construction Aggregate Transport, Inc. v. Florida Rock Industries, Inc.*, 710 F.2d 752 (11th Cir. 1983), and *In re Dealer Management Systems Antitrust Litigation*, 313 F. Supp. 3d 931 (N.D. Ill. 2018), plead forms of bilateral agreements—for *Construction Aggregate* a group boycott and for *Dealer Management* a bilateral tying agreement— rather than unilateral conduct.  And in *Isaken v. Vermont Castings, Inc.*, 825 F.2d 1158, 1163-64 (7th Cir. 1987), there was evidence of an *agreement* between the parties to raise prices that occurred after the allegedly coercive conduct, unlike here where there is no allegation of agreement or "meeting of the minds" between Epic and its customers to conspire against CureIS.  Indeed, as *Isaken* makes clear, the allegation that customers terminated their relationship with CureIS does not sufficiently allege an

agreement among the parties. *Id.* at 1164 (explaining that adherence with a request alone does not demonstrate an agreement between parties). CureIS's only response is to attack a straw man, suggesting that Epic faults the Amended Complaint for failing to allege a *written* contract. (Opp. 22.) That was never Epic's argument. Rather, Epic has shown that CureIS does not plead facts demonstrating *any* agreement, whether written or oral, with any customer, to deal exclusively with Epic. (Mot. 22.)[9]

### 2. CureIS Fails To Plead Substantial Foreclosure of Competition.

In its Motion, Epic has also shown that CureIS does not sufficiently plead substantial foreclosure of competition in the purported MCM software market, as is required for its exclusive dealing claim. (Mot. 25 (citing *In re Tecfidera Antitrust Litig.*, 791 F. Supp. 3d 852, 863 (N.D. Ill. June 25, 2025).) As Epic pointed out, a showing of substantial foreclosure is required because exclusive dealing arrangements "are not uniformly condemned under the antitrust laws and only raise anticompetitive concerns when they foreclose competition in a substantial share of the line of commerce at issue". *In re Tecfidera*, 791 F. Supp. 3d at 863. Here, CureIS pleads that Epic customers continued to use non-Epic MCM software products even after the purported "Epic-first policy" was supposedly implemented, and that Epic even encouraged one customer to use software of other *third-party* vendors. (Mot. 24.) CureIS has also pleaded that "a growing number of healthcare IT companies are developing products in the

---

[9] As part of this argument, CureIS notes that it is not arguing that the "Products You Can Replace with Epic" brochure is itself the at-issue agreement between Epic and its customers, but instead argues that the brochure is "written evidence" of an agreement. (Opp. 22-23.) But what the brochure evidences is that Epic has not mandated actual or *de facto* exclusivity or entered into an agreement with its customers. (Mot. 23-24.) The brochure is titled "Products You *Can* Replace with Epic" and describes areas where customers "*could* use [their] Epic software to either replace or avoid purchasing niche applications". (*Id.* (quoting ¶ 98).) A document describing ways customers can but need not use Epic products is not evidence of an exclusive dealing agreement.

MCM software space". (¶ 45.) Such allegations render substantial foreclosure implausible. CureIS does not contend with the fact that these allegations fundamentally undermine its theory.

Moreover, Epic has shown that CureIS does not plead the requisite facts to show "the extent of the foreclosure, what size each market is, or how the agreement affected each market or its participants' shares". *Rheumatology Diagnostics Lab'y, Inc. v. Aetna, Inc.*, 2014 WL 524076, at *11 (N.D. Cal. Feb. 6, 2014). In an attempt to dodge its failure to plead such facts, CureIS argues that "a plaintiff need not allege a specific percentage foreclosure [sic]". (Opp. 24.) But Epic does not argue that a precise percentage of foreclosure must be alleged; the issue is that CureIS fails to plead *any* facts demonstrating the extent of any alleged foreclosure as a result of the purported concerted action, let alone that foreclosure was substantial, the size of the purported MCM software market being foreclosed, or how the alleged exclusive dealing impacted any participant's share in the purported market. Contrary to CureIS's argument that substantial foreclosure is a "merits question" (*id.* at 25), where, as here, there is an absence of any facts that would support substantial foreclosure in the pleading, dismissal is appropriate. *See*, *e.g.*, *In re Tecfidera*, 791 F. Supp. 3d at 867 (granting motion to dismiss antitrust claims where substantial foreclosure was not sufficiently pleaded).

Finally, CureIS argues that the Court should not "focus[] solely on the foreclosure caused by exclusive dealing". (Opp. 24.)[10] This argument turns the substantial foreclosure requirement on its head. A plaintiff must plead substantial foreclosure that is the result of an exclusive dealing arrangement because that is the only situation in which exclusive dealing arrangements

---

[10] CureIS relies on *Continental Ore Co. v. Union Carbide & Cabron Corp.*, 370 U.S. 690, 698-99 (1962), for the general principle that courts should not "tightly compartmentaliz[e] the various factual components" of an antitrust claim. (Opp. 24.) But this statement, and this case, have no bearing on whether CureIS has satisfied the pleading requirements for plausibly alleging substantial foreclosure to plead its exclusive dealing claim.

give rise to anticompetitive concerns. *In re Tecfidera*, 791 F. Supp. 3d at 863. Considering whether other alleged conduct foreclosed competition would turn procompetitive exclusive dealing arrangements into actionable antitrust violations, which is precisely what the substantial foreclosure requirement was intended to prevent. *See Republic Tobacco Co.*, 381 F.3d at 738.

### D. CureIS Fails To Plausibly Allege Its Monopolization Claims.

The Parties agree that CureIS's monopolization claim fails unless it adequately alleges "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power through exclusionary conduct". *United Wis. Grain Prods. LLC v. Archer Daniels Midland Co.*, 144 F.4th 976, 980 (7th Cir. 2025). Attempted monopolization requires: "(1) specific intent to monopolize, (2) exclusionary conduct directed to accomplishing this purpose, and (3) a dangerous probability of achieving monopoly power". *Id.* Epic showed in its Motion that CureIS has not met its pleading burden as to all of these elements—specifically, that CureIS fails to allege market power in the purported PSHP CAPS software market or any exclusionary conduct by Epic. The Opposition does not move the needle on these issues, and thus, the Amended Complaint should be dismissed.

### 1. CureIS Fails To Plausibly Allege Monopoly Power.

Monopoly power can be pleaded "(1) through direct evidence of anticompetitive effects; or (2) by proving relevant product and geographic markets and by showing that the defendant's share exceeds whatever threshold is important for the practice in that case". *Ducere LLC v. Enbridge (U.S.) Inc.*, 2025 WL 81373, at *4 (N.D. Ill. Jan. 13, 2025). CureIS does neither. (Mot. 26-29.)

As an initial matter, it is critical to identify the relevant antitrust market in which CureIS alleges monopolization and attempted monopolization. Here, that market is the purported PSHP

CAPS software market, and only that market. (¶¶ 120-38.)[11] In its Motion, Epic pointed out that

CureIS does not allege particular factual allegations that constitute "proof of actual detrimental

effects on competition . . . such as reduced output, increased prices, or decreased quality in the

relevant" purported PSHP CAPS software market as is necessary to plead direct evidence of

anticompetitive effects. (Mot. 26-27); *Ducere*, 2025 WL 81373, at *4. In its Opposition, CureIS

makes the bare assertion that Epic's allegedly anticompetitive conduct has decreased output and

quality and increased prices, citing two paragraphs of its Amended Complaint. (Opp. 27 (citing

¶¶ 102, 105).) With respect to decreased output and quality, those two paragraphs allege these

effects in the purported *MCM software market*—not in the purported PSHP CAPS software

market that is subject to alleged monopolization. (*See* ¶¶ 102, 105.) Even if the references to

output or quality in those paragraphs had been about the alleged PSHP CAPS software market,

these sorts of bare assertions of harm to competition are not enough to escape dismissal. *See*

*Int'l Equip. Trading, Ltd. v. Illumina, Inc.*, 312 F. Supp. 3d 725, 732 (N.D. Ill. 2018) (refusing to

consider conclusory allegations of market power). With respect to increased prices, the sole

supposed factual allegation related to the purported PSHP CAPS software market to which

CureIS points is that Epic's "Tapestry is more expensive" than competing products and that, over

some undefined period, "prices went up" by some undefined amount. (Opp. 27 (citing ¶ 102).)

Such threadbare pleading is insufficient as a matter of law to plead direct evidence of

anticompetitive effects because "[p]rice increases occur for various reasons", and allegations of

---

[11] As noted above, in its Opposition, CureIS argues that Epic has monopoly power in the alleged "EHR software market". (Opp. 26.) Any such allegation is entirely irrelevant to CureIS's monopolization and attempted monopolization claims, which are directed exclusively at the purported PSHP CAPs software market, *not* any purported EHR software market. (¶¶ 120-38); s*ee Int'l Equip. Trading*, 312 F. Supp. 3d at 731 (dismissing monopolization claim where market power is alleged as to a market other than the one allegedly monopolized).

price increases thus do not amount to allegations "of *actual detrimental effects* on competition". *Ducere*, 2025 WL 81373, at *4-5.

CureIS's arguments as to its allegations of indirect evidence of market power fare no better. Even if CureIS had adequately pleaded a purported PSHP CAPS software market (which it has not—*see supra* Section I.A.), CureIS clearly does not plead "that the defendant's share" of the purported PSHP CAPS software market "exceeds whatever threshold is important for the practice in that case". *Ducere*, 2025 WL 81373, at *4. CureIS effectively concedes that the only statistic it offered for Epic's market share is wrong. (Opp. 28; *see also* Mot. 27-28.) Specifically, the Amended Complaint alleges that Epic's Tapestry software has a 76% market share (¶ 35), which is facially wrong for at least four reasons. *First*, as a matter of basic arithmetic, the figures CureIS provides in purported support of this allegation do not add up to 76%; CureIS alleges Tapestry serves 196 out of 282 Medicaid MCOs, which is less than 70%. (¶ 35 n.10; Mot. 27.) *Second*, this calculation (even if done right) is nonsensical, because not all customers are the same size, and so a share of *customers* does not equate a share of the *market*. *Third*, the Tapestry customers CureIS relies upon for this calculation are not limited to PSHP customers, but rather include non-PSHP customers that use Tapestry (further confirming that Tapestry serves both PSHP and non-PSHP customers, and CureIS's market share definition thus cannot hold). (¶ 35 n.10; Mot. 27.) *Fourth*, CureIS's total number of MCOs—the denominator in this equation—is also wrong on its face because it reflects only a subset of all MCOs (let alone of all PSHPs), by including "only capitated managed care organizations (MCOs) *providing comprehensive services to Medicaid enrollees*". (¶ 35 n.10; Mot. 27-28.)

CureIS maintains that even though its figure is wrong, it *may* not be wrong by much, and, in the alternative, CureIS's "general allegations regarding Epic's 70+% market share" are

sufficient. (Opp. 29.) CureIS also suggests that any scrutiny of its market share allegations is too factual for a motion to dismiss. (*See id.*) All of these arguments should be rejected. The 76% number is a market share allegation that CureIS itself chose to plead; Epic and the Court are entitled to rely upon that allegation, including for purposes of this Motion. By attempting to plead indirect evidence of market power based solely on facially unreliable market share figures, CureIS fails to plausibly allege Epic's purported monopoly or market power.

Moreover, CureIS's failure to adequately plead barriers to entry is also fatal. "[W]ithout a barrier there is no market power". *U.S. Bd. of Oral Implantology v. Am. Bd. of Dental Specialties*, 390 F. Supp. 3d 892, 908 (N.D. Ill. 2019). And as Epic argued in its Motion, CureIS's allegations of barriers to entry in the purported PSHP CAPS software market are conclusory and self-contradictory. (Mot. 28-29.) In its Opposition, CureIS continues to rely on labels—switching costs, staff training, the need for "reengineering", and the fact that this industry is regulated by state and federal law—without any supporting facts. (Opp. 30.) Such conclusory assertions do not plausibly establish barriers to entry. *St. Clair v. Citizens Fin. Grp.*, 340 F.App'x 62, 66 (3d Cir. 2009) (rejecting as insufficient conclusory allegations of barriers to entry). That is especially true here when there are contradictory facts alleged in the Amended Complaint. CureIS insists that MCM software products "reduce (if not eliminate) Epic's ability to obtain or maintain monopoly power in the PSHP CAPS software market". (Opp. 19.) Since MCM software products exist in the marketplace and, moreover, are alleged to be rapidly growing in popularity as "a growing number of healthcare IT companies are developing products in the MCM software space" (¶ 45), any allegations of monopoly power and barriers to entry in the PSHP CAPS software market make little sense.

## 2. CureIS Fails To Plead Any Exclusionary Conduct.

Epic's Motion demonstrated that CureIS's monopolization claims fail for the independent reason that CureIS does not plausibly allege exclusionary conduct leading to the attainment or maintenance of monopoly power. (Mot. 29-31.) As a threshold matter, CureIS alleges exclusionary conduct in the purported MCM software market, which is a different purported market from the one Epic has supposedly monopolized (or attempted to monopolize)—the purported PSHP CAPS software market. (*See supra* Section I.D.1.) As noted above, CureIS provides no plausible allegations as to *how* Epic's alleged conduct affecting the purported MCM software market could plausibly entrench Epic's alleged monopoly power in the purportedly separate PSHP CAPS software market. In its Opposition, CureIS baldly asserts that "MCM software reduces the 'stickiness' of both EHR and PSHP CAPS software, because it provides MCO customers a tool by which to disintermediate their own systems and data from Epic's control, meaning users of either or both can more easily switch away from them". (Opp. 7-8 (quoting ¶ 40).) But CureIS has not provided a single factual allegation in support of that bare assertion. (*See supra* Section I.B.) As a result, CureIS cannot plead that any supposedly exclusionary conduct by Epic in the purported MCM software market has led to possession of alleged monopoly power in the purported PSHP CAPS software market (or the purported EHR software market).

Moreover, none of the three forms of conduct that CureIS advances as exclusionary in its Opposition (Opp. 31-33) is plausibly alleged to violate Section 2 of the Sherman Act.

*First*, for the reasons set forth above (*see supra* Section I.C), CureIS does not plausibly allege exclusive dealing at all, much less that Epic's exclusive dealing "foreclose[d] competition in a substantial share of the line of commerce at issue". *In re Tecfidera*, 791 F. Supp. 3d at 863. CureIS offers nothing in its Opposition requiring further response.

*Second*, CureIS concedes in its Opposition (Opp. 31-32), that "even demonstrably false commercial speech is not actionable under the antitrust laws", "unless it leads to an agreement to restrain trade or is accompanied by some sort of enforcement mechanism". (Mot. 30 (quoting *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 851-52 (7th Cir. 2011)). CureIS nonetheless insists that the supposed "[m]isrepresentations" alleged in the Amended Complaint—supposed "false statements about Epic's and CureIS's respective products"—are actionable. (Opp. 31.) That is simply not the law. These types of allegations—allegedly overly optimistic statements about Epic's future capabilities (¶¶ 55, 59) and allegedly overly pessimistic statements about data security risks posed by CureIS (¶ 90)—are textbook examples of non-actionable statements. *See Sanderson v. Culligan Int'l Co.*, 415 F.3d 620, 623-24 (7th Cir. 2005) (stating that derogatory statements about a competitor are not actionable); *Briggs & Stratton Corp. v. Kohler Co.*, 405 F. Supp. 2d 986, 989, 991 (W.D. Wis. 2005) (stating that "false statements about [a business's] own products" are not actionable). (*See also infra* Sections II.C (discussing non-actionable opinion statements about product safety), II.D (discussing non-actionable opinion statements comparing Epic and CureIS products).)

CureIS argues that it has pleaded an "enforcement mechanism" that renders these alleged misstatements actionable, such as Epic's alleged refusal to provide "CureIS access to operational data, files, and configurations" and Epic's alleged imposition of "technological barriers". (Opp. 31-32.) None of this alleged unilateral conduct qualifies as an "enforcement mechanism" under the law. For example, in *Mercatus*, on which CureIS relies (Opp. 31-32), the Seventh Circuit recognized "that boycotts and agreements not to distribute certain products are the types of enforcement mechanisms that may render speech actionable under the antitrust laws". 641 F.3d at 851. Here there was no agreement of any sort. (*See supra* Section I.C.) And as

explained below, because Epic has no duty whatsoever under the antitrust laws to deal with CureIS, a refusal by Epic to deal with CureIS cannot amount to an anticompetitive "enforcement mechanism". (*See infra* Section I.D.2.)

*Third*, CureIS cannot plausibly allege that Epic's failure to support CureIS's integration with Epic constitutes exclusionary conduct. CureIS faults Epic for its purported failure to provide CureIS with certain "data, files, and configurations that [it] needed to adapt its process to the Epic environment" and to otherwise "integrate with CureIS". (¶¶ 68, 80; Opp. 32.) But it is black letter law that Epic has no duty to deal with CureIS. "[T]he Sherman Act does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal". *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) (quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)); *see also Pacific Bell Tel. Co. v. LinkLine Comms., Inc.*, 555 U.S. 438, 448 (2009) (similar). CureIS does not dispute that Epic has no such duty, yet tries to circumvent that bedrock principle of antitrust law by portraying the real grievance as Epic "withhold[ing]" access from CureIS to data from Epic's customers rather than merely refusing to deal with CureIS. (Opp. 32.) That is a distinction without a difference— what CureIS portrays as Epic "withhold[ing] data from [its] customers" boils down to asking Epic to affirmatively provide CureIS access to data in the form CureIS wants and on the terms CureIS prefers. (*Id.*) CureIS urges the Court to treat these facts like a newspaper preventing advertisers from working with a competing news outlet. (*Id.* at 32-33 (citing *Lorain Journal Co. v. United States*, 342 U.S. 143 (1951)).)[12] That analogy utterly fails. In *Lorain Journal*, an

_____

[12] CureIS's citations for the same proposition to *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1072 (10th Cir. 2013), and *United States v. Apple, Inc.*, 2025 WL 1829127, at *12 (D.N.J. June 30, 2025), also fail. (Opp. 32-33.) *Novell* just stands for the proposition that exclusive dealing can be an antitrust

incumbent refused to accept new ads from advertisers if they also placed ads with a competitor, even though the ads placed with the competitor required no aid or involvement on the part of the incumbent. 342 U.S. at 149. Epic, by contrast, is not alleged to refuse to serve customers that choose to work with CureIS; rather, CureIS alleges that Epic *itself* refuses to deal with CureIS or to help in such dealing by denying CureIS access to the software it develops. Thus Epic, as alleged, is simply not affirmatively helping CureIS, which Epic has no duty to do. That is on all fours with *Trinko* and its progeny. *Phillips N. Am. LLC v. Glob. Med. Imaging, LLC*, 2024 WL 4240920, at *7 (N.D. Ill. Sept. 19, 2024) (holding a monopolist "does not have to lend a helping hand to a competitor trying to bring it down").

Finally, CureIS suggests that even if Epic's alleged refusal to allow access to data with CureIS were not ordinarily actionable, it should be actionable here because Epic is purportedly violating a duty to deal with CureIS that arises under the Cures Act. (Opp. 33.) The Cures Act did nothing to upset the black letter antitrust principle that even an alleged monopolist has no duty under the antitrust laws to deal with its competitors. The Supreme Court considered this issue squarely in *Trinko*, where a plaintiff tried to cast a refusal to deal in alleged violation of a statutory scheme as an antitrust violation; the Court rejected the argument that a refusal to deal in violation of a non-antitrust statute amounted to an antitrust violation. 40 U.S. at 405-407. Even if CureIS had adequately alleged a Cures Act violation (which it does not do, *see infra* Section II.B), that conduct would not be actionable under the antitrust laws.

Because CureIS fails to plausibly allege actionable exclusionary conduct, both monopolization claims should be dismissed.

---

violation, 731 F.3d at 1072, but CureIS's exclusive dealing argument is not plausibly pleaded (*supra* Section I.C). *Apple* is inapposite because, unlike here, *Apple* did not involve another company demanding that the defendant engage with it. 2025 WL 1829127, at *12.

## II.    CUREIS'S REMAINING CLAIMS (COUNTS 4-9) SHOULD BE DISMISSED.

For the reasons explained in Epic's Motion (Mot. 31-46) and below, each of CureIS's remaining claims should be dismissed.

### A.    CureIS Fails To State a Claim for Tortious Interference with Contract.

Epic's Motion demonstrated that CureIS's claim for tortious interference with contract as to Advocate, Sharp, and Sutter fails.[13]  (Mot. 31-33.)  As to Advocate, Epic argued in its Motion that this claim is time-barred.  (*Id.* at 32.)  In its Opposition, CureIS expressly abandons its claim as to Advocate (Opp. 34 n.12), and thus, it should be dismissed.  With respect to the remaining two entities, Sharp and Sutter, this claim should be dismissed because CureIS fails to allege Epic's knowledge of the alleged contracts or its intent to interfere with the alleged contracts.

*First*, CureIS fails to plausibly allege that Epic had knowledge of CureIS's alleged contracts with Sharp or Sutter.  (Mot. 32.)  CureIS argues that knowledge "can be inferred" from Epic's alleged statements to these entities that integrating with Epic would obviate the need for CureIS's products.  (Opp. 34 (citing ¶¶ 55, 59-60).)  But Epic's alleged statements about its own product's capabilities do not support the inference that Epic knew of a specific existing contractual relationship between CureIS and Sharp or between CureIS and Sutter, let alone that Epic knew details about the terms of such contracts.[14]  This claim accordingly fails.  *See*, *e.g.*,

---

[13] In its Motion, Epic noted that CureIS appeared to have inadvertently included in this count a fourth entity named ████████, and to the extent it was intentional, Epic explained that the claim must be dismissed.  (*See* Mot. 31 n.15.)  CureIS fails to rebut—and therefore waives, *see Qureshi v. Countrywide Home Loans, Inc.*, 2010 WL 841669, at *6 n.2 (N.D. Cal. Mar. 10, 2010)—that this claim as to ████████ must be dismissed.  The same is true as to the additional stray reference to ████████ in CureIS's tortious interference with prospective business relations claim.  (*See* Mot. 33 n.17.)

[14] The cases CureIS cites for the proposition that knowledge can be inferred from conduct involved more specific allegations in support of knowledge than those at issue here.  *See*, *e.g.*, *Solyndra Residual Tr., by & through Neilson v. Suntech Power Holdings Co.*, 62 F. Supp. 3d 1027, 1048 (N.D. Cal. 2014) (allegations of statements the defendant made to plaintiff's distributors about "honor[ing] [the distributors'] purchase commitments with plaintiff", implying knowledge of specific contracts);

*Trindade v. Reach Media Grp., LLC*, 2013 WL 3977034, at \*15 (N.D. Cal. July 31, 2013) (finding failure to plead knowledge element where plaintiff failed to allege that the defendant "had knowledge of any specific contracts or details about the contracts").[15]

*Second*, CureIS fails to plead intentional interference with those contracts. Without pleading knowledge of the alleged contracts, CureIS cannot establish the requisite intent. *Id.* at \*16. Moreover, CureIS also fails to identify factual allegations in the Amended Complaint showing that Epic knew that interference with CureIS's purported contractual relationships with Sharp and Sutter was "certain or substantially certain to occur as a result of [Epic's alleged] action[s]". *Id.* CureIS asserts that Epic informed Sharp and Sutter that it could develop replacement products for certain CureIS products and directed Sutter to stop using CureIS's EnrollmentCURE product. (Opp. 34-35 (citing ¶¶ 55, 57, 59).) But Epic informing its own existing customers that Epic had the ability to develop replacements for certain CureIS products, and customers considering Epic's ability to develop replacements for CureIS products in making their own decisions on whether to work with CureIS, are not sufficient to establish intent on the part of Epic to interfere with a contract. *See ErgoCare, Inc. v. D.T. Davis Enters., Ltd.*, 2013 WL 12246342, at \*7 (C.D. Cal. Dec. 26, 2013) (explaining that allegations of intent to disrupt were insufficient where defendant's conduct "ha[d] the unintended effect of deterring the third person from dealing with the other").

---

*Quelimane Co. v. Stewart Title Guaranty Co.*, 19 Cal. 4th 26, 55-57 (Cal. 1998) (allegation that the defendant attempted to direct contract holder to initiate a quiet title action implied knowledge of specific contract).

[15] The cursory conclusion in *Jensen Enterprises Inc. v. Oldcastle, Inc.*, 2006 WL 2583681, at \*8 (N.D. Cal. Sept. 7, 2006), on which CureIS relies (Opp. 34), predates the more specific requirements for pleading knowledge set forth in *Trindade*, 2013 WL 3977034, at \*15.

**B.** **The Tortious Interference with Prospective Business Relations Claim Fails.**

Epic's Motion also demonstrated the deficiency of CureIS's claim for tortious interference with prospective business relations as to Advocate, ███████, ███████, and Sharp. (Mot. 33-37.) None of CureIS's arguments to the contrary has merit.

*First*, as detailed in Epic's Motion (*id.* at 33-35), CureIS alleges prospective relationships that are either "too attenuated or the probability of economic benefit too speculative" to state a claim. *EcoHub, LLC v. Recology Inc.*, 2023 WL 6725632, at *11 (N.D. Cal. Oct. 11, 2023). CureIS's *argument* that these prospective relationships were "on the verge of" becoming "consummated business" (Opp. 36) is insufficient, because it is wholly unsupported by *plausible factual allegations*. CureIS must allege facts demonstrating "that it is reasonably probable that the lost economic advantage would have been realized but for the defendant's interference", which CureIS fails to do. *Infectolab Ams. LLC v. ArminLabs GmbH*, 2021 WL 292182, at *4 (N.D. Cal. Jan. 28, 2021). CureIS cites inapposite caselaw in its attempt to cure this deficiency. (Opp. 36.) The plaintiff in *Silicon Labs Integration, Inc. v. Melman*, 2010 WL 890140, at *2 (N.D. Cal. Mar. 8, 2010), had a "previous sales relationship" and the plaintiff "ma[de] reference to the dates of sales discussions and negotiations and identifie[d] a specific product discussed". In *Eco Electrical Systems v. Reliaguard, Inc.*, 2022 WL 1157481, at *7, 10 (N.D. Cal. Apr. 19, 2022), there was a "fifteen-year business relationship" between the plaintiff and the potential customer and the plaintiff identified specific emails in which the potential customer discussed its decision making as to whether to purchase specific products offered by the plaintiff. And in *EcoHub*, which CureIS cites for the court's holding denying the motion to dismiss as to one of two defendants (Opp. 37 n.13), there was a prior contractual relationship for which the plaintiff was in the process of negotiating an extension. 2023 WL 6725632, at *12.

CureIS does not allege any prior relationship whatsoever with ▮▮▮▮▮▮ or ▮▮ ▮▮▮▮▮▮ or any details about the status of discussions that would support the inference of a future economic relationship.  While CureIS does allege a prior contractual relationship with Advocate and Sharp, the allegations as to CureIS's prospective relationship with each are far more attenuated than those in *Silicon Labs Integration, Inc.*, *Eco Electrical Systems*, and *EcoHub*.  CureIS pleads no more than a "[s]peculative expectanc[y]" of a future benefit (*see* ¶ 156) as to each, which is not enough to survive dismissal.  *See 7EDU Impact Acad. Inc. v. You*, 760 F. Supp. 3d 981, 1001 (N.D. Cal. 2024).

*Second*, CureIS fails to sufficiently allege Epic's knowledge of CureIS's alleged prospective economic relationships.  (Mot. 35.)  CureIS argues that it is not required to plead knowledge of a prospective relationship where a defendant "likely learned of the relationship through its position in the same industry".  (Opp. 37.)  But courts frequently reject as insufficient "generalized allegations" that a defendant's knowledge of a prospective business relationship could be reasonably inferred based on the defendant's "status as a competitor in the industry".  *Infectolab*, 2021 WL 292182, at *4; *see also Trindade*, 2013 WL 3977034, at *17.  CureIS also asserts that it has sufficiently alleged Epic's knowledge of the specific prospective relationships at issue here because it alleges that Epic "instructed customers not to work with CureIS".  (Opp. 38.)  But CureIS does not (because it cannot) cite any allegation in the Amended Complaint that such a statement was made to a specific entity or that Epic had knowledge of any specific prospective contractual relationship.  *See Trindade*, 2013 WL 3977034, at *15-17.[16]

---

[16] CureIS cites two cases in an attempt to explain away its failure to allege knowledge (Opp. 37), but those cases are inapposite because they assess interference with contract claims, not interference with prospective economic advantage claims.  *See Solyndra Residual Tr. v. Suntech Power Holdings Co.*, 62 F. Supp. 3d 1027, 1048 (N.D. Cal. 2014); *RealPage, Inc. v. Yardi Sys., Inc.*, 852 F. Supp. 2d 1215, 1230-31 (C.D. Cal. Feb. 13, 2013).  And as the California Supreme Court has explained, courts should "firmly

*Third*, because CureIS fails to sufficiently allege Epic's knowledge of any alleged prospective relationship, CureIS also necessarily fails to allege Epic's intent to interfere with any such prospective relationship. (Mot. 35 (citing *Infectolab Ams. LLC*, 2021 WL 292182, at *4).) Beyond disputing Epic's argument that CureIS fails to allege knowledge, CureIS offers no factual support for this additional element of its claim. (Opp. 38.)

*Fourth*, CureIS fails to plead that Epic engaged in an intentional wrongful act to disrupt CureIS's prospective economic relationships separate and apart from the alleged interference itself. (Mot. 35-37.)[17] CureIS's conclusory allegations are insufficient; the law requires a plaintiff to plead the elements of an underlying independent cause of action for which the conduct is wrongful to satisfy this requirement. CureIS argues that "the question is whether conduct is proscribed by some . . . determinable legal standard"—not whether it supports a separate cause of action. (Opp. 39 (citing *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1159 (Cal. 2003).) That is not the holding of *Korea Supply*; the court there held that to satisfy the independently wrongful act requirement, the plaintiff must plead "independently actionable conduct". 29 Cal. 4th at 1158-59. There is ample case law dismissing tortious interference with prospective business relations claims where the conduct alleged to satisfy the wrongful act requirement was insufficiently pleaded as an independent claim. *See, e.g.*, *Spotlight Ticket Mgmt., Inc. v. Concierge Live LLC*, 2024 WL 4866813, at *10 (C.D. Cal. Aug. 30, 2024)

---

distinguish" between the two interference claims when assessing whether the elements of those claims have been pleaded, because courts give "greater solicitude to those relationships that have ripened into agreements". *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134 (Cal. 2003).

[17] As stated in Epic's Motion, CureIS's claim is time barred as to any alleged conduct that took place prior to May 12, 2023, including the information blocking allegations as to Advocate from 2018-2020 and the alleged security concerns Epic raised to Sharp in February 2023. (Mot. 36 n.18.) CureIS does not respond to these arguments in its Opposition and thus concedes these aspects of this claim should be dismissed.

(dismissing tortious interference claim based on alleged false advertising because the separate claim brought under FAL was dismissed for failure to state a claim); *Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.*, 166 F. Supp. 3d 988, 998 (N.D. Cal. 2015) (dismissing tortious interference claim based on Sherman Act Section 1 claim because the separate Section 1 claim was dismissed for failure to state a claim).

With respect to Epic's purported false and misleading statements that form the bases of CureIS's trade libel and false advertising claims, such statements cannot satisfy the independent wrongful act requirement because each of those underlying claims fails for the reasons discussed herein (*see infra* Section II.C-D). (Mot. 36 (citing *Spotlight Ticket Mgmt., Inc.*, 2024 WL 4866813, at *10).)

CureIS's information blocking allegations similarly fail to satisfy the wrongful act requirement because CureIS fails to sufficiently allege any violation of the Cures Act's prohibition on information blocking. (*See* Mot. 36.) CureIS does nothing in its Opposition to address its conclusory allegations of information blocking as to Advocate. *See Vox Network Sols., Inc. v. Gage Techs., Inc.*, 2024 WL 1260573, at *11 (N.D. Cal. Mar. 25, 2024) (declining to "find an independently wrongful act based on [] conclusory allegations"). For ███████, CureIS does not contest that it fails to allege information blocking. (Mot. 36.) For ███████, contrary to its conclusory assertion (Opp. 40), CureIS does not allege any actual data requests ███████ made related to CureIS or that Epic ever blocked such requests (¶¶ 74-80).[18] As to Sharp, CureIS's information blocking allegations (Opp. 40) are irrelevant because CureIS alleges that Sharp terminated its relationship with CureIS for an entirely separate

---

[18] The absence of such allegations makes sense given that CureIS did not have any contractual relationship with ███████. (¶¶ 74-80.)

reason—Epic's ability to develop a replacement for EnrollmentCURE.  (¶ 57.)  Accordingly, CureIS does not allege any nexus between alleged information blocking and the alleged disruption of its relationship with Sharp, which is required to state a tortious interference claim. *See DeSoto Cab. Co. v. Uber Techs., Inc.*, 2018 WL 10247483, at *14 (N.D. Cal. Sept. 24, 2018).

CureIS also attempts to plead a new independently wrongful act into its Opposition—the purported "Epic-first policy" that it alleges in the context of its antitrust claims.  (Opp. 39.)  But CureIS cannot add new allegations in its Opposition. *Sunny Handicraft Ltd. v. Envision This!, LLC*, 2015 WL 231108, at *5 n.4 (N.D. Ill. Jan. 16, 2015) (refusing to consider new allegations included in opposition).  Regardless, because CureIS's exclusive dealing claim predicated on the purported "Epic-first policy" fails for the reasons discussed above (*see* Section I.C), CureIS does not plausibly allege any independently wrongful act based on this claim.  *See Bay Area Surgical Mgmt. LLC*, 166 F. Supp. 3d at 998 (holding that where the plaintiffs failed to properly allege an antitrust claim, that claim could not satisfy the independent wrongful act element).

### C.     CureIS Fails To State a Claim for Trade Libel.

Epic's Motion demonstrated that CureIS's trade libel claim suffers from several defects that require dismissal.  (Mot. 37-41.)  CureIS's Opposition fails to overcome those defects.

*First*, CureIS's trade libel claim is time barred as to all alleged statements made before May 12, 2023—two years before CureIS filed its Complaint.  (*Id.* at 38.)  CureIS does not dispute the two-year statute of limitations, but argues that it was tolled under the discovery rule because CureIS did not discover the alleged misstatements until June 2023.  (Opp. 40.)  California's discovery rule tolls the statute of limitations only until a plaintiff "has reason at least to suspect" that it sustained "any significant injury", not when it discovers the "defendants' specific wrongful conduct". *Soliman v. Philip Morris Inc.*, 311 F.3d 966, 971-72 (9th Cir. 2002);

*see also Mosafer Inc. v. Broidy*, 2022 WL 793029, at *4 (C.D. Cal. Feb. 4, 2022) (applying

*Soliman* to trade libel claim).  Here, CureIS does not allege any facts to support that it did not

have reason to suspect that it had sustained injury until after May 12, 2023.  To the contrary, all

it alleges is that the injury already occurred before it allegedly discovered Epic's purported

misrepresentations.  (¶ 94 ("By the time CureIS discovered Epic's misrepresentations, customers

had already implemented irreversible decisions based on Epic's falsehoods".).)  CureIS therefore

cannot rely on the discovery rule to excuse its untimely allegations as to Epic's purported

statements made before May 12, 2023.  *See*, *e.g.*, *Soliman*, 311 F.3d at 975 n.12 ("[G]eneral

conclusions to the effect that the facts were not discovered until a stated date, and that the

plaintiff could not reasonably have made an earlier discovery, are useless".).

     *Second*, as to the non-time-barred statements, CureIS fails to plead facts regarding who

made the allegedly libelous statements and to whom, the time and place of publication, and the

substance of Epic's alleged misstatements.  (Mot. 38-39.)  CureIS claims—without citing any

authority—that it "is not required to list the names of each Epic employee who made the false

statements or the exact time an email was sent to plausibly allege a trade libel claim".  (Opp. 40.)

But CureIS's conclusory statement that it has done "all that is required at this stage" (*id.* at 41) to

plead a trade libel claim is wrong (Mot. 38-39), and is belied by the case CureIS itself cites as

support, *HGCI, Inc. v. Luxx Lighting, Inc.*, 2020 WL 5913851 (C.D. Cal. Sept. 10, 2020).  *HGCI*

does not address the standard for plausibly pleading a trade libel claim, let alone find allegations

similar to CureIS's bare allegations are sufficient.  *Id.* at *3-5.  In fact, contrary to CureIS's

reliance on *HGCI* to assert that it does not need to identify what Epic employees made the at-

issue statement or the exact time the statement was made, the plaintiff in *HGCI* provided that

exact information by attaching an email to the complaint demonstrating the individuals involved,

the time, and the substance of the alleged misstatement.  *Id.* at *1.  CureIS provides no such details.

*Third*, the allegedly libelous statements are non-actionable opinions.  (Mot. 39-40.) CureIS largely ignores the standard set forth in *Trevari Media, LLC v. Colasse*, 758 F. Supp. 3d 1175, 1181 (C.D. Cal. 2024), which requires a statement to be "sufficiently factual to be susceptible of being proved true or false" to support a claim for trade libel.  CureIS merely argues that the alleged statement that "CureIS's products posed security risks" is sufficient. (Opp. 41 (citing ¶ 164).)[19]  But general subjective statements of this nature are precisely what *Trevari* held to be non-actionable opinions because the truth or falsity of such statements cannot be proven.  758 F. Supp. 3d at 1185.  Indeed, the case CureIS cites, *HGCI*, recognizes that a party's stated "belief that [another party's] products were generally unsafe is a non-actionable opinion" because no "factual basis" was offered such that the statement's truth could be assessed.  2020 WL 5913851, at *5.

*Fourth*, CureIS concedes its failure to plead that any of Epic's allegedly libelous statements were published to CureIS's customers in writing.  (Mot. 42.)  CureIS argues instead that there is no such requirement.  (Opp. 42.)  CureIS relies on California's model jury instruction, but the "California Supreme Court has caution[ed] that jury instructions . . . are not themselves the law, and are not authority to establish legal propositions or precedent". *Bernstein v. Kemper Indep. Ins. Co.*, 670 F. Supp. 3d 1018, 1029 (E.D. Cal. 2023).  The weight of authority in California does require an allegedly libelous statement to be published in writing

---

[19] CureIS also points to Epic's statements that "Epic's products could replace CureIS's solutions" to argue that its trade libel claims are not too vague to survive dismissal.  (Opp. 41.)  But CureIS nowhere alleges that statements about product functionality constitute trade libel; its trade libel allegations are limited to purported statements that CureIS's products "posed security risks" (¶¶ 163-66).

in order to state a trade libel claim[20] and courts routinely dismiss such claims when that requirement is not pleaded.  (*See* Mot. 40 (collecting cases).)

*Fifth*, CureIS fails to allege that Epic's alleged statements "played a material and substantial part in inducing others not to deal with [it]".  *Univ. Grading Serv. v. eBay, Inc.*, 2011 WL 846060, at *9 (N.D. Cal. Mar. 8, 2011).  Materiality turns on whether CureIS can "show that [its customers'] decisions were attributable to any false statements by [Epic]".  *Gopher Media LLC v. Mod. Doc Media*, 2023 WL 350531, at *7 (S.D. Cal. Jan. 20, 2023).  Here, CureIS relies on portions of CureIS's Amended Complaint that do not demonstrate that customers' decisions to stop working with CureIS were attributable to Epic's alleged false statements, rather than other conflicting reasons.  (*See, e.g.*, ¶¶ 77-80 (alleging "Epic induced ███████ to cease further . . . by imposing its Epic-first policy"); ¶ 84 (describing alleged Epic-first policy as reason ███████ did not proceed with CureIS).)

**D.      CureIS Fails To State a Claim for False Advertising.**

Epic's Motion demonstrated the deficiencies in CureIS's false advertising claims brought under the Lanham Act, the FAL, and the fraudulent prong of the UCL.  (Mot. 41-44.)  None of CureIS's arguments to the contrary saves these claims.

*First*, for the same reasons discussed below with respect to CureIS's UCL claim (*infra* Section II.E), CureIS's claim under the FAL fails because the FAL does not apply extraterritorially.  (Mot. 42 n.20; *id.* at 44-45.)

---

[20] Contrary to CureIS's argument (Opp. 42 n.17), both cases Epic cited in its Motion identify the requirement that the allegedly libelous statement must have been published in writing as part of their recital of the elements of a trade libel claim.  (Mot. 40 (citing *Virun, Inc. v. Cymbiotika, Inc.*, 2022 WL 17371057, at *6 (C.D. Cal. Aug. 18, 2022); *GeoData Sys. Mgmt., Inc. v. Am. Pac. Plastic Fabricators, Inc.*, 2015 WL 12731920, at *16 (C.D. Cal. Sept. 21, 2015).)

*Second*, CureIS fails to meet the heightened pleading standard under Rule 9(b) required for all of its false advertising claims.  (Mot. 41-43.)  CureIS argues that Rule 9(b) does not apply, citing *Priority International Animal Concepts, Inc. v. Bryk*, 2012 WL 6020044 (E.D. Wis. Dec. 3, 2012).  (Opp. 43.)  But the court's holding on this issue in that case was expressly declared to have been "overtaken by more recent and binding Seventh Circuit precedent" establishing that Rule 9(b)'s heightened pleading standard applies.  *Kunes Country Auto. Mgmt. Inc. v. Walters*, 2024 WL 2114006, at *8 (E.D. Wis. May 10, 2024).  CureIS is required to allege the "who, what, when, where and how" of the false advertising in order to state a claim.[21]  *RBG Plastics, LLC v. Sparkles Gift & Party Shop, Inc.*, 2025 WL 2764505, at *6 (N.D. Ill. Sept. 29, 2025).  CureIS fails to do so.  For example, CureIS alleges that "Epic falsely represented [to Sutter] that Epic's Tapestry system provided the same functionality" (¶ 61), but this purported statement does not describe what "functionality" is being discussed, let alone where the statement was made or how it was communicated.  *See CardioNet, Inc. v. LifeWatch Corp.*, 2008 WL 567031, at *3 (N.D. Ill. Feb. 27, 2008) (concluding that Rule 9(b) requires alleging "[t]he particulars of the false and misleading statements").  The other alleged misstatements are similarly not pleaded with the requisite particularity.  (*See* Mot. 42-43.)  In its Opposition, CureIS argues that it sufficiently alleged the "who" and "when" by alleging that false statements were made to "Sutter employees on or before January 2025" and to "███████████ at Advocate . . . in or around 2019").  (Opp. 44-45.)  Those generic allegations are not sufficient. *Kunes*, 2024 WL 2114006, at *9 (concluding that allegations as to "who (TruWarranty and its agents)" and "when (starting shortly after . . . associates resigned . . . in August 2022" lack "the

---

[21] CureIS's argument that specific fraudulent intent is not required to state a claim (Opp. 43) is a non sequitur; Epic did not argue that it was (Mot. 41-42).

specificity Rule 9(b) requires").  Moreover, Rule 9(b) is not a menu from which CureIS can pick and choose which of the requirements it wants to follow.  Even if the "who" and "when" for those statements were sufficient, nowhere does CureIS allege "how [the alleged false statements] were communicated", as is required by Rule 9(b).  *Id.*  CureIS does not address this deficiency in its Opposition.

*Third*, the two categories of Epic's alleged false statements—statements generally comparing Epic's product to CureIS's product and asserting Epic's product's ability to replace CureIS's functionalities—are non-actionable opinions.  (Mot. 41, 43); *see Conrad v. Russell*, 2011 WL 3877000, at *1 (W.D. Wis. Sept. 1, 2011).  CureIS cites *Oracle International Corp. v. Rimini Street, Inc.*, 123 F.4th 986 (9th Cir. 2024), to argue that Epic's alleged statements about "product substitutability" constitute actionable false statements of fact.  (Opp. 45.)  But the *Oracle* case supports Epic.  The *Oracle* court held that statements that an alternative product could "serve as a replacement" to another product were non-actionable opinions.  123 F.4th at 1000-01 (recognizing that "[c]omparative assertions about effectiveness, riskiness, and security are the kinds of generalized statements of product superiority that we have routinely found to be nonactionable").

*Fourth*, CureIS fails to allege that Epic's alleged statements were made in a "commercial advertising or promotion", which is also required to state a claim for all of CureIS's false advertising claims.  (Mot. 43-44.)  CureIS argues that the same allegedly "widely disseminated" brochure that was discussed in Epic's Motion (*id.* at 42-43) was the commercial advertising or promotion.  (Opp. 45.)  In its Motion, Epic argued that the alleged misstatements were to its own customers and that "communication[s] sent to current customers are not actionable under the

Lanham Act because those statements are not communicated for promotional purposes".[22]

(Mot. 43 (quoting *Segerdahl Corp. v. Am. Litho, Inc.*, 2019 WL 157924, at *3 (N.D. Ill. Jan. 10, 2019)).) CureIS tries to cabin application of *Segerdahl* to statements made in a contract with an existing customer. (Opp. 46 n.20).[23] But the court's reasoning was not so limited; *Segerdahl* recognized that "[t]he Seventh Circuit has established that communication[s] sent to current customers are not actionable", expressly noting that the reasoning extends to "letters sent to existing customers". 2019 WL 157924, at *3. CureIS simply does not allege facts as to how, when, and to whom the brochure at issue supposedly was disseminated to establish that it was a "systematic communicative endeavor" that rises to the level of commercial advertising. (Mot. 43-44 (citing *Kunes*, 2024 WL 2114006, at *9).)

### E. CureIS Fails To State a Claim Under California's UCL.

CureIS's UCL claim must be dismissed because the UCL has no extraterritorial application here and, even if it did, CureIS nonetheless fails to allege any unlawful, unfair, or fraudulent business practice required to state a claim. (Mot. 44-46.)

Extraterritorial application of the UCL is improper where, as here, a non-resident of California asserts a claim based on alleged wrongful conduct that occurred outside of California. (*Id.* at 44-45.) The relevant inquiry, which CureIS does not dispute, is whether the underlying conduct "emanated from California". (*Id.* (quoting *Ehret v. Uber Techs., Inc.*, 68 F. Supp. 3d

---

[22] The Lanham Act, the FAL, and the fraudulent prong of the UCL are "substantially congruent" and are addressed together (Mot. 41), and the court's rationale in *Segerdahl* should be applied equally to CureIS's FAL and UCL claims.

[23] CureIS argues that it also alleged Epic made false statements to "Epic's 'potential' customers". (Opp. 46 n.20 (citing ¶ 170).) But the paragraph CureIS cites does not reference any potential Epic customers, or any customers whatsoever. (¶ 170.) The Court can and should disregard CureIS's attempt to plead new facts through its Opposition when assessing Epic's Motion. *See Sunny Handicraft Ltd.*, 2015 WL 231108, at *5 n.4.

1121, 1130 (N.D. Cal. 2014).)  CureIS does not—because it cannot—point to any well-pleaded

allegations that Epic engaged in wrongful conduct that took place within or emanated from

California.  CureIS conclusorily states that it has "allege[d] exactly such California conduct and

harm" without citing a single paragraph of the Amended Complaint.  (Opp. 47.)  To the extent

CureIS intends to rely on the allegation that Epic made statements to certain CureIS customers

that are based in California (*see id.* at 43-44, 47), that is irrelevant.[24]  The focus is on defendant's

conduct and from where that conduct emanated, not where any customers were or where the

harm is allegedly felt.  *Ehret*, 68 F. Supp. 3d at 1130.  Accordingly, CureIS's UCL claim must be

dismissed.  *See Williams v. Visa, Inc.*, 2025 WL 1518044, at *6 (N.D. Cal. May 28, 2025)

(dismissing UCL claim where plaintiff failed to plead that defendant's decision to engage in

allegedly wrongful conduct occurred in California).

Even if extraterritorial application of the UCL were proper here (it is not), CureIS's UCL

claim still should be dismissed because CureIS fails to allege any requisite unlawful, unfair, or

fraudulent business acts or practices to state a UCL claim.  (Mot. 45-46.)  CureIS makes no

independent argument regarding underlying conduct other than to point to its other claims.

(Opp. 47-48.)[25]  As explained both herein and in Epic's Motion, CureIS's other antitrust and

[24] CureIS's cited cases are readily distinguishable.  In *Diva Limousine, Ltd. v. Uber Technologies, Inc.*, 392 F. Supp. 3d 1074, 1094 (N.D. Cal. 2019), the defendant was headquartered in California and its alleged misconduct at issue—namely, its practice of undercutting competitors' prices in California—was alleged to have occurred in California.  In *AT&T Mobility LLC v. AU Optronics Corp.*, 707 F.3d 1106, 1113-14 (9th Cir. 2013), the court did not find, as CureIS asserts it did, that contacts with California that were more than "slight and casual" justified application of the UCL to out-of-state injuries, but instead concluded that "anticompetitive conduct by a defendant *within a state*" that is not "slight and casual" can establish sufficient aggregation of contact to satisfy due process.  The Court then remanded for consideration of whether plaintiffs had pleaded such conduct "within California".  *Id.*  Here, none of Epic's alleged conduct occurred within California.

[25] With respect to the "unlawful" prong, while CureIS argues that purported information blocking in violation of the Cures Act constitutes a wrongful act in connection with its tortious interference with prospective economic advantage claim—which Epic disputes—CureIS does not address Epic's argument

non-antitrust claims each fail as a matter of law.  (*See* Mot. Sections I.A-II.D.)  Therefore,

CureIS cannot satisfy the unlawful, unfair, or fraudulent prongs of the UCL, which also requires

dismissal of this claim.  (Mot. 45-46.)

## CONCLUSION

For the foregoing reasons, CureIS's Amended Complaint should be dismissed, without

leave to plead, in its entirety with prejudice.

Dated:  January 30, 2026

Respectfully submitted,

By:  *Lauren A. Moskowitz*

Lauren A. Moskowitz
Yonatan Even
Michael P. Addis
**CRAVATH, SWAINE & MOORE LLP**
Two Manhattan West
375 Ninth Avenue
New York, NY 10011
Telephone:  (212) 474-1000
lmoskowitz@cravath.com
yeven@cravath.com
maddis@cravath.com

Matthew J. Duchemin
Bryce A. Loken
**Quarles & Brady LLP**
33 East Main Street, Suite 900
Madison, WI 53701
Telephone: 608-251-5000
matthew.duchemin@quarles.com
bryce.loken@quarles.com

*Attorneys for Defendant Epic Systems
Corporation*

---

that it fails to plead a violation of the Cures Act and thus cannot use this law to support a UCL claim.
(*See* Mot. 45.)

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on January 30, 2026, a true and correct copy of the foregoing with redactions to under seal information was served upon all counsel of record via CM/ECF system.  Further, a true, correct, and under seal copy of the foregoing was also served upon counsel of record via email.

*/s/ Madalyn Vaughn*
Madalyn Vaughn