**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN**

CureIS Healthcare, Inc.,

         *Plaintiff*,

    v.

Epic Systems Corporation

         *Defendant*.

)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 3:25-cv-00991-JDP

**PLAINTIFF CUREIS HEALTHCARE INC.'S OPPOSITION TO DEFENDANT
EPIC SYSTEMS CORPORATION'S MOTION TO DISMISS**

**<u>TABLE OF CONTENTS</u>**

<strong><u>Page</u></strong>

PRELIMINARY STATEMENT ............................................................................1

RELEVANT ALLEGATIONS OF THE FAC .......................................................4

    A.    This Case Is About The Managed Care Portion Of The Health Tech World .........4

    B.    CureIS Is A Pioneer In MCM Software.........................................................6

    C.    Epic Targeted CureIS Using A Variety Of Tactics, All Because MCM Software Makes Epic's Core Software Products Less "Sticky" ............................7

LEGAL STANDARD.....................................................................................10

ARGUMENT ..............................................................................................10

I.    CUREIS PLAUSIBLY ALLEGES ANTITRUST CLAIMS UNDER SECTIONS 1 AND 2 OF THE SHERMAN ACT (COUNTS 1-3) ...................................10

    A.    Epic's Market Definition Challenges Are Inappropriate For A Motion To Dismiss And Proceed Largely By Ignoring CureIS's Allegations .......................10

    B.    CureIS Plausibly Alleges Antitrust Injury .............................................18

    C.    CureIS Plausibly Alleges Concerted Action For Its Section 1 Claim ...............21

    D.    CureIS Plausibly Alleges Epic's Monopoly Power And Exclusionary Conduct...............................................................................25

II.    CUREIS PLAUSIBLY ALLEGES EACH OF ITS REMAINING CLAIMS (COUNTS 4-9)........................................................................33

    A.    CureIS Plausibly Alleges Tortious Interference With Contract ...........................33

    B.    CureIS Plausibly Alleges Tortious Interference With Prospective Economic Advantage .......................................................35

    C.    CureIS Plausibly Alleges Trade Libel .....................................................40

    D.    CureIS Plausibly Alleges False Advertising............................................43

    E.    CureIS Plausibly Alleges A Violation Of California's Unfair Competition Law ...............................................................................46

III.    IF THE COURT IS INCLINED TO GRANT EPIC'S MOTION, CUREIS SHOULD BE ALLOWED TO AMEND ...............................................48

CONCLUSION............................................................................................48

## TABLE OF AUTHORITIES

**Page**

### Cases

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)................................................................................10

*AT&T Mobility LLC v. AU Optronics Corp.,*
    707 F.3d 1106 (9th Cir. 2013) ..............................................................47

*Balle v. Kennedy,*
    73 F.4th 545 (7th Cir. 2023) .................................................................10

*Beatrice Foods Co. v. FTC,*
    540 F.2d 303 (7th Cir. 1976) ................................................................15

*Blue Shield of Va. v. McCready,*
    457 U.S. 465 (1982)..............................................................................19

*Briggs & Stratton Corp. v. Kohler Co.,*
    405 F. Supp. 2d 986 (W.D. Wis. 2005) ...............................................32

*Brown Shoe Co. v. United States,*
    370 U.S. 294 (1962)..............................................................................11

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
    429 U.S. 477 (1977)........................................................................18, 20

*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.,*
    20 Cal. 4th 163 (1999) ..........................................................................48

*Celebrity Chefs Tour, LLC v. Macy's, Inc.,*
    2014 WL 1660674 (S.D. Cal. Apr. 25, 2014).......................................39

*Constr. Aggregate Transp., Inc. v. Fla. Rock Indus., Inc.,*
    710 F.2d 752 (11th Cir. 1983) ..............................................................21

*Continental Ore Co. v. Union Carbide & Carbon Corp.,*
    370 U.S. 690 (1962)........................................................................24, 31

*Copperweld Corp. v. Indep. Tube Corp.,*
    467 U.S. 752 (1984)..............................................................................21

*Corzo v. Brown Univ.,*
    2025 WL 2753400 (N.D. Ill. Sept. 29, 2025) ......................................15

*CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.,*
    150 F.4th 1056 (9th Cir. 2025) ........................................................22, 29

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
    313 F. Supp. 3d 931 (N.D. Ill. 2018) ...................................................................22

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
    581 F. Supp. 3d 1029 (N.D. Ill. 2022) ...............................................................11

*In re Deere & Co. Repair Serv. Antitrust Litig.*,
    2023 WL 8190256 (N.D. Ill. 2023) ....................................................................26

*Dennis v. Andersons Inc.*,
    2022 WL 22761475 (N.D. Ill. May 3, 2022) ......................................................14

*Diamond Multimedia Systems, Inc. v. Superior Court*,
    19 Cal. 4th 1036 (1999) ......................................................................................47

*DiLeo v. Ernst & Young*,
    901 F.2d 624 (7th Cir. 1990) ..............................................................................45

*Diva Limousine, Ltd. v. Uber Techs., Inc.*,
    392 F. Supp. 3d 1074 (N.D. Cal. 2019) .............................................................47

*DSM Desotech Inc. v. 3D Sys. Corp.*,
    2009 WL 174989 (N.D. Ill. Jan. 26, 2009).........................................11, 27, 28, 31

*Ducere LLC v. Enbridge (U.S.) Inc.*,
    2025 WL 81373 (N.D. Ill. Jan. 13, 2025) .....................................................28, 29

*In re Ductile Iron Pipe Fittings Direct Purchaser Antitrust Litig.*,
    2013 WL 812143 (D.N.J. Mar. 5, 2013)............................................................25

*Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*,
    111 F.4th 337 (4th Cir. 2024) .............................................................................23

*Eco Elec. Sys., LLC v. Reliaguard, Inc.*,
    2022 WL 1157481 (N.D. Cal. Apr. 19, 2022) ...............................................36, 37

*Eli Lilly & Co. v. Arla Foods Inc.*,
    2017 WL 4570547 (E.D. Wis. June 15, 2017).................................................43, 44

*Eli Lilly & Co. v. Arla Foods, Inc.*,
    893 F.3d 375 (7th Cir. 2018) ..............................................................................43

*Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*,
    69 F.4th 665 (9th Cir. 2023) ...............................................................................39

*F.D.I.C. v. Countrywide Fin. Corp.*,
    2012 WL 5900973 (C.D. Cal. Nov. 21, 2012).....................................................40

*F.T.C. v. Staples, Inc.*,
  970 F. Supp. 1066 (D.D.C. 1997) .......................................................................15

*Fed. Trade Comm'n v. Sysco Corp.*,
  113 F. Supp. 3d 1 (D.D.C. 2015) .......................................................................18

*Force Partners, LLC v. KSA Lighting & Controls, Inc.*,
  2022 WL 580808 (N.D. Ill. Feb. 25, 2022) ...................................................20, 28

*Fourqurean v. Nat'l Coll. Athletic Ass'n*,
  143 F.4th 859 (7th Cir. 2025) ...........................................................................11

*In re German Auto. Mfrs. Antitrust Litig.*,
  497 F. Supp. 3d 745 (N.D. Cal. Oct. 23, 2020) .............................................14, 15

*Gulf States Reorg. Grp., Inc. v. Nucor Corp.*,
  466 F. 3d 961 (11th Cir. 2006) ..........................................................................20

*Hendricks Music Co. v. Steinway, Inc.*,
  689 F. Supp. 1501 (N.D. Ill. 1988) ...............................................................13, 16

*HGCI, Inc. v. Luxx Lighting, Inc.*,
  2020 WL 5913851 (C.D. Cal. Sept. 10, 2020) ....................................................41

*House of Brides, Inc. v. Alfred Angelo, Inc.*,
  2014 WL 64657 (N.D. Ill. Jan. 8, 2014) .............................................................17

*Humboldt Wholesale, Inc. v. Humboldt Nation Distrib., LLC*,
  2012 WL 2572065 (N.D. Cal. July 2, 2012).........................................................36

*Hytera Commc'ns Corp. Ltd. v. Motorola Sols., Inc.*,
  623 F. Supp. 3d 857 (N.D. Ill. 2022) .........................................................25, 26, 31

*Int'l Equip. Trading, Ltd. v. Illumina, Inc.*,
  2018 WL 3861575 (N.D. Ill. Aug. 14, 2018) ..................................................11, 32

*Int'l Equip. Trading, Ltd. v. Illumina, Inc.*,
  312 F. Supp. 3d 725 (N.D. Ill. 2018) .................................................................29

*Internal Med. Nephrology v. Bio-Medical Applications of Indiana, Inc.*,
  2019 WL 4688712 (S.D. Ind. Sept. 26, 2019) .....................................................19

*Isaksen v. Vermont Castings, Inc.*,
  825 F.2d 1158 (7th Cir. 1987) ..........................................................................21

*Jang v. A.M. Miller & Assocs.*,
  122 F.3d 480 (7th Cir. 1997) .......................................................................10, 15

*Jensen Enters. Inc. v. Oldcastle, Inc.*,
   2006 WL 2583681 (N.D. Cal. Sept. 7, 2006) ...................................................34, 37

*Juarez v. Jani-King of Cal., Inc.*,
   2010 WL 4807086 (N.D. Cal. Nov. 19, 2010) ........................................................38

*Kaiser Aluminum & Chem. Corp. v. FTC*,
   652 F.2d 1324 (7th Cir. 1981) ......................................................................11, 18

*Kelley v. Crosfield Catalysts*,
   135 F.3d 1202 (7th Cir. 1998) ..............................................................................12

*King ex rel. King v. E. St. Louis Sch. Dist.*
   189, 496 F.3d 812 (7th Cir. 2007) .........................................................................48

*Korea Supply Co. v. Lockheed Martin Corp.*,
   29 Cal. 4th 1134 (2003) .........................................................................35, 39, 40

*Kunes Country Auto. Mgmt. Inc. v. Walters*,
   2024 WL 2114006 (E.D. Wis. May 10, 2024)........................................................44

*Le Bleu Corp. v. Fed. Mfg. LLC*,
   2018 WL 4936032 (E.D. Wis. Oct. 10, 2018) ........................................................46

*Lektro–Vend Corp. v. Vendo Co.*,
   403 F. Supp. 527 (N.D. Ill. 1975) .........................................................................28

*Lopez v. Nissan N. Am., Inc.*,
   201 Cal. App. 4th 572 (Cal. Ct. App. 2011) ..........................................................43

*Lorain Journal Co. v. United States*,
   342 U.S. 143 (1951).................................................................................................32

*Maui Jim, Inc. v. SmartBuy Guru Enters.*,
   386 F. Supp. 3d 926 (N.D. Ill. 2019) ....................................................................17

*McCray v. Wilkie*,
   966 F.3d 616 (7th Cir. 2020) .................................................................................10

*MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*,
   708 F.2d 1081 (7th Cir. 1983) ...............................................................................33

*MCM Partners Inc. v. Andrews-Bartlett & Assocs., Inc.*,
   62 F.3d 967 (7th Cir. 1995) ...................................................................................11

*Mercatus Grp. LLC v. Lake Forest Hosp.*,
   641 F.3d 834 (7th Cir. 2011) .................................................................................31

*In re MultiPlan Health Ins. Provider Litig.*,
    789 F. Supp. 3d 614 (N.D. Ill. 2025) ...................................................................11

*N. Shore Med. Ctr., Ltd. v. Evanston Hosp. Corp.*,
    1993 WL 141717 (N.D. Ill. Apr. 30, 1993) ........................................................46

*Neu-Visions Sports, Inc. v. Soren/McAdam/Bartells*,
    86 Cal. App. 4th 303 (2000) ..............................................................................41

*Novell, Inc. v. Microsoft Corp.*,
    731 F.3d 1064 (10th Cir. 2013) ..........................................................................32

*O'Boyle v. Real Time Resolutions*,
    910 F.3d 338 (7th Cir. 2018) ..............................................................................48

*Ohio v. Am. Express Co.*,
    585 U.S. 529 (2018) ......................................................................................26, 27

*Oracle Int'l Corp. v. Rimini St., Inc.*,
    123 F.4th 986 (9th Cir. 2024) .............................................................................45

*Parkinson v. Hyundai Motor Am.*,
    258 F.R.D. 580 (C.D. Cal. 2008) ........................................................................46

*PhoneDog v. Kravitz*,
    2012 WL 273323 (N.D. Cal. Jan. 30, 2012) .......................................................36

*Plessinger v. Castleman & Haskell*,
    838 F. Supp. 448 (N.D. Cal. 1993) .....................................................................35

*PNY Techs., Inc. v. SanDisk Corp.*,
    2014 WL 1677521 (N.D. Cal. Apr. 25, 2014) .....................................................22

*Priority Int'l Animal Concepts, Inc. v. Bryk*,
    2012 WL 6020044 (E.D. Wis. Dec. 3, 2012) ......................................................43

*In re Qualcomm Antitrust Litig.*,
    2023 WL 121983 (N.D. Cal. Jan. 6, 2023) .........................................................47

*Quelimane Co. v. Stewart Title Guar. Co.*,
    19 Cal. 4th 26 (1998) ...................................................................................34, 37

*RealPage, Inc. v. Yardi Sys., Inc.*,
    852 F. Supp. 2d 1215 (C.D. Cal. 2012) ..........................................................30, 37

*Reifert v. S. Cent. Wisc. MLS Corp.*,
    450 F.3d 312 (7th Cir. 2006) ..............................................................................11

*Republic Tobacco Co. v. N. Atl. Trading Co.*,
    381 F.3d 717 (7th Cir. 2004) ........................................................21

*Rheumatology Diagnostics Lab'y, Inc. v. Aetna, Inc*.,
    2014 WL 524076 (N.D. Cal. Feb. 6, 2014) ........................................24

*RingCentral, Inc. v. Nextiva, Inc.*,
    2020 WL 4039322 (N.D. Cal. July 17, 2020)......................................42

*River Supply, Inc. v. Oracle Am., Inc*.,
    2024 WL 665188 (N.D. Cal. Feb. 16, 2024) ......................................41

*Rock v. Nat'l Collegiate Athletic Ass'n*,
    2013 WL 4479815 (S.D. Ind. Aug. 16, 2013) ....................................14

*Rovanco Piping Sys., Inc. v. Perma-Pipe Int'l Holdings, Inc.*,
    2022 WL 683690 (N.D. Ill. Mar. 8, 2022)........................................45

*Sargent-Welch Sci. Co. v. Ventron Corp.*,
    567 F.2d 701 (7th Cir. 1977) ......................................................13

*Segerdahl Corp. v. Am. Litho, Inc.*,
    2019 WL 157924 (N.D. Ill. Jan. 10, 2019)........................................46

*Selleck v. Globe Int'l, Inc*.
    166 Cal. App. 3d 1123 (1985) ....................................................42

*Sharif Pharmacy, Inc. v. Prime Therapeutics*,
    LLC, 950 F.3d 911 (7th Cir. 2020)................................................11

*Shipley v. Chi. Bd. of Election Comm'rs*,
    947 F.3d 1056 (7th Cir. 2020) ....................................................12

*Silicon Image, Inc. v. Analogix Semiconductor, Inc.*,
    2007 WL 1455903 (N.D. Cal. May 16, 2007) ....................................37

*Silicon Labs Integration, Inc. v. Melman*,
    2010 WL 890140 (N.D. Cal. Mar. 8, 2010)....................................36, 38

*Solyndra Residual Tr. v. Suntech Power Holdings Co.*,
    62 F. Supp. 3d 1027 (N.D. Cal. 2014) ........................................34, 37

*In re Surescripts Antitrust Litig.*,
    608 F. Supp. 3d 629 (N.D. Ill. 2022)........................................14, 22, 25

*Team Schierl Cos. v. Aspirus, Inc.*,
    2023 WL 6847433 (W.D. Wis. Oct. 17, 2023)................................10, 22

*Teva Pharms. USA, Inc. v. Corcept Therapeutics, Inc.*,
  2025 WL 2637507 (N.D. Cal. Sept. 12, 2025) ...................................................25

*Tiz, Inc. v. S. Glazer's Wine & Spirits, LLC*,
  2024 WL 2785142 (N.D. Ill. May 30, 2024) ....................................................27

*Toys "R" Us, Inc. v. F.T.C.*,
  221 F.3d 928 (7th Cir. 2000) ........................................................................26

*TransWeb, LLC v. 3M Innovative Props. Co.*,
  16 F. Supp. 3d 385 (D.N.J. 2014) .............................................................19, 20

*Trevari Media, LLC v. Colasse*,
  758 F. Supp. 3d 1175 (C.D. Cal. 2024) .........................................................41

*U.S. Bd. of Oral Implantology v. Am. Bd. of Dental Specialties*,
  390 F. Supp. 3d 892 (N.D. Ill. 2019) .............................................................30

*United States v. Apple, Inc.*,
  2025 WL 1829127 (D.N.J. June 30, 2025) ......................................................33

*United States v. E.I. du Pont de Nemours & Co.*,
  351 U.S. 377 (1956) ...............................................................................10, 26

*United States v. Falstaff Brewing Corp.*,
  410 U.S. 526 (1973) ......................................................................................20

*United States v. Gen. Motors Corp.*,
  384 U.S. 127 (1966) ......................................................................................22

*United States v. Google LLC*,
  747 F. Supp. 3d 1 (D.D.C. 2024) ..................................................................30

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001) ...........................................................17, 19, 25

*United States v. Visa, Inc.*,
  788 F. Supp. 3d 585 (S.D.N.Y. 2025) ...........................................................23

*Valassis Commc'ns, Inc. v. News Corp.*,
  2019 WL 802093 (S.D.N.Y. Feb. 21, 2019) ...................................................21

*Viamedia, Inc. v. Comcast Corp.*,
  951 F.3d 429 (7th Cir. 2020) ........................................................................23

*Virun, Inc. v. Cymbiotika, Inc.*
  2022 WL 17371057 (C.D. Cal. Aug. 18, 2022)...............................................42

*Walter Kidde Portable Equip., Inc. v. Universal Sec. Instruments, Inc.*,
669 F. Supp. 2d 895 (N.D. Ill. 2009) ................................................................28, 30

## **Statutes**

42 U.S.C. § 300jj–52(a)(1) ........................................................................................8

Cal. Bus. & Prof. Code § 17200 ..............................................................................47

Cal. Bus. & Prof. Code § 17500 ..............................................................................43

21st Century Cures Act, Pub. L. No. 114-255 (2016) ...........................8, 32, 33, 39, 40

## **Other Authorities**

P. Areeda & H. Hovenkamp, Fundamentals of Antitrust Law (5th ed. 2025)..................17, 18, 22

Information Blocking and the ONC Health IT Certification Program: Extension of
Compliance Dates and Timeframes in Response to the COVID-19 Public
Health Emergency, 85 Fed. Reg. 70,064 (Nov. 4, 2020)....................................2, 33

Restatement of Torts 2d, § 767 .................................................................................39

Fed. R. Civ. P. 9(b) ................................................................................................43, 44

Fed. R. Civ. P. 12(b)(6) .........................................................................................15, 29, 48

## PRELIMINARY STATEMENT

This case is about a textbook abuse of power, whether framed in terms of antitrust law, false advertising, or tortious interference. Defendant Epic Systems dominates two critical "bookend" markets in healthcare IT: electronic health records (EHR) software and provider-sponsored health plan core administrative processing system (PSHP CAPS) software. Health providers use the former to create EHRs. PSHPs (a specific type of health plan, or "payer") use the latter to, *inter alia*, determine what claims should be approved, denied, partially paid, and flagged for further review. Information from EHRs is critical for these tasks, but is often unusable in its raw state. That is where the third type of product at issue in this case—managed care middleware (MCM) software—steps in. MCM software translates and optimizes the raw data from EHR software for use in PSHP CAPS software by cleaning, organizing, and formatting it for maximum compatibility. Plaintiff CureIS pioneered this middleware market, which replaces the traditional, largely manual review of EHR records and thereby dramatically reduces PSHPs' costs and improves their workflows, ultimately inuring to the benefit of patients nationwide.

Over the years, Epic grew to dominate the EHR software market so completely that it needed to look to other markets for new growth opportunities. It identified PSHP CAPS software as one such opportunity and entered that market with a product called Tapestry. Since then, Epic has grown its share of PSHP CAPS software substantially. But there was a problem with this growth strategy (at least, in Epic's eyes): CureIS.

The PSHPs that use CureIS's products achieve massive savings and efficiencies regardless of whether they also use Epic's software. That is because CureIS's MCM software products are agnostic about the EHR and PSHP CAPS software providers that PSHPs use. To Epic's disappointment, CureIS's high degree of compatibility gave PSHPs flexibility to switch among CAPS software options at any time. Epic's preferred business practice, by contrast, is to entrench

itself in health providers' and payers' businesses so inextricably that it can dictate what its customers can and cannot do, even if other software providers begin to offer better or cheaper products. Threatened by the ability of MCM software providers like CureIS to disrupt this lucrative arrangement, Epic has engaged in a multi-pronged campaign to eliminate both the MCM software market generally and CureIS specifically. Its conduct included coercing customers into not using CureIS or other MCM software products, disparaging CureIS and its products to customers, falsely claiming that Epic did or would have similar products soon, and preventing customers from utilizing their own data unless they bowed to Epic's demands, in direct violation of federal law and regulations that the Department of Health & Human Services (HHS) has explained are meant to "*inject competition into health care by promoting an entrepreneurial economy and new business models*" and "*make sure health information follows a patient by preventing industrywide information blocking practices and other anti-competitive behavior*."[1]

In its complaint, CureIS explains its place in the healthcare world, the nature and extent of Epic's misconduct, and the effects of that conduct on CureIS specifically and competition more broadly—alleging nine separate claims that follow from Epic's anticompetitive activity. Epic fails to show that any of these claims is implausible.

With respect to CureIS's antitrust claims:

***Market Definition.*** Epic challenges CureIS's market definitions for PSHP and MCM software, but ignores the substance of CureIS's allegations. Utilizing well-accepted methods from economics and the case law, CureIS carefully explains why PSHP CAPS software is distinct from other types of CAPS software—indeed, Epic itself recognizes this distinction in how it advertises

---

[1]  *See* Information Blocking and the ONC Health IT Certification Program: Extension of Compliance Dates and Timeframes in Response to the COVID-19 Public Health Emergency, 85 Fed. Reg. 70,064 (Nov. 4, 2020).

and positions Tapestry. CureIS also explains MCM software is a ***complement*** to PSHP CAPS software rather than a substitute. Market definition turns on reasonable interchangeability (*i.e.*, reasonable substitutability for the same purpose), and Epic's argument that PSHP CAPS software and MCM software are in the same market is incorrect as a matter of basic economics.

**Antitrust Injury.** Epic suggests that eliminating a middleware provider to maintain monopoly power in another market is not actionable. That is wrong. A monopolist that targets the leading player in a market to eliminate that market entirely, commits a textbook antitrust violation.

**Section 1 (Concerted Action).** Epic focuses narrowly on exclusive dealing, but CureIS alleges not only *de facto* exclusive dealing (including foreclosure of essentially all competition in MCM software), but also other forms of coerced agreements sufficient to state a Section 1 claim.

**Section 2 (Monopoly Power and Anticompetitive Conduct).** Epic's arguments do not address CureIS's allegations of Epic's monopoly power in EHR software (and use of that power), nor CureIS's actual allegations and the reasonable inferences from its allegations regarding both direct and indirect evidence of Epic's power in PSHP CAPS software. As for anticompetitive conduct, Epic simply ignores the law and CureIS's actual allegations, which not only describe actionable coercion, but also false statements accompanied by the literal definition of a "coercive enforcement mechanism" as defined by the Seventh Circuit, ***and*** violations of federal rules that, as noted above, HHS promulgated expressly to prevent anticompetitive conduct.

Epic's attacks on the remainder of CureIS's claims fare no better. CureIS addresses each of those in detail below and, for space reasons, will not summarize them in full here. However, once again, Epic repeatedly and improperly ignores CureIS's allegations, asks the Court to find facts on disputed evidence or apply inferences against CureIS, or mischaracterizes the law. These are not valid arguments on a motion to dismiss.

For all these reasons, discussed in detail below, the Court should deny Epic's motion.

<u>**RELEVANT ALLEGATIONS OF THE FAC**</u>

**A.      This Case Is About The Managed Care Portion Of The Health Tech World**

In recent years, the U.S. healthcare industry has transitioned from paper to electronic health records (EHR). This helped reduce a number of inefficiencies and costs stemming from antiquated systems that did not interoperate. Dkt. 61 (FAC) ¶¶ 1-2; Dkt. 81 (MTD) at 5. The transition to EHRs gave rise to many distinct software markets, three of which are relevant to this case: (1) EHR software, (2) PSHP CAPS software, and (3) MCM software.

*EHR Software.* Healthcare providers use EHR software to store patients' medical records. Dkt. 61 ¶¶ 22, 26. Epic dominates this market. "Over 60% of health systems and academic medical systems use Epic EHR software, including every health system on U.S. News & World Report's best hospitals list," and "over 90% of the country's medical students train on Epic's EHR software systems." *Id.* ¶ 27. "[B]etween 81-94% of patients [in the U.S.] have at least one medical record stored in an Epic EHR software system," and Epic "manages more than 325 million patient records, with at least $813 billion in healthcare expenditures processed through Epic in 2023." *Id.*

Epic's dominance is protected by substantial barriers to entry and lock-in effects. Transitioning to Epic's EHR software involves "nine- or ten-figure investments, with over two-thirds of this cost attributable to upfront fees alone," and can take "many months to several years to fully complete." *Id.* ¶ 29. That means providers are "virtually prohibited from switching EHR software vendors after moving to Epic," *id.*, and, today, "nearly every player in the healthcare industry must be able to interact with Epic's EHR software in some way." *Id.* ¶ 2.

*PSHP CAPS Software.* In contrast to provider-focused EHR software, CAPS software is for payers like health plans and managed care organizations (MCOs). Payers use CAPS software "to determine whether a submitted healthcare claim should be approved, denied, partially paid, or

4

flagged for further review." *Id.* ¶ 3. CAPS software supports all "end-to-end lifecycle of claims processing, from intake through adjudication, payment, and reporting." *Id.* Insureds' health information, which is delivered by EHR software, is a critical input for CAPS software. *Id.* ¶¶ 3, 49, 56, 86-89.

Within the broader CAPS software market, "a narrower product market exists for CAPS software for PSHPs." *Id.* ¶ 33. This is because, as providers that own and operate their own insurance plans, PSHPs operate very differently from generic, non-provider-affiliated payers and thus have "distinct needs that cannot be served by a generic CAPS software." *Id.* PSHPs also face unique regulatory and reporting requirements, which means that CAPS software for PSHPs must be tailored to provide specialized functionality. *Id.* General CAPS software thus cannot substitute for PSHP CAPS software; among other things, a customer would need to spend significant sums to customize generic CAPS software enough to perform the same functions as a tailor-made PSHP CAPS software solution, making it much more expensive than the software that already exists in the separate PSHP CAPS market. *Id.*

Epic's PSHP CAPS software is called Tapestry, which it advertises as a "managed care product" for PSHPs; *i.e.*, "organizations that provide a health plan for their patients." *Id.* ¶ 33 n.8 (incorporating Epic's public online statement). Epic dominates this market as well, with "market share that some estimates put as high as 76%." *Id.* ¶ 35. Like the EHR market, the PSHP CAPS market features high switching costs, because switching to a different CAPS system would require "substantial investment in data conversion, staff retraining, and process reengineering." *Id.* ¶ 33.

***MCM Software.*** As its name implies, MCM software is middleware that operates in the space between EHR and PSHP CAPS software. PSHP CAPS software relies on data originating from EHR software; however, one cannot input raw EHR data into a PSHP's CAPS software

because raw data from EHR software is formatted and organized in a way that is either incompatible with, or inappropriate for, a PSHP. *Id.* ¶ 3. A PSHP therefore needs to translate, reorganize, clean, and otherwise reformat EHR data for its PSHP CAPS software. MCM software performs this task. *Id.* ¶¶ 3, 37. That is why PSHPs use MCM software alongside their PSHP CAPS software, rather than instead of it. *Id.* ¶ 43.

To perform these tasks, MCM software provides distinct functionality that PSHP CAPS software, like Epic's Tapestry platform, does not. This includes "[c]leaning, scrubbing, validating, and reconciling disparate data sources ensures payers are not incorrectly or inaccurately billing for members' care." *Id.* ¶ 41. Thus, although MCM software must necessarily interoperate with CAPS software, MCM and CAPS software are not interchangeable. *Id.* ¶ 43. Even Epic acknowledges that those who have "purchased a separate CAPS software, such as Epic's Tapestry product" would also purchase MCM software like CureIS's products. Dkt. 81 (Mot.) at 6; *see* Dkt. 61 ¶ 43 (the "only customers for MCM software are MCOs that already have CAPS software").

While Epic dominates the two software markets that bookend the MCM market, Epic does not currently offer a true, full-function MCM product. *Id.* ¶ 45. But because MCM software operates between the two markets Epic dominates, and must necessarily interoperate with both EHR and CAPS software, *id.* ¶ 41, Epic has significant leverage over MCM software providers due to the control it can exert over their current and potential customers. *Id.*

### B.     CureIS Is A Pioneer In MCM Software

"[S]everal healthcare industry veterans" founded CureIS in 2006 "with the mission of improving healthcare through information technology." *Id.* ¶ 1. Instead of focusing on more profitable payer types with greater profit margins, CureIS aimed to serve the "historically underserved portions of the overall industry," and decided to take on the technological challenge of providing a software solution for "managed services for government-managed programs like

Medicare, Medicaid, and state healthcare initiatives," who must comply with a complex set of regulatory requirements to make efficient healthcare decisions. *Id.* After devoting significant resources, CureIS achieved that solution in its proprietary "Managed Care Master Data Model," which allows CureIS's customers to respond rapidly to changes in regulations, file formats, and customer needs in ways that other products cannot. *Id.* ¶ 46.

CureIS offers several MCM software products, each addressing a distinct need that CAPS software does not meet. These include EnrollmentCURE, EncounterCure, Recovery CURE, and LettersCURE, all of which provide functionality that traditional PSHP CAPS software, such as Epic's Tapestry, do not. *Id.* ¶ 48 (describing each product's core functionality).

For nearly two decades, CureIS built and enjoyed strong, stable customer relationships with major PSHPs to whom CureIS provided its innovated middleware solutions. *Id.* ¶¶ 53, 59, 65. And, for the vast majority of its corporate existence, "CureIS had no issues with Epic or any other EHR or CAPS provider (and still has no issues with other EHR or CAPS providers besides Epic)" that hindered CureIS's ability to serve its PSHP customers. *Id.* ¶ 6. Indeed, CureIS never lost a customer until Epic began its interference and competition-elimination campaign. But that changed when Epic decided to target CureIS's business. *Id.*

**C.    Epic Targeted CureIS Using A Variety Of Tactics, All Because MCM Software Makes Epic's Core Software Products Less "Sticky"**

Despite dominating the EHR software market, Epic realized that it needed new areas for expansion in order to "continue its growth and dominance in the healthcare industry." *Id.* ¶ 50. It therefore "look[ed] to other markets" like PSHP CAPS software. *Id.* However, MCM software presented a problem for this growth plan, as well as for Epic's historical source of power in EHR software. MCM software reduces the "stickiness" of both EHR and PSHP CAPS software, because it "provides MCO customers a tool by which to disintermediate their own systems and data from

Epic's control," meaning users of either or both can more easily switch away from them. *Id.* ¶ 40.

As a result, Epic "has a powerful incentive to prevent the proliferation of MCM software and to eliminate the strongest competitors in that space; in particular, CureIS" because not doing so would mean it has to compete more. *Id.* ¶ 50. Since that was contrary to Epic's preferred method of using its power to dictate what its customers can and cannot do, it sought to eliminate CureIS through a variety of overlapping, reinforcing acts.

**Information Blocking.** The federal Cures Act states that healthcare IT developers "cannot engage in 'information blocking' of EHI." Dkt. 61 ¶¶ 86-87; *see* 42 U.S.C. § 300jj–52(a)(1). Nevertheless, Epic started to place roadblocks on PSHP customers' ability to access their insureds' EHI for use with CureIS's products. Epic began "deny[ing] CureIS's requests for data, files, and configurations that CureIS needed to adapt its process to the Epic environment." *Id.* ¶ 68. In another case, Epic relegated customers using CureIS products to inferior data sources in Epic's datastore called Clarity. Unlike Epic's main datastore, Epic Chronicles, which provides data essentially instantaneously, CureIS customers were forced to wait from a day to over a week for their data. *Id.* ¶ 60. Eventually, Epic denied access entirely for CureIS's MCM products—even when PSHP customers explicitly requested it. *Id.* ¶ 70. This is information blocking. *Id.* ¶¶ 86-89.

**Coercing Epic Customers Into Using Epic Products Only, Or None At All.** Epic also started to require that its customers either use Epic's products instead of third-party alternatives, or use none at all. *Id.* ¶ 84. To implement this "Epic-first policy," Epic required its customers to "abandon any preexisting third-party tools and forgo exploring non-Epic solutions at any point in the future if Epic believes it has a tool or service that overlaps with the third party's option—even if such third-party solutions offer superior functionality." *Id.* The provider Hill Physicians, for example, "informed CureIS that they could not work with CureIS because Epic imposed on them

an 'Epic-first' policy." *Id.* Even if some customers may have initially resisted Epic's demands for exclusivity, by 2025, Epic successfully forced terminations or severe degradation of CureIS's relationships with multiple customers. *See id.* ¶¶ 61, 85, 148.

**Marketwide False and Disparaging Statements.** Epic compounded this anticompetitive and tortious conduct with false and disparaging statements, which it then enforced through coercive tactics. Some of those statements falsely claimed that Epic's Tapestry could replace CureIS's MCM products. For example, Epic told customers like Sharp and Sutter that Epic could provide the same services CureIS did, and that "CureIS's services would no longer be needed once Epic was up and running," but none of that was ever true. *Id.* ¶¶ 55, 59, 61.

At the same time, Epic told customers it had "concerns" about data security risks associated with CureIS's products. *Id.* ¶ 165. These statements were pretextual; as Epic separately admitted, "the reason for denying CureIS access had nothing to do with data security, but rather, because Epic viewed CureIS as 'a direct competitor.'" *Id.*

Epic's conduct had the intended effect: it harmed both CureIS and MCM software competition. Despite their desire to keep working with CureIS absent Epic interference, customers Sharp, Sutter, and Advocate all terminated their relationships with CureIS. *Id.* ¶¶ 60-61, 73, 147. Epic's conduct also foreclosed prospective relationships CureIS had developed and understood customers would have consummated absent Epic's conduct. *Id.* ¶¶ 79, 84, 107. And, more broadly, by "limit[ing] the functionality MCM software customers can use," Epic has dissuaded actual and potential customers for that software to use it at all, which "has also led to higher prices for PSHP CAPS software" (because MCM software providers are unable to keep Epic honest by forcing it to compete more with other PSHP CAPS providers) and reduced the quality of technology available to payers—a significant harm to competition and the public. *Id.* ¶ 102.

9

## LEGAL STANDARD

To defeat a motion to dismiss, the plaintiff must "plead a plausible claim for relief," *Balle v. Kennedy*, 73 F.4th 545, 557 (7th Cir. 2023), which means that the complaint must include "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Jang v. A.M. Miller & Assocs.*, 122 F.3d 480, 483 (7th Cir. 1997). Ultimately, "[t]he question on a motion to dismiss is whether the plaintiff provided the defendant with fair notice of the claims and alleged facts plausibly suggesting that the plaintiff is entitled to relief." *Team Schierl Cos. v. Aspirus, Inc.*, 2023 WL 6847433, at *3 (W.D. Wis. Oct. 17, 2023) (Peterson, J.) (citing *McCray v. Wilkie*, 966 F.3d 616, 620 (7th Cir. 2020)).

## ARGUMENT

I.     **CUREIS PLAUSIBLY ALLEGES ANTITRUST CLAIMS UNDER SECTIONS 1 AND 2 OF THE SHERMAN ACT (COUNTS 1-3)**

Epic's arguments against CureIS's antitrust claims fall into four general categories, attacking CureIS's allegations regarding: relevant market, antitrust injury, the exclusive dealing portion of CureIS's for its Section 1 claim, and monopoly power/exclusionary conduct for its Section 2 claims. These attacks are meritless. Epic asks the Court to ignore well-pled factual allegations, resolve factual disputes in Epic's favor, ignore the full scope of CureIS's claims, and misconstrue the law. Those are not bases for dismissal; they are bases to deny the motion.

### A.     **Epic's Market Definition Challenges Are Inappropriate For A Motion To Dismiss And Proceed Largely By Ignoring CureIS's Allegations**

A "relevant market" under the Sherman Act is comprised of the "commodities reasonably interchangeable by consumers for the same purposes." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956). The two components of the relevant market are the product

market and the geographic market. *Sharif Pharmacy, Inc. v. Prime Therapeutics*, LLC, 950 F.3d 911, 917 (7th Cir. 2020). On this motion, Epic challenges only the product market definition. "The Supreme Court has held that the concept of economic substitution is the primary means by which to define a product market." *Kaiser Aluminum & Chem. Corp. v. FTC*, 652 F.2d 1324, 1330 (7th Cir. 1981). This is often proven through objective inquiries, such as the hypothetical monopolist test, which often relies on a SSNIP ("**s**mall but **s**ignificant **n**ontransitory **i**ncrease in **p**rice") analysis. *In re Dealer Mgmt. Sys. Antitrust Litig.*, 581 F. Supp. 3d 1029, 1056 (N.D. Ill. 2022).[2] A plaintiff may also support market definition through the use of subjective practical indicia, *see Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962), but the law in this Circuit is that such indicia do not displace the need for economic analysis. *Reifert v. S. Cent. Wisc. MLS Corp.*, 450 F.3d 312, 318, 320 (7th Cir. 2006).

Because "market definition is a deeply fact-intensive inquiry," courts "hesitate to grant motions to dismiss for failure to plead a relevant ... market." *Fourqurean v. Nat'l Coll. Athletic Ass'n*, 143 F.4th 859, 870 (7th Cir. 2025). This is why factual disputes related to market definition are typically inappropriate for dispositive motions. *See*, *e.g. MCM Partners Inc. v. Andrews-Bartlett & Assocs., Inc.*, 62 F.3d 967, 972, 977 (7th Cir. 1995) (reversing market definition-based dismissal of Sherman Act claim); *see also In re MultiPlan Health Ins. Provider Litig.*, 789 F. Supp. 3d 614, 635 (N.D. Ill. 2025) (denying market definition dismissal arguments); *DSM Desotech Inc. v. 3D Sys. Corp.*, 2009 WL 174989, at *8 (N.D. Ill. Jan. 26, 2009) (same); *Int'l Equip. Trading, Ltd. v. Illumina, Inc.*, 2018 WL 3861575, at *3 (N.D. Ill. Aug. 14, 2018) (same).

As discussed below, CureIS's relevant market allegations reflect competitive realities

---

[2]   That test assesses what is the smallest group of products for which a hypothetical monopolist could profitably impose a SSNIP. This identifies what products consumers will turn to when facing a small increase in price, thereby identifying reasonable interchangeability.

under both objective and subjective analyses. In contrast, Epic raises fact-based challenges to CureIS's market definitions that are both procedurally improper and substantively meritless. Before addressing those arguments, however, it is worth addressing up front Epic's repeated suggestion that CureIS's market definition allegations fail because the original complaint defined the markets in slightly different ways. *See*, *e.g.*, Mot. 18 ("facial unsustainability of these markets is … demonstrated by the way in which CureIS's allegations have completely changed."). Facts that are "not incorporated into the amended pleading are considered *functus officio*," and as such, "they cannot be considered by the court on a motion to dismiss the amended complaint" when "assessing whether the amended complaint states a viable claim." *Kelley v. Crosfield Catalysts*, 135 F.3d 1202, 1204-05 (7th Cir. 1998). In any event, more notable is that Epic does not contend that CureIS lacks a good faith basis to define the relevant markets in the way it does. This completely negates Epic's insinuations on market definition.

### 1. Epic Implicitly Concedes That CureIS Plausibly Alleges Epic Dominates The Relevant Market For EHR Software

In its complaint, CureIS alleges Epic has monopoly power in the EHR software market and utilizes that power to harm competition in the MCM software market. *See, e.g.*, FAC ¶¶ 2, 7, 9, 28-31, 40-41, 53-54, 59, 63, 84-85, 100. Because Epic does not argue CureIS implausibly alleges either the EHR market definition or Epic's power in that market, Epic concedes those allegations' plausibility at this time. *See Shipley v. Chi. Bd. of Election Comm'rs*, 947 F.3d 1056, 1063 (7th Cir. 2020) ("Arguments that are underdeveloped, cursory, and lack supporting authority are waived."). This is important because it essentially renders Epic's arguments about PSHP CAPS software market definition irrelevant to the viability of CureIS's claims because CureIS does not need to establish Epic's power in the PSHP CAPS software to proceed with its theory that Epic wielded market power anticompetitively to harm competition in the MCM software market. FAC

¶¶ 6-7, 9, 40-41, 45, 50, 56, 63, 84-86, 88-89, 97, 100.

### 2. CureIS Plausibly Alleges PSHP CAPS Is A Relevant Software Market

In any event, Epic is wrong on its market definition attacks. The first such attack focuses on PSHP CAPS software, which Epic argues is not a plausible market because (according to Epic) one cannot define a market based on a product designed for a specific type of buyer and CureIS does not plausibly allege practical indicia of such a market under *Brown Shoe*. Mot. 12-16. These arguments ignore or misconstrue the law, basic economics, and CureIS's factual allegations.

***First***, Epic never engages with what PSHP CAPS software actually ***does*** nor its differentiation from other types of software. The most important factor for market definition "is uniqueness of the product's functions and therefore its uses." *Sargent-Welch Sci. Co. v. Ventron Corp.*, 567 F.2d 701, 710 (7th Cir. 1977).

CureIS explains in detail that PSHPs have unique needs and PSHP CAPS software provides unique functionality relative to more general CAPS platforms. FAC ¶ 33. CureIS further explains that general CAPS platforms cannot support these specialized workflows without massive, expensive customization. *Id.* Furthermore, ***Epic itself*** markets Tapestry as a separate "managed care product" designed specifically PSHPs; *i.e.*, "organizations that provide a health plan for their patients." *Id.* ¶ 33 & n.8. This market definition simply recognizes what Epic itself advertises to the world: there is a specific type of CAPS software tailored for and sold to PSHPs. As Epic's own motion makes clear, the Supreme Court has recognized that products specifically made for a certain type of buyer can constitute their own relevant market. *See* Mot. 12 n.3 (noting the Supreme Court in *Brown Shoe* defined men's shoes—*i.e.*, shoes made solely for a certain category of buyer—as a separate product market from women's and children's shoes); *see also Hendricks Music Co. v. Steinway, Inc.*, 689 F. Supp. 1501, 1508 (N.D. Ill. 1988) (fact that only certain types of buyers (concert halls) typically bought concert grand pianos indicated concert grand pianos

were in their own submarket of the broader piano market).

**Second,** Epic focuses almost entirely on *Brown Shoe* practical indicia while ignoring CureIS's allegations under the objective hypothetical monopolist framework; relegating its argument on that analysis to a single footnote. *See* Mot. 16 n.7. Epic's argument (citing *In re German Auto. Mfrs. Antitrust Litig.*, 497 F. Supp. 3d 745 (N.D. Cal. Oct. 23, 2020)) is to essentially say that an antitrust plaintiff must allege the specific number of customers that would or would not switch away from a hypothetical monopolist to plausibly allege a SSNIP. That is wrong. A "plaintiff's burden [is] to plead the rough contours of the relevant commercial market in which anticompetitive effects may be felt." *Rock v. Nat'l Collegiate Athletic Ass'n*, 2013 WL 4479815, at *14 (S.D. Ind. Aug. 16, 2013) (cleaned up). Epic's alternative approach would essentially require a detailed expert analysis at the pleading stage that requires, in large part, data from the defendant. That is not (and could never be) the law. *See Dennis v. Andersons Inc*., 2022 WL 22761475, at *8 (N.D. Ill. May 3, 2022) ("Plaintiffs are entitled to discovery and a factual inquiry before their alleged product market may be dismissed as impermissibly narrow.") (cleaned up); *see also In re Surescripts Antitrust Litig.*, 608 F. Supp. 3d 629, 643 (N.D. Ill. 2022) ("it is typically considered an 'adequate pleading in a rule of reason antitrust case' for a plaintiff to allege (1) evidence of market structure … and (2) exclusionary effect") (internal quotations omitted).

Epic's citation, *German Auto*, does not hold otherwise. There, the plaintiffs alleged a market for "diesel passenger vehicles," which were supposedly in their own market because they were marketed as more environmentally friendly. 497 F. Supp. 3d at 757. The court concluded it "simply defies common sense to assert that other vehicles, including other purportedly environmentally friendly vehicles," did not compete with diesel passenger vehicles. *Id.* Unlike here, the *German Auto* plaintiffs alleged a product market that "would exclude obvious economic

14

substitutes" with no functional differences, unique technical specifications, distinct performance characteristics, or any other "barrier to customer cross-over." *Id.* (internal citations omitted). That is in stark contrast to CureIS's detailed allegations regarding PSHP CAPS software's uniqueness.

**Third,** addressing the *Brown Shoe* factors specifically, Epic's argument at best asks the Court to ignore CureIS's allegations, apply reasonable inferences against CureIS, and otherwise fact find in Epic's favor—all violations of the Rule 12(b)(6) standard. *Jang*, 122 F.3d at 483.

As noted above, the *Brown Shoe* factors simply add to CureIS's broader economic allegations of market definition, and CureIS is in any event not required to satisfy *every* factor to plausibly allege a product market. *See*, *e.g.*, *Beatrice Foods Co. v. FTC,* 540 F.2d 303 (7th Cir. 1976) (finding submarket based on only four of the *Brown Shoe* factors); *see also Corzo v. Brown Univ.*, 2025 WL 2753400, at *14 (N.D. Ill. Sept. 29, 2025) ("[a]ll factors need not be satisfied for the Court to conclude that [the plaintiff] has identified a relevant market."); *F.T.C. v. Staples, Inc.*, 970 F. Supp. 1066, 1075 (D.D.C. 1997) ("Since the Court described these factors as 'practical indicia' rather than requirements, subsequent cases have found that submarkets can exist even if only some of these factors are present."). Nevertheless, regarding the substance of those allegations, CureIS plausibly alleges at least six out of the seven enumerated *Brown Shoe* factors (which is itself a non-exclusive list). CureIS includes a short response on each below.

**Industry Recognition.** Contrary to Epic's unsupported assertions to the contrary, CureIS alleges that industry participants—including Epic itself—recognize PSHP CAPS software as a distinct segment within the healthcare IT industry. FAC ¶¶ 3, 32-33 n.8.

**Product Characteristics & Use.** CureIS alleges in detail how and why PSHP CAPS software has peculiar characteristics and uses, specifically designed for PSHPs. *Id.*

**Distinct Customers & Industry Recognition.** CureIS explains that PSHPs are the distinct

group of customers that purchase PSHP CAPS software, because it is literally designed for their specific and unique needs. Further, contrary to Epic's unsupported assertions, CureIS also alleges that industry participants recognize PSHP CAPS software as a distinct segment within the healthcare IT industry. Indeed, as noted, *Epic itself* recognizes and advertises PSHP CAPS software as its own type of product. *Id.*

*Distinct Prices & Price Sensitivity.* CureIS alleges PSHPs exhibit "unique pricing sensitivities and demand characteristics" distinct from other CAPS users. FAC ¶ 33. As support, it explains that PSHP CAPS platforms are "deeply embedded in providers' billing and administrative operations," requiring "substantial investment in data conversion, staff retraining, and process reengineering" to migrate. *Id.* All of these are unique costs to PSHP CAPS software and CureIS explicitly alleges other types of CAPS software (or any other type of software) do not affect pricing for PSHP CAPS software. *Id.*

*Specialized Vendors.* CureIS alleges that only a subset of CAPS software providers sell PSHP CAPS, FAC ¶ 35, demonstrating that just selling CAPS software does not itself render one a seller of highly specialized PSHP CAPS software. It is immaterial that, as Epic argues (Mot. 13), these companies might also sell other CAPS software products—the fact they are a subset of the broader CAPS software vendor population supports the inference that PSHP CAPS software is, in fact, its own relevant market. *See Hendricks*, 689 F. Supp. at 1508 (holding concert grand pianos were submarket of piano market, and noting that, *inter alia*, the small number of overall piano manufacturers making concert grand pianos supported that inference).

### 3. CureIS Plausibly Alleges MCM Software Is A Relevant Product Market

Epic's next attack focuses on MCM software, which CureIS alleges is a separate product market, but which Epic contends "is alleged to perform the same functions that are also performed

by CAPS software." Mot. 16. This argument mischaracterizes the allegations and law.

As an initial matter, CureIS alleges that MCM software is ***not*** reasonably interchangeable with any form of CAPS software because it provides "functionality that both providers' EHR and payers' CAPS software ***does not***." FAC ¶ 36 (emphasis added); *see also* ¶¶ 37-42. Payers use CAPS software to "evaluate and process healthcare claims" in order to determine "what should be paid, denied, or flagged." *Id.* ¶ 32. MCM software "sits ***between*** EHR Software and CAPS software" and makes raw EHR software data usable by a PSHP's CAPS software. *Id.* ¶ 4; *see also id.* ¶¶ 37-38. As CureIS explains, the only real alternative to MCM software is manual review of EHR data by contract biller services—the horse-and-buggy to MCM software's automobile (which became its own market due to being so much better). *Id.* ¶¶ 41-43.

As these facts indicate, MCM is thus a ***complement*** to CAPS (and EHR) software because they are consumed most efficiently together, but cannot replace each other. P. Areeda & H. Hovenkamp, Fundamentals of Antitrust Law ¶565a (5th ed. 2025) (Areeda & Hovenkamp). "Grouping complementary goods into the same market is not only economic nonsense, it also undermines the rationale for the policy against monopolization or collusion in the first place." *Id.* This is why middleware is ***not*** in the same relevant product market as the software products with which it interacts. *See*, *e.g.*, *United States v. Microsoft Corp.*, 253 F.3d 34, 54 (D.C. Cir. 2001) (affirming district court finding that middleware market was "not now interchangeable" with operating system market because "consumers could not now abandon their operating systems and switch to middleware in response to a sustained price for Windows above the competitive level").[3]

---

[3] Epic's citations are not to the contrary. It primarily relies on cases where a plaintiff alleged a market made up of a single brand of product without explaining why other brands were not interchangeable with the product. *See Maui Jim, Inc. v. SmartBuy Guru Enters.*, 386 F. Supp. 3d 926, 947-48 (N.D. Ill. 2019); *House of Brides, Inc. v. Alfred Angelo, Inc.*, 2014 WL 64657, at (footnote continued)

Indeed, to this latter point, CureIS alleges that "the only customers for MCM software are MCOs that ***already have*** CAPS software." FAC ¶ 43. And, contrary to Epic's attempt to spin the situation by arguing Tapestry replaced CureIS's products, *see* Mot. 16-17, CureIS alleges Epic forced those customers not to use CureIS despite their desire to do so after obtaining Tapestry. FAC ¶¶ 53-55, 59, 61, 66-70, 72. Where consumers purchase or otherwise plan to use two different products together because of the ways they interact, this demonstrates their complementarity and that they are not substitutes, demonstrating that they are not in the same relevant market. *See Kaiser Aluminum & Chem. Corp. v. F.T.C.*, 652 F.2d 1324, 1330 (7th Cir. 1981) (product market boundaries depend on what products are reasonable substitutes for each other); *cf. Fed. Trade Comm'n v. Sysco Corp.*, 113 F. Supp. 3d 1, 31 (D.D.C. 2015) (observing that it "would be improper to group complementary goods into the same relevant market" ***even if*** "they occasionally substitute for one another") (quoting Areeda & Hovenkamp ¶ 565b (4th ed. 2017)).

That is the extent of Epic's market definition argument on MCM software and it therefore fails on that basis alone. However, Epic does not engage with CureIS's hypothetical monopolist/SSNIP and *Brown Shoe* allegations regarding this software. *See* FAC ¶¶ 36-45. That implicitly concedes the sufficiency of the MCM software relevant market definition.

### B.    CureIS Plausibly Alleges Antitrust Injury

Antitrust injury is a personal harm flowing from a broader harm to competition. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). Although competitors and consumers within a relevant market are prototypical antitrust plaintiffs, if a defendant attempts to

---

*6-7 (N.D. Ill. Jan. 8, 2014). In *Harley-Davidson*, the plaintiff relied on the existence of a single magazine to define an "American-made motorcycles" market without explaining why those motorcycles failed to compete with other regions' motorcycles.

eliminate competition in one market in order to preserve or obtain monopoly power in a different market, that describes an actionable harm to competition, ***regardless*** of whether the defendant competes with a plaintiff in that market. *See*, *e.g. TransWeb, LLC v. 3M Innovative Props. Co.*, 16 F. Supp. 3d 385, 408 (D.N.J. 2014), *aff'd*, 812 F.3d 1295 (Fed. Cir. 2016) (affirming attempted monopolization trial verdict where defendant tried to eliminate "the only merchant supplier" of a certain type of filtration media to monopolize a downstream respirator market); *see also Microsoft*, 253 F.3d at 75-76 (finding harm to competition where agreements foreclosed substantial distribution channels for middleware products).

Here, that is the case. CureIS alleges Epic is trying to eliminate it and other MCM software providers because they reduce (if not eliminate) Epic's ability to obtain or maintain monopoly power in the PSHP CAPS software market. FAC ¶¶ 45, 49, 50-51, 85, 89, 102-105. Thus, CureIS describes antitrust injury because it is a competitor in the relevant market Epic is trying to eliminate. *Id.*; *see also Blue Shield of Va. v. McCready*, 457 U.S. 465, 484 (1982) (a plaintiff suffers antitrust injury where its personal injury is "inextricably intertwined with the injury the [defendant] sought to inflict on a market").[4]

But Epic's dismissal argument also ignores that it specifically identified CureIS as a "direct competitor." FAC ¶ 70. This not because Epic actually had an MCM software product but because, as it repeatedly (and falsely) told CureIS's customers, Epic ***could*** at some later point replace CureIS's solutions with its own products—a false promise that it used to induce (including by forcing) CureIS customers to terminate ties with CureIS. *Id.* ¶¶ 55, 57, 61. If a defendant eliminates

---

[4] Epic's citation, *Internal Med. Nephrology v. Bio-Medical Applications of Indiana, Inc.*, 2019 WL 4688712 (S.D. Ind. Sept. 26, 2019), is inapposite. There, the plaintiff was neither a competitor nor consumer in the relevant dialysis services market, but its problem was that the injuries it claimed did not flow from any abuse of the defendant's market power, meaning there was no harm to competition that led to the plaintiff's personal injury. *Id.* at *3-4.

preexisting competition in a market to clear the way, it cannot later claim lack of antitrust injury because it is not yet a "competitor." *See TransWeb*, 812 F.3d at 1310-12; *cf. United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 531 (1973) (denying acquisition of regional brewer by company "situated as to be a potential competitor" due to competitive harm that would result).

Yet another example of competitive harm CureIS alleges (rather than just use "buzzwords," as Epic claims) is its allegation that Epic blocks CureIS's customers' access to their own data in order to foreclose CureIS from competing. Such customer harm is injury "of the type the antitrust laws were intended to prevent," *Brunswick*, 429 U.S. at 489, because these tactics have led to "higher prices for PSHP CAPS software" and "higher healthcare costs because Epic has attacked powerful ways that MCOs can reduce their own costs and increase efficiencies." FAC ¶ 102. CureIS also alleges Epic's exclusionary conduct has reduced choice for PSHP CAPS software, thereby increasing costs to patients and delaying payments to providers. *Id.* ¶ 4. These harms, supported by specific factual allegations, adequately plead antitrust injury. *Force Partners, LLC v. KSA Lighting & Controls, Inc.*, 2022 WL 580808, at *10 (N.D. Ill. Feb. 25, 2022) (denying motion to dismiss antitrust claim because the complaint alleged the defendant's acts had the effect of reducing meaningful choice in the market); *see also*, *e.g.*, FAC ¶ 61.

Finally, contrary to Epic's assertions, CureIS does not just allege harm to itself; it notes that it is currently the main competitor in the MCM software market (although others are working on products). FAC ¶¶ 4, 36-40, 45, 104. Where excluding one competitor would either destroy an entire market or eliminate the risk it poses to a defendant's power, that describes antitrust injury. *TransWeb*, 812 F.3d at 1310-12; *Gulf States Reorg. Grp., Inc. v. Nucor Corp.*, 466 F. 3d 961, 967-68 (11th Cir. 2006) (antitrust injury plausible where exclusion of one competitor would have substantial effect on consumers); *Valassis Commc'ns, Inc. v. News Corp.*, 2019 WL 802093, at

*11 (S.D.N.Y. Feb. 21, 2019) (excluding "only competing provider" was harm to competition). That is exactly the case here, where preventing PSHPs from using CureIS—and, according to CureIS's allegations, ultimately from using any other MCM software providers, FAC ¶¶ 45, 50, 88, 102, 104—Epic entrenches its power in EHR and PSHP CAPS software, thereby harming purchasers of PSHP CAPS and MCM software. FAC ¶¶ 3, 7, 8, 9, 32-33, 36-37, 40, 42-43, 102.

### C.    CureIS Plausibly Alleges Concerted Action For Its Section 1 Claim

A plaintiff alleging a Section 1 Sherman Act must identify some "concerted action" between two or more entities that unreasonably restrains competition. *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984). If a defendant coerces companies into not dealing with the plaintiff, that constitutes concerted action, regardless of the customers' willingness to do so. *See Isaksen v. Vermont Castings, Inc.*, 825 F.2d 1158, 1163 (7th Cir. 1987) ("The fact that Isaksen may have been coerced into agreeing is of no moment; an agreement procured by threats is still an agreement for purposes of section 1."), *cert. denied*, 486 U.S. 1005 (1988).

### 1.    CureIS Alleges Epic Coerces Customers Into Dealing Only With Epic

The first error in Epic's Section 1 argument is to assume that exclusive dealing is the only form of concerted action CureIS alleges. Exclusive dealing is certainly one form of illegal concerted action. *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 738 (7th Cir. 2004). CureIS, however, alleges Epic's anticompetitive acts ***include*** exclusive dealing, but are not limited to that type of conduct. FAC ¶¶ 111-13, 122, 130. This is because coercing customers into not doing business with another is a sufficient "agreement" to establish a Section 1 claim, regardless of whether it fits into the exclusive dealing "bucket." *See, e.g.*, Areeda & Hovenkamp ¶ 1447b2; *Constr. Aggregate Transp., Inc. v. Fla. Rock Indus., Inc*., 710 F.2d 752, 779-80 (11th Cir. 1983) (Section 1 claim viable where company discouraged existing customers from purchasing stone from a competitor); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d 931, 959 (N.D. Ill.

2018) ("Section 1 also forbids 'negative' ties," which "occurs when the customer promises not to take the tied product from the defendant's competitor."). As CureIS explains, among other acts, Epic coerced such agreements through additional conduct, such as simply refusing to let customers use their own data if they utilized CureIS products. FAC ¶¶ 56, 60, 68, 73, 78, 80, 89, 96. That ends the inquiry on concerted action in CureIS's favor.

Addressing exclusive dealing specifically, however, a plaintiff need not point to a written contract to plausibly establish liability. *Surescripts*, 608 F. Supp. 3d at 647 ("an express exclusivity requirement is not necessary because *de facto* exclusive dealing may be unlawful"); *CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, 150 F.4th 1056, 1073 (9th Cir. 2025) (similar, noting that would be an "overly formalistic rule that the Supreme Court has cautioned against in antitrust cases").[5] This is because proof of a written agreement is not required to plead a Sherman Act Section 1 claim. *See, e.g.*, *United States v. Gen. Motors Corp.*, 384 U.S. 127, 144 (1966) (describing "a fabric interwoven by many strands of joint action to eliminate" competition from the market).[6]

Here, CureIS alleges Epic imposes *de facto* exclusive dealing requirements on its EHR and

---

[5] Epic's reliance on *PNY Techs., Inc. v. SanDisk Corp.*, 2014 WL 1677521, at *5 (N.D. Cal. Apr. 25, 2014), which preceded the Ninth Circuit's decision in *CoStar*, is misguided. In contrast to the significant lock-in effects associated with Epic's EHR and PSHP CAPS software, (¶¶ 29, 33), and allegations discussed above that Epic disparaged CureIS and blocked customers from working with CureIS, the court in *PNY Techs.* relied on allegations that "nearly all of [the contracts] have short terms" and "easy terminability" of defendant's agreements to find the plaintiff failed to plausibly allege substantial foreclosure, and the plaintiff's "bare assertions" of de facto exclusive dealing were "unaccompanied by supporting facts." *Id.* at *5-7.

[6] Epic's citation to this Court's decision in *Team Schierl Companies v. Aspirus, Inc.*, 2023 WL 6847433 (W.D. Wis. Oct. 17, 2023), directly contradicts its argument. In *Team Schierl*, this Court dismissed exclusive dealing claims as to one defendant specifically because that defendant was not alleged to be "a signatory to the agreements at issue." *Id.* at *8. However, contrary to Epic's argument that "CureIS points to no contractual provision reflecting any" exclusive dealing arrangement, this Court recognized that, as to the defendants with which plaintiff did allege entered into agreements, "[w]hat matters are the actual restraints the defendant imposes on the market, not words on a page." *Id.* at *11.

Tapestry customers through a variety of means. FAC ¶¶ 51, 61, 63, 77, 80, 84, 112, 157. Epic focuses on the "Products You Can Replace with Epic" brochure while ignoring that CureIS does not allege the brochure is the agreement; it is written ***evidence*** of what Epic tells and then imposes on customers with its "Epic-first" policy. *Id.* Once payers purchase Tapestry, Epic forces them to agree they cannot and will not use any products Epic does not explicitly authorize. *Id.* ¶¶ 73, 78, 80, 84. This requires such customers to use Epic's products, or none at all; *i.e.*, the hallmark of an exclusive deal. *United States v. Visa, Inc.*, 788 F. Supp. 3d 585, 609 (S.D.N.Y. 2025) ("Under an exclusive dealing agreement, the buyer agrees to purchase specific goods or services only from the seller for a set period of time."). It is also facially exclusionary and, as the Seventh Circuit warns, should be viewed in light of antitrust law's broader goal of preventing harm to competition rather than narrowly assessing conduct under specific "buckets." *See Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 453 (7th Cir. 2020) (noting courts should not focus on "categories of conduct," but rather "the underlying inquiry: the conduct must harm the competitive *process* and thereby harm consumers"); *see also Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 355 (4th Cir. 2024), *cert. denied sub nom.*, 2026 WL 79821 (U.S. Jan. 12, 2026) ("when a plaintiff alleges that a scheme or course of conduct was anticompetitive, the scheme or conduct must be considered as alleged, not in manufactured subcategories").

### 2.    CureIS Explains How Epic's Conduct Substantially Forecloses Competition In The MCM Software Market

Epic's next argument concerning exclusive dealing is that the FAC does not allege what specific percentage of the MCM market Epic's exclusive dealing forecloses, so CureIS does not plausibly allege Epic substantially foreclosed competition with its acts. Mot. 25.[7] There are several

---

[7] Epic cites *Rheumatology Diagnostics Lab'y, Inc. v. Aetna, Inc*., 2014 WL 524076 (N.D. Cal. Feb. 6, 2014), as support for its argument that CureIS's antitrust claims should be dismissed (footnote continued)

problems with this argument.

First is that CureIS alleges Epic's exclusive dealing is part of a broader scheme of overlapping acts that essentially eliminate MCM software providers' ability to work with between 70-76% of their potential customers (*i.e.*, Epic's Tapestry customers). *See* FAC ¶¶ 35, 37, 50, 104. It is legal error to assess anticompetitive conduct as "completely separate and unrelated lawsuits," effectively "tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698-99 (1962). An antitrust claim is therefore not "judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Id.* at 699.

This matters to Epic's substantial foreclosure argument because it highlights why focusing solely on the foreclosure caused by exclusive dealing ignores the required broader inquiry. As discussed below, *see* Section I.D.3 *infra*, CureIS plausibly alleges that Epic's conduct prevents it from competing on the merits due to a broader harm to competition in the MCM market. That clearly states actionable anticompetitive conduct, regardless of the requirements for a standalone exclusive dealing claim (which is not what CureIS alleges).

But, even looking purely at the effects of Epic's exclusive dealing, a plaintiff need not allege a specific percentage foreclosure when it alleges that the defendant's exclusive arrangements effectively foreclose the plaintiff from competing for the vast majority (*i.e.*, well over 50%) of potential customers. *See*, *e.g.*, *Microsoft*, 253 F.3d at 69 (substantial foreclosure where agreements excluded competitor "from an important segment of the market"). All that is

---

for failure to plead the specific percentage of the market Epic's anticompetitive conduct foreclosed. But in that case, plaintiffs did "not point to any specific market and explain how it was harmed." *Id.* at *14. The FAC contains detailed allegations of substantial foreclosure. FAC ¶¶ 40, 45, 63, 73, 85, 88, 89.

necessary is that the "allegations raise a reasonable inference that ... Defendants' exclusive-dealing provisions … could foreclose a substantial portion of the … market and reduce output." *Surescripts*, 608 F. Supp. 3d at 655; *In re Ductile Iron Pipe Fittings Direct Purchaser Antitrust Litig.*, 2013 WL 812143, at *19 (D.N.J. Mar. 5, 2013) ("The question of whether the alleged exclusive dealing arrangements foreclosed a substantial share of the line of commerce is a merits question not proper for the pleading stage."); *see also Teva Pharms. USA, Inc. v. Corcept Therapeutics, Inc.*, 2025 WL 2637507, at *11 (N.D. Cal. Sept. 12, 2025) (noting agreements of indefinite duration that are not incentive-based and do not leave open alternative channels for competition by rivals demonstrate "the hallmarks of substantial foreclosure").

CureIS alleges Epic eliminated all viable pathways to remain and grow within the MCM software market. FAC ¶¶ 60, 63, 68, 92, 96, 102, 106, 107. As noted above, when a defendant cuts off all meaningful avenues for a competitor to participate in the market, the foreclosure is substantial by definition. CureIS need not allege any more for substantial foreclosure (even if viewed solely in connection with its exclusive dealing allegations rather than the broader scheme).

### D.     CureIS Plausibly Alleges Epic's Monopoly Power And Exclusionary Conduct

To state a claim for monopolization under Section 2, a plaintiff must allege "(1) that the [defendant] possessed monopoly power in that market; and (2) that the [defendant] willfully acquired or maintained that power by means other than the quality of its product, its business acumen, or historical accident." *Hytera Commc'ns Corp. Ltd. v. Motorola Sols., Inc.*, 623 F. Supp. 3d 857, 871 (N.D. Ill. 2022). For attempted monopolization, they must show (1) the [defendant's] specific intent to achieve monopoly power in a relevant market; (2) predatory or anticompetitive conduct directed to accomplishing this purpose; and (3) a dangerous probability that the attempt at monopolization will succeed. *Hytera*, 623 F. Supp. 3d at 872.

Monopoly power is the power to control prices or exclude competition. *du Pont*, 351 U.S.

at 391. "The Supreme Court has made it clear that there are two ways of proving market power," (1) "through direct evidence of anticompetitive effects," or (2) the "more conventional way … by proving relevant product and geographic markets and by showing that the defendant's share exceeds whatever threshold is important for the practice in the case." *Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928, 937 (7th Cir. 2000). "[R]educed output, increased prices, *or* decreased quality in the relevant market" may serve as "proof of actual detrimental effects [on competition]." *Ohio v. Am. Express Co.*, 585 U.S. 529, 542 (2018) ("*Amex*").

As for anticompetitive conduct, which "is the same for both a monopolization claim and an attempted monopolization claim," a plaintiff "must allege that the defendant engaged in predatory or anticompetitive behavior of some kind." *Hytera*, 623 F. Supp. 3d at 872 (internal quotations omitted). "Anticompetitive conduct is conduct without a legitimate business purpose that makes sense only because it eliminates competition." *In re Deere & Co. Repair Serv. Antitrust Litig.*, 2023 WL 8190256, at *34 (N.D. Ill. 2023).

### 1. Epic Does Not Address (And Therefore Concedes The Adequacy Of) CureIS's Allegations Of Epic's EHR Software Monopoly Power

Epic fails to acknowledge CureIS's well-pleaded allegations that Epic uses its monopoly power in the EHR software market to eliminate MCM software providers and thereby protect its budding monopoly in PSHP software. FAC ¶¶ 6-7, 9, 28-31, 33, 40-41, 45, 50, 52-54, 56, 59, 60, 63, 68-73, 78, 80, 84-86, 88-89, 90-94, 96-97, 100, 130-138. Epic does not—and cannot—challenge CureIS's allegation that it has durable monopoly power in EHR software with "[o]ver 60% of health systems and academic medical systems us[ing] Epic EHR software," with "somewhere between 81%-94% of patients hav[ing] at least one medical record stored in an Epic EHR software system," and having "gained 79% of new hospital EHR deals between 2017 and 2022," all with "overwhelming lock-in effects" and "significant barriers to entry." *Id.* ¶¶ 27-30.

### 2. CureIS Plausibly Alleges Epic's Monopoly Power Over PSHP CAPS Software

#### (a) CureIS alleges Direct Evidence Of Epic's Monopoly Power

Epic's argument on direct evidence (Mot. 26) is that "CureIS presents only the conclusory allegation that Epic's conduct has led to higher prices." This, however, ignores CureIS's allegations of additional direct evidence that Epic's monopoly power led to reduced output and decreased quality in ***both*** the PSHP CAPS and MCM software markets. FAC ¶¶ 102, 105. These allegations, which Epic fails to address, are more than enough to plausibly allege direct evidence of monopoly power. *Amex.*, 585 U.S. at 542. But, even if that were not the case, given CureIS explains Tapestry is more expensive than competing PSHP CAPS offerings, *see* FAC ¶ 102, its allegations that PSHP CAPS software prices went up similarly supports the plausible inference that Epic has (or is dangerously likely to obtain) monopoly power in that market. *See, e.g.*, *Tiz, Inc. v. S. Glazer's Wine & Spirits, LLC*, 2024 WL 2785142, at *12 (N.D. Ill. May 30, 2024) (plaintiff plausibly alleged direct evidence of monopoly power by alleging that the conduct in question "raised prices," even though the court was skeptical of that allegation).

#### (b) CureIS Plausibly Alleges Epic Is Dangerously Likely To Obtain Monopoly Power In PSHP CAPS Software

Epic tries to sidestep the difference in proof for monopolization and attempted monopolization by conflating the requirements for those two claims. But this ignores that the latter requires only a plausible allegation the antitrust defendant has "sufficient ***market*** power to threaten actual monopolization within the relevant market"—otherwise known as the "dangerous probability" requirement. *DSM Desotech*, 2009 WL 174989, at *6.

This is a lower showing than monopoly power requires. The threshold for alleging market power for an attempted monopolization claim is just "significant market share" of "over 20%." *See Lektro–Vend Corp. v. Vendo Co.,* 403 F. Supp. 527, 534 (N.D. Ill. 1975), *aff'd* 545 F.2d 1050

(7th Cir. 1976), *rev'd on other grounds,* 433 U.S. 623 (1977). That is why "the Seventh Circuit has held that questions of whether the defendant possessed the requisite market power frequently are best addressed on a motion for summary judgment or at trial." *Walter Kidde Portable Equip., Inc. v. Universal Sec. Instruments, Inc.*, 669 F. Supp. 2d 895, 901-02 (N.D. Ill. 2009).

CureIS alleges that Epic "has obtained an approximately 70% share to date" of the PSHP CAPS software market, with "some estimates put[ting] [Tapestry's market share] as high as 76%." ¶¶ 35, 50. Even though Epic quibbles with this number in its motion, *see* Mot. 27-28 (which CureIS addresses below), Epic does not contest CureIS's repeated allegations that Epic holds a dominant (*i.e.*, far greater than 50%) share of the market in which Tapestry competes. *See* FAC ¶¶ 9, 32, 50, 102, 110, 122. Epic therefore offers no basis to dismiss CureIS's attempted monopolization claim on "dangerous probability" grounds. *See DSM Desotech*, 2009 WL 174989, at *7 (denying motion to dismiss attempted monopolization claim where the plaintiff alleged a highly concentrated market in which the antitrust defendant held a 50 percent market share); *Walter Kidde*, 669 F. Supp. 2d at 901 (similar, where plaintiff alleged 65% market share); *Force Partners,* 2022 WL 580808, at *15 (similar, where plaintiffs alleged defendants' "dominan[ce] … in the market").

(c)    CureIS Plausibly Alleges Indirect Evidence Of Epic's Monopoly Power In PSHP CAPS Software

As noted, CureIS alleges Epic has over 70% share—and growing—of the PSHP CAPS software market, despite consumers' desire to use—or at least have the choice to use—other lower-priced and/or higher-quality options. FAC ¶¶ 35, 61, 84. On its face, that is more than sufficient to plausibly allege monopoly power. *See, e.g.*, *Ducere LLC v. Enbridge (U.S.) Inc.*, 2025 WL 81373, at *4 (N.D. Ill. Jan. 13, 2025) ("As a general rule in monopolization cases, allegations that

defendant's market share is at least 50 percent will support an inference of monopoly power.").[8]

To the extent Epic quibbles with CureIS's market share estimates—arguing as a factual matter, that CureIS overestimates Epic's share, *see* Mot. 27-28— "the degree of overestimation and its effect on [a defendant's] overall market share is a fact-intensive inquiry that cannot be resolved on a motion to dismiss." *CoStar*, 150 F.4th at 1070-71.

In any event, Epic's argument is essentially that the Court should ignore CureIS's general allegations regarding Epic's 70+% market share in PSHP CAPS software (*see* FAC ¶¶ 35, 50) and instead focus solely on footnote 10 of the FAC, then find as a matter of law based on nothing more than Epic's *ipse dixit* that the numerator implied by CureIS's cited statistics is too high and the denominator too low. *See* Mot. 27-28. The problem with this argument is it not only asks the Court to fact find, but also to apply inferences against CureIS, rather than for it as required by the Rule 12(b)(6) standard. For example, Epic argues the Enlyft document CureIS cites could not describe PSHP CAPS market share because it lists IBM and Accenture as Tapestry customers. But Epic itself notes Tapestry is a "managed care product" for organizations that provide a health plan; *i.e.*, PSHPs. *See* FAC ¶ 33 n.8, IBM and Accenture are companies with well-known health consulting practices. The reasonable inference is they were mislabeled as Tapestry customers when in fact their customers—PSHPs—are the actual Tapestry customers (and likely number far more than just the two entries for IBM and Accenture). Furthermore, Epic does not say either the estimated

---

[8] Epic's citations are not to the contrary, as both involved a plaintiff alleging power over markets **other than** the alleged relevant market. *See Int'l Equip. Trading, Ltd. v. Illumina, Inc.*, 312 F. Supp. 3d 725, 731 (N.D. Ill. 2018) (plaintiff failed to allege any non-conclusory facts establishing the defendant's market share in the relevant market, and instead alleged only market share in an "entirely distinct" market); *Ducere LLC v. Enbridge (U.S.) Inc.*, 2025 WL 81373 (N.D. Ill. Jan. 13, 2025) (allegations regarding defendant's "control over the various pipelines that enter the Chicago area from Canada and then travel south … [did] not necessarily translate to a proportionate percent of market share" in the total relevant market for crude oil transportation services, where other pipelines and transport methods were reasonable substitutes).

number of Tapestry customers (the numerator) or number of MCOs in the U.S. (the denominator) are materially incorrect; it just insinuates they might be. If Epic actually believes the numbers are wrong, that is an inherently factual argument for later in the case.

As for barriers to entry, the import of such barriers is that they help support monopoly power by making it difficult for new entrants to participate in a relevant market. *See United States v. Google LLC*, 747 F. Supp. 3d 1, 117 (D.D.C. 2024) ("A barrier to entry is "[a]ny market condition that makes entry more costly or time-consuming and thus reduces the effectiveness of potential competition as a constraint on the pricing behavior of the dominant firm"). Epic ignores CureIS's allegations of such barriers in the PSHP CAPS market. CureIS alleges, *inter alia*, high switching costs between PSHP CAPS platforms, extremely high implementation costs, staff training requirements, and the need for process reengineering. FAC ¶ 33. CureIS further identifies additional barriers to new entry, including federal and state regulatory requirements that "demand a significant investment in security, privacy, documentation, and compliance." *Id.* ¶¶ 32-33. Courts have recognized "high barriers to entry and expansion" in relevant markets that require such regulatory compliance. *See Walter Kidde*, 669 F. Supp. 2d at 902. So, too, have courts found substantial barriers to entry when a variety of different barriers work together (like here) to dissuade would-be market entrants. *See RealPage, Inc. v. Yardi Sys., Inc.*, 852 F. Supp. 2d 1215, 1229 (C.D. Cal. 2012).[9] Epic is simply incorrect about CureIS's barrier-related allegations.

### 3.    CureIS Plausibly Alleges Multiple Forms Of Anticompetitive Conduct

Moving to the anticompetitive conduct prong of CureIS's Section 2 claims, it is telling that

---

[9]  Epic's reliance on *U.S. Bd. of Oral Implantology v. Am. Bd. of Dental Specialties*, 390 F. Supp. 3d 892, 908 (N.D. Ill. 2019) is misplaced. In *Board of Oral Implantology*, the plaintiff failed to allege anything "preventing the plaintiffs from designing and offering" an alternative product or anything "enabling the defendants to limit the market's total output." *Id.*

Epic once again tries to improperly "tightly compartmentaliz[e]" the various facets of its scheme rather than address their exclusionary effects as a whole. *Continental Ore*, 370 U.S. at 698-99. Epic's arguments fail on that basis alone. Nonetheless, even assessing each portion of Epic's conduct in this way still reveals that CureIS plausibly alleges anticompetitive conduct.

*Exclusive Dealing.* As an initial matter (and as discussed in Section IV, *supra*), CureIS plausibly alleges Epic coerced customers into not dealing with CureIS or any other MCM software provider. This plausibly states anticompetitive conduct. *See Hytera*, 623 F. Supp. 3d at 877 (allegations of exclusive dealing and false statements alleged as "part of a larger anticompetitive scheme" sufficient to state Section 2 claims); *DSM*, 2009 WL 174989, at *8 (creating interoperability problems for downstream products was anticompetitive because it "would undoubtedly increase [defendant's] ability to control prices and exclude competitors").

*Misrepresentations To The Market.* The next general category of conduct CureIS alleges is a widespread campaign of false statements about Epic's and CureIS's respective products. FAC ¶¶ 55, 59, 77, 78, 90, 96. In arguing against these allegations, Epic does not contend CureIS fails to plausibly allege the campaign in question; it simply states that the statements must be accompanied by a "coercive enforcement mechanism" and then contends CureIS does not identify such a mechanism. Mot. 30 (citing *Mercatus Grp. LLC v. Lake Forest Hosp.*, 641 F.3d 834 (7th Cir. 2011)). In *Mercatus*, however, the Seventh Circuit noted that examples of a "coercive enforcement mechanism" include, *inter alia*, threatening to boycott the services of the recipient of the false statements if they do not acquiesce to the defendant's wishes and/or preventing the recipient from receiving critical supplies for their business. 641 F.3d at 851.

That is exactly what CureIS alleges Epic did. Epic refused to grant customers access to their own data, FAC ¶¶ 56, 122(b); refused to provide CureIS access to operational data, files, and

configurations, *id.* ¶ 68; and implemented technological barriers to reduce the quality of CureIS's products, *id.* ¶¶ 62. *See, also, id.* ¶¶ 57 (false promise to induce discontinuation), 60-61 (demanding phase-out), 77-78 (killing LettersCURE project through data restrictions), 84 (Epic-first policy). These allegations identify tactics that, as *Mercatus* observed, render accompanying false statements actionable. They therefore plausibly identify anticompetitive conduct. *See Int'l Equip. Trading, Ltd. v. Illumina, Inc.*, 2018 WL 3861575, at *6 (N.D. Ill. Aug. 14, 2018) (defendant's failure to service equipment, sell related or replacement parts, refusal to license its software were "sufficient enforcement mechanisms to harm competition in the relevant markets.").[10]

**Interoperability And Information Blocking.** Epic argues that its Cures Act violations against current and potential CureIS customers cannot be anticompetitive conduct because "even monopolists are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." Mot. 31. This argument invokes the "refusal to deal" doctrine, but misapplies that law. A monopolist's efforts "to limit the abilities of third parties to deal with rivals" is a matter of exclusive dealing with the monopolist's customers, not a refusal to deal with the monopolist's competitors. *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1072 (10th Cir. 2013) (Gorsuch, J.). If (as CureIS alleges, *see* FAC ¶¶ 68, 73, 78, 80) a defendant threatens to withhold data from a plaintiff's **customers** in order to force them to boycott the plaintiff or others like the plaintiff, that is anticompetitive conduct. *See generally Lorain Journal Co. v. United States*, 342

---

[10] Epic also relies on *Briggs & Stratton Corp. v. Kohler Co.*, 405 F. Supp. 2d 986, 990 (W.D. Wis. 2005), but in *Briggs*, unlike here, the antitrust plaintiff could not connect the allegedly false statements to any personal or competitive harms. Here, CureIS specifically connects Epic's false statements to its exclusion from the PSHP CAPS and MCM markets because it alleges its customers cited Epic's false statements as the reason for terminating contracts with CureIS.

U.S. 143 (1951) (newspaper's efforts to prevent local advertisers from running ads on competing radio station constituted attempted monopolization); *see also United States v. Apple, Inc.*, 2025 WL 1829127, at *12 (D.N.J. June 30, 2025) (holding similarly and collecting cases).

Furthermore, "antitrust courts can and do consider the particular circumstances of an industry and therefore adjust their usual rules to the existence, extent, and nature of regulation" within that industry. *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1106 (7th Cir. 1983). As HHS stated when implementing the Cures Act rules requiring reasonable interoperability and prohibiting information blocking (both of which CureIS alleges Epic violated):

> These technical provisions **will inject competition into health care by promoting an entrepreneurial economy and new business models** using smartphone apps to provide novel services and choices in care. The ONC Cures Act Final Rule will also **make sure health information follows a patient <u>by preventing industrywide information blocking practices and other anti-competitive behavior</u>** by those entrusted to hold patients' electronic health information (EHI).[11]

The government itself views violations of these rules as inherently anticompetitive conduct.

## II.    CUREIS PLAUSIBLY ALLEGES EACH OF ITS REMAINING CLAIMS (COUNTS 4-9)

In addition to its Sherman Act claims, CureIS alleges: tortious interference with contract (Count 4); tortious interference with prospective economic advantage (Count 5); trade libel (Count 6); false advertising under the Lanham Act (Count 7); unfair competition under California's Unfair Competition Law (Count 8); and false advertising under California's relevant statute (Count 9). As Epic concedes, Mot. 31 n.14, California law continues to apply to the state law claims.

### A.    CureIS Plausibly Alleges Tortious Interference With Contract

To state a claim for tortious interference with contract, a party must show (1) a valid

---

[11]    *See* Information Blocking and the ONC Health IT Certification Program: Extension of Compliance Dates and Timeframes in Response to the COVID-19 Public Health Emergency, 85 Fed. Reg. 70,064 (Nov. 4, 2020).

contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage. *Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal. 4th 26, 55 (1998)). Epic only challenges CureIS's allegations regarding elements 2 and 3.[12]

Epic argues CureIS only offers conclusory allegations of Epic's knowledge of the Sharp and Sutter contracts. Knowledge, however, can be inferred from conduct. *Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal. 4th 26, 56–57 (1998) (knowledge "alleged impliedly" where defendant's conduct demonstrated awareness of plaintiff's relationship with third party); *see also Jensen Enters. Inc. v. Oldcastle, Inc.*, 2006 WL 2583681, at *8 (N.D. Cal. Sept. 7, 2006).

Here, Epic specifically represented to Sharp it could offer services ***instead of CureIS.*** FAC ¶¶ 55. Epic also represented to Sutter that CureIS's services would no longer be needed once Epic was up and running and "demanded that Sutter phase out EnrollmentCURE entirely." *Id.* ¶¶ 59-60. These Epic statements facially show knowledge about Sharp's and Sutter's contractual relationship with CureIS and go far beyond the minimum required to plausibly establish knowledge. *See Solyndra Residual Tr. v. Suntech Power Holdings Co.*, 62 F. Supp. 3d 1027, 1048 (N.D. Cal. 2014) (knowledge of contract plausible where defendant communicated directly with plaintiff's customers about plaintiff).

As for Epic's intent to breach or disrupt CureIS's contracts, California law simply requires "that the defendant acted either with the desire to interfere or the knowledge that interference was

---

[12] CureIS does not seek damages for Epic's interference with the Advocate contract. *See* Mot. 32; FAC ¶¶ 64-73. The Advocate saga, however, establishes liability for tortious interference with prospective economic advantage (for the later 2023 interactions), and is a component of CureIS's antitrust, unfair competition, and false advertising claims.

certain or substantially certain to occur as a result of its action." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1165 (2003). Specific intent "is not a required element." *Id.*

CureIS alleges with respect to Sharp that Epic falsely promised it could develop a replacement to CureIS's EnrollmentCURE products and directed Sharp to stop paying CureIS. FAC ¶ 57. For Sutter, "Epic refused to provide CureIS access to Sutter's operational data," "delayed access to CureIS for several months," and ultimately "demanded that Sutter phase out EnrollmentCURE entirely." FAC ¶ 60. Sutter then confirmed Epic's involvement. FAC ¶ 61. When a defendant blocks data access, makes false promises to replace a competitor's products, and demands customers terminate their relationships—and customers confirm they terminated for those very reasons—interference is not merely "substantially certain"; it is the intended result. *See Plessinger v. Castleman & Haskell*, 838 F. Supp. 448, 454 (N.D. Cal. 1993) ("Requisite intent for intentional interference with business relations "can be inferred from an allegation that the defendant engaged in conduct substantially certain to interfere with performance of the contract.").

### B.    CureIS Plausibly Alleges Tortious Interference With Prospective Economic Advantage

Tortious interference with prospective economic advantage requires a plaintiff to show (1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant. *Korea Supply Co. v. Lockheed Martin* Corp., 29 Cal. 4th 1134, 1153 (2003). It must also "allege an act that is wrongful apart from the interference itself." *Id*. at 1154.

***First***, CureIS has adequately alleged an economic relationship with the probability of future economic benefit. Epic argues that CureIS pleads "no more than a '[s]peculative

expectanc[y]' of a future benefit." Mot. 34. But a complaint adequately pleads an sufficiently likely prospective economic relationship where it makes "specific references to potential customers with which plaintiff had previous sales relationships" and "engaged in business negotiations." *Silicon Labs Integration, Inc. v. Melman*, 2010 WL 890140, at *2 (N.D. Cal. Mar. 8, 2010); *see also Eco Elec. Sys., LLC v. Reliaguard, Inc.*, 2022 WL 1157481, at *10 (N.D. Cal. Apr. 19, 2022) (probability of future economic benefit plausible where third party was "closely considering" plaintiff's product at time of defendant's interference). Courts have also recognized claims based on both "current and prospective" relationships. *PhoneDog v. Kravitz*, 2012 WL 273323, at *1 (N.D. Cal. Jan. 30, 2012); *see also Humboldt Wholesale, Inc. v. Humboldt Nation Distrib., LLC*, 2012 WL 2572065, at *6 (N.D. Cal. July 2, 2012) (plausible claim based on "existing and prospective business relationships with third-party distributors and retailers").

CureIS identifies each of its prospective customers and explains how each relationship was on the verge of consummated business before Epic intervened. ███████ "approved a project to implement LettersCURE," "approved CureIS's budget to begin work in 2023," and "held contract finalization meetings … after ███████ had verbally agreed to a contract with CureIS." FAC ¶¶ 75-76. Hill Physicians signed an NDA and spent a significant time working on how to implement CureIS's products. FAC ¶¶ 81-83. Advocate was "actively pursuing EnrollmentCURE integration with Epic through August 2023." FAC ¶ 156. And Sharp, already an EnrollmentCURE and EncounterCURE customer, even requested CureIS's help managing its transition to Epic. FAC ¶ 54. These are not speculative expectancies—they are approved projects, budget allocations, verbal agreements, signed NDAs, and C-suite meetings—all of which terminated only after Epic intervened. That plausibly states an actionable expectancy. *See Silicon Labs*, 2010 WL 890140, at *2; *Eco Elec. Sys., LLC v. Reliaguard, Inc.*, 2022 WL 1157481, at *10

(N.D. Cal. Apr. 19, 2022).[13]

**Second**, CureIS has adequately alleged Epic's knowledge of these prospective relationships. Epic contends that CureIS's knowledge allegations are "conclusory." Mot. 35. But, as noted above, knowledge "can be inferred from other allegations." *Jensen*, 2006 WL 2583681, at *8-9; *Quelimane*, 19 Cal. 4th at 56-57. A defendant plausibly has knowledge where it likely learned of the relationship through its position in the same industry. *Silicon Image, Inc. v. Analogix Semiconductor, Inc.*, 2007 WL 1455903, at *4 (N.D. Cal. May 16, 2007).

Here, CureIS does not merely allege that Epic "knew"—it alleges Epic directly communicated with each prospective customer specifically about CureIS. FAC ¶¶ 55, 57, 59-61, 70, 77-78, 84, 90, 96, 157, 164-65. Epic cannot ask a customer about "other vendor[s] … besides CureIS," direct a customer to "not go forward" with a CureIS contract, or instruct a customer "not to work with CureIS" without knowing CureIS is seeking to work with them. *See Solyndra*, 62 F. Supp. 3d at 1048 (knowledge adequately pled where defendant communicated about plaintiff directly with plaintiff's customers); *RealPage*, 852 F. Supp. 2d at 1230-31 (allegations "more than sufficient" where defendant advised customer it "could not continue to work with" plaintiff).

Epic's cases are not to the contrary. In *Infectolab Americas LLC v. ArminLabs GmbH*, the court dismissed a tortious interference claim where the plaintiff alleged only that defendant had "prior dealings" with plaintiff and "status as a competitor in the industry"—"highly generalized allegations" that were "insufficient to plausibly establish" knowledge. 2021 WL 292182, at *4-5

---

[13] Epic's cited cases are inapposite. In *Santa Fe Properties*, the plaintiff alleged only unidentified "prospective third-party lessees." 2021 WL 6104156, at *3. In *EcoHub*, the plaintiff had "solo status submitting an RFP" with no prior relationship—but notably, the court in that case denied the motion to dismiss as to a different defendant where the plaintiff alleged a "formalized relationship" and "negotiations … for months," circumstances far closer to CureIS's allegations here. 2023 WL 6725632, at *12. And in *American Blind*, the plaintiff alleged only that unidentified consumers were diverted to competitors' websites. 2005 WL 832398, at *2-3.

(N.D. Cal. Jan. 28, 2021). In *Trindade v. Reach Media Grp., LLC*, the court dismissed where the plaintiff alleged only "generalized knowledge" that the defendant knew plaintiff "was a party to contracts with advertisers," without "knowledge of any specific contracts or details." 2013 WL 3977034, at *15-16 (N.D. Cal. July 31, 2013). Here, by contrast, Epic communicated directly with each customer about CureIS by name and instructed customers not to work with CureIS. These allegations establish knowledge far beyond generalized awareness and are sufficient to meet the pleading standard at this phase. *See Juarez v. Jani-King of Cal., Inc.,* 2010 WL 4807086, at *5 (N.D. Cal. Nov. 19, 2010) (provider of cleaning services stated an intentional interference claim against franchisees where it identified former customers who terminated their relationships with plaintiff and hired an independent cleaning company established by the franchisees)*; Silicon Labs Integration, Inc. v. Melman*, 2010 WL 890140, at *2 (N.D. Cal. Mar. 8, 2010) (complaint adequately pled an existing economic relationship by making specific references to potential customers with whom plaintiff had previous sales relationships and engaged in sales negotiations).

**Third,** CureIS has adequately alleged Epic's intent to disrupt these prospective relationships. Epic contends that because CureIS fails to allege knowledge, it necessarily fails to allege intent. Mot. 35. Given this argument hinges on Epic's similarly incorrect knowledge argument, it fails. *See* Section II.A, *supra*.

Epic also suggests that ███████████ decision to handle the work "internally" defeats CureIS's claim. Mot. 34-35. But CureIS alleges the opposite, and explains why: ███████████ only made this decision after "Epic killed the project" with CureIS. FAC ¶¶ 76-77. That switch was the direct consequence of Epic's interference.[14] As CureIS explained in the FAC, the

---

[14]  Epic cites *Celebrity Chefs Tour, LLC v. Macy's, Inc.*, 2014 WL 1660674 (S.D. Cal. Apr. 25, 2014), but that case does not support Epic's position. The decision addressed claims for breach of (footnote continued)

alternative to its MCM software is essentially just manual review that companies previously handled through brute force. FAC ¶¶ 42-43. It is fully consistent with Epic's alleged interference that ███████ would go back to such outdated, inefficient practices when deprived of the opportunity to use time- and cost-saving options like CureIS's products.

**Fourth,** CureIS adequately pleads independently wrongful acts. An act is "independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." *Korea Supply*, 29 Cal. 4th at 1159. CureIS alleges three categories of independently wrongful conduct: (1) false statements disparaging CureIS's products, which are proscribed by common law trade libel and California's unfair competition statutes, FAC ¶ 158; (2) information blocking in violation of the 21st Century Cures Act, FAC ¶ 158; and (3) imposition of an "Epic-First" exclusive dealing policy in violation of the Sherman Act, FAC ¶¶ 7, 84, 157. Each independently satisfies the wrongful act requirement. *See Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*, 69 F.4th 665, 679-80 (9th Cir. 2023) (false advertising was independently wrongful act); Restatement of Torts 2d, § 767, comments on Clause A, Sec. C. ("Conduct specifically in violation of statutory provisions or contrary to established public policy" is unlawful conduct for purposes of tortious interference).

Epic's contrary arguments fail. Epic contends that false statements cannot constitute a wrongful act because CureIS's trade libel claim purportedly fails. Mot. 36. But the question is whether conduct is "proscribed by some … determinable legal standard"—not whether it supports a separate cause of action. *Korea Supply*, 29 Cal. 4th at 1159. As discussed below, CureIS's trade libel claim does not fail. But even if it did, false statements disparaging a competitor's products

---

contract, misrepresentation, and trademark infringement against the Alexander Defendants; the tortious interference claims were asserted against different defendants and were not discussed.

remain proscribed by common law and statute. Epic also argues information blocking is "irrelevant" for certain customers because CureIS "never consummated relationships" with ███████████ or Hill Physicians, and Sharp terminated "solely due to misrepresentations." Mot. 36-37. Epic has it backwards. For ███████████, Epic's threat to block data access is precisely what "shut[] down the project." FAC ¶ 80. For Sharp, CureIS alleges both misrepresentations and that "Epic denied CureIS access to necessary data." FAC ¶ 159. And whether the data at issue—including, *e.g.*, "detail[ed] information about the patient's care," (FAC ¶ 48(b))—constitutes "EHI" under the Cures Act is a factual question inappropriate for resolution at this stage. *Id.* Epic's motion should be denied.

### C.    CureIS Plausibly Alleges Trade Libel

Epic argues that CureIS's trade libel claim fails to the extent premised on statements made prior to May 2023; the FAC fails to allege who made the false statements and to whom and when; the statements are too "vague" to be actionable; and as alleged, the statements were neither published in writing nor material to CureIS's customers' decisions to sever ties with CureIS. Mot. 39–40. Epic is incorrect on each of these points:

*First*, CureIS's trade libel claims accrue "whenever the plaintiff discovered or should have discovered the untrue statement or omission" and CureIS alleges the first time it learned of Epic's false and defamatory statements was in June 2023. *F.D.I.C. v. Countrywide Fin. Corp.*, 2012 WL 5900973, at *3 n. 6 (C.D. Cal. Nov. 21, 2012). It was not until after June 2023, when Epic induced ███████████ to cease onboarding CureIS's LettersCURE, that CureIS discovered Epic's untrue statements, and "[b]y the time CureIS discovered Epic's misrepresentations, customers had already implemented irreversible decisions based on Epic's falsehoods." FAC ¶¶ 96, 94.

*Second*, CureIS is not required to list the names of each Epic employee who made the false statements or the exact time an email was sent to plausibly allege a trade libel claim. The FAC

sufficiently sets out Epic employees' false and disparaging statements and the specific customers to whom they made those statements. FAC ¶ 90. CureIS further explains how the statements specifically disparaged the quality of CureIS's goods or services and caused CureIS financial harm. *Id.* ¶¶ 165-166. This is all that is required at this stage. *HGCI, Inc. v. Luxx Lighting, Inc.*, 2020 WL 5913851, at *3 (C.D. Cal. Sept. 10, 2020).

**Third,** Epic cannot escape liability by claiming its statements were "too vague" to be actionable,[15] when Epic's message to CureIS's customers was crystal clear: CureIS poses security risks and they must therefore cease using CureIS's products entirely. Epic made numerous false and misleading statements to CureIS's customers that Epic's products could replace CureIS's solutions with equivalent functionality, despite knowing these statements were untrue. FAC ¶ 158. These include statements "in June 2023," "in June 2024," and "in or around February 2, 2023 and 2024" that "CureIS's products posed security risks when interfacing with Epic's systems and citing such concerns to block access to data when Epic knew no such risks existed. FAC ¶ 164. These are not statements of "opinion"; they are actionable statements of fact that can be shown to be true or false. *River Supply, Inc. v. Oracle Am., Inc.*, 2024 WL 665188, at *7-8 (N.D. Cal. Feb. 16, 2024) (statement that "NetSuite had the same functionality as ECI Spruce" was actionable) (citing *Neu-Visions Sports, Inc. v. Soren/McAdam/Bartells*, 86 Cal. App. 4th 303, 307 (2000)).

**Finally,** Epic's arguments that the Court should dismiss the trade libel claims because CureIS does not allege Epic published its false statements in writing or that they played a material role in inducing customers to terminate their relationships with CureIS are wrong on the law and

---

[15] Epic cites *Trevari Media, LLC v. Colasse*, 758 F. Supp. 3d 1175, 1181 (C.D. Cal. 2024), for this point, but that case involved complaints submitted solely to online platforms for internal review, whereas Epic made statements directly to CureIS's customers and potential customers to induce them to terminate their relationships with CureIS, which caused concrete harm. FAC ¶ 63.

facts. Mot. 40. With respect to published statement in writing, there is no such requirement under California law, as demonstrated by the form jury instructions for trade libel.[16] Epic's cited cases do not hold otherwise.[17] Thus, this argument fails out of the gate.

As to Epic's claim that CureIS cannot show Epic's false and defamatory statements were "material,"[18] CureIS alleges its customers informed it that the reason they were terminating their agreements was due to Epic's false statements regarding CureIS's products. FAC ¶¶ 78, 80, 84, 96, 166. This is not surprising, given patient privacy is paramount in the heavily regulated healthcare industry. If the entity controlling approximately 94% of Americans' medical records raises "security concerns" about CureIS, those statements would (and did) materially influence customers' decisions with respect CureIS, even though they were unfounded. *See Selleck v. Globe Int'l, Inc.*, 166 Cal. App. 3d 1123, 1131 (1985) (looking at the statement's "natural and probable effect upon the mind of the average reader."); *see also* FAC ¶ 92 ("When Epic urges a would-be customer to block CureIS's access to customer data because of implied or explicit (but untrue) concerns about CureIS's data security, that is deeply harmful to CureIS, given that one of its

---

[16] *See* Judicial Council of Cal. Civ. Jury Instruction 1732 (Oct. 2025 Update).

[17] *Virun* is distinguishable because the plaintiff failed to identify or describe with any particularity what statements defendants made, to whom they were communicated, or how they were made, offering only bare allegations that defendants "falsely represented" to unidentified "customers" that plaintiff was still their manufacturer. *Virun, Inc. v. Cymbiotika, Inc.* 2022 WL 17371057, at *6 (C.D. Cal. Aug. 18, 2022). Here, by contrast, CureIS identifies specific false statements communicated by Epic personnel directly to CureIS's customers, resulting in the loss of at least four identified customer relationships. FAC ¶¶ 90, 164.

[18] Epic cites *RingCentral* to support its argument that CureIS fails to allege that Epic's false statements caused CureIS's customers to cut ties with CureIS. Mot. 40. In *RingCentral*, however, the plaintiff "fail[ed] to allege any facts suggesting that [plaintiff's] clients were aware of RingCentral's false statements or that they intended to deal with Nextiva." *RingCentral, Inc. v. Nextiva, Inc.*, 2020 WL 4039322, at *4 (N.D. Cal. July 17, 2020). Here, by contrast, CureIS alleges specific customers with whom it had longstanding dealings who communicated Epic's false statements to CureIS as the basis for terminating contracts with CureIS. The facts alleged here bear no resemblance to those alleged in *RingCentral*.

primary selling points is its ability to ensure the safekeeping of sensitive health data.").

### D.    CureIS Plausibly Alleges False Advertising

CureIS asserts false advertising claims as its Seventh and Ninth claims for relief. Epic's arguments against those claims should be rejected for the following reasons.

***First***, regarding "extraterritoriality," CureIS alleges Epic engaged falsely advertised in California to CureIS's California customers. *See, e.g.*, FAC ¶¶ 59-61 (Sharp HealthCare in California), 75-78 (Sutter Health in California), 51, 53 (███████████ in California). Five of the seven customer relationships Epic has so far disrupted involve customers based in California. *See generally* Dkt. 28 at 5. CureIS also identifies specific individuals located in California to whom Epic made false statements. *Id.* Under Epic's own cited law, this is not "extraterritorial" conduct.

***Second***, regarding Rule 9(b), "the heightened pleading standard of Rule 9 does not apply to false advertising claims." *Priority Int'l Animal Concepts, Inc. v. Bryk*, 2012 WL 6020044, at *5 (E.D. Wis. Dec. 3, 2012). Even if it does, Epic's argument that CureIS must allege Epic's specific fraudulent intent is incorrect. California's FAL (Cal. Bus. & Prof. Code § 17500) prohibits advertisements that are "untrue or misleading." To establish a violation, "it is necessary only to show that 'members of the public are likely to be deceived.'" *Lopez v. Nissan N. Am., Inc.*, 201 Cal. App. 4th 572, 595 (Cal. Ct. App. 2011). Similarly, the Lanham Act requires only allegations that "the false statement actually deceived or had the tendency to deceive a substantial segment of its audience." *Eli Lilly & Co. v. Arla Foods, Inc.*, 893 F.3d 375, 381-82 (7th Cir. 2018).[19] Epic's

---

[19]    The district court in *Eli Lilly & Co*, cited by Epic, did not apply Rule 9(b)'s heightened pleading standard to Lanham Act false advertising claims. *Eli Lilly & Co. v. Arla Foods Inc.*, 2017 WL 4570547, at *7 (E.D. Wis. June 15, 2017), *modified*, 2017 WL 5244681 (E.D. Wis. July 18, 2017), *aff'd*, 893 F.3d 375 (7th Cir. 2018). The court instead focused on whether the statements were literally false. *Id.*

cited case, *Kunes Country Auto. Mgmt. Inc. v. Walters*, 2024 WL 2114006, at \*8 (E.D. Wis. May 10, 2024), does not hold otherwise. The plaintiff failed there because it did not attribute specific statements to the six different defendants, thereby failing to explain who said what. *Id.* at \*9. Here, there is just one defendant and thus no ambiguity.

**Third**, again assuming, *arguendo*, that Rule 9(b) applies, CureIS provides detailed factual allegations regarding the substance of Epic's deceptive commercial statements. Among other things, CureIS alleges: Epic purposefully made false and misleading statements about  Epic's own products and product lineup, as well as about CureIS's reputation and products, through brochures, online communications, and direct communications with CureIS's customers, FAC ¶¶ 170, 172, 186-87, including to: ███████████ at Sharp on or before March 2024 that Epic offered the same services as CureIS to induce Sharp to replace CureIS with Epic's non-existent "replacement" product, *id.* ¶ 55; Sutter employees on or before January 2025 that Tapestry provided the same functionality as EnrollmentCURE, *id.*¶ 61; ██████████ at Advocate that Epic's that CureIS's EnrollmentCURE directly competed with Epic's Tapestry in or around 2019, and also that Epic had security concerns about integrating with EnrollmentCURE at the end of 2023, *id.* ¶¶ 64, 96; on or about June 27, 2023 to ██████████ at ██████████ that Epic could not share data with CureIS due to security concerns. *id.* ¶¶ 76-77. Also, "CureIS is aware that Epic raised false and unfounded security concerns during critical transition periods for at least the following former CureIS customers: Hill Physicians in August 2024, Sutter in 2024, Sharp on February 2, 2024, and Advocate in March 2023. These material misrepresentations influenced the purchasing decisions of PSHPs and caused injury to CureIS. FAC. ¶¶ 171, 173, 188-89.

CureIS further alleges Epic made these false statements in or around August 2024, February 2023, March 2023, and June 2024, but more false statements may emerge with the benefit

of discovery. FAC ¶ 90. CureIS alleges Epic employees made these false statements to specific team members at Sharp, Sutter, █████████, Hill Physicians, and Advocate, as well as many other specific clients or prospective clients. FAC ¶¶ 69, 74, 83. These are highly particularized allegations that describe the "the who, what, when, where, and how" of the alleged fraud. *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990).

*Fourth*, CureIS addressed Epic's argument that its alleged false statements are mere "opinion" or "puffery" in Section VI.C above, but notes, in contrast to the plaintiff in Epic's citation, *Rovanco Piping Sys., Inc. v. Perma-Pipe Int'l Holdings, Inc.*, 2022 WL 683690, at *9 (N.D. Ill. Mar. 8, 2022), that CureIS alleges Epic made specific, verifiable claims about products and features it does not actually offer, disseminated these claims widely through promotional materials to prospective customers, and actively solicited CureIS's customers with concrete, false representations about product substitutability—resulting in actual customer losses. *Id.* Epic's conduct constitutes actionable false advertising under the Lanham Act; not nonactionable puffery. *Oracle Int'l Corp. v. Rimini St., Inc.*, 123 F.4th 986, 1002 (9th Cir. 2024) (holding product capability claims survive motion to dismiss when they involve "binary determination" with "falsifiable criteria"—either product provides stated functionality or it doesn't—making them verifiable statements of fact rather than nonactionable puffery).

*Fifth*, Epic is wrong that its false statements were not made "within a commercial advertising or promotion," or that they were "one-off" statements. CureIS alleges Epic made its false statements in: "widely disseminated" marketing materials, including the "Products to Replace with Epic" brochure; the course of pitching new business and during contract negotiations; and written communications to persuade CureIS's customers to replace CureIS products with Epic's inferior or nonexistent ones. These are commercial communications made for the promotional

45

purpose of taking business away from CureIS, and thus actionable. *N. Shore Med. Ctr., Ltd. v. Evanston Hosp. Corp*., 1993 WL 141717, at *3 (N.D. Ill. Apr. 30, 1993) (denying motion to dismiss Lanham Act claim where defendant directly communicated false and misleading information to plaintiff's prospective customers and lenders through private letters, thereby deceiving substantial segment of those with whom plaintiff intended to engage in commercial activities). As long as representations were made to "induce" or "influence" customers' purchases, it satisfies the "commercial advertising or promotion" element. *Le Bleu Corp. v. Fed. Mfg. LLC*, 2018 WL 4936032, at *10 (E.D. Wis. Oct. 10, 2018) (denying motion for summary judgment for false advertising claim because whether "Le Bleu was not a member of the public when Federal made representations about the capabilities of the filler is a disputed question of material fact").[20]

**E.      CureIS Plausibly Alleges A Violation Of California's Unfair Competition Law**

Epic argues CureIS fails to plead extraterritorial application of the UCL and fails to allege unlawful, unfair, or fraudulent conduct. Both arguments fail.

***First***, "extraterritorial application of the UCL is not barred where the alleged wrongful conduct occurred in California." *Parkinson v. Hyundai Motor Am*., 258 F.R.D. 580, 598-99 (C.D. Cal. 2008). State remedies may be invoked by out-of-state parties when they are harmed by wrongful conduct occurring in California, because California has a "clear and substantial interest

---

[20]     Epic cites *Segerdahl Corp. v. Am. Litho, Inc.*, 2019 WL 157924, at *3 (N.D. Ill. Jan. 10, 2019) to argue that false advertising claims cannot be premised on false statements to existing customers. That case does not go nearly as far as Epic claims. There, the court found statements in a Master Services Agreement did not constitute an advertising or promotion. Here, CureIS alleges Epic made false statements about its products in the course of marketing Tapestry, in its "widely disseminated" marketing brochures, and in written communications promoting its products over CureIS's products to at least seven of CureIS's customers. FAC ¶ 186. CureIS also alleges that Epic made false statements about its products and CureIS's products to Epic's "potential" customers. *Id.* ¶ 170.

[in] preventing fraudulent practices in this state" and "a legitimate and compelling interest in preserving a business climate free of fraud and deceptive practices." *Diamond Multimedia Systems, Inc. v. Superior Court*, 19 Cal. 4th 1036, 1063-64 (1999); *Diva Limousine, Ltd. v. Uber Techs., Inc.*, 392 F. Supp. 3d 1074, 1094 (N.D. Cal. 2019) (rejecting argument that harm to out-of-state affiliates "arises from Uber's extraterritorial conduct" because "there [wa]s a direct causal link between Uber's alleged misconduct in California and the out-of-state affiliates' loss of revenue."). The UCL applies when alleged conduct "took place, at least in part, in California." *Cf. AT&T Mobility LLC v. AU Optronics Corp.*, 707 F.3d 1106, 1113 (9th Cir. 2013) (holding out-of-state defendant's contacts with California were more than "slight and casual" and justified application of the UCL to out-of-state injuries).

As noted above, CureIS alleges exactly such California conduct and harm. That ends Epic's extraterritoriality arguments.

***Second***, CureIS has adequately plead that the acts were unlawful, unfair, and fraudulent. "Unlawful" acts under the UCL are acts that violate some other law. "Virtually any law ... can serve as a predicate for an action under Business and Professions Code section 17200." *In re Qualcomm Antitrust Litig.*, 2023 WL 121983, at *20 (N.D. Cal. Jan. 6, 2023), *aff'd sub nom. Key v. Qualcomm Inc.*, 129 F.4th 1129 (9th Cir. 2025). If the Court finds that CureIS has adequately pled even one of the other claims discussed in this brief, CureIS satisfies the unlawful prong.

Next, "unfair" acts are acts that "threaten[] an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal. 4th 163, 187 (1999).

As discussed above, CureIS plausibly alleges Epic's conduct violates the Sherman Act, *see*

Sections I-V, *supra*, in particular because it has "led to higher prices for PSHP CAPS software" and "lower output in [the MCM software market], as well as lower market wide product quality." FAC ¶ 102. This conduct harms payers, providers, and patients. FAC ¶¶ 4, 102. *See* Section III, *supra*. These are all unfair acts. *See Epic Games,* 67 F.4th at 1000.

Finally, Epic argues the fraudulent prong fails for the same reasons the Lanham Act and California FAL claims fail. Mot. 46. As discussed above, those claims are plausible and should proceed. *See* Section VI.D, *supra*. This argument therefore also fails.

## III.    IF THE COURT IS INCLINED TO GRANT EPIC'S MOTION, CUREIS SHOULD BE ALLOWED TO AMEND

"Generally, a plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend his complaint before the entire action is dismissed." *O'Boyle v. Real Time Resolutions*, 910 F.3d 338, 347 (7th Cir. 2018) (internal quotations omitted). The only exception is if it is certain "the amended complaint would not survive a motion for summary judgment." *King ex rel. King v. E. St. Louis Sch. Dist.* 189, 496 F.3d 812, 819 (7th Cir. 2007). Here, Epic does not argue CureIS's allegations are so fundamentally problematic that CureIS would be unable to address any of the supposed deficiencies; Epic just argues that CureIS does not provide enough detail to get over the low plausibility threshold. If the Court is inclined to dismiss any portion of CureIS's FAC due to pleading failures, Epic's own motion therefore establishes why, contrary to its request, leave to amend would be appropriate.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny Epic's motion to dismiss CureIS's claims.

Dated: January 20, 2026

Stephen P. Hurley
Andrew W. Erlandson
Catherine E. White
**Hurley Burish, S.C.**
33 East Main Street, Suite 400
Madison, WI 53703
Tel: 608.257.0945
Fax: 608.257.5764

Respectfully submitted,

By: */s/ Adam B. Wolfson*

Adam B. Wolfson
Ryan S. Landes (*admission forthcoming*)
**Quinn Emanuel Urquhart & Sullivan, LLP**
865 S Figueroa Street
Los Angeles, CA 90017
Tel: 213.443.3000
Fax: 213.443.3100

Paulina Slagter (*admission forthcoming*)
**Quinn Emanuel Urquhart & Sullivan, LLP**
555 Twin Dolphin Drive
Redwood Shores, CA 94065
Tel: 650.801.5000
Fax: 650.801.5100

Joseph H. Margolies
**Quinn Emanuel Urquhart & Sullivan, LLP**
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
Tel: 312.705.7400
Fax: 312.705.7401

*Attorneys for Plaintiff CureIS Healthcare, Inc.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on January 20, 2026, a true and correct copy of the foregoing with redactions to under seal information was served upon all counsel of record via CM/ECF system. Further, a true, correct, and under seal copy of the foregoing was also served upon counsel of record via email.

DATED: January 20, 2026

By  */s/ Adam B. Wolfson*
　　Adam B. Wolfson