| | |
|---|---|
| CureIS Healthcare, Inc., <br><br> Plaintiff, <br><br> v. <br><br> Epic Systems Corporation, <br><br> Defendant. | Case No. 3:25-cv-00991-jdp <br><br> **REDACTED** |

## EPIC'S BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION TO REDUCE "ATTORNEYS' EYES ONLY" DESIGNATIONS

Defendant Epic Systems Corporation ("Epic") hereby responds to Plaintiff CureIS Healthcare, Inc.'s ("CureIS") Motion to Reduce "Attorneys' Eyes Only" Designations for 27 documents[1] containing Epic's highly sensitive and trade secret information. (Dkt. 125).

### INTRODUCTION

CureIS's motion to strip the "Highly Confidential—Attorneys' Eyes Only" ("HC-AEO") designation from 27 of Epic's proprietary documents should be denied in its entirety. The motion fails at the threshold because CureIS has not met—or attempted to meet—the burden of proof imposed on the objecting party under the Court's Protective Order. (Dkt. 116, at 7). Rather than engage with the substance of each document whose designation it challenges, CureIS cherry-picked a single piece of information from a single document and extrapolated a sweeping

---

[1] CureIS's Motion sought to reduce the designation for 33 of Epic's documents. Epic has since agreed to reduce the designation for six Application Overview Guides to CONFIDENTIAL and is producing re-designated copies to CureIS contemporaneously. (Declaration of Bryce A. Loken, ¶ 3).

conclusion across all documents at issue. That approach is both procedurally deficient and substantively unfounded.

CureIS's legal arguments fare no better. CureIS misreads both the Protective Order and the case law it cites to argue trade secret and commercially sensitive materials cannot be designated HC-AEO. But unlike the protective order at issue in the cited case law, the Court's Protective Order here expressly reserves HC-AEO designation for materials that "contain[], reflect[], or could reveal" trade secrets or highly competitive and commercially sensitive proprietary information. (*Id.*, at 3). CureIS's contention that Epic's documents lose their trade secret status simply because they are accessible to customers through a secure, password-protected portal, and subject to strict contractual confidentiality obligations is contrary to well-established law.

Regardless of CureIS's shortcomings, the documents at issue warrant HC-AEO protection because they contain the very categories of information the designation is intended to safeguard. The 27 documents—comprising Setup and Support Guides, Upgrade Overviews, and Strategy Handbooks—disclose, in granular detail, Epic's ███████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████ refined over more than four decades of investment and experiential learning. Disclosure of these materials to a vendor like CureIS—which, according to its own allegations is in competition with Epic—could enable CureIS to replicate Epic's proprietary capabilities without incurring comparable research and development costs, exploit perceived undeveloped features or functionality in Epic's software to unfairly undercut its offerings, and preempt Epic's planned product releases. On balance, CureIS has articulated no legitimate need for its officers, directors, or employees to access this information, and the Court should not permit it.

QB\102357830.1

**BACKGROUND**

Epic is a developer of healthcare software and provider of related services to healthcare and life sciences organizations. (Declaration of Jim McDermott ("McDermott Decl."), ¶ 3; Dkt. 40, First Am. Compl., ¶¶ 2, 21). For example, as relevant to CureIS's claims, Epic's Tapestry software suite enables health plan customers to manage core payment-related administrative and operations tasks within a single system. (Dkt. 40, ¶ 3). CureIS alleges that CureIS and a number of competitors offer "middleware" software that purports to perform certain payment-related tasks and that CureIS is in competition with Epic because certain customers have decided to replace CureIS's software with Epic's Tapestry. (*Id.*, ¶¶ 3–4, 55–57, 61; *see also* Dkt. 81, at 4–6).

On March 30, 2026, Epic served its first document production containing 40 documents collected from Epic's secure Galaxy documentation repository. (Dkt. 125, at 20–21; McDermott Decl., ¶ 7). Epic's Galaxy documents contain years, if not decades, of hard-gained, proprietary, and highly sensitive technical, business, and industry knowledge acquired by (and fine-tuned, honed and developed due to the efforts and skills of) Epic executives, attorneys, technical personnel, pricing analysts, accountants, and salespeople. (McDermott Decl., ¶ 9). Given the nature of information routinely kept in Epic's Galaxy portal, Epic originally designated the 40 documents as HC-AEO under the Protective Order. (Dkt. 125, at 20-21; McDermott Decl., ¶¶ 7–9).

Epic's Galaxy document repository is located within Epic's UserWeb. (McDermott Decl., ¶ 8). Epic's UserWeb is a secure, password-protected, web portal that contains information on training, setup, support, and operation of Epic's software. (*Id.*). Epic's UserWeb and Galaxy content is not publicly accessible. (*Id.*). Instead, Epic limits access to UserWeb, and thus to Galaxy content, to Epic's employees and individuals employed by or affiliated with Epic's customer organizations who are provisioned with accounts on an individualized basis. (*Id.*).

3

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████ For security reasons, Epic regularly disables inactive user accounts and maintains auditing capabilities to identify specific users that have viewed or downloaded Galaxy content. (*Id.*, ¶ 8). Epic limits access to UserWeb and Galaxy to customer organizations or other third parties who have entered into a non-disclosure agreement with Epic or are subject to similar strict confidentiality measures. (*Id.*, ¶ 19). For example, Epic's agreements with all of its customers include unambiguous confidentiality requirements and protections over Epic's trade secrets and confidential information, covering everything from Epic's source code and documentation to the terms of the relationships with its customers. (*Id.*, ¶¶ 20–22). Additionally, each individual who accesses UserWeb, and thus Galaxy, agrees to Epic's UserWeb Terms of Use, which include the requirement to keep Epic's documents and information within UserWeb strictly confidential. (*Id.*, ¶ 19).

On March 31, counsel for CureIS wrote to demand Epic reduce the designation for 35 of the 40 documents to CONFIDENTIAL. (Dkt. 125, at 20–21). Counsel's sole justification for the demand was "these materials appear to have been created for use by third parties." (*Id.*, at 21). At the same time, CureIS's counsel agreed that five documents warranted HC-AEO designation. (*Id.*). These five documents contain, *inter alia*, Epic's development and release roadmap for various applications or modules. (*See* McDermott Decl., ¶ 53, Exs. 28–32).

QB\102357830.1

On April 14, 2026, Epic's counsel responded that (a) Epic agreed to re-designate two documents to CONFIDENTIAL, (b) CureIS failed to meet its burden of proof obligation under Section 5 of the Protective Order, and (c) Epic would maintain the remaining documents as HC-AEO because "created for use by third parties" is not the standard for designation under the Protective Order. (Dkt. 125, at 19–20). Epic's counsel explained that these documents were collected from Epic's secure Galaxy repository, are not disseminated or publicly available, and can only be accessed by customers or third parties who entered into a confidentiality agreement with Epic. (*Id.*). Epic's counsel articulated how the documents contain Epic's trade secrets and/or highly sensitive information and thus their disclosure would commercially harm Epic. (*Id.*). In particular, counsel explained the documents describe in detail, *inter alia*, ██████████ ████████████████████████████████████████ ████████████████

On April 18, 2026, counsel for CureIS responded that these documents do not warrant HC-AEO protection because they "appear to be guides, manuals, and handbooks shared with as many as thousands of third parties." (*Id.*, at 18–19). Counsel did not provide a basis for reduced designation on a per document basis, let alone engage with any specific information within the documents. (*Id.*). As with CureIS's instant motion, counsel simply concluded "Epic has not established any plausible risk of competitive harm if they are de-designated." (*Id.*). CureIS asserted that unless Epic re-designated the documents, the Parties were at an impasse and that CureIS would be filing a motion to re-designate by April 22, 2026. (*Id.*).

On April 21, 2026, counsel for Epic responded that CureIS's sole objection that the documents are provided to Epic's customers is without merit. (*Id.*, at 17–18). Counsel explained that Epic's customers enter into strict confidentiality agreements to access the documents, the

5

documents are only accessed via a secure portal, and customers agree not to disseminate the documents in any manner. (*Id.*). Counsel provided examples where courts have already determined that similar Epic information and documents constitute trade secrets or highly competitive information, thus warranting the HC-AEO designation. (*Id.*). Epic's counsel agreed the parties were at an impasse if CureIS's sole basis for re-designation is that the documents are provided to customers. (*Id.*). However, counsel made clear that if CureIS intended to meet its burden of proof by asserting any other grounds for re-designation then CureIS must provide such basis so that Epic had the opportunity to consider and respond. (*Id.*).

CureIS filed the instant motion on April 28, 2026 without any further communications.

**ARGUMENT**

CureIS's motion should be denied because (i) CureIS failed to meet its burden of proof and (ii) the 27 documents that remain at issue contain Epic's commercially sensitive information, including Epic's proprietary trade secrets, the disclosure of which to another software vendor like CureIS would irreparably harm Epic.

## I. CUREIS FAILED TO MEET ITS BURDEN OF PROOF.

Under the Court's Protective Order, the party objecting to confidentiality designation(s) "will bear the burden of proof" as to why the documents should be re-designated. (Dkt. 116, at 7). CureIS has failed to meet its burden of proof either during the meet and confer process or in its instant motion. (*See* Pretrial Conference Order, Dkt. 114, at 4 ("A party may not file a motion regarding discovery until that party has made a good faith attempt to resolve the dispute. . . . By this order, the court requires all parties to a discovery dispute to attempt to resolve it quickly and in good faith.")); *Golat v. Wisconsin State Ct. Sys.*, No. 23-CV-719-JDP, 2025 WL 2390556, at *1–3 (W.D. Wis. Aug. 18, 2025) (denying motion to compel because, *inter alia*, the requirement

6

to meet and confer in good faith "is not a meaningless formality" and "[p]remature motions to compel discovery are likely to fail and thus waste the court's and parties' time.").

Rather than engage with the specific information contained in each of the documents, CureIS instead relies on a selective analysis of a single document to support a sweeping conclusion that cannot withstand scrutiny when applied even to the actual contents of that single document, let alone the remaining documents. (Dkt. 125, at 6–7). CureIS's Motion should be denied because conclusory, and incorrect, statements about one Epic Galaxy document cannot apply equally to other documents at issue.

CureIS's reliance on the single document to extrapolate across all documents fails because the two-page document CureIS allegedly located online in no way encapsulates the same level of technical and commercially sensitive information contained in the remaining 27 documents at issue. As detailed below, the 27 documents at issue contain, *inter alia*, ████████████ ███████████████████████████████████████████████ ██████████████████████████████ in a format with enough specificity that other software vendors could misappropriate the trade secrets. Indeed, presumably because even a cursory review exposes the flawed nature of CureIS's analogy, CureIS failed to include any documents for the Court's review beyond a single one.

Showcasing CureIS's failed generalization, CureIS did not object to Epic designating five documents containing roadmap and development plans as HC-AEO, despite them also being available to customer organizations via Galaxy. (*See* Dkt. 125, at 20–21; McDermott Decl., ¶ 53, Exs. 28–32). Just like these five undisputed HC-AEO documents, certain of Epic's other documents at issue contain roadmap and development plans detailing Epic's yet-unreleased features and functionalities. (*See* McDermott Decl., Exs. 24–25). CureIS's failure to attach each

of the documents referenced within its motion, let alone engage with the contents within each document, is fatal to its motion. *See Advanced Magnesium Alloys Corp. v. Dery*, No. 1:20-cv-02247-RLY-MJD, 2022 WL 3139391, at *4 (S.D. Ind. Aug. 5, 2022) (holding propriety of AEO designations must be determined based on the documents' contents and rejecting plaintiff's attempt to use small number of example documents to demonstrate abuse of AEO designations for all documents); *In re Adobe Sys., Inc. Sec. Litig.*, 141 F.R.D. 155, 165 (N.D. Cal. 1992) (enforcing protective order that "places the burden of proof on the party challenging the confidential designation").

Finally, CureIS fails to meet its burden of proof because it has not articulated any need for the documents to be reduced to CONFIDENTIAL. A party's "legitimate interest in ensuring that certain confidential information be protected must be weighed in the balance with [the opposing party's] competing interest in its counsel having access to that information so that it may prosecute its claims. Those competing interests are accommodated by an 'attorneys'-eyes-only' protective order." *Autotech Techs. Ltd. P'ship v. Automationdirect.com, Inc.*, 237 F.R.D. 405, 406–07 (N.D. Ill. 2006) (granting motion for protective order limiting in-house counsel to CONFIDENTIAL documents due to their proximity to competitive decision makers); *see also Hitz Ent. Corp. v. Mosley*, No. 16 C 1199, 2017 WL 444073, at *8 (N.D. Ill. Feb. 1, 2017) (rejecting argument that attorneys for party seeking down-designation "were not able to show the documents" to its client or obtain the client's input when attorneys failed to "explain what additional information [the client] could have provided about the documents that would have been relevant" to the legal issue at hand).

CureIS has not provided **any** justification for why CureIS's officers, directors, and employees who are engaged in commercial decision-making need to view detailed descriptions of

QB\102357830.1

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████ in order to "mak[e] decisions dealing directly with this Action." (*See* Dkt. 116, at 8); *Autotech Techs.*, 237 F.R.D. at 412 ("Autotech offers no *proof* that restricting its in-house counsels' access will impair its ability to prosecute its claims or defend against those of ADC."). The competitive harm risks identified in *Autotech* and *Hitz* are elevated here where CureIS does not employ any in-house counsel and thus all CONFIDENTIAL documents can be shown to CureIS's employees involved in competitive decision making. CureIS's reliance on case law regarding limiting disclosure to outside counsel only is inapposite. (*See* Dkt. 125, at 3–4 (citing *Team Play, Inc. v. Boyer*, 2005 WL 256476 (N.D. Ill. Jan 31, 2005))). In accordance with the Protective Order, Epic would not object to disclosure to "[o]ne In-House Counsel of [CureIS] who is not regularly involved in competitive decision-making for [CureIS], and to whom disclosure is reasonably necessary because he or she has responsibility for making decisions dealing directly with this Action". (Dkt. 116, at 10).

## II.     EPIC'S DOCUMENTS AT ISSUE WARRANT HC-AEO PROTECTION.

Under the Protective Order (Dkt. 116), Epic is within its rights to designate a document HC-AEO where the document "contains, reflects, or could reveal: (a) trade secrets or other highly competitive or commercially sensitive proprietary and non-public information that, if disclosed, would likely result in competitive or commercial harm to the Producing Party; (b) material that a Producing Party reasonably determines in good faith would not otherwise be adequately protected under the procedures set forth herein for Confidential Information." (Dkt. 116, at 3). For the 27 documents at issue, both of the above conditions exist warranting HC-AEO designation.

QB\102357830.1

Trade secrets are defined as information that "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of that information," and is the subject of "reasonable measures to keep such information secret." 18 U.S.C. § 1839(3); *see also* Wis. Stat. § 134.90(1)(c) (providing similar definition).

As detailed in the following sub-sections, Epic's HC-AEO designations are warranted because the 27 documents at issue indeed contain Epic's proprietary trade secrets, including, *inter alia*, ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ████████████████████████████████████ The documents at issue, including the information within, are subject to Epic's diligent efforts to maintain their secrecy, including entering and enforcing contractual confidentiality provisions, contractual provisions limiting access to Epic's software and its documentation, identifying materials as confidential or proprietary, and by initiating or appearing in litigation to preclude disclosure of Epic's protected trade secret and confidential information. (McDermott Decl., ¶¶ 8, 17–22).

HC-AEO designation is also appropriate here because disclosure to CureIS's officers, directors, or employees accompanying a CONFIDENTIAL designation would not adequately protect Epic's sensitive and proprietary information. *See Autotech Techs.*, 237 F.R.D. at 408–09 (even disclosure to in-house attorneys who agree to be bound by a protective order may be properly restricted when they are involved in competitive decision making; the risk of inadvertent disclosure was not offset by in-house counsel's "sincere assurance" to maintain confidentiality because "compartmentalization of protected information from that which may be properly utilized in

QB\102357830.1

competitive decision-making is . . . 'a feat beyond the compass of ordinary minds'"); *see also Intel Corp. v. VIA Techs., Inc.*, 198 F.R.D. 525, 528–32 (N.D. Cal. 2000) (denying a motion to provide in-house counsel with access even to "confidential" information despite agreement to be bound by the protective order due to her involvement in competitive decision making, explaining that "[t]he party seeking access must demonstrate that its ability to litigate will be prejudiced, not merely its ability to manage outside litigation counsel" and that "good intentions are insufficient to prevent inadvertent disclosure of confidential information because it is not possible . . . to 'lock up trade secrets in [one's] mind.'").

For more than four decades, Epic has channeled extraordinary resources—measured in time, workforce effort, and institutional knowledge—into building and continuously improving its proprietary healthcare information technology platforms. (McDermott Decl., ¶¶ 4–6). Epic's sustained commitment to research and development sets it apart from other vendors and is foundational to Epic's success. (*Id.*, ¶¶ 4, 13–16). Through decades of hands-on experience deploying complex systems across the healthcare industry, Epic has cultivated a proprietary body of implementation knowledge— ██████████████████████████ ██████████████████████ (*Id.*, ¶¶ 5, 8–9, 11–16). Epic's proprietary body of knowledge has earned it the reputation of delivering installations that are consistently on time, done well, and at or below budget. (*Id.*, ¶ 5). Epic's proprietary tools and strategies are the direct result of experiential learning informed by Epic's deep and extensive knowledge of the healthcare industry. (*Id.*). Epic closely guards its implementation expertise as trade secret material, and for good reason: if disclosed to other vendors or the public, it would erode the very edge Epic has spent more than forty years developing. (*Id.*, ¶¶ 4–6, 8–9, 11–16).

As detailed below, the disclosure of Epic's highly sensitive information contained in the 27 documents would place Epic at a competitive disadvantage because maintaining the secrecy of the information has inherent value to Epic and its customers. For example, Epic's documents at issue describe the capabilities, features, functionality, and performance characteristics of Epic's software in highly detailed manner. (*Id.*, ¶¶ 15, 23, 47, 50). Given this level of detail, other vendors seeking to enter or advance in the healthcare and payer software space could copy those capabilities, features, and functionality into their own products without incurring the same research and development costs expended by Epic. (*Id.*); *Hitz Ent. Corp.*, 2017 WL 444073, at \*7 (finding good cause to maintain AEO designation where other party "could use that information to obtain a competitive advantage"); *ABRO Indus., Inc. v. 1 New Trade, Inc.*, No. 3:14-CV-1984-TLS-CAN, 2015 WL 13655677, at \*2 (N.D. Ind. Sept. 16, 2015) (AEO category proper due to alleged competitive relationship between parties). Moreover, other vendors that have less developed or less-successful capabilities, features, or functionality of their own, lacking knowledge of Epic's capabilities, features, and functionality (as described or contained in the documents at issue), could use the information to mimic or replicate Epic's proprietary capabilities, features, and functionality. (McDermott Decl., ¶ 16).

The risk of harm from disclosure of these documents is not speculative. Indeed, in *Epic Sys. Corp. v. Tata Consultancy Servs. Ltd.* ("TCS"), such harms were evident from the same types of Galaxy documents found on Epic's UserWeb. 980 F.3d 1117, 1125–26 (7th Cir. 2020).[2] There, the software vendor defendant used Epic's Galaxy documents to create an 11-page spreadsheet comparing the features and functionalities of Epic's software and the defendant's software. *Id.*

---

[2] *See also* Martin 10/28/2015 Dep. Tr., at 105:15–106:14, *Epic Sys. Corp. v. Tata Consultancy Servs. Ltd.*, No. 3:14-CV-00748-WMC, 2017 WL 4357993 (W.D. Wis. Sept. 29, 2017), Dkt. No. 186.

QB\102357830.1

Because the defendant obtained the trade secrets and confidential information in Epic's Galaxy documents, the defendant was able to avoid substantial research and development costs it would have incurred developing its software without using Epic's proprietary information. *See id.* at 1130–32. The Seventh Circuit ultimately affirmed the jury finding the defendant liable for trade secret misappropriation. *Id.* at 1131–32. When considering the jury's damages award, the Seventh Circuit rejected the defendant's argument that Epic suffered no harm, instead holding that "Epic likely suffered a competitive harm; TCS, a potential competitor, had access to Epic's confidential information . . . This gave TCS insight into the strengths and weaknesses of Epic's software, regardless of whether TCS was able to turn that knowledge into a direct economic harm to Epic." *Id.* at 1142.

The *TCS* decision thus confirms the information contained in the 27 Galaxy documents carries significant competitive value precisely because it is not generally known, and its disclosure to an alleged rival vendor would inflict concrete and measurable harm. The sections that follow demonstrate that each of the 27 documents at issue contain precisely the type of trade secret and commercially sensitive information that the *TCS* court recognized as warranting protection from an alleged competitor's access. To aid the Court in its analysis of the 27 Galaxy documents at issue, Epic has organized the documents into three general categories: (i) Setup and Support Guides; (ii) Upgrade Overviews; and (iii) Strategy Handbooks. (McDermott Decl., ¶ 10).

### A. Epic's Setup and Support Guides.

Of the 27 Galaxy documents at issue, 23 are Epic's Setup and Support Guides for various Epic software applications or modules. (*Id.*, ¶ 24, Exs. 1–23). Epic's Setup and Support Guides, including the 23 Guides at issue, contain ████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████ Epic's Setup and Support Guides contain, and are themselves, quintessential trade secrets and commercially sensitive. *See Epic Sys. Corp.*, 980 F.3d at 1125; *ISC-Bunker Ramo Corp. v. Altech, Inc.*, 765 F. Supp. 1310, 1333 (N.D. Ill. 1990) (party's technical bulletins, service manuals, and "the information and procedures set forth therein that pertain to the installation, service, maintenance, diagnosis and repair of [the party's] computer systems" constituted trade secrets).

For example, ███████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████

14



(*Id.*, Ex. 2, at EPIC_CUREIS_00000382–384).

Epic Setup and Support Guides provide sufficient detail that another vendor could utilize the information in the Guides to mimic or replicate Epic's proprietary capabilities, features, and

functions. (*Id.*). The information in the Setup and Support Guides could also reveal ███ ████████████████████████████████ which vendors could exploit and would find competitively valuable in their development. (*Id.*). Indeed, alleged middleware vendors like CureIS would benefit from the information in the Guides by ████████████████████████████████ ████████████████████████████████████████████████. Epic would therefore be commercially and competitively harmed if its Setup and Support Guides were disclosed to another vendor like CureIS. *See Epic Sys. Corp.*, 980 F.3d at 1142 (access to information in UserWeb materials that gave party "insight into the strengths and weaknesses of Epic's software" constituted likely competitive harm); *Inter-Med Inc. v. ASI Med. Inc.*, No. 09-CV-383, 2010 WL 2679992, at *2 (E.D. Wis. July 1, 2010) (intolerable risk of harm existed where disclosure would allow competitor to aggressively price its products and undercut opposing party).

## B.   Epic's Upgrade Overviews.

Epic's production also included two Upgrade Overview documents from Galaxy. (McDermott Decl., ¶¶ 47–49, Exs. 24–25). Epic's Upgrade Overview documents ████████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████

QB\102357830.1



(*Id.*, ¶ 49, Ex. 25 at EPIC_CUREIS_00001817–1818; *see also id.*, ¶ 48, Ex. 24 at EPIC_CUREIS_00000305–307).

If Epic's Upgrade Overview Guides were disclosed to other vendors, like CureIS, the vendors could exploit ███████████████████████████████████ ██████████████████████████████████████████—to replicate or preemptively develop substantially similar functionalities. Epic would be deprived of its first-mover advantage earned through Epic's independent research, development, and strategic

17

planning. *See Intel Corp.*, 198 F.R.D. at 531 (finding great risk of competitive injury from disclosure of trade secret information that could be used to duplicate the disclosing party's products or "interfere with its business plan and thereby gain a competitive advantage in the marketplace"); *Bauer Bros. LLC v. Nike, Inc.*, No. 09cv500-WQH-BGS, 2012 WL 1899838, at *2 (S.D. Cal. May 24, 2012) (on motion to seal, recognizing that disclosure of "confidential business materials" including "product development plans" could allow "business competitors . . . to replicate [the disclosing party's] business practices and circumvent the considerable time and resources necessary in product and marketing development").

Indeed, CureIS did not object to the HC-AEO designation of the five other documents Epic produced that contained the same type and level of detail for Epic's other future development plans. (Dtk. 125, at 21; *see* McDermott Decl., ¶ 53, Exs. 28–32).

**C.      Epic Strategy Handbooks.**

Epic's production also included two Strategy Handbooks for Epic's ███████████ ███████████████████████████████ (*Id.*, ¶¶ 50–52, Exs. 26–27). Epic's Strategy Handbooks identify in detail Epic's ███████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

███████████████████████████████

QB\102357830.1



(*Id.*, ¶ 52, Ex. 27 at EPIC_CUREIS_00001715–1716; *see also id.*, ¶ 51, Ex. 26 at EPIC_CUREIS_00001423–1424).

Other vendors, like CureIS, could use the ██████████████████████

████████████████████████████████████████████████████

████ Epic has honed over decades without incurring the requisite research and development costs Epic incurred. (*Id.*, ¶¶ 51–53); *see Bauer Bros. LLC*, 2012 WL 1899838, at \*2; *Intel Corp.*, 198 F.R.D. at 531.

QB\102357830.1

**III.    CUREIS'S ARGUMENT FOR RE-DESIGNATION IS FATALLY FLAWED.**

CUREIS provides two flawed arguments to conclude Epic's materials may only be designated as CONFIDENTIAL because certain individuals affiliated with an Epic customer organization can securely access Epic's Galaxy documents. ***First***, CureIS ignores the Protective Order and misrepresents the cited case law to argue trade secret and commercially sensitive information warrants only CONFIDENTIAL treatment. (Dkt. 125, at 4–5). The Court's Protective Order in this action controls what may be designated as HC-AEO. *T.W. Vending, Inc. v. Cod Food Servs.*, No. 17-cv-529-slc, 2018 WL 1773540, at *1 (W.D. Wis. Apr. 13, 2018) (recognizing that "the parties' definition of AEO level protection governs the court's review of the disputed documents"); *see also Knauf Insulation, LLC v. Johns Manville Corp.*, No. 1:15-cv-00111-TWP-MJD, 2019 WL 13217355, at *1 n.1 (S.D. Ind. July 15, 2019) ("The parties have agreed to a definition of AEO information and, absent a request to modify the terms of the protective order, the only relevant issue is whether that definition is satisfied."). Here, HC-AEO is appropriate for Epic's documents and information that "contains, reflects, or could reveal" Epic's trade secrets or its highly competitive or commercially sensitive information. (Dkt. 116, at 3).

CureIS cites *THK America, Inc. v. NSK Co.* to claim "that only 'extremely confidential materials from within the trade secrets or other confidential research, development, or commercial information' can properly be designated as AEO." (Dkt. 125, at 4–5 (quoting 157 F.R.D. 637, 643 (N.D. Ill. 1993))). However, the protective order in *THK America* was quite different from here and defined the lesser tier of "Confidential Materials" to encompass "trade secrets or other confidential research, development or commercial information." 157 F.R.D. at 641. The protective order reserved "Attorneys' Eyes Only" for the subset of "'extremely confidential' documents within the larger category of confidential materials." *Id.* at 641–43. By stark contrast, the Protective Order here does not define CONFIDENTIAL to include trade secrets or highly sensitive

information. (Dkt. 116, at 2). Rather, that information is expressly protected under an HC-AEO designation. (*Id.*, at 3).

**Second**, CureIS incorrectly argues Epic's restrictions on its customers' access to Galaxy documents is "akin to the 'CONFIDENTIAL' designation under the Protective Order" and thus the documents must be CONFIDENTIAL only. (*See* Dkt. 125, at 9). The Protective Order does not distinguish CONFIDENTIAL and HC-AEO designations based on the obligations or restrictions in place. Rather, the determination is made based on the information contained within the documents. *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F. 4th 531, 541 (7th Cir. 2001) ("[Courts] focus on the precise information that the plaintiff seeks to protect and ask if it qualifies as a trade secret under the relevant statutory definition."). As detailed above, the Galaxy documents at issue contain trade secrets or, at minimum, commercially sensitive or highly competitive information. The "obligations" CureIS points to demonstrate Epic's diligent efforts to maintain the trade secret status of its information. And CureIS's claim that it is "a similar third party" to Epic's customers who may access documents stored in the password-protected Galaxy portal is baseless. (Dkt. 125, at 3). Indeed, CureIS alleges that it is in competition with Epic for the same customers who have decided to replace CureIS's software with Epic's Tapestry. (Dkt. 40 ¶¶ 3–4, 55–57, 61; *see also* Dkt. 81, at 4–6).

Courts agree that disclosure of a party's trade secrets to third parties pursuant to confidentiality obligations does not "alter the trade secret status of [party's] computer programs, compilations, technical information and procedures." *ISC-Bunker Ramo Corp.*, 765 F. Supp. at 1334; *Medline Indus., Inc. v. C.R. Bard, Inc.*, No. 16 C 3529, 2017 WL 11689704, at *2, 5 (N.D. Ill. June 5, 2017) (rejecting challenge to highly confidential designation despite documents being shared with customers that treated the information therein as confidential).

QB\102357830.1

**CONCLUSION**

For the reasons set forth above, the Court should deny CureIS's Motion.


Respectfully submitted this 5th day of May, 2026.

/s/ Bryce A. Loken
Matthew J. Duchemin
Bryce A. Loken
QUARLES & BRADY LLP
33 East Main Street, Suite 900
Madison, WI 53703
Tel.: (608) 251-5000
Fax: (608) 251-9166
matthew.duchemin@quarles.com
bryce.loken@quarles.com

Lauren A. Moskowitz
Yonatan Even
Michael P. Addis
CRAVATH, SWAINE & MOORE LLP
Two Manhattan West
375 Ninth Avenue
New York, NY 10011
Telephone: (212) 474-1000
lmoskowitz@cravath.com
yeven@cravath.com
maddis@cravath.com


*Attorneys for Epic Systems Corporation*

QB\102357830.1

**CERTIFICATE OF SERVICE**

I hereby certify that on May 5, 2026, I electronically filed the foregoing with the Clerk of Court using the Court's CM/ECF system, which will send notification of such filing to all counsel of record. In addition, a true and correct copy of the sealed version of this filing has been served via e-mail on the following counsel of record for Plaintiff:

Adam B. Wolfson
Ryan S. Landes
Paulina Slagter
Joseph H. Margolies
QUINN EMANUEL URQUHART & SULLIVAN, LLP
adamwolfson@quinnemanuel.com
ryanlandes@quinnemanuel.com
paulinaslagter@quinnemanuel.com
josephmargolies@quinnemanuel.com

Stephen P. Hurley
Andrew W. Erlandson
Catherine E. White
HURLEY BURISH, S.C.
shurley@hurleyburish.com
aerlandson@hurleyburish.com
cwhite@hurleyburish.com

*/s/ Bryce A. Loken*
Bryce A. Loken

QB\102357830.1